UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| CAPT. JAKE ELMSTROM; CAPT. TOMAS BUSTO; CAPT. CARLOS E. RAMOS; CAPT. KENNETH DÍAZ; CAPT. RICHARD FLYNN; CAPT. CARLOS GUTIÉRREZ, CAPT. PATRICK LÓPEZ.<br><br>Plaintiff<br><br>Vs.<br><br>NFENERGIA LLC, A NEW FORTRESS ENERGY SUBSIDIARY; PILOTAGE COMMISSION OF PUERTO RICO; ATTORNEY. JESSICA ÑECO MORALES, IN HER OFFICIAL CAPACITY AS ACTING PRESIDENT OF THE PILOTAGE COMMISSION.<br><br>Defendants | CASE NO.<br><br>RE: COMPLAINT; PRELIMINARY AND PERMANENT INJUNCTION; DECLARATORY JUDGMENT<br><br>**IN ADMIRALTY** |

## VERIFIED COMPLAINT IN ADMIRALTY FOR INJUNCTIVE RELIEF, BREACH OF CONTRACT, AND DECLARATORY JUDGMENT

TO THE HONORABLE COURT:

Come now Plaintiffs, Captain Tomas Busto Álvarez; Captain Carlos E. Ramos; Captain Ray Díaz; Captain Jacob Elmstrom; Captain Richard Flynn Caro; Captain Carlos Gutiérrez; Captain Patrick López, and San Juan Bay Pilots Corporation (collectively, "Plaintiffs"), by and through undersigned counsel, hereby allege upon knowledge, information, and belief as follows:

## I. INTRODUCTION

The Pilotage Profession

Since ancient times, dating back to the Greek civilization and the Roman Empire, fishermen and mariners with local knowledge have assisted vessels in docking and navigating safely. Over time, this vital safety service evolved into a highly technical and specialized profession known worldwide as pilotage, and its practitioners are commonly referred to as "pilots" or "marine pilots."

"The term "pilot" refers to a person with specialized knowledge of local conditions and navigational hazards who is generally taken on board a vessel at a specific place for the purpose of navigating or guiding a ship through a particular channel, river, or other enclosed waters to or from a port. The specific functions performed by a pilot are (1) conning a vessel from the open sea into a port or from a port to the open sea; (2) conning a vessel from anchorage within a port to a berth; (3) conning a vessel from one berth or terminal to another within a port; and (4) docking or undocking maneuvers within a port". T. Shoenbaum, *Admiralty and Maritime Law* § 13–1 at 267 (3d ed. 2001). "Pilots are a meritorious class, and the service in which they are engaged is one of great importance to the public. It is frequently full of hardship, and sometimes of peril; night and day, in winter and summer, in tempest and calm, they must be present at their proper places and ready to perform the duties of their vocation". Ex parte McNiel, 80 U.S. 236, 238–39, 20 L. Ed. 624 (1871).

The pilotage profession has become indispensable to maritime safety worldwide: protecting port infrastructure, preventing maritime accidents with catastrophic environmental consequences, ensuring uninterrupted commerce, and safeguarding human life. Modern large vessels must transit narrow channels, rivers, bays, and challenging ports, and pilots—who possess extensive and localized expertise—are entrusted with overseeing such operations as safely and efficiently as

possible.

Each port, bay, river, and navigable channel is distinct due to its geographic and topographic features. Accordingly, a group of properly trained, licensed professionals, free from commercial, political, or economic pressure, must safeguard the public interest to prevent accidents and promote the safe operation of commerce. The Puerto Rico Harbor Pilotage Commission Act, Act August 12, 1999, No. 226, 23 L.P.R.A. § 361 et. Seq., (hereafter "Law 226"), provides in its purposes and motives section:

> Over ninety percent (90%) of goods imported to Puerto Rico arrive by sea. The port with the greatest activity is San Juan, where seventy-five percent (75%) of the Island's commerce is concentrated. The Port of San Juan has a hazardous approach that requires special traffic control in the port, as well as stricter safety measures and excellent pilotage service. In addition, the other ports available in Puerto Rico require the assistance of pilots to provide the necessary safety guarantees in those waters. Waters, ports, bays, roads, inlets, coves and soundings are natural resources of vital importance to Puerto Rico. The Legislative Assembly of Puerto Rico, recognizing these facts, has a strong public policy interest in enacting a law to regulate the activity of pilots that provide and render services to vessels navigating the navigable waters of Puerto Rico, for the purpose of assuring that natural resources, the environment, life, and property of citizens are fully protected.

Section 3 of Law 226 states that:

> '(a) Harbor pilotage is an essential service, of such importance that its continued existence must be guaranteed by the Laws of Puerto Rico.
> '(b) Since safety in maritime traffic is the primary objective in the regulation of harbor pilotage and due to the economic significance of the rendering of the service, the need of a large investment of capital to provide the required service, and the fact that harbor pilots are rendering services that are deemed to be essential to the economy and the public benefit, it is hereby determined that economic regulation, rather than competence in the market, is better served to protect the public health, safety and benefits.
> '(c) The Puerto Rico Harbor Pilotage Commission shall have the power to issue Harbor Pilot licenses in the number that it discretionally determines as necessary and in an adequate number to render the service. The Commission shall provide the procedure to be offered to fix the rates and other economic aspects of the regulation of Harbor Pilotage, which is done with the intention of establishing state-of-the-art regulations, with the purpose of protecting the interests of the parties engaged in pilotage, as well as protecting the security and economy of the people of Puerto Rico. This Act which created this chapter seeks the rendering of a pilotage service which is reliable, stable, economical and safe in the ports of Puerto Rico.'

Puerto Rico established its Pilotage Commission through Law 226 to regulate the pilotage profession, oversee pilot recruitment and licensing, conduct disciplinary processes, set pilotage rates, and ensure that pilots have the necessary equipment and resources to perform their work. **The essence of the pilotage profession is to remain independent of political, commercial, and economic pressures, so that safety alone guides its decisions.**

In the United States, roughly twenty-three (23) coastal states have enacted laws and adopted regulations to regulate the pilotage profession. States, through pilotage commissions or analogous institutions, oversee pilot recruitment; issue licenses; provide continuing education programs for pilots; conduct disciplinary proceedings; regulate pilotage rates; and ensure that pilots have the best equipment and resources to perform their work. The same is true internationally. Since 1789, the First Congress of the United States delegated the regulation of pilotage to the states, despite federal authority over interstate commerce. This principle was affirmed by the U.S. Supreme Court in <u>Cooley v. Board of Wardens of the Port of Philadelphia</u>, 53 U.S. (12 How.) 299 (1852). Congress has displaced state power over pilotage in only two narrowly defined circumstances: (1) states may not require compulsory pilotage services on U.S.-flag vessels engaged in domestic trade; and (2) states may not regulate pilotage in the Great Lakes region. Otherwise, the United States Congress has repeatedly reaffirmed the states' strong interest in maintaining their pilotage systems.

The pilotage profession is crucial to Puerto Rico, particularly in the San Juan Bay area. Over 80% of items shipped to Puerto Rico enter through the San Juan Bay. Entering the San Juan Bay itself is a complex task, and past errors have ensnared the San Juan Bay, imposing a considerable burden on the Puerto Rico population. Safety, of course, is the paramount concern, particularly in

light of the nature of the cargo. Pilots, while preparing to conduct their job, take into consideration potential marine hazards, such as narrow channels, engine or rudder failure, loss of control, squalls, strong gusts, etc. <u>Large liquified gas vessels and the Agreement with San Juan Pilots</u>

The maritime transport of natural gas is a heavily regulated operation within the shipping industry.

**The movement of Large liquefied natural gas ("LNG") vessels in and out of the San Juan Bay is a daunting task not only because of the considerations mentioned previously, but because of the contingencies that must be in place to ensure the integrity of the vessel and the safety of the San Juan Bay and the people of Puerto Rico in the event of an emergency such as those listed previously.** When Defendant NFENERGÍA LLC ("NFE") proposed bringing large LNG vessels into the San Juan Bay, it took almost two years of simulations, technical analyses, and consultations with experts, numerous advisors, and several entities, for the harbor pilots of San Juan Bay and Defendant NFE, arrived at a consensus as to how to safely move large LNG vessels **in and out of the San Juan Bay using four** 80-metric-ton bollard pull escort-rated tugs **to escort and maneuver the large LNG vessels. This led to the execution of a contract between NFE and a third party for the charter of the tugs.** However, in an unprecedented push to save costs at the expense of safety, NFE has decided to terminate the contract with the company that provides the agreed-upon services; the four 80-metric-ton bollard pull escort-rated tugs. Accordingly, the four tugs will leave San Juan Bay soon.

NFE is now demanding that the pilots use lower-rated tugs without conducting the extensive use of simulations, detailed technical analyses, and consultations with experts and advisors that led to a consensus on how to move large LNG vessels safely in and out of San

Juan Bay. Seven of the eight pilots who provide services in the San Juan Bay believe that

NFE's actions are unsafe. **II. JURISDICTION AND VENUE**

1.    This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, as will more fully appear, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as all relevant events giving rise to the claims occurred in this district and the damages inflicted were upon property located in this venue.

### III. THE PARTIES

3.    Plaintiff San Juan Bay Pilots Corporation (SJBPC) is a non-profit Puerto Rico corporation that associates state and federally licensed harbor pilots authorized to provide compulsory pilotage services within the navigational waters of the Port of San Juan.

4.    Plaintiffs, Captain Tomas Busto Álvarez; Captain Carlos E. Ramos; Captain Ray Díaz; Captain Jacob Elmstrom; Captain Richard Flynn Caro; Captain Carlos Gutiérrez; Captain Patrick López, and, are all state-licensed pilots and members of San Juan Bay Corporation.

5.    Defendant NFENERGIA LLC ("hereafter, "NFE") is a Puerto Rico Limited Liability Corporation, registered number 402298 before the State Department, with legal personality and capacity to sue and to be sued. NFE is a subsidiary of New Fortress Energy Holdings LLC.

6.    The Defendant, Puerto Rico Harbor Pilot Commission (the "Commission"), was established by Law No. 226 of August 12, 1999, as amended, known as the Pilotage

Commission Act of Puerto Rico ("Law 226"). The Commission has the authority to regulate the pilotage profession in Puerto Rico. The Commission has its own legal personality and capacity to sue and to be sued by virtue of Article 5 of Law 226. The Commission's mailing address is P.O. Box 9862, San Juan, Puerto Rico 00908, and is located at Pier 15 in the Isla Grande sector of San Juan, Puerto Rico.

7.    Defendant Attorney Jessica Ñeco Morales (Attorney Ñeco or President) was appointed to the Commission to represent the Ports Authority on June 2, 2025. Said appointment was approved on June 16, 2025. She was subsequently designated Acting (Interim) President of the Commission in July 2025.  Her appointment remains pending in the Senate

8.  ABC Company and John Doe are natural persons or entities that have assisted, participated, or colluded with the defendants, or independently acted to harm or deprive the plaintiffs of their rights.

## IV. FACTS

9.  Several years ago, the Government of Puerto Rico announced its intention to rely on natural gas as an energy source in the island's power plants. This created the need to identify and establish safer and more efficient processes, consistent with national and international standards, for importing gas to Puerto Rico and transporting it to power plants safely and efficiently.

10. On May 3, 2018, Defendant NFE, through its subsidiary, NFENERGIA, entered into an agreement with the Puerto Rico Ports Authority (PRPA) for the lease of a waterfront facility located in the San Juan Bay, to be used as a fuel handling facility, specifically for liquefied natural gas.

11. In 2019, NFE, through its subsidiary, NFENERGIA, executed an agreement with the Puerto Rico Energy Public Authority (PREPA) to convert power plants number 5 and 6 from diesel to natural gas and to supply natural gas to operate the plants.

12. The Defendants planned to transport the liquified natural gas on ships that would enter the San Juan Bay and dock at the Puerto Nuevo facilities leased to PRPA.

13. The transportation of LNG to the San Juan Bay started using smaller ships of approximately 30,000 cubic meters of LNG capacity, which the pilots would berth alongside a similarly sized vessel already moored at the berth.  A transfer of cargo, commonly referred to as a ship-to-ship transfer, would then occur between the vessels. As demand for gas increased, and following the revocation of the initially granted U.S. Coast Guard permission for ship-to-ship transfer operations, NFE decided to employ **vessels with an LNG capacity of approximately 145,000 cubic meters, which is almost five times larger than those previously used**.

14. The San Juan Bay Pilots were first approached by an NFE representative, Mr. Andrew Murray, on May 16, 2023. At that time, only limited information about the project was provided, which later led to more detailed communications regarding the nautical requirements for LNG vessels with a capacity of 145,000 cubic meters.

15. While the information regarding the vessels varied as there were no definitive answers at the time, their dimensions were similar to what is currently arriving in San Juan: these are about 285 meters long, 43.4 meters wide, 84,823 tons deadweight, and 155,000 cubic meter cargo capacity, an average draft of 11.5 meters but which varies depending on load, and a 6518 square meter sail area, which also varies depending on load.

16. Because of their cargo and dimensions, including draft and sail area, these large LNG vessels require a very high degree of care, particularly when transiting narrow navigation channels due to wind forces on their sides and hydrodynamic interactions in those channels.

17.  The Pilots explained to Defendant NFE that due to the complexity of the navigation channels in the San Juan Bay estuary, the hydrodynamic effects in narrow channels with vessels that exceed limits recommended by international authorities (e.g., PIANC[1] & USACE[2]), and the heavy dependency of the public on this port, a specific inbound/outbound maneuver was necessary, particularly in light of other port infrastructure deficiencies—such as the absence of a harbor master to supervise, control, and prioritize traffic according to the state's needs and to coordinate with local agencies; the lack of contingency areas for safe anchorage or transit; missing or obstructed navigational aids, including the relocation of buoys after dredging and blocked or absent range lights; the presence of floating debris; the absence of adequate seaside firefighting equipment and arrangements; and the lack of escort-rated tugs for transiting vessels. The most critical shortfall is the insufficient number of assist tugs required to direct and control the passage of large LNG carriers safely; These large LNG vessels carry dangerous cargo and are well-known to be highly dependent on such tug assistance, which is essential and routinely relied upon by the pilots.

**18. After extensive simulations and consultations, Plaintiffs and Defendant NFE agreed on a plan that contemplated and managed foreseeable contingencies, including possible emergency scenarios identified above. At the heart of the plan was the use of four**

---

[1] "PIANC unites international experts to write leading-edge technical reports" … "As a non-political and non-profit organization established in 1885, PIANC's mission is to bring together international experts to issue high-ranking technical reports covering a wide range of topics related to sustainable waterborne transport infrastructure".  PIANC's Web page, http://www.pianc.org.
[2] United States Army Corps of Engineers

80-ton escort-rated tugs**, which plaintiffs and NFE had agreed were necessary <u>for maneuvers</u>**.

     **19.** A maneuver was explicitly developed to address the unique geographic conditions of the San Juan Bay estuary, the critical overreliance of the people of Puerto Rico on this port for essential goods, the regular presence of vessels exceeding recommended dimensional limits, prevailing climate and weather patterns, and additional port infrastructure deficiencies. This maneuver was deliberately structured to ensure the safety of every transit, as these operations constitute a zero-failure undertaking due to the hazardous nature of the cargo involved and the severe consequences of any incident. The plan was formally approved by all parties involved.

     **20.** Since May 2023, all eight (8) active pilots of San Juan Bay have worked as a team with NFE in preparation for safely handling LNG operations with larger vessels in San Juan Bay. <u>This started with the technically daunting task of creating a simulation of the San Juan Bay. Thereafter,</u> All San Juan Bay Pilots conducted hundreds of computer-based simulations at the Seamen's Church Institute (SCI) in Houston, Texas, reproducing real-life scenarios with similar LNG vessels, tugs, and the conditions of San Juan Bay. The simulations conducted by all pilots and NFE included propulsion failures, rudder failures, sudden changes in wind direction and intensity, human errors by the bridge team, tug operators, and even the loss of one or more assisting tugs. Several types of tugboats, with varying power and capabilities, were tested to determine the most suitable configuration. Moreover, all pilots visited Corpus Christi, Texas, and rode along with the local pilots to observe real-life transits on similar vessels firsthand. **This collaboration, and the input and analysis of top experts, led to a series of agreements between NFE and all San Juan Bay pilots as to the need to use four**

**80-metric-ton bollard pull, escort-rated tugs in order to safely maneuver the large LNG vessels and the bollard pull rating of said tugs, among other things. This matches the equipment used in other ports where such vessels typically operate. Their power and handling characteristics are essential to ensure that each tug can be interchanged among the predetermined positions, providing redundancy in the event of need, including the failure of a tug.**

**21. The agreements between NFE and the San Juan Bay pilots included the repositioning of buoys after dredging in the Army Terminal channel; modifications to aids to navigation and alignment lights, the use of two pilots aboard the LNG vessel for the maneuvers; and the establishment of environmental operational parameters such as wind limits over which the maneuvers would not be executed.**

22. . Additionally, tug operators would be required to receive specialized training to be able to execute the pre-agreed-upon maneuver, ensuring coordinated and effective support.

23. An "escort-rated" tug is a vessel specifically designed, built, and certified to perform escort operations, meaning it can assist, control, and, where necessary, stop or redirect the movement of a larger vessel during transit. Such tugs have greater stability, maneuverability, and bollard pull; they are equipped with propulsion and steering systems capable of exerting significant indirect forces on the assisted vessel. They differ from conventional harbor tugs because their design enables them to provide hydrodynamic braking, steering, and emergency stopping capability in restricted or high-risk waters. Escort certification is granted by recognized classification societies based on performance tests and technical assessments demonstrating a tug's capability to control a vessel of a certain size and speed in emergency conditions.

24. In accordance with the agreements reached, and after determination—based on hundreds of simulations, technical findings, and sustained discussions among all San Juan Pilots and participating tug masters—that tugs of the stated capacity were necessary, NFE contracted tugs from Edison Chouest Offshore (ECO) and brought four units with such specifications to Puerto Rico.

25. There are no other tugs in San Juan Bay, aside from ECO's, that have the 80-metric-ton bollard pull capacity required by the simulation standards and studies; nor are there four sister vessels of equivalent maneuvering characteristics so that they could be interchanged in any of the positions necessary in case of failure in the harbor.

26. Since the arrival of the GASLOG SINGAPORE on March 20, 2025—when it first berthed in San Juan using the four tugs with the necessary characteristics to guarantee a safe maneuver—all maneuvers of large LNG vessels have been carried out by all of the pilots using the same equipment and employing the planned maneuver, taking into account the risks identified in prior simulations and studies. Eighteen (18) such maneuvers were successfully completed, including an emergency maneuver on July 12, 2025, when in transit, NFE requested to cancel the berthing and to have the vessel removed from the port. That instruction was issued without communicating a reason at that time, or to date despite formal requests for explanation. This created a high risk for all involved, requiring them to follow a contingency plan without any idea if it was the right plan, as the need for the sudden maneuver was not given. To perform this operation, the previously planned and simulated maneuver for a terminal bomb threat scenario was executed. It was performed safely only because the proper equipment was in place and because the personnel involved had received specific training. The maneuver included a 180-degree turn in the cruise area to take the vessel out to sea. The maneuver was

performed in the cruise area because, in light of the draft of the large LNG vessel, the only areas where such a maneuver could be executed were the entrance channel, the designated berth, or the cruise area where that maneuver occurred. Such an operation can only be executed following the specific parameters established by the United States Coast Guard (USCG). See **Exhibit 1**. Also, Marine Safety Information Bulletin was issued and rescinded due to local pressure, which led to a public hearing held by the USCG on April 7 and May 5, 2025.

27. Earlier this year, press reports began to surface that NFE was experiencing financial difficulties.

28. Subsequently, San Juan pilots received information that NFE would not renew the contract with ECO—the owner of the four tugs with the required capacity to conduct the maneuvers safely—and instead would replace the four tugs provided by ECO with lower-capacity tugs.

29. At a meeting held on July 31, 2025, NFE and its consultants confirmed to several pilots NFE's intention to replace the existing ECO tugs with others of lesser capacity.

30. NFE had an agreement with the San Juan Bay Pilots to provide specific equipment to conduct the marine operations of the LNG vessels on the San Juan Harbor. The agreement was reached with active participation from a broad spectrum of stakeholders, including the San Juan Bay Pilots, NFE representatives, and their technical consultants. That process was deliberate, collaborative, and consistent with global maritime standards to ensure a safe operation in the Bay of San Juan.

31. NFE's acts represent a breach of contract with the Plaintiffs and a breach of safe marine practices and standards.

32. On August 3, 2025, seven (7) of the eight (8) San Juan Bay pilots sent an extensive letter to NFE and its consultants expressing their grave concern about the intention to use lower-capacity tugs for an operation of such high risk to public safety and in contravention of the agreed standards. See **Exhibit 2**.

33. The transit and transportation of LNG vessels through the waters of San Juan Bay is a matter of grave seriousness and responsibility, with significant repercussions. Performing such operations with vessels roughly five times larger than those used by NFE two years ago substantially increases the risks.

34.

35. On **August 14, 2025**, at 10:35 a.m., the agent for the natural gas-carrying vessel notified the San Juan Bay pilots that they planned to use four replacement tugs belonging to two different towing companies for the departure of a gas vessel scheduled for **August 16, 2025**. See **Exhibit 3**. The owners of the tugs are McAllister Towing and Moran Towing.

36. The replacement tugs proposed by the vessel's agent possess the 80-metric-ton bollard pull capacity specified in the designed maneuver, nor do they have equivalent maneuvering characteristics that would allow them to be interchanged in the predetermined positions. Furthermore, no simulations or studies were conducted to validate that such tugs would be capable of performing such maneuvers.

37. Captain Daniel Montes, one of the eight (8) pilots in San Juan Ba, who actively participated in the simulations and agreements with NFE, issued a brief response which suggested he was willing to perform the pilotage service with the replacement tugs. See **Exhibit 4**.

38. Subsequently, at 2:38 pm on August 15, 2025, seven (7) pilots sent a letter to the sole pilot willing to perform the service with the proposed tugs. Those pilots informed Captain Daniel Montes of their concerns regarding maritime safety, citing the use of lower-capacity equipment, a deviation from standards agreed upon after dozens of technical simulations, and the severe consequences that could occur in the event of an accident. That letter was forwarded to, among others, the Pilotage Commission and to all its Commissioners, the Coast Guard, and the vessel owners. See **Exhibit 5**.

39. That same day, at 5:42 p.m., a law firm representing McAllister Towing, one of the owners of the tugs to be used on the August 16, 2025 maneuver, sent a cease-and-desist letter to the pilots because the letter addressed to Captain Daniel Montes allegedly interfered with its client's economic interests. That letter was copied to the Puerto Rico Pilotage Commission. See **Exhibit 6**.

40. About an hour and a half later, at 7:17 pm, Mr. Carlos Faris, Terminal Manager /FSO of New Fortress Energy, addressed a letter to the Puerto Rico Pilotage Commission requesting assistance to "ensure that the normal established procedures are followed..." **Exhibit 7**.

41. **That same day**, at 9:28 p.m., the President of the Commission, Jessica Ñeco, **issued a cease-and-desist order** (the "Order") to the seven (7) pilots who had expressed legitimate safety concerns to Captain Montes—the only pilot willing to perform the maneuver on Saturday, August 16, 2025. See **Exhibit 8**.

42. When issuing the Order, the President of the Commission did not convene the Commissioners or notify them that any communication or order would be issued.

43. The Order was issued unilaterally by the President, without informing or securing the approval of the two other Commissioners then serving.

44. In the cease-and-desist letter, the President prevents the pilots from communicating with the maritime industry and even threatens to refer them to the Puerto Rico Department of Justice. In other words, <u>the President ordered the experts charged with safeguarding port safety to refrain from communicating with maritime entities and vessel owners they serve to alert them of potentially dangerous or inadequate situations</u>.

45. The President's actions constitute a de facto disciplinary action with serious safety consequences and were taken without due process of law, processes which any governmental entity must observe.

46. The Pilotage Commission is a collegial body composed of Commissioners appointed by the Governor of Puerto Rico and confirmed by the Senate. No Commissioner may act unilaterally and assume for himself or herself the Commission's powers.

47. Such conduct constitutes impermissible behavior and a usurpation of the duties and powers of the other Commissioners, in clear violation of Law 226.

48. The President did not convene the other Commissioners for an emergency meeting to deliberate, vote, and take action by majority concerning these critical matters as required by Law 226. She also failed to disclose to them that she intended to take the actions she took. Instead, the President decided to prejudge the situation on her own and to speak on behalf of the entire Commission autonomously and independently.

49. At the time the Order was issued, Attorney Ñeco had been Acting President for only fifteen (15) days following her designation by the Governor on July 30, 2025. On that date, she lacked familiarity with the pilots' functions, the scope of their work, and the

operational details of the profession. Consequently, she did not possess the necessary technical preparation to adopt the measure she took, which created and continues to create a risk to the People of Puerto Rico by attempting to restrict the rights and duties of pilots without affording due process. She also lacked any knowledge of the simulations, studies, and facts that led to the agreement between NFE and the San Juan Bay pilots.

50. Upon receiving communications about the foregoing situation, the President was obliged to inform the Commissioners of the receipt and of any intent to act, and to take other steps such as requesting additional technical information and convening the parties.

51. The function of the Commission is not to censor, suppress, or threaten the professional voices that raise the alarm to protect maritime safety and prevent catastrophic accidents.

52. **The Commission's role is to protect the public interest, ensure that the practice of pilotage is performed according to the highest safety standards, keep it free from all economic influence, and never place the financial interests of any company above the safety of the People of Puerto Rico**.

53. On August 16, Pilot Captain Daniel Montes maneuvered the LNG vessel out of San Juan Bay. The maneuver was conducted using four tugs. From information and belief, the maneuver was performed by only one (1) pilot and with the four ECO tugs standing by. The replacement tugs of Moran and McAllister assisted with the actual maneuver.

54. Following this maneuver, Captain Daniel Montes communicated with the San Juan Bay Pilots Corporation administrator, instructing the corporation that the pilotage monetary proceeds from this operation, as well as from any future maneuver he performed on LNG

vessels, should be paid solely to him and not shared with the other seven pilots, as it is currently done with all jobs performed by the San Juan Bay Pilots.

55. On August 20, 2025, the San Juan Bay Pilots received an "invitation" to attend simulations at Siport21 in Madrid, Spain, scheduled for August 28–29, 2025, in an "observer" capacity. Puerto Rico Maritime Group, the consulting firm representing New Fortress Energy ("NFE"), was designated as the entity responsible for coordinating all travel and lodging arrangements.

56. The extremely short notice for these simulations is highly concerning, particularly when compared to prior simulations that took months to set up because creating a computer model of the San Juan Bay is an enormous undertaking, and which were conducted over nearly two years in Houston, Texas. Those simulations in Houston, which involved extensive planning, took place with the active participation of a broad range of stakeholders, including, but not limited to, the Harbor Pilots, representatives of NFE, various technical consultants, and representatives from the ship's owners.

57. The prior simulation effort was deliberate, collaborative, and aligned with internationally recognized maritime standards. In contrast, the simulations in Spain were hastily set up, took place over two days, and are a stark contrast to the comprehensive and inclusive processes that were underscored by the prior simulations. The expedited and unilateral nature of the latest, albeit brief, simulations raises legitimate concerns regarding the technical soundness, procedural integrity, and overall credibility of the simulations that are now being hastily conducted.

58. On August 21, 2025, the President of the Puerto Rico Pilotage Commission issued a resolution without the participation or approval of Commissioner Carlos Ramos, in a manner

that exceeded the President's statutory authority under the applicable law. The resolution purports to authorize Captain Daniel Montes to attend the Spain-based simulations, accompanied by his brother, Captain Cesar Montes who, while holding a license for the San Juan Harbor, is not an active pilot at the Port of San Juan and is not a member of the San Juan Bay Pilots Corporation as he instead provides pilotage services along Puerto Rico's southern coast

59. The referenced Commission resolution constitutes an overreach of statutory authority and is an attempt to exert unlawful control over the San Juan Bay Pilots, who are not government employees, but independent contractors with a constitutionally protected right to association, consistent with the rights recognized in all coastal states of the United States.

60. The aforementioned resolution is illegal, as it infringes upon the autonomous operational capacity of the Pilots and contradicts the plain language of Act 226. Said Act does not grant the Commission the expansive and invasive powers it now seeks to exercise through this resolution.

61. On August 22, 2025, the San Juan Bay Pilots submitted a formal letter to the Commission requesting the postponement of the scheduled simulation. The request was based on the extremely short notice provided and the lack of adequate time to prepare for international travel. The Pilots also underscored the vast difference between these "new" simulations and the extensive simulations conducted two years prior, which required substantial logistical planning and the collaborative involvement of all relevant parties. **The letter addressed to the Commission, requesting a postponement of the simulations and/or permission for a representative to attend, remains unanswered. Exhibit 9**

62. Defendant NFE has decided to rescind all agreements reached with the pilots and remove the tugs, which the parties previously agreed were required for the safe entry and exit of large LNG vessels in and out of the San Juan Bay. In doing so, NFE is placing the safety of San Juan Bay and the broader Puerto Rican economy at risk for its own gain.

63. The Commission has placed a gag order on the pilots, forbidding them from communicating with agents, vessel owners, dock operators, etc. In doing so, the Commission has placed the safety of the San Juan Bay and the Puerto Rico economy at risk to protect its own political interests and maintain control.

64. The Puerto Rico Pilot Commission has acted to silence the Pilots at the state level, even though their professional qualifications and pilotage endorsements are federal in origin and serve as a condition for holding a state license that itself does not require any testing or verification of competency. Ships under the control of the Pilots navigate through federally controlled channels, and ensuring their safe passage is their essential duty. The pilot's responsibility is individual, non-transferable, and carried out as independent contractors who are not subject to political or economic pressures.

## V. CAUSES OF ACTION

### A.  Count I – Breach of Agreement or Implied Contract Causes Irreparable Harm

74.    For about two years, Plaintiffs and Defendant NFE engaged in technical discussions and safety simulations to determine the proper equipment necessary to maneuver large LNG vessels within San Juan Harbor safely. These discussions culminated in an understanding and agreement by which Defendant NFE would provide, or cause to be provided, four (4) 80-metric-

ton bollard pull capacity escort-rated tugs to assist the Plaintiffs in conducting safe and effective maneuvers of large LNG vessels.

75.     The tugs were subsequently deployed, and approximately eighteen (18) large LNG vessel maneuvers were completed using these powerful tugs. Suddenly, and without consultation or formal notice, Defendant NFE announced its decision not to renew the contract for these four tugs, declaring that it would instead rely on local harbor tugs not rated, not proven, or tested for large LNG vessel maneuvers within the port.

76.     The Plaintiffs have expressed serious safety concerns regarding these replacement tugs, which lack empirical testing. Because of the unsafe nature of the proposed tug configuration, only one San Juan Bay (1) pilot is presently willing to board LNG vessels, resulting in diminished availability of pilots.

77.     NFE's unilateral actions constitute a breach of the agreement with the San Juan Bay Pilots and a violation of industry safety standards, and present an imminent risk to life, property, and navigation within San Juan Harbor.

78.     Plaintiffs request a temporary restraining order enjoining Defendant NFE from removing the tugs from San Juan Bay until all parties involved, including the pilots, NFE, and the entities that provide tug services, agree on the equipment to be used after being empirically tested with valid and peer-reviewed simulations for safe navigation in the San Juan Bay.

**Count II: Request for Preliminary and Permanent Injunctive Relief**

79.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

74.     The framework for considering whether to grant or deny a preliminary injunction has four elements. The Court must gauge the movant's likelihood of success on the merits; must evaluate whether and to what extent the movant will suffer irreparable harm if injunctive relief is

withheld; must calibrate the balance of hardships as between the parties; and must consider the effect, if any, that the issuance of an injunction (or the withholding of one) will have on the public interest. *Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020).

75.     "A plaintiff seeking a permanent injunction is traditionally required to satisfy a four-factor test: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.' " Greene v. Ablon, 794 F.3d 133, 156 (1st Cir. 2015) (quoting CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008)).

76.     The Court of Appeals for the First Circuit has stated that "[t]he first two factors together require 'a substantial injury that is not accurately measurable or adequately compensable by money damages.' " KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, 729 F. Supp. 3d 84, 123 (D. Mass. 2024) (quoting Glob. NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 13 (1st Cir. 2013)). Thus, "[a]n injunction should not be granted where 'a less drastic remedy' will suffice." Greene, 794 F.3d at 156 (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 165-66, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)). Insulet Corp. v. EOFlow Co., 779 F. Supp. 3d 124, 132–34 (D. Mass. 2025).

74.     The illegal acts of the Commission, through its President, with the cease-and-desist order impose an illegal gag on the San Juan pilots. Said order was notified to the entire maritime community that they serve, and threatens to refer them to the Department of Justice.

75.     Presently, the Pilots are not allowed to warn the industry of dangers or even answer questions from industry members.

76.     The pilots are not allowed to perform their service adequately with said gag order.

77. Hampering the Pilots ' communication with the marine industry creates a grave danger to the pilots and Puerto Rico as a whole.

78. Because of the characteristics of the Bay of San Juan, a stranded vessel may cause the entrance of any ships to the Bay to be impeded, impeding free traffic and the loss of commerce at the most important port of the Island.

79. The Pilots face the imminent danger of losing their licenses and civil and criminal penalties.

80. Plaintiffs seek a temporary, preliminary, and permanent injunction barring Defendant NFE from withdrawing the 80-metric-ton bollard pull escort-rated tugs until replacement tugs are demonstrated to meet or exceed equivalent safety and maneuverability standards.

81. NFE's unilateral actions constitute a breach of the agreement with the San Juan Bay Pilots and a violation of industry safety standards, and present an imminent risk to life, property, and navigation within San Juan Harbor.

82. Plaintiffs request a temporary restraining order enjoining Defendant NFE from removing the tugs from San Juan Bay until all parties involved, including the pilots, NFE, and the entities that provide tug services, agree on the equipment to be used after being empirically tested with valid and peer-reviewed simulations for safe navigation in the San Juan Bay.

**Count III: Declaratory Judgment (28 U.S.C. §2201)**

83. Plaintiffs seek a declaration that Defendant NFE has a continuing duty to provide adequate and safe tugs for large LNG maneuvers as previously agreed.

84. Plaintiffs seek a declaratory judgment declaring that the Cease-and-Desist order is null and void.

85.    Plaintiff SJBPC seeks an order declaring that it is entitled to receive full pilotage fees.

**Count IV: Damages for Loss of Income**

86.    Plaintiffs reallege all previous allegations.

87.    As a result of defendants' unlawful rescission of the agreed-to, safe protocol for maneuvering large LNG vessels, Plaintiff SJBP have suffered loss of shared pilotage revenues, to be established at trial.

88.    Defendants' unlawful rescission of the agreed-to, safe protocol for maneuvering large LNG vessels has caused and continues to cause economic harm to the other pilots, who—pursuant to long-standing association rules—share in pilotage fees generated by pilotage. Defendant's conduct breached its implied agreement to provide adequate and tested escort-rated tugs as a condition of safe LNG navigation.

**Count V: Ultra Vires Action — Void — Acted Unilaterally and Usurped Powers of Other Commissioners**

85.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

86.    Article 6 of Law 226 provides, in relevant part:

(a) Composition.- The Commission shall be composed of seven (7) Commissioners, one of whom shall be its Chairperson, appointed by the Governor of Puerto Rico, with the advice and consent of the Senate. The members of the Commission shall be United States citizens, and residents of the Commonwealth of Puerto Rico. The Chairman of the Commission shall be its executive officer, and may designate an Associate Commissioner to act as chairman in his/her absence. The presiding Commissioner shall have the discretion to assign areas of work, in the adjudicative as well as the quasi legislative and/or operational areas of the agency, to one or more Commissioners. It shall be composed as follows:

Two (2) of the members shall be licensed harbor pilots, who are actively practicing their profession; one to represent the San Juan Harbor Pilots, and the other, the harbor pilots of the Commonwealth, who are nominated by each harbor pilotage association;

two (2) of whom shall be actively involved in their professional or business capacity in the shipping business, who are users of the pilotage services and are nominated by the Puerto Rico Shipowners Association; two (2) who are not or were involved financially interested or related to the pilotage profession, shipping business or maritime industry who shall represent the public interest; and one who represents the Government of Puerto Rico, who shall be a Ports Authority employee. For the purposes of this section, a 'user of the pilotage services' is any person who is an agent or representative of any person with a proprietary interest in a business that regularly employs harbor pilots with a Puerto Rico license, with the purpose of providing pilotage services, or any person who is a direct employee thereof. (Emphasis ours). (§ 361c Commissioners-Composition and term of office)

86.     As the statutory text makes plain, the Commission is a collegial body of seven (7) Commissioners, and the President's role is limited to administrative tasks such as assigning areas of work—i.e., an administrative role concerning agenda and assignment of tasks.

87.     The President **does not** have the authority to act unilaterally; she is only one vote among equals.

88. Moreover, Articles 8(b) and 8(c) of Law 226 reiterate the collegial nature of the Commission:

> (b) The Commission shall hold one or more regular quarterly meetings in a convenient place in the Commonwealth, on the day or days selected by the Commission. The special meetings may be called by a majority of the Commissioners. The Secretary of the Commission shall deliver a notice of all the regular and special meetings to all the Commissioners, and also to any person who should be notified by law.

> (c) Within fourteen (14) calendar days following each meeting of the Commission, it shall issue a written report to each harbor pilot explaining any action taken by the Commission at the meeting, if any determination is made that affects pilotage conditions.

89.     Law 226 is premised on the Commission acting as a collegial body and that determinations shall be taken by a majority of the Commissioners.

90.    The President's unilateral action bypassed and usurped the powers of the other Commissioners, who have equal rights to vote, deliberate, and speak on Commission matters.

91.    All Commissioners were appointed by the Governor and confirmed by the Senate. No Commissioner may circumvent or defeat the balance established by Law 226.

92. Therefore, the cease-and-desist order issued by the President on August 15, 2025, is ultra vires and void.

**Count VI: Ultra Vires Action — Void — President Failed to Afford Due Process Required by** Article 16 of Law 226 for Disciplinary Actions

93.    The foregoing paragraphs are incorporated by reference.

94.    In addition to being void and ultra vires because it was a unilateral determination by Attorney Ñeco, the order violates the most fundamental due process protections applicable to disciplinary actions against pilots, which the Commissioners are required to safeguard.

93.    Article 16 of Law 226 enumerates conduct that may be sanctioned by the Commission (by a majority of Commissioners). That article lists fourteen (14) types of conduct subject to discipline.

94.    The fact that seven (7) pilots sent a letter to a colleague, copied to the maritime industry and including the Commission, expressing concerns about the adequacy and safety risks of a maneuver—manifestations protected by the freedom of speech guarantees of the Constitutions of Puerto Rico and the United States and arising from their professional experience and responsibility—is not among those punishable conducts.

95. Article 16(b) provides, in relevant part:

(b) When the Commission determines that a pilot or apprentice pilot committed any of the acts indicated in subsection (a) of this section, upon notice to the said pilot, giving him/her the opportunity to be heard. The Committee shall issue an order imposing one or more of the following penalties:

96.     If the Commission, by a majority of its members (not by the President alone), determines that conduct should be sanctioned, pilots must be afforded robust due process under Law 226 and under the Constitutions of the United States and Puerto Rico (professional licenses constitute a property interest protected by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution).

97.     The cease-and-desist order—which should have been presented to, discussed by, and approved by all Commissioners—unlawfully imposes sanctions summarily and constitutes censorship as it states that "any similar communication shall be immediately submitted to the Commission for its evaluation and determination in accordance with due process of law." See Exhibit 8.

98.     Consequently, the President's letter, in addition to being void and ultra vires for being a unilateral action of a single Commissioner, imposes de facto disciplinary sanctions and violates the constitutional rights of the pilots by denying them their right to due process.

99.     All Commissioners have a statutory duty to safeguard the due process rights of those who hold pilotage licenses under Law 226.

100.     Sanctions are being imposed without due process under the guise of a "cease-and-desist" letter. Moreover, the Order has the intention to intimidate and create a "chilling effect" on the pilots from undertaking constitutionally protected speech and from performing mandatory duties of their profession.

101.    Therefore, the plaintiff requests that the Court declare void and ultra vires the Commission President's August 15, 2025 order for imposing sanctions in violation of the due process required by Law 226 and the Constitutions of Puerto Rico and the United States.

**Count VII – Cease and Desist Letter Violates Pilot's Rights and Duties**

103.    Pilots in San Juan Bay have a proprietary interest in their licenses at the state and federal levels.

104.    Pilots use their local knowledge, sailing experience, and professional judgment to be informed, independent, and free from the economic interests of boat owners and operators.

105.    As Pilots have a license to practice their profession, they are very similar to doctors, engineers, lawyers, among others.

106.    The Supreme Court of the United States has expressed itself in this way about the profession of Pilotage:

> The long history of pilotage reveals that it is a unique institution and must be judged as such. To avoid invisible hazards, vessels approaching or departing from ports should be driven to and from open waters by people intimately familiar with local waters. The pilot's job usually requires the pilot to go out of the harbor entrance in a small vessel to meet incoming ships, board them, and steer their course from open water to the harbor. The same service is provided to vessels leaving the port. Pilots are, therefore, indispensable parts in the transport system of any maritime economy.
> Kotch v. Board of River Pilots Commissioners, 330 U.S. 552, 557–558 (1947). (Emphasis supplied)

107.    In the cease-and-desist letter, the President of the commission mentioned the following:

> In response to the public policy established by the Honorable Governor of Puerto Rico, Jennifer González Colón, through an official communication on the energy crisis, the Government has ordered to facilitate and not hinder the handling and operation of liquefied natural gas vessels essential for Puerto Rico's energy system. Any action that delays, conditions, or prevents such operations without the authorization of the Commission and the

Government of Puerto Rico contravenes this public policy and puts the island's energy security at risk.

108.    This expression reflects a remarkable lack of understanding of the essence of the millennial profession of Pilotage. At the core of this profession is the Pilot's freedom from economic and political pressure, allowing them to prioritize safety above all other considerations and exercise their profession to the best of their ability to avoid accidents.

109.    Separately, the cease-and-desist order of the President of the Commission contradicts itself. On one hand, it recognizes Captain Daniel Montes' discretion as an "independent contractor" to carry out maneuvers on large LNG ships (much larger than those that arrived in San Juan Bay two years ago) with equipment and tugboats of lower capacity. But on the other hand, it does not recognize that same professional right to the Pilots when they remain firm in their demand to continue using the equipment and tugboats with the agreed specifications (regardless of which company provides them) that were selected after hundreds of simulations, long hours of training, and relying on empirical data that demonstrated the safe manner to conduct the maneuvers.

110.    A chorus of professionals raised their voices in unison; the President elected to silence them.

111.    The correct course is not to threaten and intimidate Pilots who are raising the alarm, under their professional discretion.

112.    It is worth emphasizing that Article 226 recognizes a Pilot's right not to perform a maneuver "for security reasons that prevent it from doing so or those others that the Commission determines by regulation." (Emphasis supplied).

113.    In consideration of all of the above, the cease-and-desist order violates the most basic principles of the centuries-old profession of Pilotage, the professional discretion of each Pilot when carrying out his work and violates Article 4 of Law 226.

114.    The cease-and-desist order of the President of the Commission states that the letter sent by the seven (7) Pilots on August 15 was disseminated and shared with the maritime industry "without the due authorization of the Commission" Suggesting that the Commission must grant the Pilots of the Bay of San Juan prior authorization before they communicate with their colleagues and members of the maritime industry, constituting a prior censorship, so that they can communicate with their colleagues and the maritime industry. To the extent the cease-and-desist order of the President of the Commission purports to silence the Pilots unless previously authorized by the Commission to communicate with anyone, it constitutes unlawful censorship.

115.    Moreover, the null and unlawful order requires that:

> The maritime community is hereby warned that any communication of this nature, issued by San Juan pilots individually or collectively, whether or not under a recognized association, and not authorized by the Commission, lacks official recognition and shall be considered null and void. All such communications must be immediately referred to the Commission for evaluation and determination in accordance with due process of law.

117.    Once again, the President of the Commission decides to arrogate to herself powers attributed to her by Law 226. The Commission is not there to approve, censor, gag, carry out prior censorship, and regulate the content of communications, protected by the right to freedom of expression of the First Amendment of the United States, or by other rights that protect these professionals.

118.    The Pilots' Letter of August 15 does not contain confidential information prohibited by Law 226.

119.    It is an essential and operational duty that Pilots must communicate with agents, the Commission, boat owners, regulatory agencies, other Pilots, and make such safety warnings as they deem appropriate.

120.    Pilots are not employees of vessels or agents. The Pilots serve the public interest in ensuring safety in San Juan Bay.

121.    Safety is the reason Law 226 exists; its explanatory memorandum acknowledges that "[t]he Port of San Juan has a dangerous access that requires special traffic control in the port, as well as stricter security measures and an excellent pilotage service. In addition, the other ports available in Puerto Rico require the assistance of pilots to provide the necessary security guarantees in these waters."

122.    Trying to silence or censure the Pilots and restrict their communications to prevent them from voicing valid security concerns is highly worrying, particularly coming from the Commission and its President.

123.    In addition to the requirements of Law 226, which states that maritime safety must take precedence over all other considerations, Pilots in Puerto Rico do not have a limit of liability. Consequently, the monetary exposure to them and their families is overwhelming. No agent or member of the Commission is exposed to such civil liabilities and potential substantial economic damage.

124.    The Commission must ensure that the operation in San Juan Bay, particularly one involving the transportation of natural gas in a large ship, is conducted safely.

125.    Such an attempt to gag violates the principle of Article 3 of Law 226, which provides that "[b]ecause security in maritime transit is the primary objective in the regulation of pilotage."

126.    In fact, Article 4 a of Law 226 provides that a Pilot may refuse to offer a pilotage service when, for security reasons, he is prevented from doing so or for any other that the Commission determines by regulation." (Emphasis supplied).

127.    As we can see, it is the principle of security that prevails, governs and governs the profession of practice. To do this, every Practitioner must be free from economic, political, and commercial influences. Stop from that duty of security, it is to inform.

128.    Taking into consideration the above, communication between pilots and the industry should be encouraged, rather than restricted, to prevent accidents.

129.    The President's actions violated and disparaged the constitutional rights protected by the First Amendment and Article II of the United States Constitution, as well as the Puerto Rico Constitution. The cease-and-desist order is intended to establish prior censorship and control the content of a constitutionally protected expression.

130.    Although this Honorable Court may declare the cease-and-desist order null and void and ultra vires, and the controversy becomes academic or moot, we respectfully request that a permanent injunction be issued and the exception to the doctrine of mootness be applied.

131.    Because the Commission has acted in such an erratic and questionable manner, and the pilotage profession is essential for the entry of food and medicine into Puerto Rico by sea, the Pilots cannot operate feeling threatened and are victims of a "chilling effect" resulting from the Commission's illegal actions. We therefore request this robust protection from this Honorable Tribunal.

132.    The plaintiffs seek preliminary and permanent injunctive relief ordering the Commission to render its determinations as a collegial body.

133.    The plaintiff also seeks an order enjoining the President of the Commission from issuing unilateral determinations and from usurping the powers of other Commissioners, in accordance with Law 226.

## VI. PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, the plaintiff respectfully requests that this Honorable Court:

(i) Grant the requested preliminary and permanent injunction.

(ii) Enter judgment in favor of the Verified Complaint, declaring that:

- Defendant NFE is enjoined from withdrawing the 80-metric-ton bollard pull escort-rated tugs until replacement tugs are demonstrated to meet or exceed equivalent safety and maneuverability standards.
- Declaring that the cease-and-desist letter of August 15, 2025, issued by the President of the Commission, is void and ultra vires because it was issued unilaterally and in violation of Law 226; and
- Declaring that all fees generated by pilots are to be paid to SJBPC.

(iv) Award the plaintiff any other relief not specifically requested but to which he is legally entitled.

I HEREBY CERTIFY that I filed this pleading through the CM/ECF of the Court.

RESPECTFULLY SUBMITTED.

San Juan, Puerto Rico, August 31, 2025.

 S/Giancarlo Font García
GIANCARLO FONT
USDC-PR NO. 210612
306 Calle Coll y Toste
San Juan, PR 00918
TEL. (787)622-6999/
(787)647-1876
gfont@drcprlaw.com

S/ FRANCISCO E. COLÓN-RAMÍREZ
Francisco Colón-Ramírez, Esq.
Bar No.: 210510

E-mail : fecolon@colonramirez.com
COLÓN RAMÍREZ LLC
PO Box 361920
San Juan, PR 00936-1920
Tel.: (787) 425-4652
Fax: (787) 425-4731

s/LUIS MANUEL PAVÍA-VIDAL
LUIS MANUEL PAVÍA-VIDAL S/
USDC-PR NO. 227205
pavialaw@gmail.com
URB. BALDRICH
COLL Y TOSTE ST. #306
SAN JUAN, PR  00918
*TEL. (787)622-6999*