


San Juan Puerto Rico

August 3, 2025

Dear Carlos Faris,

Thank you for your time last Thursday, July 31, 2025. We also thank Jose Rosario for his time and efforts in supporting your company's current operations and future plans.

We are reaching out to formally reaffirm our position and to document this communication for future reference. Given that nearly all individuals with whom we have previously interacted at New Fortress Energy are no longer involved in this project, we believe it is important to summarize key aspects of our prior discussions and operational experience to date. At the same time, we wish to reiterate our ongoing commitment to supporting these operations, provided that formal agreements are established among all responsible parties to ensure that any transit or berthing is conducted safely, lawfully, and in accordance with recognized industry standards.

### I. Background

The San Juan Bay Pilots have been actively supporting New Fortress Energy (NFE) in the development of plans to expand LNG operations in San Juan Harbor. Given the complexities involved in maneuvering large vessels within a confined waterway, it has been imperative from the outset to conduct accurate, technical, and comprehensive feasibility studies. Since our initial engagement on May 16, 2023, we have offered detailed input and collaborated on key evaluations to ensure the necessary infrastructure, equipment, training, and contingency planning are in place to guarantee safety, efficiency, and operational reliability from a nautical standpoint.

As part of this effort, NFE retained several capable and experienced marine consultants. A validated simulator database for the harbor was developed; ship models were created; and several hundred simulator runs were conducted in Houston to identify operational limits and required support measures. These efforts have greatly improved our understanding of the safety margins and maneuvering needs required to execute LNG vessel transits and berthing operations in this port. Additional studies were completed to assess vessel interaction, hydrodynamic effects on adjacent facilities, and the risks posed by shallow areas.



**San Juan Bay Pilots Corporation**

### II. Outstanding Commitments

From our perspective as harbor pilots, and based on the extensive collaborative process that took place, the following items were to be in place <u>prior to the first call</u> of the proposed LNG vessels. However, several of these commitments remain outstanding, and others—such as the presence of specific tug assets—appear to be in the process of being removed or replaced in a manner that does not align with the original project agreement.

Buoy Relocation: Upon completion of the Army Terminal Channel dredging, several buoys were to be repositioned appropriately. This has been completed but the official Navigational Charts have not been updated to reflect new positions.

Navigational Ranges and Lighting: Modifications to range lights in the Army Terminal Channel remain pending. These include; Raising the 30870 Range Rear Light to ensure visibility when the Trailer Bridge barge is docked. Installing new Front and Rear Range Lights to support northbound LNG vessel transits on Pier 4 (approx. 356.4°). These improvements have not been completed.

Training and Equipment: Combined simulator training involving pilots and tug masters has been completed. Emergency ship handling training has also been conducted. Pilots have independently purchased standalone PPU systems, though sensor upgrades through USACE with NFEs support are still needed (RTK).

Environmental Limitations: Preliminary wind limits for LNG transits were established at 10 knots sustained, 15 knots gusts, measured using Caricoos, Airport Tower, and onboard sensors. The agreed-upon installation of a fixed anemometer in the southwest corner of Bahía de Puerto Nuevo is critical but has not been completed. Initial operations were also restricted to daylight hours, subject to future revision as operational familiarity increases.

Adequate tugboat assistance: The most critical component of the entire LNG operation is tugboat assistance. These large vessels present unique challenges due to their size, high windage profile, and the hydrodynamic forces acting on them—especially within the confined and complex parts of the bay. Their maneuverability in such conditions is heavily dependent on properly rated escort tugs, as these vessels are not self-sufficient within harbor limits.

### III. Withdrawal of required Tug Boats

During a scheduled debrief aboard the Chouest vessels, we were informed that the four tugboats currently supporting NFE's LNG operations are expected to be withdrawn toward the end of this month. These are not ordinary tugs. They are four sister vessels—escort-rated, each capable of delivering 80 metric tons of bollard pull—with identical capabilities and handling characteristics. Their uniformity is vital, allowing each tug to operate safely




and effectively in any of their assigned positions, providing the consistency and responsiveness required to support both planned maneuvers and emergency contingencies.

These vessels were introduced only after extensive simulation studies confirmed their necessity. Their proven performance so far—<u>both during standard transits and in demanding, unplanned scenarios</u>—has made clear that this tug spread is an indispensable component of the LNG maneuvering framework for San Juan Harbor.

### IV. Concerns About Decision-Making Oversight

The anticipated departure of the designated tugboats raises significant concerns—not only regarding the availability of equipment, but also with respect to how critical operational decisions are now being managed. We are increasingly alarmed by a discernible shift in New Fortress Energy's approach to technical oversight, wherein key responsibilities appear to be moving away from active maritime professionals with direct ship-handling and navigational duties. Instead, these matters are being delegated to a local company with limited understanding, whose input is based primarily on the past experience of retired pilots and others who no longer bear any legal or operational responsibility should an incident occur. This trend undermines the fundamental role of harbor pilots in the United States and calls into question the integrity and accountability of the decision-making process in high-risk operations.

While PR Maritime Group may offer value in administrative or logistical coordination, the planning and execution of complex LNG vessel maneuvers is not an administrative task. Nautical operations, navigation, and especially ship handling in confined waters require deep, specialized knowledge and real-world experience. That expertise resides with the ship masters and the harbor pilots—two entities who actually share direct responsibility for the safe conduct of vessel movements. Pilots support the ship masters in meeting their obligations by providing the local knowledge, harbor-specific expertise, and technical judgment required to assess and mitigate risks in real time. The proposal to replace a proven tug configuration with less capable equipment—while sidelining the professionals best qualified to guide and oversee these decisions—is unacceptable. We are concerned that this approach may result in undue pressure on the pilots to proceed under unsafe or substandard conditions, while individuals brought in to assist external consultants—who lack operational context and direct accountability—attempt to dictate the terms of navigation.

Since New Fortress Energy appears to have delegated most technical discussions to PR Maritime Group—an entity we understand may be acting in a consulting capacity on NFE's behalf—this approach is fundamentally flawed given the complexity and risk profile of the project. It raises serious concerns regarding accountability, potential conflicts of interest, and the adequacy of technical decision-making in matters that bear directly on navigational

 

safety and regulatory compliance. New Fortress Energy, as the party chartering the vessels, must be fully engaged in the technical aspects of the operation and must retain direct involvement in all planning and decision-making. The marine operations function of the company may delegate tasks—but it cannot delegate ultimate responsibility.

### V. Requirement for Direct Involvement

As previously stated—but regretfully not observed during Thursday's meeting—<u>we require that New Fortress Energy's senior marine operations leadership participate directly in all discussions moving forward.</u> Additionally, <u>we expect that vessel Masters and/or Ship Owners' Representatives be included in all future planning and coordination meetings with the San Juan Bay Pilots.</u> The safety, reliability, and continuity of LNG operations in San Juan are not merely aspects of project management; they constitute a shared responsibility. Ensuring that qualified and accountable parties are present at the table is essential to maintaining the level of safety, professionalism, and operational integrity that both this port and this cargo demand.

### VI. Energos Maria and Princess Transits

On Wednesday July 9, 2025, we conducted the outbound transit of the Energos Maria. On Thursday, we attempted to bring in the Energos Princess in accordance with the official pilotage service request. However, due to high winds exceeding the agreed-upon operational limits, the maneuver could not proceed safely. It is worth noting that the Energos Princess had been holding north of Puerto Rico for several days. We assume she was awaiting the departure of the Maria, and until that point, there had been no indication of urgency or need to prioritize the vessel exchange. Suddenly, however, we were told that Puerto Rico was facing an "energy emergency," and that bringing the Princess in had become a matter of immediate priority.

For context, pilots accept service requests up to 30 days in advance, strictly on a first-come, first-served basis. In the absence of a harbor master or a state-managed traffic control system, we do not assign priority to any vessel or cargo. Harbor pilots operate independently and, by design, do not act under commercial pressure or political influence. This independence is the foundation of the profession and the reason why pilotage is a compulsory service under both Federal and Commonwealth law—to ensure that navigational decisions are made solely in the interest of safety. On Saturday July 14, 2025, with weather conditions aligning with those identified during simulations and within the parameters previously agreed upon, we proceeded to bring in the Energos Princess per the service request. The maneuver began at 0800. However, once the vessel had passed the abort point and was well inside the harbor, we received the unprecedented and unexplained instruction to cancel the maneuver and not bring the ship in.




At that stage, there was no way to abort safely under normal procedures. The pilots immediately executed the emergency contingency maneuver that had been specifically developed, tested, and approved for such scenarios. The vessel was stopped in the cruise ship turning basin near the U.S. Coast Guard station—the only location capable of accommodating her size and draft—then safely turned and returned to sea. This maneuver, which involves significant complexity and risk, is typically reserved for true emergencies such as propulsion failure or a major security threat. That it was carried out without incident is a direct result of the pilots' training, the preparedness of the tug teams, and the integrity of the simulation-based planning process that underpins this operation.

An excerpt from the incident report is included for reference:

0754 – POB
0815 – call from LAC Boarding agent Jorge Seda informing that at request of NFE, service must be cancelled.
0816 – Pilots Busto & Ramos were informed by dispatch. They asked San Juan Port Control if they knew anything about the cancellation. Rosvaldo Velazquez said no, and that the PRPA Director is monitoring the situation since 0430 in the morning. Subsequently, Pilots told port control that they're aborting the maneuver and turning around.
0822 – LAC Boarding agent Roberto Perez called also informing dispatch of the cancellation. He stated that they just received orders from NFE to cancel the service.
0831 – Email received from Jose Yordan informing cancellation at request of NFE.
0918 – Pilots disembarked.

### VII. Request for Formal Response

To date, no explanation has been provided for the cancellation of this maneuver mid-transit. <u>We respectfully request a formal response.</u> The safe handling of LNG vessels in San Juan Harbor depends on adherence to established protocols, sound decision-making, and coordination among qualified professionals. These events are deeply concerning and must not be repeated.

### VIII. Way Forward

It was our understanding that, despite prior warnings regarding the need to secure the appropriate support equipment—particularly given the limited availability of such assets throughout the duration of this project—we are now faced with what amounts to a critical impasse: the departure of the four assist tugs that had been contracted precisely to meet the operational and safety requirements previously identified.

We acknowledge the proposal to engage a new simulation facility, model the harbor, every vessel to be employed, and evaluate alternative tug configurations. <u>While we are committed</u>




**San Juan Bay** **Pilots Corporation**

to participating constructively in that process as time permits, it must be recognized that such work is both time-consuming and resource-intensive. In the interim, we will not compromise on the operational standards established through prior simulations and real-world experience. To ensure the integrity of the process, we will engage an independent consultant with recognized maritime simulation expertise to guarantee that maritime simulation industry standards are strictly followed—particularly since our prior experience in Houston closely mirrors the conditions and outcomes observed in San Juan.

Following our extensive discussions on Thursday, we wish to reiterate that, having conducted 12 live-maneuver exercises with these vessels in our bay, and based on the professional judgment and firsthand experience of seven of the San Juan Pilots, services will only be provided under the original operational parameters, as outlined below. We also note that several critical components required prior to the first transit as described above remain pending.

We respectfully acknowledge one dissenting opinion among our group. While we disagree with his approach and conclusions, we recognize his right to hold a differing professional perspective and wish him well.

Accordingly, we reaffirm the requirement for four escort-rated tugboats, ideally sister vessels, each capable of delivering 80 metric tons of bollard pull. Each tug operator must be trained and be able to carry out the designed maneuver in any of the predetermined positions until a new method is established and accepted per your proposal yesterday. Alternatively, two matched pairs of tugs with equivalent bollard pull and all having similar handling characteristics may be considered, provided they meet the same operational standards.

We remain committed to supporting New Fortress Energy's operations to the highest professional standard. As harbor pilots entrusted with the safe movement of commercial vessels in the Port of San Juan, our foremost responsibility is to protect life, property, the environment and the uninterrupted flow of commerce. We support the continued development of this project, provided that all necessary resources, protocols, and safeguards are fully respected and properly implemented.

We should aim to emulate the successful completion of similar LNG projects across the United States by building upon their operational lessons and safety benchmarks. However, we cannot continue to engage under conditions where established safety protocols are disregarded, pilots are subjected to inappropriate pressure, or maneuvering plans are abruptly altered mid-execution. These actions undermine the integrity of the process and create unacceptable risk.



# San Juan Bay  Pilots Corporation

<u>We urge all parties involved to treat this matter with the seriousness it warrants and to restore a collaborative, technically grounded decision-making process—one that includes all relevant stakeholders, respects the roles of regulatory authorities, and places safety above all other considerations.</u> With these conditions in place, we are confident that the desired outcomes can be achieved—safely, effectively, continually, and in the best interest of the Port of San Juan and the people of Puerto Rico.

Sincerely,

San Juan Bay Pilots

Endorsed by Captains:

Kenneth Diaz

Carlos Gutierrez

Richard Flynn

Patrick Lopez

Carlos Ramos

Tomas Busto

Jake Elmstrom


CC:

US Coast Guard Captain of the Port

Comision de Practicaje de Puerto Rico

Captain Jesee Renkins, New Fortress Energy

Masters of the Energos Princes and Energos Maria

Martí Rosario Carpio <jrosario@pr-mar.com>, zahmed@newfortressenergy.com, "Collazo, Alejandro M CDR USCG SEC SAN JUAN (USA)" <Alejandro.M.Collazo@uscg.mil>, Julian Villalon <jvillalon@newfortressenergy.com>, Asad Imran <aimran@newfortressenergy.com>, Carlos Faris <cfaris@newfortressenergy.com>, Jesse Reijskens <jreijskens@newfortressenergy.com>, fgaffa@newfortressenergy.com

P.O Box 9021034, San Juan Puerto Rico 00902-1034 • Tels. 787-722-1169 / 787-722-1166 • Fax 787-725-3720 • sjbaypilots@prtc.net