**From:** Captain Tomás Busto, Captain Kenneth Diaz, Captain Jake Elmstrom, Captain Richard Flynn, Captain Carlos Gutierrez, Captain Patrick Lopez, Captain Carlos Ramos

**To:** Captain Daniel Montes
**Date:** August 15, 2025

Subject: URGENT AND FORMAL NOTICE – Imminent Deviation from Established Large LNG Tanker Minimum Standards

Dear Captain Montes:

This letter serves as a formal notice and warning regarding your stated intention to maneuver the <u>**large liquified natural gas**</u> ("LNG") **tanker** Energos María in San Juan Harbor on Saturday, August 16, 2025, using fewer escort-rated tugs than the operational standard adopted by all other members of the San Juan Bay pilot group. This standard, established through collective professional judgment, is entirely consistent with recognized national best practices for large LNG tanker escort requirements at U.S. ports. As you are aware, this situation was notified in our August 3, 2025, communication to New Fortress Energy ("NFE") and other stakeholders (Addendum #1).

You have indicated acceptance of a tug spread <u>unexpectedly</u> submitted by the vessel's agent, Ayala Colon, <u>a person or entity neither qualified to determine safe tug requirements nor responsible for the safe nautical conduct of the operation</u>. The proposed configuration includes only three escort-rated tugs, directly conflicting with the agreed standard of four escort-rated tugs, ideally sister vessels or with at least similar characteristics, each capable of delivering 80 metric tons of bollard pull.

The standard to maneuver the large LNG tanker Energos María in San Juan was established and agreed upon after a thorough two-year technical process involving all pilots, including yourself. The process included the following necessary and time-consuming activities and studies:

• Hundreds of validated simulator runs using the San Juan Harbor database and vessel models.
• Hydrodynamic studies on vessel interaction and shallow-water effects.
• Live-maneuver exercises with large LNG tankers under varied environmental conditions, failures, and unforeseen circumstances.
• Demonstrated emergency response capability in high-risk scenarios.

The above was deemed necessary by all parties, including yourself, taking into consideration the dimensions of the harbor and the vessels, and the hazardous product being carried in these vessels. You participated in and contributed to these studies and

evaluations that led to the development of this standard, providing feedback throughout. At no time during development, early implementation, or the first dozen real-life maneuvers did you express any objection. All these maneuvers, including those where you were present, employed the agreed-upon methodology with trained personnel and four escort-rated tugs specifically brought for NFE's large LNG operations. Only in recent weeks, specifically during a meeting with NFE and their consultants, PR Maritime, have you expressed unwillingness to adhere to the standard, despite no change in operational risk or resources. At no time did you express in what scientific studies, experience, or simulations you have based your decision to disregard the agreed-upon standard.

You have personally used these tugs for every large LNG tanker maneuver to date, employing all four exactly as designed, and they have in no way restricted your ability to conduct your maneuvers as you see fit. On the contrary, their availability has given you and all of us additional capability and redundancy, advantages you have fully benefited from, and they remain unquestionably more capable than any other tugs in San Juan Harbor.

Even if you consider yourself capable of conducting this complex and risky operation without the necessary scientific data and without following the proven procedures in this and other jurisdictions, there is no reasonable justification for unilaterally agreeing to a configuration that disregards years of preparation and the opinions and experience of **all other San Juan Bay pilots**. Your unexplained, actions will deliberately set the stage for the removal of the four escort-rated tugs that other pilots require to meet the agreed standard. With nothing to gain and nothing to lose, why work against the consensus of all of your colleagues, the established standard, and the clear weight of evidence? The answer remains difficult to understand.

The majority of pilots have verifiable, validated data from simulation and have successfully completed over a dozen LNG maneuvers — supporting the current standard. You have no equivalent data showing that the reduced tug spread you intend to use can meet the same safety margins. The most recent NFE/PR Maritime proposal to run new simulations with the Moran and McAllister tugs you've accepted has not been pursued; we suspect NFE shelved it, although we agreed to participate as requested by Mr. Rosario with Mr. Faris on behalf of NFE.

No objective validation exists for this configuration, which would operate within margins already exceeding PIANC guidelines. Testing such a configuration in real-life operations is unsafe, professionally unacceptable, and precisely the type of experimentation standards of care are designed to prevent, particularly with approaching adverse weather from the outer bands of an incoming hurricane.

Additionally, even if the tugboats met the agreed-upon standards, the tug captains on the Moran and McAllister vessels have not been trained in the maneuvering methodology specifically designed for these LNG vessels — training tailored to San Juan Harbor's confined waterways, heavy reliance on tug assistance, and complex hydrodynamic conditions. These measures were part of the mitigation required to gain federal agency support. Using untrained crews further reduces safety margins. The fact that NFE is also pursuing increased wind limits for these transits is in direct conflict with reducing tug capability.

By proceeding with fewer than the agreed number of escort-rated tugs, you are:

1. Rejecting the collective professional judgment and expertise of seven colleagues who share your legal responsibility for safe navigation.

2. Departing from a standard documented, validated, and successfully implemented in both simulation and live operations, consistent with national and international LNG practices.

3. Introducing avoidable risks to life, property, the environment, and the reputation of this pilot group.

4. Placing the profession, tug crews, and the public in a vulnerable position in the event of an incident or channel blockage.

5. Weakening our ability to insist on essential safeguards in future negotiations, eroding our authority as subject-matter experts, and setting a precedent for unsafe commercial concessions.

6. Disregarding the positive effects of healthy competition among tug providers, which has raised nautical safety, improved crew performance, and supports the capability to safely handle the demand for larger vessels with the most appropriate tools available.

The engine failure and total loss of control experienced by the LNG tanker *TITAN UNIKUM* in close proximity to the Coast Guard Station in San Juan is proof that failures happen. That vessel is several times smaller than the LNG ships now transiting our harbor. Our duty is to ensure we can address such emergencies — something not properly evaluated with the tugs you intend to use.

While we respect and fully embrace each pilot's independence, willfully disregarding an evidence-based safety standard —one you helped shape and never opposed until now —weakens our ability to uphold critical safety measures and exposes all

pilots to greater political and commercial pressure to erode safeguards. Redundancy and support, even if rarely used, are precisely why compulsory pilotage exists. Large LNG vessel transits are a zero-failure mission.

We urge you to state in writing how you intend to conduct Saturday's outbound transit, given its deviation from the established standard. It is our professional duty to take preventive action whenever a colleague's planned actions create legitimate safety concerns.

Finally, we believe it is our duty to put on notice of this situation, and the risks involved, all pertinent entities and persons, including the Coast Guard, Comisión de Practicaje de Puerto Rico, the vessel master, and through him, the owners and underwriters. Under U.S. pilotage law, the pilot and master share responsibility for the vessel's safe navigation, and both may be held accountable for the consequences of unsafe decisions. Should the transit proceed despite these concerns, we will document the decision as a willful departure from the adopted standard and refer it to the relevant regulatory and oversight authorities. If necessary, we reserve the right to pursue all legal remedies available under applicable law to address the professional, operational, and safety risks created by such actions.

Respectfully,

Captain Tomás Busto
Captain Kenneth Diaz
Captain Jake Elmstrom
Captain Richard Flynn
Captain Carlos Gutierrez
Captain Patrick Lopez
Captain Carlos Ramos

Cc:

U.S. Coast Guard Captain of the Port - luis.j.rodriguez@uscg.mil
Comisión de Practicaje de Puerto Rico - compracticaje@prtc.net
New Fortress Energy – Marine Operations - cfaris@newfortressenergy.com
Patrick Schmidt, Energos Commercial Operations Manager: pschmidt@energosinfra.com
Alexander Mills, Northern Marine Management Superintendent: Alexander.Mills@Stena.com
Energos Maria: energosmaria@nmm.stena.com
Energos Princess: energosprincess@nmm.stena.com
Northern Marine Management Operations Team: nmmoperationsukfleetgroup7@stena.com
Energos Operations Team: EnergosOps@energosinfra.com