**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| CAPT. JAKE ELMSTROM; CAPT. TOMAS BUSTO; CAPT. CARLOS E. RAMOS; CAPT. KENNETH DÍAZ; CAPT. RICHARD FLYNN; CAPT. CARLOS GUTIÉRREZ; CAPT. PATRICK LÓPEZ; Demandantes | **CIVIL NÚM**: |
| v. | **SOBRE:** DEMANDA; INTERDICTO PRELIMINAR Y PERMANENTE; SENTENCIA DECLARATORIA |
| COMISIÓN DE PRACTICAJE DE PUERTO RICO; LCDA. JESSICA ÑECO MORALES, EN SU CARÁCTER OFICIAL COMO PRESIDENTA INTERINA DE LA COMISIÓN DE PRACTICAJE; Demandados | |

**DEMANDA JURADA; SOLICITUD DE INTERDICTO**
**PRELIMINAR Y PERMANENTE; Y SENTENCIA DECLARATORIA**

AL HONORABLE TRIBUNAL:

COMPARECE la parte demandante, Capitán Tomas Busto Álvarez; Capitán Carlos E. Ramos; Capitán Ray Díaz; Capitán Jacob Elmstrom; Capitán Richard Flynn Caro; Capitán Carlos Gutiérrez; Capitán Patrick López por conducto de sus abogados que suscriben, y muy respetuosamente expone, alega y solicita:

## I. INTRODUCCIÓN

El transporte de gas natural por vía marítima es una operación sumamente regulada en la industria marítima. Luego de dos años de simulaciones, análisis técnicos y decenas de consultores, varias entidades incluyendo los prácticos de la bahía de San Juan y New Fortress Energy ("NFE") establecieron y acordaron conjuntamente los equipos necesarios que deben utilizarse en la Bahía de San Juan para la entrada y salida de barcos de gran tamaño de gas natural (liquid natural gas, "LNG", por sus siglas en inglés").

El 15 de agosto de 2025, la Presidenta de la Comisión de Practicaje de Puerto Rico ("Comisión"), Lcda. Jessica Ñeco Morales, actuando unilateralmente, sin notificarle a los otros Comisionados, sin citar a las partes, y sin mediar un voto entre los miembros de la Comisión, emitió una orden de cese y desista contra siete (7) Prácticos licenciados que operan en la Bahía de San Juan, por estos haberle cursado una misiva a otro Práctico, el Capitán Daniel Montes

(Capitán Montes). Estos siete Prácticos licenciados están convencidos que la entrada y salida del tipo de embarcación que trasporta gas natural en la Bahía de San Juan, sin los equipos y remolcadores adecuados, y previamente acordados, constituye una negligencia y pone en riesgo la vida de muchas personas, la infraestructura y economía de Puerto Rico, así como el bienestar de la sociedad.

Los argumentos de esa orden de cesa y desista son erróneos en derecho por las siguientes razones: (1) la Presidenta de la Comisión actuó de manera ultra vires, unilateralmente y sin haber mediado un voto de los demás Comisionados; (2) la referida orden viola el Artículo 16 de la Ley 226, al ser esta una acción disciplinaria de facto y emitirse sin observar el debido proceso de ley; (3) la orden de cese y desista pretender restringir la expresión de los Prácticos, en violación a los principios de la Ley 226 los elementos más esenciales del Practicaje; y (4) la aludida orden de cese y desista trasgrede la Primera Enmienda de los Constitución de los Estados Unidos y el Artículo II, Sección 4, de la Constitución de Puerto Rico.

La función de los Comisionados de la Comisión de Practicaje es velar por el interés público; que el ejercicio de la profesión del practicaje se lleve a cabo según los estándares más altos de seguridad; libres de toda influencia económica y política; y no anteponiendo lo intereses económicos de una compañía en particular sobre la seguridad del Pueblo de Puerto Rico.

## II.   <u>**JURISDICCIÓN**</u>

1.       Este Honorable Tribunal posee jurisdicción y competencia para dirimir la controversia y causas de acción de epígrafe al amparo del Artículo 5.001 de la Ley Núm. 201 de 22 de agosto de 2003, según enmendada, denominada como "Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003" (4 L.P.R.A. § 25a).

2.       Conjuntamente se presenta la causa de acción de interdicto preliminar y permanente al amparo de los artículos 675 al 677 del Código de Enjuiciamiento Civil de Puerto Rico (32 L.P.R.A. § 3521-3523) y las Reglas 56, 57, 59, 59.1 de las Reglas de Procedimiento Civil vigentes (32 L.P.R.A. Ap. V, R. 56, R. 57, R. 59, R.59.1).

3.       Se presenta la solicitud de Sentencia Declaratoria al amparo de la Regla 59 de Procedimiento Civil vigente.

## III.   LAS PARTES

4.       Las partes demandantes, Capitán Tomas Busto; Capitán Carlos E. Ramos; Capitán

Ray Díaz; Capitán Jacob Elmstrom; Capitán Richard Flynn; Capitán Carlos Gutiérrez; Capitán Patrick López son todos prácticos licenciados de profesión y representan siete (7) de los ocho (8) prácticos que trabajan en la Bahía de San Juan. La dirección postal de todos es PO Box 902-1034. Su dirección física de su trabajo en la estación de San Juan Bay Pilots es Navy Frontier Pier, Ave. Fernández Juncos, teléfono (787)722-1169.

5.       La parte demandada, Comisión de Practicaje, fue creada por la Ley Núm. 226 de 12 de agosto de 1999, según enmendada, conocida como la "Ley de la Comisión de Practicaje de Puerto Rico" ("Ley 226").   Esta tiene la facultad de regular la profesión del Practicaje en Puerto Rico. La Comisión tiene personalidad jurídica propia, con capacidad de demandar y ser demandado, en virtud del Artículo 5 de la Ley 226.   La dirección postal de la Comisión es P.O. Box 9862, San Juan Puerto Rico, 00908. La Comisión opera desde el muelle 15 en la zona de Isla Grande, San Juan, Puerto Rico.

6.       La parte demandada, Lcda. Jessica Ñeco Morales ("Lcda. Ñeco" o "Presidenta"), fue nombrada a la Comisión, en representación de la Autoridad de los Puertos, el 2 de junio de 2025. Dicho nombramiento fue aprobado el 16 de junio de 2025. Posteriormente, fue nombrada como Presidenta de la Comisión en receso en el mes de julio de 2025.

### III.      LOS HECHOS

7.       Desde tiempos antiguos, y desde los tiempos de las civilizaciones griegas y el Imperio Romano, pescadores y marinos con conocimiento y experiencia en las particularidades de los cuerpos de agua cercanos a un puerto ayudaban a otras embarcaciones a atracar y navegar de manera segura. Con el tiempo, este importante servicio que promueve la seguridad marítima se fue trasformando en una profesión sumamente técnica y adiestrada. Esta profesión es conocida mundialmente como el Practicaje, y quienes la ejercen son frecuentemente denominados como "pilotos" o "prácticos"[1]. "The term "pilot" refers to a person with specialized knowledge of local conditions and navigational hazards who is generally taken on board a vessel at a specific place for the purpose of navigating or guiding a ship through a particular channel, river, or other enclosed waters to or from a port. The specific functions performed by a pilot are (1) conning a vessel from the open sea into a port or from a port to the open sea; conning a vessel from anchorage within a port to a berth; (3) conning a vessel from one berth or terminal to another

---

[1] La Ley 226 define al "Práctico" como "la persona experimentada, versada y diestra que, a través de la práctica, adquiere el conocimiento del lugar en que navega cualificándolo para dirigir y dirige a vista el rumbo de las embarcaciones, llamándose de costa o de puerto, respectivamente, según sea en una u otro donde ejerce su profesión". "

within a port; and (4) docking or undocking maneuvers within a port". T. Shoenbaum, *Admiralty and Maritime Law* § 13–1 a la pág. 267 (3d ed. 2001)

8.      La profesión del Practicaje ha ocupado un mayor relieve e importancia para la seguridad marítima mundial, con el fin de proteger la infraestructura portuaria, evitar accidentes marítimos que causen graves daños ambientales, procurar que el intercambio comercial no se interrumpa y no se pierdan vidas humanas. Hoy en día, barcos de gran tamaño tienen que transitar a través de canales de navegación estrechos, ríos, bahías y puertos desafiantes, y son los prácticos, con amplio y experimentado conocimiento local, los llamados a velar por estas operaciones marítimas de la forma más eficiente y segura.

9.      En el año 1871, el Tribunal Supremo de Estados Unidos, en el contexto de definir su importancia y cobro por sus servicios, describió a los pilotos de esta manera: "*Pilots are a meritorious class, and the service in which they are engaged is one of great importance to the public. It is frequently full of hardship, and sometimes of peril; night and day, in winter and summer, in tempest and calm, they must be present at their proper places and ready to perform the duties of their vocation*". *Ex parte McNiel*, 80 U.S. 236, 238–39, 20 L. Ed. 624 (1871).

10.      Cada puerto, bahía, río o canal navegable es distinto y singular por sus atributos geográficos, topográficos, entre otros. Por consiguiente, es necesario que un grupo de profesionales, debidamente adiestrados, licenciados y libres de cualquier presión comercial, política o económica, proteja el interés público para evitar accidentes y promueva el intercambio comercial.  Así lo reconoce la Ley 226 en su exposición de motivos, al establecer:

> Sobre el noventa porciento (90%) de los bienes importados a Puerto Rico llegan por mar. El puerto de mayor actividad es el de San Juan, donde está concentrado el setenta y cinco porciento (75%) del comercio de la Isla. **El Puerto de San Juan tiene un acceso peligroso que requiere un control especial del tráfico en el puerto, así como medidas de seguridad más estrictas y un servicio de practicaje de excelencia**. Además, los otros puertos disponibles en Puerto Rico requieren de la asistencia de prácticos para brindar las garantías de seguridad necesarias en estas aguas. Las aguas, puertos, bahías, radas, ensenadas y sondas son recursos naturales de vital importancia para Puerto Rico. La Asamblea Legislativa de Puerto Rico, reconociendo este hecho, tiene sumo interés, por razones de política pública, salud y seguridad, en crear una ley con el fin de reglamentar la actividad de los prácticos que ofrecen y rinden el servicio a las embarcaciones que navegan en las aguas navegables de Puerto Rico, con el propósito de que los recursos naturales, el medio ambiente, la vida y propiedad de los ciudadanos queden absolutamente protegidos.

11.      En los Estados Unidos, unos 23 estados costeros de los Estados Unidos han aprobado leyes y adoptado regulaciones para promover la profesión del Pilotaje. Son los estados, a través de comisiones de practicaje o instituciones análogas, las que regulan la profesión, velan

por los procesos de reclutamiento de los Prácticos, los procesos de expedición de licencias; los programas de educación continua para los Prácticos; los procesos disciplinarios; regulan las tarifas sobre el practicaje; y velan porque los Prácticos tengan los mejores equipos y recursos para realizar su trabajo, entre otras.  Esto también ocurre a nivel mundial.

12.    Desde el año 1789, el primer Congreso de los Estados Unidos le delegó a los estados la facultad de regular el ejercicio del practicaje, a pesar de que el Gobierno Federal regula el comercio interestatal.  Esto fue avalado por el Tribunal Supremo en *Cooley v. Board of Wardens of the Port of Philadelphia* (53 U.S. (12 How.) 299 (1852)).

13.    En materia del practicaje, el Congreso solo ha desplazado el poder de los estados en dos instancias bien limitadas y circunspectas: (1) los estados no pueden exigir servicios de practicaje compulsorio en barcos de bandera estadounidense en el comercio doméstico; y (2) no pueden regular el practicaje en la zona de los Grandes Lagos.  Reiteradamente el Congreso de los Estados Unidos ha reafirmado el interés apremiante que tienen los estados en proteger sus sistemas de practicaje.

14.    Puerto Rico constituyó su propia Comisión de Practicaje a través de la Ley 226, para regular la profesión del practicaje, velar por los procesos de reclutamiento de los Prácticos, los procesos de expedición de licencias; los procesos disciplinarios; regular las tarifas sobre el pilotaje; y velar porque los Prácticos tengan los mejores equipos y recursos para ser su trabajo, entre otras.  **La esencia de la profesión del practicaje es estar libre de presiones políticas, comerciales y económicas para velar únicamente por la seguridad**.

15.    Desde hace varios años, el Gobierno de Puerto Rico anunció su intención de utilizar el gas natural como fuente de energía en las plantas de generación eléctrica del país. Esto generó la necesidad de identificar y establecer procesos más eficientes y seguros, conforme a estándares nacionales e internacionales, para traer el gas a Puerto Rico y transportarlo hasta las plantas de generación de manera segura y eficiente. Con el tiempo, y debido a un incremento en la demanda, así como a la cancelación del permiso inicialmente otorgado por la Guardia Costera de las operaciones de transferencia de carga de buque a buque NFE decidió emplear embarcaciones aproximadamente cuatro veces más grandes. Además, resulta menos costoso fletar un buque de mayor tamaño que operar con varios más pequeños.  New Fortress Energy y su subsidiaria, NF Energía, obtuvieron el contrato de importación de gas natural.  Es de conocimiento público que dicha corporación se encuentra actualmente en serios problemas de

flujo de efectivo.

16.    Por la naturaleza de su carga y dimensiones incluyendo su calado y "sail area", los barcos de LNG requieren un alto grado de cuidado, particularmente durante su tránsito en canales de navegación angostos debido a la fuerza que los vientos ejercen en su costado y la interacción hidrodinámica en dichos canales.

17.    Desde el mes de mayo 2023, todos los Prácticos activos de la Bahía de San Juan, incluyendo al Capitán Daniel Montes, trabajaron en equipo con la compañía New Fortress Energy ("NFE"), en preparación para el transporte de gas natural (Liquid Natural Gas o LNG) en barcos más grandes de manera segura en la Bahía de San Juan.

18.    Debido a la complejidad de los canales de navegación dentro de las aguas del **estuario de la Bahía de San Juan,** los efectos hidrodinámicos en canales estrechos con buques que exceden los límites recomendados por entidades de calibre internacional (PIANC & USACE) y la marcada dependencia ciudadana de este puerto, se diseñó y acordó una maniobra de entrada y salida capaz de contemplar y manejar la mayoría de los escenarios previsibles, siempre contando con el equipo de apoyo necesario. Las simulaciones realizadas por todos los prácticos y NFE incluyeron fallas de propulsión, fallas de timón, cambios súbitos en la dirección e intensidad del viento, errores humanos tanto del equipo de puente como de los operadores de remolcadores, e incluso la pérdida de uno o varios remolcadores de asistencia. Asimismo, se dispuso que los operadores de los remolcadores recibieran adiestramiento específico para ejecutar dicha maniobra, garantizando la coordinación y eficacia del apoyo. Con base en todo lo anterior, se determinó la cantidad y potencia del equipo de asistencia requerido por este tipo de buque, que coincide con lo utilizado en otros puertos donde estos buques operan.

19.    Esta colaboración desembocó en una serie de acuerdos entre NFE y todos los prácticos de la bahía de San Juan relativos al equipo necesario para que se realizarán dichas maniobras de manera segura.

20.    Entre los acuerdos alcanzados entre NFE y los Prácticos de la Bahía de San Juan se encontraban el reposicionamiento de boyas luego del dragado en canal del *Army Terminal*; modificaciones en los equipos de ayuda de navegación, y modificaciones a las luces de enfilación disponibles, se realizaron cientos de simulaciones en equipos técnicos computarizados en el Seaman's Church Institute (SCI) en Houston, Texas, para reproducir escenarios reales con el mismo tipo de barcos de LNG, remolcadores, y las condiciones de la Bahía de San Juan; se

establecieron limitaciones ambientales para la operación tales como límites de viento; y se acordó que para la delicada operación del barco de gran tamaño de LNG se utilizarían cuatro remolcadores "*escort rated*" idénticos, con capacidad de "*80 metric tons of bollards pull*", entre otros.

21. Un remolcador con clasificación de escolta es una embarcación específicamente diseñada, construida y certificada para realizar operaciones de escolta, lo que significa que puede asistir, controlar y, en caso necesario, detener o redirigir de manera segura el movimiento de un buque de mayor tamaño durante su tránsito. Estos remolcadores poseen una mayor estabilidad, maniobrabilidad, fuerza de tiro (bollard pull), y están equipados con sistemas de propulsión y gobierno capaces de ejercer fuerzas indirectas significativas sobre el buque asistido. Se distinguen de los remolcadores portuarios convencionales porque su diseño les permite proporcionar frenado hidrodinámico, dirección y capacidad de detención de emergencia en aguas restringidas o de alto riesgo. La clasificación de escolta se otorga mediante certificación de sociedades de clasificación reconocidas, con base en pruebas de desempeño y evaluaciones técnicas que demuestran la capacidad del remolcador para controlar un buque de tamaño y velocidad determinados en condiciones de emergencia.

22. De acuerdo con los acuerdos alcanzados, y tras determinarse —luego de cientos de simulaciones, hallazgos técnicos y discusiones sostenidas entre todos los prácticos de San Juan y capitanes de remolcadores participantes— la necesidad de contar con equipos de esa capacidad, NFE contrató los remolcadores de Edison Chouest Offshore (ECO), trasladando a Puerto Rico cuatro unidades con dicha especificación. En dichas simulaciones también se comprobó la importancia de que dichos remolcadores fueran buques gemelos (sister vessels) o, en su defecto, que mantuvieran características y capacidades de maniobra equivalentes, de forma tal que pudieran intercambiarse en cualquiera de las posiciones en caso de que alguno presentara una falla. En la Bahía de San Juan no existe ningún otro remolcador, aparte de los de ECO, que cuente con la capacidad de tiro (bollard pull) de 80 toneladas métricas, conforme a los estándares establecidos en las simulaciones marítimas y estudios realizados.

23. Desde la llegada del buque GASLOG SINGAPORE el 20 de marzo de 2025 —cuando atracó por primera vez en el puerto de San Juan utilizando los cuatro remolcadores con las características necesarias para garantizar una maniobra segura— todas las maniobras de este tipo se han ejecutado por todos los prácticos con el mismo equipo y empleando la maniobra

planificada, tomando en cuenta los riesgos identificados en las simulaciones y estudios previos. Los prácticos realizaron exitosamente múltiples maniobras de esta naturaleza, incluyendo una maniobra de emergencia el 12 de julio de 2025, cuando en pleno tránsito NFE solicitó cancelar el atraque y sacar el buque del puerto. Dicha instrucción se emitió sin comunicar la razón en ese momento ni hasta la fecha, a pesar de haberse solicitado formalmente la explicación, lo cual conllevó un alto riesgo para todos los involucrados. Para poder ejecutarla, se aplicó la maniobra previamente planificada y simulada para un escenario de amenaza de bomba en el terminal, lo que permitió llevarla a cabo con seguridad gracias a la existencia del equipo adecuado y al adiestramiento específico recibido. La maniobra incluyó un giro de 180 grados en el área de cruceros para sacar el buque mar afuera. Cabe destacar que, debido a su calado, este buque no puede dirigirse a ningún otro punto dentro de la bahía distinto al canal de entrada, el muelle designado, y el área de cruceros donde se efectuó dicha maniobra.

24. Es importante acentuar que la Guardia Costera de los Estados Unidos (USCG, por sus siglas en inglés), emitió una orden estableciendo ciertos parámetros en que dicha operación debe realizarse. **Anejo 1**

25. Durante este año comenzó a salir en la prensa que NFE confrontaba problemas económicos.

26. Posteriormente, los Prácticos de San Juan comenzaron a recibir información de que NFE no le renovaría el contrato a la compañía ECO, dueña de los cuatro remolcadores con la capacidad necesaria para hacer las maniobras de manera segura en estos barcos de dimensiones más grande y que trasportan gas natural a la Bahía de San Juan, según practicado y acordado.

27. Luego, en una reunión celebrada el 31 de julio de 2025, NFE y sus consultores confirmaron a varios prácticos la intención de NFE de sustituir los remolcadores de ECO existentes y sustituirlos por otros de menor capacidad.

28. El 3 de agosto de 2025, siete (7) de los ocho (8) prácticos de la Bahía de San Juan el cursaron una extensa carta a NFE y a sus consultores expresando su gran preocupación con la intención de utilizar remolcadores de menor capacidad para una operación de tan alto riesgo a la seguridad pública y en contravención a lo acordado. **Anejo 2**

29. El **14 de agosto de 2025**, a las 10:35 am, el agente de la embarcación que transporta gas natural a Puerto Rico le notificó a los Prácticos de la Bahía de San Juan que utilizarían 4 remolcadores pertenecientes a dos compañías remolcadoras distintas para la salida

de un barco de gas a realizarse el **16 de agosto de 2025**. **Anejo 3**

30.     Ninguno de los remolcadores propuestos por el agente del buque posee la capacidad de 80 toneladas métricas de tiro (bollard pull) establecida según la maniobra diseñada, ni cuentan con características de maniobrabilidad equivalentes que permitan su intercambio en las posiciones predeterminadas. Además, los remolcadores presentados por la agencia no han formado parte de estudio alguno ni han sido sometidos a simulaciones que validen su capacidad para realizar dichas maniobras.

31.     El Capitán Daniel Montes, uno de los ocho (8) prácticos en la Bahía de San Juan, emitió una escueta respuesta, la cual infería que aceptaba realizar el servicio de practicaje con dicho equipo. **Anejo 4**

32.     Posteriormente, el 15 de agosto de 2025, siete (7) Prácticos le cursaron una carta al Capitán Montes, único Práctico dispuesto a realizar el servicio con dichos equipos. Estos Prácticos le comunicaron al Capitán Daniel Montes sus preocupaciones con la seguridad marítima al utilizar equipo de menor capacidad, al desviarse de los estándares que se acordaron luego de realizarse decenas de simulaciones técnicas y las serias repercusiones de ocurrir un accidente. Dicha carta se le remitió, entre otras, a la Comisión de Practicaje y a todos sus Comisionados. **Anejo 5**

33.     El mismo 15 de agosto, a las 5:42 pm, un bufete de abogados que representa a uno de los dueños de los remolcadores que serían utilizados en la maniobra del 16 de agosto de 2025, notificaron a los prácticos una carta de cese y desista ya que la carta enviada al Capitán Daniel Montes interfería con los intereses económicos de su cliente. Dicha carta fue copiada a la Comisión de Practicaje. **Anejo 6**

34.     **Ese mismo día**, **a las 9:30 pm, la Presidenta de la Comisión le remitió una orden de cese y desista ("la Orden") a los siete (7) pilotos que mostraron sus preocupaciones legítimas al Capitán Montes, único práctico dispuesto a realizar la maniobra del sábado, 16 de agosto de 2025**. **Anejo 7**

35.     Al momento en que se emitiera dicha Orden, no existía una querella ni petición ante la Comisión de Practicaje a esos efectos. Al momento de emitir la Orden, la Presidenta no convocó a los comisionados, y ni siquiera informó que se estaría emitiendo una comunicación u orden.

36.     La Orden fue emitida por la Presidenta de manera unilateral, sin informarlo y sin

contar con el aval de los otros dos Comisionados en funciones.

37.     En el referido cese y desista, **la Presidenta impidió a los Prácticos comunicarse con la industria marítima y hasta los amenazó con referirlos al Departamento de Justicia de Puerto Rico. En otras palabras, <u>la Presidenta le ordena a los expertos y a los llamados a velar por la seguridad portuaria, que no pueden comunicarse con las entidades marítimas ni con los dueños de embarcaciones a los cuales sirven para alertarlos de situaciones peligrosas</u>**.

38.     Las acciones de la Presidenta son acciones intimidatorias y disciplinarias de graves consecuencias de seguridad sin el debido proceso de Ley; procesos de ley que debe observar toda entidad gubernamental.

39.     La Comisión de Practicaje es un cuerpo colegiado y está compuesto por Comisionados nombrados por el Gobernador de Puerto Rico y confirmados por el Senado. Ningún Comisionado puede actuar de manera unilateral y abrogarse todas las facultades de la Comisión en sí mismo.

40.     Esto último constituye una conducta no permitida y una usurpación de los deberes y facultades de los demás Comisionados, en violación manifiesta a la Ley 226.

41.     La Presidenta de la Comisión no reunió a los otros Comisionados para una reunión de emergencia para deliberar, votar y tomar una acción por mayoría sobre estos asuntos importantes como le exige la propia Ley 226. Tampoco informó que estaría tomando las acciones que tomó.

42.     La Presidenta decidió prejuzgar la situación por sí misma y hablar a nombre de toda la Comisión de manera autónoma e independiente.

43.     Al momento de emitir la Orden, la Lcda. Ñeco llevaba apenas 15 días de haber sido nombrada presidenta en receso por la Gobernadora el 30 de julio de 2025. En esa fecha carecía de conocimiento sobre las funciones de los prácticos, el alcance de su función y los detalles propios de la profesión. En consecuencia, no contaba con la preparación técnica necesaria para adoptar la medida que tomó, lo cual generó y genera un riesgo al Pueblo de Puerto Rico al intentar limitar los derechos y obligaciones de los prácticos sin seguir el debido proceso de ley.

44.     Al recibir las comunicaciones sobre la situación antes mencionada, la Presidenta tenía que informar a los Comisionados sobre el recibo y la intención de tomar acción al respecto,

además de tomar otras medidas como las de solicitar más información técnica y reunir a las partes.

45.    El tránsito y transporte de embarcaciones de gran tamaño de LNG, por las aguas de la Bahía de San Juan es un asunto de gran seriedad y responsabilidad, con repercusiones significativas. Realizarlo en un buque cuatro veces más grande que los empleados anteriormente por NFE aumenta considerablemente los riesgos en comparación con los que se utilizaban hace apenas dos años.

46.    La función de la Comisión, y de la Presidenta, no es censurar, suprimir o amenazar las voces profesionales que están levantando la voz de alerta para proteger la seguridad marítima, y evitar fatídicos accidentes.

47.    **La función de la Comisión es velar por el interés público; que el ejercicio de la profesión del practicaje se lleve a cabo según los estándares más altos de seguridad; libres de toda influencia económica; y nunca anteponer los intereses económicos de cualquier compañía sobre la seguridad del Pueblo de Puerto Rico.**

## IV.    CAUSAS DE ACCIÓN

A.    Acción ultra vires, y nula, por parte de la Presidenta de la Comisión por actuar unilateralmente; y por usurpar las facultades de los otros Comisionados

48.    Se adoptan por referencia los párrafos que anteceden.

49.    El Artículo 6, de la Ley 226, preceptúa lo siguiente:

(a)    Composición La Comisión estará compuesta **por siete (7) comisionados, uno de los cuales será su presidente, nombrados todos por el Gobernador de Puerto Rico, con el consejo y consentimiento del Senado.** Los miembros de la Comisión serán ciudadanos de los Estados Unidos y residentes del Estado Libre Asociado de Puerto Rico. El presidente de la Comisión será el funcionario ejecutivo de la misma y podrá designar a un comisionado asociado para actuar como presidente en su ausencia. **El comisionado presidente tendrá discreción para asignar áreas de trabajo, tanto en la fase adjudicativa como en la cuasilegislativa y/o operacional de la agencia a uno o más comisionados.** La composición será la siguiente: Dos (2) de estos miembros deberán ser prácticos licenciados, que estén activamente practicando la profesión; uno (1) para representar a los prácticos de San Juan y, el otro, a los prácticos de la Isla, que sean nominados por cada asociación de prácticos; dos (2) de los cuales deberán estar activamente envueltos en su capacidad profesional o de negocio en el negocio naviero, que sean usuarios de los servicios de practicaje y sean nominados por la Asociación de Navieros de Puerto Rico; dos (2) que no deben estar y que nunca hayan estado envueltos o monetariamente interesados o relacionados con la profesión del practicaje, negocio naviero o industria marítima, quienes representarán al interés público; y uno (1) que represente al Gobierno de Puerto Rico, el cual será empleado de la Autoridad de los Puertos. Para propósitos de este Artículo, un "usuario de los servicios de practicaje" es cualquier persona que sea

agente o representante de cualquier persona con un interés propietario en el negocio que regularmente emplea prácticos con licencia de Puerto Rico, con el propósito de proveer practicaje o servicios de practicaje o cualquier persona que sea un empleado directo de éstos. (Énfasis Suplido)

50. Como podemos notar, la Comisión es un cuerpo colegiado de siete (7) Comisionados y la Comisionada Presidente solo tiene facultades para "asignar áreas de trabajo". Es decir, es un rol administrativo y de organización de la agenda; y los trabajos.

51. La Comisionada Presidente **no** tiene la autoridad de actuar unilateralmente y es un voto más, como cualquier otro Comisionado.

52. Más aun, los Artículo 8(c) y 8(d) de la Ley 226 nuevamente reitera la naturaleza colegiada de la Comisión:

(c) la Comisión sostendrá **una o más reuniones** regulares trimestralmente en algún lugar conveniente en la Isla el día o los días que la Comisión seleccione. Las reuniones especiales podrán ser convocadas por la **mayoría de los comisionados**. El secretario de la Comisión entregará notificación de todas las reuniones regulares y especiales a **todos los comisionados** y, en adición, a cualquier otra persona que por ley deba ser notificada. (d) Dentro de los catorce (14) días calendarios siguientes a cada reunión de la Comisión, ésta emitirá un repone escrito a cada práctico explicando cualquier **acción tomada por la Comisión en la reunión, si se tomare alguna determinación que afecte las condiciones de practicaje.** (Énfasis Suplido).

53. Como vemos, la Ley 226 parte de la premisa que la Comisión es un cuerpo colegiado y las determinaciones deberán tomarse por la mayoría de los Comisionados.

54. Por otra parte, esta actuación unilateral usurpa y soslaya las facultades que tienen los otros Comisionados, los cuales tienen el mismo derecho al voto, al deliberar y expresarse sobre todos los asuntos de la Comisión.

55. Todos los Comisionados fueron nombrados por un Gobernador de Puerto Rico y confirmados por el Senado de Puerto Rico. Un Comisionado no puede obliterar y conculcar el balance que estableció en la Comisión a través de la Ley 226.

56. Por consiguiente, la orden de cese y desista, emitida por la Presidenta de la Comisión el 15 de agosto de 2025, es ultra vires y totalmente nula.

B. Acción ultra vires, y nula, por parte de la Presidenta de la Comisión por no seguir el Debido Proceso de Ley que dispone el Artículo 16 de la Ley 226 para Acciones Disciplinarias

57. Se adoptan por referencia los párrafos que anteceden.

58. Además de la nula y ultra vires determinación unilateral del cese y desista por parte de la Lcda. Ñeco, dicha orden vulnera los principios más básicos del debido proceso de ley para las acciones disciplinarias de los prácticos, para el cual los Comisionados están llamados y

obligados a salvaguardar.

59.     El Artículo 16 de la Ley 226 establece una lista de acciones y conductas que pudieran ser sancionadas por la Comisión (por mayoría de los Comisionados). El referido artículo enumera catorce (14) conductas sujetas a acciones disciplinarias.

60.     El que siete (7) prácticos le envíen una carta a su colega, con copia a toda la industria marítima, incluyendo la Comisión misma, para expresar su preocupación sobre la adecuacidad de una maniobra y sus inherentes riesgos de seguridad (expresiones cobijadas por el derecho de libertad de expresión de la Constitución de Puerto Rico y los Estados Unidos y el producto de su experiencia y responsabilidad profesional) no es una de esas conductas punibles.

61.     Por otra parte, el Artículo 16 (b) dispone lo siguiente:

b) Cuando la Comisión determinare que un práctico o práctico aprendiz **cometió alguno de los actos señalados en el inciso (a), previa notificación a dicho práctico brindándole la oportunidad a ser oído.** (Énfasis Suplido).

62.     Si la Comisión, por mayoría de sus miembros (no solo la Presidenta) determina que una conducta debe ser sancionada, se le debe proveer a los Prácticos un robusto debido proceso de Ley, en virtud de la Ley 226 y la Constitución de los Estados Unidos y Puerto Rico, ya que, entre otras cosas, las licencias profesionales constituyen un interés propietario y están cobijadas por la cláusula de debido proceso de Ley de la Decimocuarta Enmienda de la Constitución de los Estados Unidos).

63.     La orden de cese y desista, que debió ser informada, discutida y aprobada originalmente por todos los Comisionados, impone sumariamente sanciones al exigir una censura previa al requerir que "toda comunicación similar deberá remitirse de inmediato a la Comisión para su evaluación y determinación conforme al debido proceso de ley." **Ver Anejo 7**

64.     Por consiguiente, la carta de la Presidenta de la Comisión, además de ser nula y *ultra vires* por ser una actuación unilateral de un solo Comisionado, impone sanciones disciplinarias de facto y vulnera derechos constitucionales de los prácticos a negárseles su derecho a un debido proceso de ley.

65.     Todos los Comisionados tienen un deber en Ley para salvaguardar el debido proceso de Ley de los que ostentan una licencia profesional de practicaje al amparo de la Ley 226.

66.     Se les están imponiendo sanciones disciplinarias, sin el debido proceso de Ley,

bajo el manto subrepticio de una carta de "cese y desista". Además, la orden de cese y desista tiene un interés de intimidación y de imponer un "*chilling effect"* para que los prácticos se retraigan de ejercer acciones constitucionalmente protegidas y acciones mandatorias de su profesión.

67.    Por consiguiente, solicitamos que se declare nula y *ultra vires* la orden del 15 de agosto de 2025, emitida por la Presidenta de la Comisión, por imponer sanciones en violación all debido proceso de ley que exige la Ley 226 y las Constituciones de Puerto Rico y los Estados Unidos.

B.    La orden de Cese y Desista Vulnera los Principios más Esenciales de la Profesión del Practicaje y la Ley 226

**i. La Discreción de los Prácticos**

68.    Los Prácticos en la Bahía de San Juan, poseen un interés propietario sobre sus licencias a nivel estatal y federal.

69.    Los Prácticos utilizan su conocimiento local, experiencia en navegación y juicio profesional informado, independiente y libre de los intereses económicos de los propietarios y operadores de embarcaciones.

70.    Como los Prácticos poseen una licencia para ejercer su profesión, son muy similares a los médicos, ingenieros, abogados, entre otros.

71.    El Tribunal Supremo de los Estados Unidos se ha expresado de esta manera sobre la profesión del Practicaje:

> La larga historia del practicaje revela que se trata de una **institución única y debe ser juzgada como tal**. Para evitar peligros invisibles, las embarcaciones que se aproximan o salen de los puertos deben ser conducidas desde y hacia aguas abiertas por personas íntimamente familiarizadas con las aguas locales. El trabajo del práctico generalmente requiere que éste salga fuera de la entrada del puerto en una pequeña embarcación para encontrarse con los barcos entrantes, abordarlos y dirigir su rumbo desde aguas abiertas hasta el puerto. El mismo servicio se presta a las embarcaciones que salen del puerto. **Los prácticos son, por lo tanto, piezas indispensables en el sistema de transporte de toda economía marítima**. *Kotch v. Board of River Pilots Commissioners*, 330 U.S. 552, 557–558 (1947). (Énfasis Suplido)

72.    En los casos de *The China* (74 U.S. 53, 1868), *Kotch v. Board of River Pilots Commissioners*, 330 U.S. 552, 557–558 (1947) y muchos otros casos en los pasados cien años, se ha discutido y elaborado la discreción que tienen los Prácticos a la hora de ejercer su profesión y emitir las instrucciones mientras estos tienen el control direccional de la embarcación.

14

73.     Ahora bien, dicha discreción no es absoluta y la Ley 226, así como otras jurisdicciones, establecen procesos disciplinarios cuando se realizan maniobras de manera negligente y no observado lo mejores estándares de la profesión. Como ocurre con cualquier profesión con licencia en el mundo.

74.     En la carta de cese y desista, la Presidenta de la comisión mencionó lo siguiente:

En atención a la política pública establecida por la Honorable Gobernadora de Puerto Rico, Jennifer González Colón, mediante comunicación oficial sobre la crisis energética, el Gobierno ha ordenado facilitar y no obstaculizar el manejo y operación de embarcaciones de gas natural licuado esenciales para el sistema energético de Puerto Rico. **Cualquier acción que retrase, condicione o impida dichas operaciones sin la autorización de la Comisión y del Gobierno de Puerto Rico contraviene esta política pública y pone en riesgo la seguridad energética de la Isla.** (Énfasis suplido)

75.     Esta expresión refleja un gran desconocimiento de la esencia de la profesión milenaria del Practicaje. La esencia de esta profesión es que los Prácticos están libres de toda presión económica y política, para evitar accidentes, y para que prime la seguridad sobre cualquier otra consideración.

76.     Por otra parte, la orden de cese y desista de la Presidenta de la Comisión se contradice. Por un lado, le reconoce al Capitán Daniel Montes su discreción como "contratista independiente" para realizar las maniobras en los barcos de LNG de gran tamaño (muchos más grandes que los que llegaban a la Bahía de San Juan hace dos años) con equipos y remolcadores de menor capacidad. Pero por otro lado no le reconoce ese mismo derecho profesional a los Prácticos cuando se mantienen firmes en su exigencia de continuar usando los equipos y remolcadores con las características acordadas (independientemente que compañía los provea), ya que fueron parte de cientos de simulaciones, producto de decenas de hora de entrenamiento y con data empírica, que demuestra que de esa manera las maniobras sí son seguras.

77.     Dicha distinción hasta podría considerarse como una violación a la igual protección de las leyes.

78.     La irresponsabilidad y negligencia crasa, a juicio de siete (7) Prácticos, consiste en utilizar esos mismos remolcadores con barcos de mayor capacidad y de gran tamaño, lo que no ocurre en ningún puerto con terminales de gas natural en los Estados Unidos.

79.     Ante tan claro coro de voces de profesionales levantando la voz de alerta al unísono, es deber de la Comisión realizar las vistas que sean necesarias para poder recibir evidencia técnica de la peligrosidad de esta operación. Ese sería el curso ordinario y responsable

de un ente regulador imparcial; y objetivo. Máxime cuando la vida y seguridad de muchas personas están en riesgo.

80.     **El curso correcto no es amenazar e intimidar a los Prácticos que están levantando la voz de alerta, al amparo de su discreción profesional. Porque de ocurrir algún accidente, la Comisión no podrá argumentar desconocimiento.**

81.     Es meritorio enfatizar que el Artículo 226 le reconoce a un Práctico el no realizar una maniobra "**por razones de seguridad** que impidan hacerlo o aquellas otras que la Comisión determine por reglamento". (Énfasis Suplido).

82.     Por consideración a todo lo anterior, dicha orden de cese y desista vulnera los principios más básicos de la profesión centenaria del Practicaje, la discreción profesional de cada Práctico a la hora de realizar su trabajo, y se vulnera el Artículo 4 de la Ley 226.

ii. **Deber de Comunicar y de Informar de los Prácticos**

83.     La orden de cese y desista de la Presidenta de la Comisión expresa que la carta que remitieron los siete (7) Prácticos el 15 de agosto fue diseminada y compartida con la industria marítima "sin la debida autorización de la Comisión". Intimando que la Comisión debe concederles a los Prácticos de la Bahía de San Juan alguna autorización previa, constituyéndose en una censura previa, para que estos se comuniquen con sus compañeros y la industria marítima.

84.     Mas aún, la nula e ilegal orden exige que:

> Se advierte a toda la comunidad marítima que cualquier comunicación de esta índole, emitida por prácticos de San Juan de manera individual o colectiva, sea o no bajo una asociación reconocida, **y que no haya sido previamente autorizada por la Comisión,** carece de reconocimiento oficial y debe considerarse nula y sin efecto. Toda comunicación similar deberá remitirse de inmediato a la Comisión para su evaluación y determinación conforme al debido proceso de ley. (Énfasis Suplido).

85.     Una vez más la Presidenta de la Comisión decide arrogarse facultades que nos le atribuye la Ley 226. La Comisión no está para aprobar, censurar, amordazar, realizar censuras previas y regular el contenido de comunicaciones, cobijadas por el derecho a la libertad de expresión de la Primera Enmienda de los Estados Unidos o por otros derechos que cobijan a estos profesionales.

86.     La Carta de los Prácticos del 15 de agosto no contiene información confidencial y prohibida por la Ley 226.

87.     Es un deber esencial y operacional que los Prácticos deban comunicarse con los agentes, la Comisión, los dueños de embarcaciones, agencias reguladoras, otros Prácticos y hacer

las advertencias de seguridad que estos entiendan pertinentes.

88. Los Prácticos no son empleados de las embarcaciones y los agentes. Sus clientes son únicamente el interés público y velar por la seguridad en la Bahía de San Juan.

89. La seguridad es la columna vertebral de la Ley 226 y su razón de ser. Tanto es así, que su exposición de motivos reconoce que "[e}l Puerto de San Juan tiene **un acceso peligroso** que requiere un control especial del tráfico en el puerto, así como **medidas de seguridad más estrictas y un servicio de practicaje de excelencia**. Además, los otros puertos disponibles en Puerto Rico requieren de la asistencia de prácticos para brindar las garantías de seguridad necesarias en estas aguas." (Énfasis Suplido).

90. El tratar de silenciar, establecer censuras previas y pretender coartar la comunicación de los Prácticos para que estos puedan llevar preocupaciones de seguridad, es altamente preocupante proviniendo de la Comisión y su Presidenta.

91. No olvidemos que, además de las exigencias de la Ley 226, relativas a que debe primar la seguridad marítima ante toda otra consideración, los Prácticos en Puerto Rico no tienen un límite de responsabilidad. Por consiguiente, la exposición monetaria en cuanto a estos y su familia es abrumadora. Ningún agente o miembro de la Comisión está expuesto a semejantes responsabilidades civiles y potenciales daños económicos cuantiosos.

92. La Comisión debe velar porque la operación en la Bahía de San Juan, particularmente una operación en donde se transporta gas natural en un barco con unas dimensiones inmensas, en comparación con los barcos que se utilizaban para esta operación dos años atrás.

93. Dicho intento de mordaza viola el principio del Artículo 3 de la Ley 226, que preceptúa que "[d]ebido a que la seguridad en el tránsito marítimo es el objetivo primario en la reglamentación del practicaje."

94. De hecho, el Artículo 4 a de la Ley 226 dispone que un Práctico puede negarse a ofrecer un servicio de practicaje cuando **por razones de seguridad** que impidan hacerlo o aquellas otras que la Comisión determine por reglamento". (Énfasis Suplido).

95. Como podemos ver, es el principio de seguridad el que prima, gobierna y rige la profesión de la práctica. Para eso, todo Práctico debe estar libre de influencias económicas, políticas y comerciales. Párate de ese deber de seguridad, es informar.

96. Finalmente, el contenido de la comunicación de los demandantes al Capitán

Daniel Montes, comunicación que motiva el cese y desista ilegal, solo plantea asuntos de seguridad y le hacer preguntas al Capitán Daniel Montes de cómo llegó a las conclusiones de hacer una maniobra con un equipo de menor capacidad, a los probados por todos los Prácticos (incluyéndolo a él) en las simulaciones y cientos de hora de entrenamiento. **¿Cuál es la evidencia empírica para sostener esa decisión? Ante una Comisión que no realiza esas preguntas, le corresponde a los profesionales que, de ocurrir un accidente, están expuestos a responder civilmente.**

97.     Este es precisamente el tipo de expresión y comunicación que debe fomentarse, y no restringirse, en la industria marítima, para evitar accidentes.

98.     El contenido de la misiva al Capitán Daniel Montes no contiene información cobijada por el derecho constitucional a la privacidad (información contributiva financiera; de menores; entre otras) y tampoco contiene información prohibida por la Ley 226.

D. Violación a la Primera Enmienda de la Constitución de los Estados Unidos y el Artículo II, Sección IV de la Constitución de Puerto Rico

99.     Bajo el Artículo VI de la Constitución de los Estados Unidos (Cláusula de Supremacía), los Tribunales estatales como este tienen la jurisdicción para interpretar y aplicar la Constitución y las leyes federales.

100.    Por otro lado, los Tribunales tienen la facultad de revisar, no solo la validez de la Leyes, sino de las actuaciones de la Rama Ejecutiva y sus organismos administrativos. Véase Peña Clos v. Cartagena, 114 DPR 576 (1983).

101.    Tanto la Constitución de Puerto Rico protege las ideas, la libertad de conciencia y la libertad de expresión.

102.    Por tratarse de un derecho fundamental, si el Estado desea restringir el ejercicio de la liberta de expresión, se debe aplicar el escrutinio estricto. Véase Universidad de Puerto Rico v. Laborde, 180 DPR 253 (2010).

103.    El derecho a la libertad de expresión, como todo derecho fundamental no es absoluto. Los Estados tienen facultad para restringir expresiones difamatorias, palabras de riña, que alteren la paz, comunicaciones de seguridad nacional, obscenidad de menores, privilegios evidenciarios, entre otras muy circunspectas. Estas instancias son la excepción y no la norma, por la libertad de expresión ser un derecho fundamental.

104.    La Comunicación de los Prácticos al Capt. Daniel Montes no contiene ni un ápice

de este tipo de expresión que el Estado pueda doblegar el derecho fundamental a la libertad de expresión a través de un análisis de escrutinio estricto.

105.    Por consiguiente, las actuaciones de la Presidenta de la Comisión violaron y menospreciaron los derechos constitucionales cobijados por la Primera Enmienda y el Artículo II de la Constitución Federal y Local, respectivamente.

106.    En la orden de cese y desista de la Presidenta de la Comisión se pretende establecer una censura previa y controlar el contenido de una expresión protegida constitucionalmente.

107.    Aunque este Honorable Tribunal pueda declarar en su día nula y ultra vires la orden de cese y desista, y la controversia se torne académica, respetuosamente solicitamos que se emita un interdicto permanente y se aplique la excepción a la doctrina de academicidad.

108.    En *Pueblo v. Rivera Ortiz*, 202 TSPR 56, el Tribunal Supremo de Puerto Rico estableció los tres factores de la doctrina de la excepción a pleitos académicos. Estos son: (a) la probabilidad de ocurrir; (b) las partes involucradas; y (c) la probabilidad de que la controversia evada la revisión judicial.

109.    Por la Comisión haber actuado de manera tan errática y cuestionable, y el Practicaje tratándose de una profesión esencial para que entre en Puerto Rico la comida y las medicinas por vía marítima, los Prácticos no pueden operar sintiéndose amenazados, y víctimas de un "*chilling effect*" por parte de actuaciones ilegales de la Comisión. Por consiguiente, solicitamos esta protección robusta de este Honorable Tribunal.

E. Interdicto Preliminar y Permanente

110.    Se adoptan por referencia los párrafos que anteceden.

Se solicita el remedio de Interdicto Preliminar y Permanente para que; (1) la Presidenta cese y desista de emitir determinaciones unilateralmente y usurpando las facultades de los otros Comisionados; (2) para que cesen y desistan acciones disciplinarias sin seguir el debido proceso de Ley establecido en el Artículo 16 de la Ley 226; (3) cese y desista cualquier acción de la Presidenta o la Comisión de restringir la discreción profesional e individual de los Prácticos; y (4) que cese y desista la Presidenta de la Comisión de trasgredir los derechos de los demandantes en virtud de la Primera Enmienda de los Constitución de los Estados Unidos y el Artículo II, Sección 4, de la Constitución de Puerto Rico.

111.    Los criterios para que un tribunal expida un remedio provisional fueron esbozados por el Tribunal Supremo de Puerto Rico en *Misión Industrial v. Junta de Planificación*, 143 D.P.R. 804 (1997), donde se reiteran los criterios normativos. Estos son: a) La probabilidad de que la parte promovente eventualmente prevalezca en el litigio pertinente; b) La naturaleza de los daños que se puedan ocasionar a las partes de concederse o denegarse el injunction; c) La probabilidad que la causa se torne académica de no concederse el injunction; d) La irreparabilidad del daño o la inexistencia de un remedio adecuado en ley; y e) El impacto sobre el interés público del remedio.143 D.P.R., a la pág. 731.

112.    La concesión de un injunction preliminar o permanente descansa en el ejercicio de la sana discreción judicial, la que actuará a tenor con las necesidades e intereses de todas las partes envueltas en la controversia. <u>Municipio de Ponce v. Gobernador</u>, 136 D.P.R. 776, 790-791 (1994).

i.   <u>Probabilidad que la parte promovente prevalezca en el litigio</u>

113.    En virtud de todos los argumentos previamente esbozados, no hay duda alguna que la Presidenta realizó todas dichas actuaciones, en violación de la Ley 226 y las Constituciones de Puerto Rico y Estados Unidos.

<u>ii. La naturaleza de los daños que pueden ocasionarse a las partes de concederse o denegarse el injunction</u>

114.    Estamos ante una situación donde los derechos de los Prácticos se han estado vulnerando con frecuencia y se están poniendo en riesgo los derechos propietarios de profesionales con licencia; se está poniendo en riesgo la seguridad de la ciudadanía y el tráfico marítimo de una isla, como lo es Puerto Rico.

<u>iii. La irreparabilidad del daño y la inexistencia de un remedio adecuado en ley</u>

115.    El que un Comisionado(a) esté abrogándose las facultades de la Comisión por sí misma, usurpando las facultades de los otros Comisionados al no permitirles participación en los asuntos deliberativos y emitiendo determinaciones so color de oficialidad sobre asuntos que son cumplidos por terceros con inmediatez, constituye un daño irreparable.

116.    El hecho de que una sola persona, no cualificada, determine que los Prácticos no puedan comunicarse con dueños y agentes de buques con relación a maniobras marítimas impide que los Prácticos realicen sus funciones plenamente, velando por la seguridad del Pueblo de Puerto Rico.

117.    El cese y desista emitido tiene el efecto de limitar la labor profesional de los Prácticos, creando riesgo para la propiedad y la vida en la Bahía de San Juan.

118.    Un accidente en la Bahía de San Juan, con barcos del tamaño de los que estamos hablando, potencialmente tendría el efecto de bloquear la entrada y salida de barcos a San Juan, afectando así el comercio y la economía de Puerto Rico.  Un accidente con un barco de LNG, puede tener consecuencias trágicas como pérdida a la vida, daños a los recursos ambientales de la bahía y la incapacidad de suplir gas a plantas generadoras de energía, afectando así a todo el Pueblo de Puerto Rico de manera irreparable.

iv. Probabilidad de que la causa se torne académica de no concederse el injunction y el consecuente daño irreparable

119.    Cada vez que la Presidenta emite una determinación, violando la Ley 226 y la Constitución, y con rapidez algún Práctico realice la maniobra o se impida que los Prácticos realicen su trabajo, la controversia se puede volver académica con facilidad.

C.    Solicitud de Sentencia Declaratoria

120.    Se adoptan por referencia los párrafos que anteceden.

121.    La Regla 59 de las de Procedimiento Civil, supra, R. 59, dispone que la sentencia declaratoria es el mecanismo adecuado para aclarar la incertidumbre jurídica de alguna parte. Además, este mecanismo permite declarar los derechos, estados y otras relaciones jurídicas, aunque existan otros remedios disponibles. *Mun. Fajardo v. Srio. Justicia*, et al., 187 DPR 245, 254 (2012). Asimismo, la sentencia declaratoria podrá "ser en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y el vigor de las sentencias o resoluciones definitivas".

122.    Regla 59.1 de Procedimiento Civil, supra, R. 59.1. Esta goza de idéntica trascendencia que las demás sentencias emitidas por los Tribunales.

123.    Por otra parte, el Tribunal Supremo ha expresado que la sentencia declaratoria es "un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra el promovente". Beltrán Cintrón et al. v. ELA et al., 204 DPR 89, 109 (2020); Senado de PR v. ELA, 203 DPR 62, 71 (2019); Sánchez v. Secretario de Justicia, 157 DPR 360, 383- 384 (2002).

124.    De igual modo, el Tribunal Supremo ha reconocido la disponibilidad del mecanismo de la sentencia **declaratoria para atender planteamientos constitucionales**. Ello incluye reclamaciones relacionadas con la validez de disposiciones legales que potencialmente

tendrían un impacto futuro adverso en el solicitante de remedio declaratorio y/o controversias constitucionales justiciables por su recurrencia. Véase, por ejemplo, Comisión Asuntos de la Mujer v. Srio. de Justicia, 109 DPR 715, 721 (1980); Figueroa Ferrer v. ELA, 107 DPR 250, 256-57 (1978); Asoc. de Periodistas v. González, 127 DPR 704, 723–24 (1991).

125.    En virtud de lo anterior, se presenta la presente Sentencia Decretoria para encausar las violaciones constitucionales que la Presidenta de la Comisión causó al emitir esa ilegal orden de cese y desista, según se describe en ese recurso judicial.

## VI. SÚPLICA

EN MÉRITO DE LO EXPUESTO, se solicita muy respetuosamente de este Honorable Tribunal que:

(i)    Se dicte el interdicto preliminar y permanente solicitado.

(ii)    Se declare HA LUGAR la Demanda Jurada, declarando que:

●    La carta de cese y desista del 15 de agosto de 2025, emitida por la Presidenta de la Comisión con nulas y ultra vires por actuar de manera unilateral y en violación a la Ley 226.

●    La carta de cese y desista del 15 de agosto de 2025, emitida por la Presidenta de la Comisión con nulas y ultra vires por violar el Artículo 16 de la Ley 226.

●    La carta de cese y desista del 15 de agosto de 2025, emitida por la Presidenta de la Comisión, viola el Artículo 4 de la Ley 226, así como el principio fundamental e insoslayable de la discreción profesional de cada Práctico.

●    La carta de cese y desista del 15 de agosto de 2025, emitida por la Presidenta de la Comisión, viola la ley 226 y el derecho fundamental a la libre expresión de los demandantes al impedirles emitir comunicaciones, pretender cesuras previas y prohibirles comunicarse libremente con la industria marítima,

(iii)    Se dicte HA LUGAR la solicitud de Sentencia Declaratoria como el vehículo adecuado para encaminar cuestionamientos de naturaleza constitucional.

(iv)    Se emita a favor del demandante cualquier remedio no solicitado, pero que en Derecho proceda.

**CERTIFICO:** Haber presentado este escrito mediante el Sistema Unificado de Manejo y Administración de Casos (SUMAC), el cual provee notificación adecuada a los abogados y abogadas de récord, en conformidad con el ordenamiento procesal prevaleciente.

**RESPETUOSAMENTE SOMETIDO.**

En San Juan, Puerto Rico, el 21 de agosto de 2025.

f/Giancarlo Font García                    f/Luis Manuel Pavía Vidal
Giancarlo Font García                        Luis Manuel Pavía Vidal
Número ante el TSPR 10671                Número ante el TSPR 14805
gfont@drcprlaw.com                          pavialaw@gmail.com
Calle Coll y Toste 306                        Calle Coll y Toste 306
Urb. Baldrich                                    Urb. Baldrich
San Juan, PR 00918                           San Juan, PR 00918
(787) 622-6999

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

CAPT. JAKE ELMSTROM; CAPT. TOMAS BUSTO; CAPT. CARLOS E. RAMOS; CAPT. KENNETH DÍAZ; CAPT. RICHARD FLYNN; CAPT. CARLOS GUTIÉRREZ; CAPT. PATRICK LÓPEZ;

Demandantes

v.

COMISIÓN DE PRACTICAJE DE PUERTO RICO; LCDA. JESSICA ÑECO MORALES, EN SU CARÁCTER OFICIAL COMO PRESIDENTA INTERINA DE LA COMISIÓN DE PRACTICAJE;

Demandados

CIVIL NÚM:

SOBRE: DEMANDA; INTERDICTO PRELIMINAR Y PERMANENTE; SENTENCIA DECLARATORIA

**JURAMENTO**

Yo, Capitán Richard Flynn Caro, mayor de edad, Práctico licenciado, casado y vecino de Guaynabo, Puerto Rico, parte demandante en este pleito, bajo juramento declaro que he leído la Demanda Jurada; Solicitud de Injunction Preliminar y Permanente; y Sentencia Declaratoria y que, según mi mejor conocimiento, los hechos que se alegan en la misma son correctos.

_____
Richard Flynn Caro

Afidávit Núm. 2018

Jurado y suscrito ante mí por Richard Flynn Caro, de las circunstancias antes expresadas, a quien identifiqué mediante licencia de conducir número 7130486, en San Juan, Puerto Rico, a 21 de agosto de 2025.

_____
NOTARIO PÚBLICO





**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Sector San Juan

5 Calle La Puntilla
San Juan, PR 00901
Staff Symbol: s
Phone: (787) 729-2300
Email: Luis.J.Rodriguez@uscg.mil

16670
P 218-25
July 2, 2025

To Master, Owner, Agent, or Person in Charge:

**CAPTAIN OF THE PORT ORDER #218-25: ENERGOS PRINCESS (IMO # 9253715)**

By the authority of the Ports and Waterways Safety Act, 46 United States Code (U.S.C.) § 70002, and Title 33, Code of Federal Regulations (CFR), Part 160, vested in me as Captain of the Port (COTP), I hereby issue this order.

I have received an Advanced Notice of Arrival for the subject vessel. After review of your vessel's characteristics, and through consultation with local subject matter experts, it is clear the transit of your vessel through this waterway presents unique challenges for vessel navigation, requiring careful consideration of factors such as waterway current, vessel maneuvering capabilities, visibility, and wind. As such, I issue the following conditions:

1- Transits shall only take place between sunrise and sunset, and in the absence of any reduced visibility conditions.
2- Transit, docking, undocking, and shifting within the port shall only take place when prevailing sustained wind is less than 10 knots and gusts are less than 15 knots.
3- Transit, docking, undocking, and shifting within the port shall only take place with escort-rated tugs of sufficient horsepower and bollard pull to the satisfaction of the pilot.
4- Per 33 CFR §165.754, a safety zone will be enforced during the transit, docking, undocking, and while the vessel is moored. While moored, escort-rated tugs of sufficient horsepower and bollard pull must be readily crewed and available to adequately respond to any incident which may pose a hazard to the moored vessel during the transit of other vessel traffic through the safety zone.
5- Any uncoordinated breach of the safety zone must be immediately notified to the Sector San Juan Command Center on VHF-FM channels 16 or 22A.

### PENALTY FOR VIOLATING THIS ORDER

Title 46 USC § 70036 provides for penalties to any person who violates this order. The statute authorizes a maximum civil penalty in the amount of $117,608, as adjusted by the Federal Civil Penalties Inflation Adjustment Act, as amended, for each day of a continuing violation. A willful and knowing violation of this order may also be tried as a Class D felony.

### APPEAL OF THIS ORDER

Should you be aggrieved by this order, you may appeal under the procedures described in 33 CFR § 160.7, and request reconsideration orally or in writing to me directly. Should you be further aggrieved, appeal orally or in writing through this office to the Commander, Seventh Coast Guard District.

However, if the appeal is made orally, a written submission is required within five days of the oral presentation. While any request or appeal is pending, all provisions of this order remain in effect.

## COAST GUARD POINT OF CONTACT FOR THIS ORDER

All questions pertaining to this order may be directed to the Sector Command Center at 787-289-2044.

## TERMINATION OF THIS ORDER

This order will remain in effect until released by me in writing. The Sector Command Center will inform you when I have issued the release for this order.

Sincerely,

Digitally signed by
RODRIGUEZ.LUIS.J.11834709
37
Date: 2025.07.02 15:10:12
-04'00'

Luis J. Rodríguez
Captain, U.S. Coast Guard
Captain of the Port, San Juan

Received by: _____     Position: _____

Date: _____     Time: _____



**San Juan Bay**    **Pilots Corporation**

San Juan Puerto Rico

August 3, 2025

Dear Carlos Faris,

Thank you for your time last Thursday, July 31, 2025. We also thank Jose Rosario for his time and efforts in supporting your company's current operations and future plans.

We are reaching out to formally reaffirm our position and to document this communication for future reference. Given that nearly all individuals with whom we have previously interacted at New Fortress Energy are no longer involved in this project, we believe it is important to summarize key aspects of our prior discussions and operational experience to date. At the same time, we wish to reiterate our ongoing commitment to supporting these operations, provided that formal agreements are established among all responsible parties to ensure that any transit or berthing is conducted safely, lawfully, and in accordance with recognized industry standards.

### I.    Background

The San Juan Bay Pilots have been actively supporting New Fortress Energy (NFE) in the development of plans to expand LNG operations in San Juan Harbor. Given the complexities involved in maneuvering large vessels within a confined waterway, it has been imperative from the outset to conduct accurate, technical, and comprehensive feasibility studies. Since our initial engagement on May 16, 2023, we have offered detailed input and collaborated on key evaluations to ensure the necessary infrastructure, equipment, training, and contingency planning are in place to guarantee safety, efficiency, and operational reliability from a nautical standpoint.

As part of this effort, NFE retained several capable and experienced marine consultants. A validated simulator database for the harbor was developed; ship models were created; and several hundred simulator runs were conducted in Houston to identify operational limits and required support measures. These efforts have greatly improved our understanding of the safety margins and maneuvering needs required to execute LNG vessel transits and berthing operations in this port. Additional studies were completed to assess vessel interaction, hydrodynamic effects on adjacent facilities, and the risks posed by shallow areas.

 

**San Juan Bay** **Pilots Corporation**

## II. Outstanding Commitments

From our perspective as harbor pilots, and based on the extensive collaborative process that took place, the following items were to be in place prior to the first call of the proposed LNG vessels. However, several of these commitments remain outstanding, and others—such as the presence of specific tug assets—appear to be in the process of being removed or replaced in a manner that does not align with the original project agreement.

Buoy Relocation: Upon completion of the Army Terminal Channel dredging, several buoys were to be repositioned appropriately. This has been completed but the official Navigational Charts have not been updated to reflect new positions.

Navigational Ranges and Lighting: Modifications to range lights in the Army Terminal Channel remain pending. These include; Raising the 30870 Range Rear Light to ensure visibility when the Trailer Bridge barge is docked. Installing new Front and Rear Range Lights to support northbound LNG vessel transits on Pier 4 (approx. 356.4°). These improvements have not been completed.

Training and Equipment: Combined simulator training involving pilots and tug masters has been completed. Emergency ship handling training has also been conducted. Pilots have independently purchased standalone PPU systems, though sensor upgrades through USACE with NFEs support are still needed (RTK).

Environmental Limitations: Preliminary wind limits for LNG transits were established at 10 knots sustained, 15 knots gusts, measured using Caricoos, Airport Tower, and onboard sensors. The agreed-upon installation of a fixed anemometer in the southwest corner of Bahía de Puerto Nuevo is critical but has not been completed. Initial operations were also restricted to daylight hours, subject to future revision as operational familiarity increases.

Adequate tugboat assistance: The most critical component of the entire LNG operation is tugboat assistance. These large vessels present unique challenges due to their size, high windage profile, and the hydrodynamic forces acting on them—especially within the confined and complex parts of the bay. Their maneuverability in such conditions is heavily dependent on properly rated escort tugs, as these vessels are not self-sufficient within harbor limits.

## III. Withdrawal of required Tug Boats

During a scheduled debrief aboard the Chouest vessels, we were informed that the four tugboats currently supporting NFE's LNG operations are expected to be withdrawn toward the end of this month. These are not ordinary tugs. They are four sister vessels—escort-rated, each capable of delivering 80 metric tons of bollard pull—with identical capabilities and handling characteristics. Their uniformity is vital, allowing each tug to operate safely

 

**San Juan Bay**          **Pilots Corporation**

and effectively in any of their assigned positions, providing the consistency and responsiveness required to support both planned maneuvers and emergency contingencies.

These vessels were introduced only after extensive simulation studies confirmed their necessity. Their proven performance so far—both during standard transits and in demanding, unplanned scenarios—has made clear that this tug spread is an indispensable component of the LNG maneuvering framework for San Juan Harbor.

### IV.    Concerns About Decision-Making Oversight

The anticipated departure of the designated tugboats raises significant concerns—not only regarding the availability of equipment, but also with respect to how critical operational decisions are now being managed. We are increasingly alarmed by a discernible shift in New Fortress Energy's approach to technical oversight, wherein key responsibilities appear to be moving away from active maritime professionals with direct ship-handling and navigational duties. Instead, these matters are being delegated to a local company with limited understanding, whose input is based primarily on the past experience of retired pilots and others who no longer bear any legal or operational responsibility should an incident occur. This trend undermines the fundamental role of harbor pilots in the United States and calls into question the integrity and accountability of the decision-making process in high-risk operations.

While PR Maritime Group may offer value in administrative or logistical coordination, the planning and execution of complex LNG vessel maneuvers is not an administrative task. Nautical operations, navigation, and especially ship handling in confined waters require deep, specialized knowledge and real-world experience. That expertise resides with the ship masters and the harbor pilots—two entities who actually share direct responsibility for the safe conduct of vessel movements. Pilots support the ship masters in meeting their obligations by providing the local knowledge, harbor-specific expertise, and technical judgment required to assess and mitigate risks in real time. The proposal to replace a proven tug configuration with less capable equipment—while sidelining the professionals best qualified to guide and oversee these decisions—is unacceptable. We are concerned that this approach may result in undue pressure on the pilots to proceed under unsafe or substandard conditions, while individuals brought in to assist external consultants—who lack operational context and direct accountability—attempt to dictate the terms of navigation.

Since New Fortress Energy appears to have delegated most technical discussions to PR Maritime Group—an entity we understand may be acting in a consulting capacity on NFE's behalf—this approach is fundamentally flawed given the complexity and risk profile of the project. It raises serious concerns regarding accountability, potential conflicts of interest, and the adequacy of technical decision-making in matters that bear directly on navigational

 

**San Juan Bay** **Pilots Corporation**

safety and regulatory compliance. New Fortress Energy, as the party chartering the vessels, must be fully engaged in the technical aspects of the operation and must retain direct involvement in all planning and decision-making. The marine operations function of the company may delegate tasks—but it cannot delegate ultimate responsibility.

### V.    Requirement for Direct Involvement

As previously stated—but regrettably not observed during Thursday's meeting—<u>we require that New Fortress Energy's senior marine operations leadership participate directly in all discussions moving forward.</u> Additionally, <u>we expect that vessel Masters and/or Ship Owners' Representatives be included in all future planning and coordination meetings with the San Juan Bay Pilots.</u> The safety, reliability, and continuity of LNG operations in San Juan are not merely aspects of project management; they constitute a shared responsibility. Ensuring that qualified and accountable parties are present at the table is essential to maintaining the level of safety, professionalism, and operational integrity that both this port and this cargo demand.

### VI.    Energos Maria and Princess Transits

On Wednesday July 9, 2025, we conducted the outbound transit of the Energos Maria. On Thursday, we attempted to bring in the Energos Princess in accordance with the official pilotage service request. However, due to high winds exceeding the agreed-upon operational limits, the maneuver could not proceed safely. It is worth noting that the Energos Princess had been holding north of Puerto Rico for several days. We assume she was awaiting the departure of the Maria, and until that point, there had been no indication of urgency or need to prioritize the vessel exchange.  Suddenly, however, we were told that Puerto Rico was facing an "energy emergency," and that bringing the Princess in had become a matter of immediate priority.

For context, pilots accept service requests up to 30 days in advance, strictly on a first-come, first-served basis. In the absence of a harbor master or a state-managed traffic control system, we do not assign priority to any vessel or cargo. Harbor pilots operate independently and, by design, do not act under commercial pressure or political influence. This independence is the foundation of the profession and the reason why pilotage is a compulsory service under both Federal and Commonwealth law—to ensure that navigational decisions are made solely in the interest of safety. On Saturday July 14, 2025, with weather conditions aligning with those identified during simulations and within the parameters previously agreed upon, we proceeded to bring in the Energos Princess per the service request. The maneuver began at 0800. However, once the vessel had passed the abort point and was well inside the harbor, we received the unprecedented and unexplained instruction to cancel the maneuver and not bring the ship in.

 

# San Juan Bay    Pilots Corporation

At that stage, there was no way to abort safely under normal procedures. The pilots immediately executed the emergency contingency maneuver that had been specifically developed, tested, and approved for such scenarios. The vessel was stopped in the cruise ship turning basin near the U.S. Coast Guard station—the only location capable of accommodating her size and draft—then safely turned and returned to sea. This maneuver, which involves significant complexity and risk, is typically reserved for true emergencies such as propulsion failure or a major security threat. That it was carried out without incident is a direct result of the pilots' training, the preparedness of the tug teams, and the integrity of the simulation-based planning process that underpins this operation.

An excerpt from the incident report is included for reference:

0754 – POB
0815 – call from LAC Boarding agent Jorge Seda informing that at request of NFE, service must be cancelled.
0816 – Pilots Busto & Ramos were informed by dispatch. They asked San Juan Port Control if they knew anything about the cancellation. Rosvaldo Velazquez said no, and that the PRPA Director is monitoring the situation since 0430 in the morning. Subsequently, Pilots told port control that they're aborting the maneuver and turning around.
0822 – LAC Boarding agent Roberto Perez called also informing dispatch of the cancellation. He stated that they just received orders from NFE to cancel the service.
0831 – Email received from Jose Yordan informing cancellation at request of NFE.
0918 – Pilots disembarked.

## VII.    Request for Formal Response

To date, no explanation has been provided for the cancellation of this maneuver mid-transit. <u>We respectfully request a formal response.</u> The safe handling of LNG vessels in San Juan Harbor depends on adherence to established protocols, sound decision-making, and coordination among qualified professionals. These events are deeply concerning and must not be repeated.

## VIII.    Way Forward

It was our understanding that, despite prior warnings regarding the need to secure the appropriate support equipment—particularly given the limited availability of such assets throughout the duration of this project—we are now faced with what amounts to a critical impasse: the departure of the four assist tugs that had been contracted precisely to meet the operational and safety requirements previously identified.

We acknowledge the proposal to engage a new simulation facility, model the harbor, every vessel to be employed, and evaluate alternative tug configurations. <u>While we are committed</u>



**San Juan Bay**                    **Pilots Corporation**

to participating constructively in that process as time permits, it must be recognized that such work is both time-consuming and resource-intensive. In the interim, we will not compromise on the operational standards established through prior simulations and real-world experience. To ensure the integrity of the process, we will engage an independent consultant with recognized maritime simulation expertise to guarantee that maritime simulation industry standards are strictly followed—particularly since our prior experience in Houston closely mirrors the conditions and outcomes observed in San Juan.

Following our extensive discussions on Thursday, we wish to reiterate that, having conducted 12 live-maneuver exercises with these vessels in our bay, and based on the professional judgment and firsthand experience of seven of the San Juan Pilots, services will only be provided under the original operational parameters, as outlined below. We also note that several critical components required prior to the first transit as described above remain pending.

We respectfully acknowledge one dissenting opinion among our group. While we disagree with his approach and conclusions, we recognize his right to hold a differing professional perspective and wish him well.

Accordingly, we reaffirm the requirement for four escort-rated tugboats, ideally sister vessels, each capable of delivering 80 metric tons of bollard pull. Each tug operator must be trained and be able to carry out the designed maneuver in any of the predetermined positions until a new method is established and accepted per your proposal yesterday. Alternatively, two matched pairs of tugs with equivalent bollard pull and all having similar handling characteristics may be considered, provided they meet the same operational standards.

We remain committed to supporting New Fortress Energy's operations to the highest professional standard. As harbor pilots entrusted with the safe movement of commercial vessels in the Port of San Juan, our foremost responsibility is to protect life, property, the environment and the uninterrupted flow of commerce. We support the continued development of this project, provided that all necessary resources, protocols, and safeguards are fully respected and properly implemented.

We should aim to emulate the successful completion of similar LNG projects across the United States by building upon their operational lessons and safety benchmarks. However, we cannot continue to engage under conditions where established safety protocols are disregarded, pilots are subjected to inappropriate pressure, or maneuvering plans are abruptly altered mid-execution. These actions undermine the integrity of the process and create unacceptable risk.




**San Juan Bay** **Pilots Corporation**

<u>We urge all parties involved to treat this matter with the seriousness it warrants and to restore a collaborative, technically grounded decision-making process—one that includes all relevant stakeholders, respects the roles of regulatory authorities, and places safety above all other considerations.</u> With these conditions in place, we are confident that the desired outcomes can be achieved—safely, effectively, continually, and in the best interest of the Port of San Juan and the people of Puerto Rico.

Sincerely,

San Juan Bay Pilots

Endorsed by Captains:

Kenneth Diaz

Carlos Gutierrez

Richard Flynn

Patrick Lopez

Carlos Ramos

Tomas Busto

Jake Elmstrom


CC:

US Coast Guard Captain of the Port

Comision de Practicaje de Puerto Rico

Captain Jesee Renkins, New Fortress Energy

Masters of the Energos Princes and Energos Maria

Martí Rosario Carpio <jrosario@pr-mar.com>, zahmed@newfortressenergy.com, "Collazo, Alejandro M CDR USCG SEC SAN JUAN (USA)" <Alejandro.M.Collazo@uscg.mil>, Julian Villalon <jvillalon@newfortressenergy.com>, Asad Imran <aimran@newfortressenergy.com>, Carlos Faris <cfaris@newfortressenergy.com>, Jesse Reijskens <jreijskens@newfortressenergy.com>, fgaffa@newfortressenergy.com

---- Forwarded Message -----
**From:** Roberto Perez <roberto.perez@ayacol.com>
**To:** request services <request_services@yahoo.com>
**Cc:** Agencia San Juan <agencysj@yacol.com>
**Sent:** Thursday, August 14, 2025 at 11:51:47 AM GMT-4
**Subject:** Fwd: ENERGOS MARIA OUT 08/16 POB 0900hrs // SAN JUAN

Good afternoon FYI on below.
Thanks.

Sent from my iPhone

Begin forwarded message:

> **From:** Roberto Perez <roberto.perez@ayacol.com>
> **Date:** August 14, 2025 at 10:35:56 AM EDT
> **To:** request services <request_services@yahoo.com>
> **Cc:** Agencia San Juan <agencysj@yacol.com>
> **Subject: ENERGOS MARIA OUT 08/16 POB 0900hrs // SAN JUAN**

Good morning SJBP,

Please be advised that Energos Maria's outbound will be held by Moran & Mcallister.

Please see below for updating Tidalis.

Thanks in advance.

Regards,

ROBERTO PEREZ

Agency Representative

LAAC-Agency/ San Juan Office

Mobile Phone: 939-341-9176

Tel: 787-792-9000 Ext-3403/02/01

Fax:787-793-3575

Agency General email:agencysj@yacol.com

Individual email:roberto.perez@ayacol.com

www.ayacol.com

NO LOAD IS TOO HEAVY

*Luis A. Ayala Colón Sucrs., Inc.*





**Carlos Ramos <cramos19999@gmail.com>**

---

## Fw: ENERGOS MARIA OUT 08/16 POB 0900hrs // SAN JUAN

**daniel montes** <capitanmontes@yahoo.com>                          Thu, Aug 14, 2025 at 12:00 PM
To: request services <request_services@yahoo.com>
Cc: Jake Elmstrom <rinconjake@hotmail.com>, Patrick Lopez <lofish71@yahoo.com>, Richard Flynn
<rfcmarine@yahoo.com>, Tomas Busto <tomasbustoalvarez@gmail.com>, Carlos Ramos <cramos@sanjuanbaypilots.com>,
Kenny Diaz <kdpilot1@gmail.com>, Carlos Gutierrez <capt.carlos.gutierrez@gmail.com>, eberwein@sanjuanbaypilots.com

> Ok
> Daniel Montes
> Sent from my iPhone
>
>> On Aug 14, 2025, at 11:53, request services <request_services@yahoo.com> wrote:
>>
>>
>>
>>
>> ----- Forwarded Message -----
>> **From:** Roberto Perez <roberto.perez@ayacol.com>
>> **To:** request services <request_services@yahoo.com>
>> **Cc:** Agencia San Juan <agencysj@ayacol.com>
>> **Sent:** Thursday, August 14, 2025 at 11:51:47 AM GMT-4
>> **Subject:** Fwd: ENERGOS MARIA OUT 08/16 POB 0900hrs // SAN JUAN
>>
>> Good afternoon FYI on below.
>> Thanks.
>>
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** Roberto Perez <roberto.perez@ayacol.com>
>>> **Date:** August 14, 2025 at 10:35:56 AM EDT
>>> **To:** request services <request_services@yahoo.com>
>>> **Cc:** Agencia San Juan <agencysj@ayacol.com>
>>> **Subject: ENERGOS MARIA OUT 08/16 POB 0900hrs // SAN JUAN**
>>>
>>>
>>> Good morning SJBP,
>>>
>>>
>>> Please be advised that Energos Maria's outbound will be held by Moran & Mcallister.
>>>
>>>
>>> Please see below for updating Tidalis.
>>>
>>>
>>> Thanks in advance.

Regards,

ROBERTO PEREZ

Agency Representative

LAAC-Agency/ San Juan Office

Mobile Phone: 939-341-9176

Tel: 787-792-9000 Ext-3403/02/01

Fax:787-793-3575

Agency General email:agencysj@ayacol.com

Individual email:roberto.perez@ayacol.com

<image001.png>

<image002.gif>

---

**From:** Roberto Perez <roberto.perez@ayacol.com>
**Sent:** Thursday, August 14, 2025 10:33 AM
**To:** San Juan Ops <sanjuanops@morantug.com>; Mcallister <dispatchpr@mcallistertowing.com>
**Cc:** Agencia San Juan <agencysj@ayacol.com>; Alejandro Vazquez <avazquez@newfortressenergy.com>; Carlos Faris <cfaris@newfortressenergy.com>; Agency SJ (gmail) <agencysj@gmail.com>; Agency Ponce <AgencyPonce@ayacol.com>; Armando Torres <atmaritimesupply@gmail.com>; edmontalvoatmaritimesupply@gmail.com; Michael Budesa <mbudesa@newfortressenergy.com>; Maria Rosa-Soto <Mrsoto@nortonlilly.com>; Energos Maria Master <energosmaria@nmm.stena.com>
**Subject:** ENERGOS MARIA OUT 08/16 POB 0900hrs // SAN JUAN

Good afternoon @'MORANTUGPR' ( Maxwell, Eleanor ) @Mcallister (Audrey, Timothy),

Please see below POB for outbound 08/16 0900hrs.

Thanks in advance.

Please be advised that your good vessel's outbound set for 08/16 0900hrs.

Vessel: ENERGOS MARIA

Movement From: Puerto Nuevo A/B NFE

To: SEA

Requested Service Time: Aug 16, 2025 09:00 Approved Service Time: Aug 16, 2025 09:00 Approval Status: Approved Approval Remarks: N/A Reviewed By: Ignacio Rey

8/18/25, 8:21 AM                    Gmail - Bienvenido/a Our Note 85797/25/ SAR
SJ2025CV07446, 21/08/2025 04:02 pm, Entrada Núm. 1 Página 3 de 4
Case 3:25-cv-01462-SCC    Document 1-5    Filed 09/19/25    Page 36 of 48

Please login to Agent portal to get details.


---

This message was auto-generated on 8/8/2025 9:54:22 AM by MARS (WIN-QTMLIKV29V8) server.




Keep in touch.




Regards,

ROBERTO PEREZ

Agency Representative

LAAC-Agency/ San Juan Office

Mobile Phone: 939-341-9176

Tel: 787-792-9000 Ext-3403/02/01

Fax:787-793-3575

Agency General email:agencysj@ayacol.com

Individual email:roberto.perez@ayacol.com

<image001.png>

<image002.gif>

CONFIDENTIALITY AND SECURITY NOTICE

This message is covered by the Electronic Communications Privacy Act 18 U.S.C. 2510-2521, is confidential and legally privileged. In addition, the information contained in this E-mail message is protected from disclosure under the Gramm-Leach-Bliley Act. If your are not the intended recipient, you should delete this message immediately and are hereby notified that any disclosure, copying, or distribution of this message and/or its attachments, or the taking of any action based on it, is STRICTLY PROHIBITED as noted above. This electronic commmication is covered by the Electronic Communications Privacy Act of 1986, codified at 18 U.S.C. §§ 1367, 2510-2521, 2701-2710, 3121-3126. Also, see: http://www.ftc.gov/privacy/gltact/glbsub1.htm Please note that any opinions expressed in this e-mail are those of the author personally and not your business name who do not accept responsibility for the contents of the message. EDT (Electronic Document Transmissions): Is and shall be deemed valid and enforceable in respect of any provisions of this Contract / E-mail. As applicable, this agreement shall be: 1. Incorporate U.S. Public Law 106-229, "Electronic Signatures in Global and National Commerce Act" or such other applicable law conforming to the UNCITRAL Model Law on Electronic Signatures (2001) 2. ELECTRONIC COMMERCE AGREEMENT (ECE/TRADE/257, Geneva, May 2000) adopted by the United Nations Centre for Trade Facilitation and Electronic Business (UN/CEFACT). 3. EDT documents shall be subject to European Community Directive No. 95/46/EEC, as applicable. Either Party may request hard copy of any document that has been previously transmitted by electronic means provided however, that any such request shall in no manner delay the parties from performing their respective obligations and duties under EDT instruments.

<image001.png>
<image002.gif>

Case 3:25-cv-01462-SCC    Document 25-2    Filed 08/27/25    Page 37 of 48

**From:** Captain Tomás Busto, Captain Kenneth Diaz, Captain Jake Elmstrom, Captain Richard Flynn, Captain Carlos Gutierrez, Captain Patrick Lopez, Captain Carlos Ramos

**To:** Captain Daniel Montes
**Date:** August 15, 2025

Subject: URGENT AND FORMAL NOTICE – Imminent Deviation from Established Large LNG Tanker Minimum Standards

Dear Captain Montes:

This letter serves as a formal notice and warning regarding your stated intention to maneuver the **large liquified natural gas** ("LNG") **tanker** Energos María in San Juan Harbor on Saturday, August 16, 2025, using fewer escort-rated tugs than the operational standard adopted by all other members of the San Juan Bay pilot group. This standard, established through collective professional judgment, is entirely consistent with recognized national best practices for large LNG tanker escort requirements at U.S. ports. As you are aware, this situation was notified in our August 3, 2025, communication to New Fortress Energy ("NFE") and other stakeholders (Addendum #1).

You have indicated acceptance of a tug spread underexpectedly submitted by the vessel's agent, Ayala Colon, a person or entity neither qualified to determine safe tug requirements nor responsible for the safe nautical conduct of the operation. The proposed configuration includes only three escort-rated tugs, directly conflicting with the agreed standard of four escort-rated tugs, ideally sister vessels or with at least similar characteristics, each capable of delivering 80 metric tons of bollard pull.

The standard to maneuver the large LNG tanker Energos María in San Juan was established and agreed upon after a thorough two-year technical process involving all pilots, including yourself. The process included the following necessary and time-consuming activities and studies:

• Hundreds of validated simulator runs using the San Juan Harbor database and vessel models.
• Hydrodynamic studies on vessel interaction and shallow-water effects.
• Live-maneuver exercises with large LNG tankers under varied environmental conditions, failures, and unforeseen circumstances.
• Demonstrated emergency response capability in high-risk scenarios.

The above was deemed necessary by all parties, including yourself, taking into consideration the dimensions of the harbor and the vessels, and the hazardous product being carried in these vessels. You participated in and contributed to these studies and

evaluations that led to the development of this standard, providing feedback throughout. At no time during development, early implementation, or the first dozen real-life maneuvers did you express any objection. All these maneuvers, including those where you were present, employed the agreed-upon methodology with trained personnel and four escort-rated tugs specifically brought for NFE's large LNG operations. Only in recent weeks, specifically during a meeting with NFE and their consultants, PR Maritime, have you expressed unwillingness to adhere to the standard, despite no change in operational risk or resources. At no time did you express in what scientific studies, experience, or simulations you have based your decision to disregard the agreed-upon standard.

You have personally used these tugs for every large LNG tanker maneuver to date, employing all four exactly as designed, and they have in no way restricted your ability to conduct your maneuvers as you see fit. On the contrary, their availability has given you and all of us additional capability and redundancy, advantages you have fully benefited from, and they remain unquestionably more capable than any other tugs in San Juan Harbor.

Even if you consider yourself capable of conducting this complex and risky operation without the necessary scientific data and without following the proven procedures in this and other jurisdictions, there is no reasonable justification for unilaterally agreeing to a configuration that disregards years of preparation and the opinions and experience of **all other San Juan Bay pilots**. Your unexplained, actions will deliberately set the stage for the removal of the four escort-rated tugs that other pilots require to meet the agreed standard. With nothing to gain and nothing to lose, why work against the consensus of all of your colleagues, the established standard, and the clear weight of evidence? The answer remains difficult to understand.

The majority of pilots have verifiable, validated data from simulation and have successfully completed over a dozen LNG maneuvers — supporting the current standard. You have no equivalent data showing that the reduced tug spread you intend to use can meet the same safety margins. The most recent NFE/PR Maritime proposal to run new simulations with the Moran and McAllister tugs you've accepted has not been pursued; we suspect NFE shelved it, although we agreed to participate as requested by Mr. Rosario with Mr. Faris on behalf of NFE.

No objective validation exists for this configuration, which would operate within margins already exceeding PIANC guidelines. Testing such a configuration in real-life operations is unsafe, professionally unacceptable, and precisely the type of experimentation standards of care are designed to prevent, particularly with approaching adverse weather from the outer bands of an incoming hurricane.

Additionally, even if the tugboats met the agreed-upon standards, the tug captains on the Moran and McAllister vessels have not been trained in the maneuvering methodology specifically designed for these LNG vessels — training tailored to San Juan Harbor's confined waterways, heavy reliance on tug assistance, and complex hydrodynamic conditions. These measures were part of the mitigation required to gain federal agency support. Using untrained crews further reduces safety margins. The fact that NFE is also pursuing increased wind limits for these transits is in direct conflict with reducing tug capability.

By proceeding with fewer than the agreed number of escort-rated tugs, you are:

1.    Rejecting the collective professional judgment and expertise of seven colleagues who share your legal responsibility for safe navigation.

2.    Departing from a standard documented, validated, and successfully implemented in both simulation and live operations, consistent with national and international LNG practices.

3.    Introducing avoidable risks to life, property, the environment, and the reputation of this pilot group.

4.    Placing the profession, tug crews, and the public in a vulnerable position in the event of an incident or channel blockage.

5.    Weakening our ability to insist on essential safeguards in future negotiations, eroding our authority as subject-matter experts, and setting a precedent for unsafe commercial concessions.

6.    Disregarding the positive effects of healthy competition among tug providers, which has raised nautical safety, improved crew performance, and supports the capability to safely handle the demand for larger vessels with the most appropriate tools available.

The engine failure and total loss of control experienced by the LNG tanker *TITAN UNIKUM* in close proximity to the Coast Guard Station in San Juan is proof that failures happen. That vessel is several times smaller than the LNG ships now transiting our harbor. Our duty is to ensure we can address such emergencies — something not properly evaluated with the tugs you intend to use.

While we respect and fully embrace each pilot's independence, willfully disregarding an evidence-based safety standard —one you helped shape and never opposed until now —weakens our ability to uphold critical safety measures and exposes all

pilots to greater political and commercial pressure to erode safeguards. Redundancy and support, even if rarely used, are precisely why compulsory pilotage exists. Large LNG vessel transits are a zero-failure mission.

We urge you to state in writing how you intend to conduct Saturday's outbound transit, given its deviation from the established standard. It is our professional duty to take preventive action whenever a colleague's planned actions create legitimate safety concerns.

Finally, we believe it is our duty to put on notice of this situation, and the risks involved, all pertinent entities and persons, including the Coast Guard, Comisión de Practicaje de Puerto Rico, the vessel master, and through him, the owners and underwriters. Under U.S. pilotage law, the pilot and master share responsibility for the vessel's safe navigation, and both may be held accountable for the consequences of unsafe decisions. Should the transit proceed despite these concerns, we will document the decision as a willful departure from the adopted standard and refer it to the relevant regulatory and oversight authorities. If necessary, we reserve the right to pursue all legal remedies available under applicable law to address the professional, operational, and safety risks created by such actions.

Respectfully,

Captain Tomás Busto
Captain Kenneth Diaz
Captain Jake Elmstrom
Captain Richard Flynn
Captain Carlos Gutierrez
Captain Patrick Lopez
Captain Carlos Ramos

Cc:

U.S. Coast Guard Captain of the Port - luis.j.rodriguez@uscg.mil
Comisión de Practicaje de Puerto Rico - compracticaje@prtc.net
New Fortress Energy – Marine Operations - cfaris@newfortressenergy.com
Patrick Schmidt, Energos Commercial Operations Manager: pschmidt@energosinfra.com
Alexander Mills, Northern Marine Management Superintendent: Alexander.Mills@Stena.com
Energos Maria: energosmaria@nmm.stena.com
Energos Princess: energosprincess@nmm.stena.com
Northern Marine Management Operations Team: nmmoperationsukfleetgroup7@stena.com
Energos Operations Team: EnergosOps@energosinfra.com



Office: 787-767-1030
Fax:  787-751-4068
Web: www.jgl.com

August 15, 2025

*VIA EMAIL*

Captain Tomás Busto, <u>tomasbustoalvarez@gmail.com</u>
Captain Kenneth Diaz, <u>kdpilot1@gmail.com</u>
Captain Jake Elmstrom, <u>rinconjake@hotmail.com</u>
Captain Richard Flynn, <u>rfcmarine@yahoo.com</u>
Captain Carlos Gutierrez, <u>capt.carlos.gutierrez@gmail.com</u>
Captain Patrick Lopez, <u>lofish71@yahoo.com</u>
Captain Carlos Ramos, <u>cramos@sanjuanbaypilots.com</u>

**RE:    Objection to "Urgent and Formal Notice Letter – Imminent Deviation from Established Large LNG anker Minimum Standards"**

Dear Captains:

Our law firm represents McAllister Towing and Transportation Company, Inc., Puerto Rico Branch (McAllister Towing). We are in receipt of your letter sent earlier this afternoon concerning the planned August 16, 2025, maneuver of the LNG tanker, Energos María. Although the letter was not addressed to us, it contains assertions and demands that directly affect our operations and contractual relationships, and we therefore find it necessary to respond.

McAllister Towing's participation in harbor operations is guided by applicable federal and Puerto Rico laws, regulations, and the terms of lawful directives issued by competent regulatory authorities. However, we must forcefully object to any attempt to impose operational requirements, such as a minimum tug configuration, as a binding standard of general applicability absent adoption through a valid regulatory process. The tug configuration described in your letter appears to be the product of an agreement among certain pilots, reached outside of any formal rulemaking or regulatory proceeding.

Under both United States and Puerto Rico law, operational requirements of general applicability that affect multiple parties, including tug operators, vessel owners, and pilots, must be promulgated in accordance with established procedures, including public notice, opportunity for comment, and review by the appropriate governmental body, in this case, the United States Coast Guard or the Puerto Rico Pilotage Commission. Attempting to enforce such requirements without compliance with those procedures exceeds the authority granted to individual pilots or pilot associations under the Puerto Rico Pilotage Commission's enabling act (Law 226 of August 12, 1999, as amended), and raises concerns under applicable competition and maritime laws.

Our position is not to substitute our operational judgment for that of the duly empowered regulators, but to ensure that any binding standards affecting our operations are enacted lawfully, transparently, and in a manner that affords all affected stakeholders, including tug operators, an opportunity to be heard. Until such a standard is formally adopted through the proper regulatory channels, McAllister Towing will continue to operate in compliance with the directives of the vessel's master and the duly authorized pilot for the specific transit, consistent with applicable safety regulations.

Accordingly, McAllister Towing hereby demands that you immediately cease and desist from any further attempts, whether through correspondence, operational directives, or communications to third parties, to impose, enforce, or represent as a rule of general applicability any tug configuration or other operational requirement that has not been formally adopted through the lawful regulatory process. We reserve all rights and remedies available under applicable federal and Puerto Rico law to address any actions that interfere with our lawful operations or contractual relationships.

Mcallister Towing remains committed to safe navigation in San Juan Harbor and to cooperating fully with all stakeholders, including the pilotage community and regulatory authorities, to address safety concerns within the framework of lawful and transparent regulation.

Respectfully,

Jorge F. Blasini

Andrés F. Picó

cc.  <u>Via Electronic Mail to</u>:
    U.S. Coast Guard Captain of the Port - luis.j.rodriguez@uscg.mil
    Comisión de Practicaje de Puerto Rico - compracticaje@prtc.net
    Captain Javier Figueroa, Presidente, Comisión de Practicaje de Puerto Rico - javierf@morantug.com
    New Fortress Energy – Marine Operations - cfaris@newfortressenergy.com
    Patrick Schmidt, Energos Commercial Operations Manager: pschmidt@energosinfra.com
    Alexander Mills, Northern Marine Management Superintendent: Alexander.Mills@Stena.com
    Energos Maria: energosmaria@nmm.stena.com
    Energos Princess: energosprincess@nmm.stena.com
    Northern Marine Management Operations Team: nmmoperationsukfleetgroup7@stena.com
    Energos Operations Team: EnergosOps@energosinfra.com
    Captain Daniel Montes: capitanmontes@yahoo.com
    Brian Buckley McAllister, President McAllister Towing  buck@mcallistertowing.com
    Robert Hughes, Chief Commercial Officer  rhughes@mcallistertowing.com
    Jaime Santiago VicePresident-General Manager McAllister Towing Puerto Rico Branch jsantiago@mcallistertowing.com)



**COMISION DE PRACTICAJE DE PUERTO RICO**

---

**VIA CORREO ELECTRONICO**
**COMISIÓN DE PRÁCTICAJE DE PUERTO RICO**


San Juan, Puerto Rico
15 de agosto de 2025

**Asunto:** Orden de Cese y Desista – Comunicaciones no autorizadas y nulidad de efectos


A la comunidad marítima, agencias reguladoras y partes interesadas:


La Comisión de Practicaje de Puerto Rico, en virtud de la Ley Núm. 226-1999 y la Ley Núm. 38-2017, notifica que ha recibido una comunicación fechada el 15 de agosto de 2025, suscrita por varios prácticos licenciados para el Puerto de San Juan, dirigida al Capitán Daniel Montes y distribuida a múltiples entidades y personas ajenas a esta Comisión. Dicha comunicación contiene señalamientos operacionales, imposiciones de estándares y condicionamientos de servicio sin la debida autorización de la Comisión, constituyendo actuaciones que exceden las facultades conferidas por ley.

Se advierte a toda la comunidad marítima que cualquier comunicación de esta índole, emitida por prácticos de San Juan de manera individual o colectiva, sea o no bajo una asociación reconocida, y que no haya sido previamente autorizada por la Comisión, carece de reconocimiento oficial y debe considerarse nula y sin efecto. Toda comunicación similar deberá remitirse de inmediato a la Comisión para su evaluación y determinación conforme al debido proceso de ley.

En el presente caso, la carta del 15 de agosto de 2025 será referida al Departamento de Justicia de Puerto Rico para investigación y determinación de posibles acciones legales o penales por constituir interferencia e influencia indebida hacia un servidor público y contratista independiente (Capitán Daniel Montes). Este tipo de actuación, al condicionar o intentar regular las decisiones de un contratista independiente y servidor público, priva de forma ilegal la prestación de servicios de practicaje, en contravención de la Ley 226 y demás disposiciones legales aplicables.

Adicionalmente, se advierte que dirigir este tipo de comunicaciones a compañías navieras, agentes, armadores, aseguradores u otros entes externos, ejerciendo presiones indebidas o generando temor colectivo mediante imposiciones operacionales no

---

autorizadas, constituye una usurpación de funciones regulatorias que corresponden exclusivamente a esta Comisión. Tales actos, además, podrían implicar interferencia con el comercio internacional e interestatal, en violación de la cláusula de comercio de la Constitución de los Estados Unidos (Art. I, Sec. 8, cl. 3), conforme a jurisprudencia aplicable, incluyendo Trailer Marine Transport Corp. v. Rivera Vázquez, 977 F.2d 1 (1st Cir. 1992).

Estas actuaciones representan la imposición de directrices operacionales de facto y no de jure, sin haber cumplido con el procedimiento reglamentario requerido por la Ley 38-2017 (LPAU) y sin autorización de la Comisión, lo que ha sido objeto de pronunciamientos judiciales que prohíben a los prácticos legislar o reglamentar sin el debido proceso.

En atención a la política pública establecida por la Honorable Gobernadora de Puerto Rico, Jennifer González Colón, mediante comunicación oficial sobre la crisis energética, el Gobierno ha ordenado facilitar y no obstaculizar el manejo y operación de embarcaciones de gas natural licuado esenciales para el sistema energético de Puerto Rico. Cualquier acción que retrase, condicione o impida dichas operaciones sin la autorización de la Comisión y del Gobierno de Puerto Rico contraviene esta política pública y pone en riesgo la seguridad energética de la Isla.

Se recuerda que la Comisión de Practicaje de Puerto Rico es el único ente regulador de practicaje en la jurisdicción, según lo dispuesto en el Artículo 5 de la Ley 226-1999, con facultades para autorizar, reglamentar, supervisar e imponer sanciones sobre el practicaje. Los prácticos licenciados por esta Comisión pueden organizarse en asociaciones según el Artículo 24(a) de la Ley 226; sin embargo, dichas asociaciones no pueden asumir funciones regulatorias ni emitir comunicaciones que condicionen la prestación de servicios de practicaje sin autorización expresa de la Comisión.

**Fundamento legal:**

1. Ley Núm. 226-1999, Artículos 5, 16 y 24(a).

2. Ley Núm. 38-2017 (LPAU), Artículo 3.17 – Medidas adjudicativas inmediatas ante peligro inminente para la salud, seguridad o bienestar público.

3. Política pública del Gobierno de Puerto Rico sobre la crisis energética, que ordena facilitar la operación de embarcaciones de gas natural licuado esenciales para el sistema energético.

4. Cláusula de comercio de la Constitución de los Estados Unidos (Art. I, Sec. 8, cl. 3) y jurisprudencia aplicable (Trailer Marine Transport Corp. v. Rivera Vázquez, 977 F.2d 1 (1st Cir. 1992)).

Por tanto, se ordena a los prácticos firmantes de la carta de fecha 15 de agosto de 2025 el cese y desista inmediato de emitir cualquier comunicación de índole similar sin autorización de la Comisión. El incumplimiento de esta orden podrá ser referido al Departamento de Justicia para las acciones correspondientes.

Se invita a toda la comunidad marítima, agencias reguladoras, compañías navieras, agentes, armadores y demás partes interesadas a remitir a la Comisión cualquier comunicación recibida de los prácticos de San Juan de carácter individual o colectivo que contenga imposiciones operacionales o condicionamientos de servicio no autorizados, para su evaluación y determinación conforme al marco legal vigente.

Atentamente,

Lcda. Jessica Neco Morales
Presidenta
Comisión de Practicaje de Puerto Rico

**CC:**
Cap. Tomás Busto – tbusto@sanjuanbaypilots.com
Cap. Kenneth Díaz – kdpilot1@gmail.com
Cap. Jake Elmstrom – rinconjake@hotmail.com
Cap. Richard Flynn – rfcmarine@yahoo.com
Cap. Carlos Gutiérrez – capt.carlos.gutierrez@gmail.com
Cap. Patrick López – lofish71@yahoo.com
Cap. Carlos Ramos – cramos@sanjuanbaypilots.com
Cap. Daniel Montes – capitanmontes@yahoo.com
Norberto Negrón – norberto.negron@puertos.pr.gov
New Fortress Energy – Marine Operations – cfaris@newfortressenergy.com
Patrick Schmidt – Energos Commercial Operations Manager – pschmidt@energosinfra.com
Alexander Mills – Northern Marine Management Superintendent – Alexander.Mills@Stena.com
Energos Maria – energosmaria@nmm.stena.com

Energos Princess – energosprincess@nmm.stena.com
Northern Marine Management Operations Team –
nmmoperationsukfleetgroup7@stena.com
Energos Operations Team – EnergosOps@energosinfra.com

Forwarded message ---------
From: **Carlos Ramos** <cramos@sanjuanbaypilots.com>
Date: Fri, Aug 1, 2025 at 14:46
Subject: Solicitud de información
To: Javier Figueroa <javierf@morantug.com>
CC: Jessica Ñeco Morales <JNeco@prpa.pr.gov>, Medina, Hiram <Hiram.Medina@crowley.com>, Rafa Toro <rafa@toro-arsuaga.com>, Comision de Practicaje <compracticaje@prtc.net>

Saludos cordiales,

Mediante este correo electrónico, solicito la siguiente información, y que la misma se provea en o antes de **24 horas**:

1.    Que se me provea copia fiel y exacta de todas las notificaciones que, en virtud del Artículo (b) de la Ley 226, que el Secretario tiene que remitirle a los Comisionados para las reuniones regulares y especiales. Favor de proveer los reportes de los pasados 4 años.

2.    Que se me provea copia, fiel y exacta, de los reportes que exige el Artículo 8(d) de la Ley 226. La referida Ley exige que se deben notificar a los Comisionados, en o antes de 14 días calendario siguientes a cada reunión de la Comisión, una explicación cada decisión tomada en las reuniones. Favor de proveer los reportes de los pasados 4 años.

3.    Favor e enviarme la última versión vigente del reglamento interno de administración, según lo ordena el Artículo 8(a) de la Ley 226.

Finalmente, en una búsqueda en registro de reglamentos del Departamento de Estado, no surge que se haya adoptado un reglamento de funcionamiento interno como exige el Artículo 8(a). Por consiguiente, solicito que en un término de **cuarenta y ocho (48) horas** se realice una votación electrónica entre los Comisionados activos para ordenar que se inicie con tal reglamento.

La Comisión **lleva años** sin un reglamento que gobierne su funcionamiento interno. Esto es sumamente peligroso, ya que además de violar el lenguaje expreso de la Ley, provoca acciones que menoscaban las facultades de los Comisionados y fomentan acciones sin contar con el aval y las deliberaciones de todos los Comisionados (quienes fueron nombrados por un Gobernador y confirmados por el Senado de Puerto Rico).

Todo esto lacera un funcionamiento eficiente, saludable y óptimo de una entidad tan importante como lo es la Comisión de Practicaje de Puerto Rico.

Sinceramente,


Carlos Ramos
Comisionado