UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| CAPT. JAKE ELMSTROM; CAPT. TOMAS BUSTO; CAPT. CARLOS E. RAMOS; CAPT. KENNETH DÍAZ; CAPT. RICHARD FLYNN; CAPT. CARLOS GUTIÉRREZ, CAPT. PATRICK LÓPEZ SNA JUAN BAY PILOTS CORPORATION<br><br>Plaintiff<br><br>Vs.<br><br>NFENERGIA LLC, A NEW FORTRESS ENERGY SUBSIDIARY; PILOTAGE COMMISSION OF PUERTO RICO; ATTORNEY JESSICA ÑECO MORALES, IN HER OFFICIAL CAPACITY AS ACTING PRESIDENT OF THE PILOTAGE COMMISSION.<br><br>Defendants | CASE NO. 25-CV-01462<br><br>RE: COMPLAINT; PRELIMINARY AND PERMANENT INJUNCTION; DECLARATORY JUDGMENT<br><br>**IN ADMIRALTY** |

**OPINION AND ORDER**

**I.     Background**

The Plaintiffs, seven (7) licensed harbor pilots for the San Juan Bay Harbor and the San Juan Bay Pilots Corporation ("SJBP") seek a preliminary and permanent injunction against the defendants, NFEnegia, LLC ("NFE"), the Puerto Rico Pilotage Commission ("PRPC") and its Acting President, Jessica Ñeco, Esq.

The Plaintiffs allege that they were retained by NFE to transport liquified natural gas on LNG tankers to the San Juan Bay.  Initiallly, NFE  started using smaller ships of

approximately 30,000 cubic meters of LNG capacity, which the pilots would berth alongside a similarly sized vessel already moored at the berth. A transfer of cargo, commonly referred to as a ship-to-ship transfer, would then occur between the vessels. As demand for gas increased, and following the revocation of the initially granted United States Coast Guard ("USCG") permission for ship-to-ship transfer operations, NFE decided to employ vessels with an LNG capacity of approximately 145,000 cubic meters, which is almost five times larger than those previously used.

Because of their cargo and dimensions, including draft and sail area, these large LNG vessels require a very high degree of care, particularly when transiting narrow navigation channels due to wind forces on their sides and hydrodynamic interactions in those channels; and the complexity of the navigation channels in the San Juan Bay estuary, the hydrodynamic effects in narrow channels with vessels that exceed limits recommended by international authorities the parties decided to enter into a series of  computer-based simulations at the Seamen's Church Institute (SCI) in Houston, Texas, reproducing real-life scenarios with similar LNG vessels, tugs, and the conditions of San Juan Bay.  All 8 active pilots of the San Juan Bay Harbor, NFE's personnnell, and its consultant, among other persons participated in the simulations.  The simulations included propulsion failures, rudder failures, sudden changes in wind direction and intensity, human errors by the bridge team, tug operators, and even the loss of one or more assisting tugs. Several types of tugboats, with varying power and capabilities, were tested to determine the most suitable configuration. Moreover, all pilots visited Corpus Christi, Texas, and rode along with the local pilots to observe real-life transits on similar vessels firsthand.

The simulation process lated two years and resulted in an agreements between NFE and the San Juan Bay Pilots to safely tranport the LNG into and out of the San Juan bay.

Said agreement included the repositioning of buoys after dredging in the Army Terminal channel; modifications to aids to navigation and alignment lights, the use of two pilots aboard the LNG vessel for the maneuvers; he establishment of environmental operational parameters such as wind limits over which the maneuvers would not be executed; and the use of four 80-ton escort-rated tugs.  In accordance with the agreements reached, NFE contracted tugs from Edison Chouest Offshore (ECO) and brought four units with such specifications to Puerto Rico.

Since the arrival of the GASLOG SINGAPORE on March 20, 2025 when it first berthed in San Juan using the four tugs with the necessary characteristics to guarantee a safe maneuver all maneuvers of large LNG vessels have been carried out by all of the pilots using the same equipment and employing the planned maneuver, taking into account the risks identified in prior simulations and studies. Eighteen (18) such maneuvers were successfully completed, including an emergency maneuver on July 12, 2025, when in transit, NFE requested to cancel the berthing and to have the vessel removed from the port.

Earlier this year, press reports began to surface that NFE was experiencing financial difficulties.  Subsequently, San Juan pilots received information that NFE would not renew the contract with ECO, the owner of the four tugs with the required capacity to conduct the maneuvers safely, and instead would replace the four tugs provided by ECO with lower-capacity tugs.  At a meeting held on July 31, 2025, NFE and its consultants confirmed to several pilots NFE's intention to replace the existing ECO tugs with others of lesser capacity.

On August 3, 2025, seven (7) of the eight (8) San Juan Bay pilots sent an extensive letter to NFE and its consultants expressing their grave concern about the intention to use lower-capacity tugs for an operation of such high risk to public safety and in contravention of the agreed standards.

On August 14, 2025, at 10:35 a.m., the agent for the natural gas-carrying vessel notified the San Juan Bay pilots that they planned to use four replacement tugs belonging to two different towing companies for the departure of a gas vessel scheduled for August 16, 2025. The owners of the tugs are McAllister Towing and Moran Towing. None of the replacement tugs proposed by the vessel's agent possesses the 80-metric-ton bollard pull capacity specified in the designed maneuver, nor do they have equivalent maneuvering characteristics that would allow them to be interchanged in the predetermined positions. Furthermore, no simulations or studies were conducted to validate that such tugs would be capable of performing such maneuvers.

Captain Daniel Montes, one of the eight (8) pilots in San Juan Ba, who actively participated in the simulations and agreements with NFE, issued a brief response which suggested he was willing to perform the pilotage service with the replacement tugs. Subsequently, at 2:38 pm on August 15, 2025, seven (7) pilots sent a letter to the sole pilot willing to perform the service with the proposed tugs. Those pilots informed Captain Daniel Montes of their concerns regarding maritime safety, citing the use of lower-capacity equipment, a deviation from standards agreed upon after dozens of technical simulations, and the severe consequences that could occur in the event of an accident. That letter was forwarded to, among others, the Pilotage Commission and to all its Commissioners, the Coast Guard, and the vessel owners. That same day, at 5:42 p.m., a law firm representing McAllister Towing,[1] one of the owners of the tugs to be used on the August 16, 2025 maneuver, sent a cease-and-desist letter to the pilots because the letter addressed to Captain Daniel Montes allegedly interfered with its client's economic interests. That letter was copied to the Puerto Rico Pilotage Commission.

---

[1] That same law firm represents NFE, the Puerto Rico Pilotage Commission, its President, attorney Jessica Ñeco and the vessel agent in Puerto Rico, Ayala Colón.

About an hour and a half later, at 7:17 pm, Mr. Carlos Faris, Terminal Manager/FSO of New Fortress Energy, addressed a letter to the Puerto Rico Pilotage Commission requesting assistance to "ensure that the normal established procedures are followed..."

That same day, at 9:28 p.m., the President of the Commission, Jessica Ñeco, issued a cease-and-desist order (the "Order") to the seven (7) pilots who had expressed legitimate safety concerns to Captain Montes—the only pilot willing to perform the maneuver on Saturday, August 16, 2025. When issuing the Order, the President of the Commission did not convene the other two (2) Commissioners or notify them that any communication or order would be issued. In the cease-and-desist letter, the President prevents the pilots from communicating with the maritime industry and even threatens to refer them to the Puerto Rico Department of Justice. In other words, the President ordered the experts charged with safeguarding port safety to refrain from communicating with maritime entities and vessel owners they serve to alert them of potentially dangerous or inadequate situations.

On August 16, 2025, Captain Daniel Montes maneuvered the LNG vessel out of San Juan Bay. The maneuver was performed by only one (1) pilot using four tugs with lower capacity of 80 ton. The replacement tugs of Moran and McAllister assisted with the actual maneuver. However, the four ECO tug boats were standing by.

On September 15, 2025, at 12:00 a.m., the four ECO tug boats left Puerto Rico.

II. **Allegations subject to the Preliminary Injunction**

Plaintiffs allege that NFE breached the agreement with the San Juan Bay Pilots to safely tranport the LNG into and out of the San Juan bay; that replacing the ECO escort rated tug boats with the lower capacity tugs boats constitutes a violation of industry safety standards; and, that said action presents an imminent risk to life, property, and navigation within San Juan Harbor and the broader Puerto Rican economy at risk for its own gain.

The Plaintiffs also allege that the cease-and-desist order (the "Order") issued by the President of the Puerto Rico Harbor Pilot Commission, Jessica Ñeco, on August 15, 2025, to the seven plaintiffs without convening with the other Commissioners or notifying them is illegal. The plaintiffs allege that the Order prevents the pilots from communicating with the maritime industry and threatens to refer them to the Puerto Rico Department of Justice and that the President's actions constitute a de facto disciplinary action with serious safety consequences; and that said action was taken without due process of law.

## II.   Standard of Review

The framework for considering whether to grant or deny a preliminary injunction has four elements. The Court must gauge the movant's likelihood of success on the merits; must evaluate whether and to what extent the movant will suffer irreparable harm if injunctive relief is withheld; must calibrate the balance of hardships as between the parties; and must consider the effect, if any, that the issuance of an injunction (or the withholding of one) will have on the public interest. Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020).

## III.   Analysis

### A. Breach of Contract

The arguments for the plaintiffs in support of their request is that after two years of simulations in Texas, the parties reached to an agreement as to safely tranport the LNG into and out of the San Juan bay. The record show that there is an agreement between the parties. Said agreement included the use of of four 80-ton escort-rated tugs. However, NFE deployed from Puerto Rico the ECO tugs that were being used for said opertions, and intents to replace them with lower capacity tug boats from McCallister and Moran Towing.[2]  That clearly

---

[2] Mr. Javier Figueroa is one of the three actual commissioner of the PR Pilotage Commission. He is also the General Manager for Moran Towing, a company with finacial interest in taking over the business of ECO.

constitutes a breach of the agreement reached between the parties. Also, and pursuant to the testimonies of the pilots of the San Juan Bay, Capt. Tomás Busto and Capt. Carlos E. Morales, who have federal and state licenses to conduct said services, replacing the ECO escort rated tug boats with the lower capacity tugs boats constitutes a violation of industry safety standards; and, that said action presents an imminent risk to life, property, and navigation within San Juan Harbor and the broader Puerto Rican economy.

**B. Unilaterally and Usurped Powers of the President of the Pilotage Commision**

Law No. 226 of August 12, 1999, as amended, known as the Pilotage Commission Act of Puerto Rico ("Law 226") created the Pilotage Commission. Article 6 of Law 226 provides, in relevant part:

> (a) Composition.- The Commission shall be composed of seven (7) Commissioners, one of whom shall be its Chairperson, appointed by the Governor of Puerto Rico, with the advice and consent of the Senate. The members of the Commission shall be United States citizens, and residents of the Commonwealth of Puerto Rico. The Chairman of the Commission shall be its executive officer, and may designate an Associate Commissioner to act as chairman in his/her absence. The presiding Commissioner shall have the discretion to assign areas of work, in the adjudicative as well as the quasi legislative and/or operational areas of the agency, to one or more Commissioners. It shall be composed as follows:
>
> Two (2) of the members shall be licensed harbor pilots, who are actively practicing their profession; one to represent the San Juan Harbor Pilots, and the other, the harbor pilots of the Commonwealth, who are nominated by each harbor pilotage association; two (2) of whom shall be actively involved in their professional or business capacity in the shipping business, who are users of the pilotage services and are nominated by the Puerto Rico Shipowners Association; two (2) who are not or were involved financially interested or related to the pilotage profession, shipping business or maritime industry who shall represent the public interest; and one who represents the Government of Puerto Rico, who shall be a Ports Authority employee. For the purposes of this section, a 'user of the pilotage services' is any person who is an agent or representative of any person with a proprietary interest in a business that regularly employs harbor pilots with a Puerto Rico license, with the purpose of providing pilotage services, or any person who is a direct employee thereof. (Emphasis ours). (§ 361c Commissioners-Composition and term of office)

As the statutory text makes plain, the Commission is a collegial body of seven (7) Commissioners, and the President's role is limited to administrative tasks such as assigning areas of work—i.e., an administrative role concerning agenda and assignment of tasks. The President does not have the authority to act unilaterally; she is only one vote among equals. The President's unilateral action bypassed and usurped the powers of the other Commissioners, who have equal rights to vote, deliberate, and speak on Commission matters.

Articles 8(b) and 8(c) of Law 226 reiterate the collegial nature of the Commission:

> (b) The Commission shall hold one or more regular quarterly meetings in a convenient place in the Commonwealth, on the day or days selected by the Commission. The special meetings may be called by a majority of the Commissioners. The Secretary of the Commission shall deliver a notice of all the regular and special meetings to all the Commissioners, and also to any person who should be notified by law.
>
> (c) Within fourteen (14) calendar days following each meeting of the Commission, it shall issue a written report to each harbor pilot explaining any action taken by the Commission at the meeting, if any determination is made that affects pilotage conditions.

Section 16 of Law 226 enumerates conduct that may be sanctioned by the Commission (by a majority of Commissioners). Said article lists fourteen (14) types of conduct subject to discipline.

Article 16(b) provides, in relevant part:

> (b) When the Commission determines that a pilot or apprentice pilot committed any of the acts indicated in subsection (a) of this section, upon notice to the said pilot, giving him/her the opportunity to be heard.

The record shows that the cease and desit order was issued unilaterly by the Acting President of the Commission wihtout consuling with the other commisioners.  A cease and desist order is not a sanction that is not contemplated by Section 16.   Finally, the action taken was done without following the due process stated in Law 226.  Pursuant to the evidence received, the Court agrees

that an essential and operational duty of Pilots is to communicate with agents, the Commission, boat owners, regulatory agencies, other Pilots, and to make such safety warnings as they deem appropriate. The cease and desist order does not permit the pilots to fulfill their duties.

### IV.     Conclusions

The Court has heard the testimony of three witnesses and have studied the documents introduced into evidence. Based on the record, the Court issues the following Orders:

Pursuant to the simulations that latsted two years; the testimonies of the SJBH, Capt. Tomás Busto; Capt. Carlos E. Morales; and, the expert witness, Capt. Anne L. McIntyre that confirmed the allegations in the complaint (Docket No. 1) and amended complaint (Docket No. 14) NFE breached the agreement with the plaintiffs to safely transport liquified natural gas in LNG tankers into the San Juan bay. The agreed upon process between the parties have to be stricly followed. Thus, NFE is hereby order to comply with the agreement reached with the San Juan Bay Harbor and is hereby order to use the tugs that it contracted with ECO. In the alternative, NFE is order to use escort rated tug boats with similar specifications and capacity, 80 tons, to safely transport the NLG tankers in and out of the San Juan Bay.

The cease and desist order is null, void and illegal and the same is set aside. All the pilot shall communicate any safety and security concerns with any person as it is a require to fully complly with their duty to safeguard the safety of the maritime traffic in the San Juan Bay.

Also, it is order to the President of the Commission from refraining to issue unilateral determinations and from usurping the powers of other Commissioners, in accordance with Law 226. The President of the Commission is order to enjoin all the commissioner of all the matters presented before the Commssion as requirdd by Law 226

IT IS SO ORDERED.

In San Juan, Puerto Rico, this ___ day of September 2025.

                        S/ SILVIA CARREÑO-COLL
                   UNITED STATES DISTRICT COURT JUDGE