**CASE**

CAPT. JAKE ELMSTROM; CAPT. TOMAS BUSTO; CAPT. CARLOS E. RAMOS; CAPT. KENNETH DÍAZ; CAPT. RICHARD FLYNN; CAPT. CARLOS GUTIÉRREZ, CAPT. PATRICK LÓPEZ.
Plaintiff
Vs.
NFENERGIA LLC, A NEW FORTRESS ENERGY SUBSIDIARY; PILOTAGE COMMISSION OF PUERTO RICO; ATTORNEY. JESSICA ÑECO MORALES, IN HER OFFICIAL CAPACITY AS ACTING PRESIDENT OF THE PILOTAGE COMMISSION.
Defendants

United States District Court, District of Puerto Rico

Case No: 3:25-cv--01462

# Preliminary Report of Capt. Anne L. McIntyre

Issued to:

S/Giancarlo Font García
GIANCARLO FONT
USDC-PR NO. 210612
306 Calle Coll y Toste
San Juan, PR 00918
TEL. (787)622-6999/
(787)647-1876
gfont@drcprlaw.com

15 September 2025

Captain Anne L. McIntyre
188 King St, Unit 308
San Francisco, CA  94107
415-966-6702

**Expert Report of Capt. Anne L. McIntyre**                                    *Elstrom et al v. NFEnergia LLC et al*

I.      **INTRODUCTION & QUALIFICATIONS**

I have been retained to provide an expert opinion on matters concerning state-regulated maritime pilotage to include, in the context of the provided documents, the role and importance of state licensed maritime pilots, the role and importance of pilot commissions, the role and importance of recognized pilot associations, the role and importance of simulation in waterway safety and safety standards, the prohibition of direct communication by the president of the commission, and deficiencies in pilot commission oversight.  My professional qualifications and experience are detailed in my curriculum vitae, attached as Appendix A.

The opinions expressed herein are based on my professional experience, my understanding of pilotage and maritime customs and practice, and a thorough review of the documents listed below.

II.     **PROVIDED DOCUMENTS REVIEWED**

1. Complaint Filed: Verified Complaint in Admiralty for Injunctive Relief, Breach of Contract and Declaratory Judgment, *Elmstrom et al. v. Energeia LLC et al.* (Case 3:25-cv--01462), filed August 31, 2025.
2. Law 226 (Annotated): "Law 226 English.docx", an annotated version of Title 23, Chapter 26 of the Laws of Puerto Rico Annotated, detailing the current Harbor Pilot Commission law.
3. Exhibit 1: U.S. Coast Guard Captain of the Port Order #218-25, July 2, 2025.
4. Exhibit 2: Letter from San Juan Bay Pilots to Carlos Faris, NFE, August 3, 2025.
5. Exhibit 3: Email from Roberto Perez, vessel agent, regarding tug change, August 14, 2025.
6. Exhibit 4: Email from Capt. Daniel Montes accepting tug change, August 14, 2025.
7. Exhibit 5: Letter from seven San Juan Pilots to Capt. Daniel Montes, August 15, 2025.
8. Exhibit 6: Cease and Desist Letter from McAllister Towing to San Juan Pilots, August 15, 2025.
9. Exhibit 7: Letter from Carlos Faris, NFEnergia LLC, to the Puerto Rico Pilotage Commission, August 15, 2025.
10. Exhibit 8: Cease and Desist Order from the Puerto Rico Pilotage Commission, August 15, 2025.
11. Exhibit 9: Request to Postpone Simulations from San Juan Bay Pilots to the Puerto Rico Pilotage Commission, August 22, 2025.
12. NOAA Nautical Chart 25670, Bahia de San Juan
13. Video of Portable Pilot Unit data, Energos Princess, July 2025

1

**Expert Report of Capt. Anne L. McIntyre**          *Elstrom et al v. NFEnergia LLC et al*

### III.  OTHER DOCUMENTS REVIEWED

1.  H.B. 2329 (1999): House Bill 2329, approved August 12, 1999, creating the Puerto Rico Harbor Pilotage Commission.
2.  33 CFR, Chapter I, Subchapter L, Part 127, Waterfront Facilities Handling LNG and LHG
3.  "Unique Institutions, Indispensable Cogs, and Hoary Figures: Understanding Pilotage Regulation in the United States," University of San Francisco Maritime Law Journal, Volume 23, 2011.
4.  APA Commission Recommendations: "Comments on State Pilot Commissions," American Pilots' Association, August 2022.
5.  Why Compulsory Pilotage is So Effective, by Clay Diamond
6.  International Maritime Organization Website - Pilotage

### IV.  OPINIONS

**1. The Role of State-Licensed Maritime (Harbor) Pilot**

In the United States, a state-licensed maritime pilot is a highly trained, expert mariner who possesses specialized knowledge of a specific waterways and advanced ship navigation and maneuvering skills. The primary role of a state-licensed maritime pilot is to ensure the safe and efficient navigation and maneuvering of vessels within often confined and challenging waterways to protect lives, property, and the environment. This role is crucial because the unique characteristics of each port, such as tides, currents, shoals, traffic density, and berthing requirements require local, in-depth knowledge that most vessel captains do not possess.  As defined in *23 L.P.R.A. 361 (b*), they are professionals who, through extensive training and practice, acquire the expertise to "direct and visually direct the course of the vessels, along the coast or within the port."

A unique characteristic of a state-licensed maritime pilot is that their primary responsibility is to the state, not the vessel owner. They are not considered part of a vessel's crew, nor are they government employees.   A pilot's independence is the cornerstone of state regulated pilotage, ensuring that piloting decisions are based solely on safety, free from commercial or political pressures. For example, a vessel captain may be subject to commercial pressure from their vessel owners to sail a ship under unsafe environmental conditions to meet a scheduled arrival in their next port.  Under some circumstances, the economic and logistical consequences of that late arrival have the potential to bias the captain's safety decision making. Under a compulsory state pilotage system, a state-licensed pilot is empowered to independently make and implement safety decisions and has the authority to refuse service for safety reasons. In Puerto Rico, this authority is codified in *23 L.P.R.A 361a (a*).

**Expert Report of Capt. Anne L. McIntyre**                    *Elstrom et al v. NFEnergia LLC et al*

## 2. The Importance of State-Licensed Maritime (Harbor) Pilots and Compulsory Pilotage

Pilots and the compulsory pilotage system under which they operate are the first line of defense against maritime accidents that could have catastrophic public safety, environmental and economic consequences. State-licensed pilots also facilitate commerce by ensuring that vessels are moved efficiently and without discrimination. With limited vessel exceptions, state pilotage systems are compulsory; most large commercial vessels are required by statute to engage a state-licensed pilot.

The mandate of state-licensed maritime pilots is built upon three important concepts: maritime safety, public and environmental protection, and economic security.  These concepts are well demonstrated in several of the documents I reviewed:

- **Maritime Safety**: The letter from the San Juan Pilots to NFE (*Exhibit 2*) and the *Video of the Energos Princess* PPU data provide a real-world example of pilots preventing a maritime accident.  On July 14, 2025, an inbound LNG vessel maneuver was ordered to be cancelled mid-transit, well past the abort point. This resulted in the pilot executing a high-risk emergency turn in the confined cruise ship basin. This letter states that this was performed safely only because the proper equipment, the four 80-ton escort tugs, was in place and the tug crews were properly trained. This incident evidences the importance of the pilots' critical role in managing unforeseen emergencies and the pilot association's important role in implementing established operational, training and safety standards.
- **Public and Environmental Protection**: Many commercial cargoes, as well as fuel carried on board commercial vessels, pose a threat to the public and environment if inadvertently discharged.  An incident involving the LNG vessels referred to in this case has the potential to be catastrophic. Forces generated by the vessel itself (for example, a vessel's wake) can cause injury and damage to property.  Pilots are a critical line of defense in managing the risks vessels pose while navigating Puerto Rico's environmentally sensitive waters.
- **Economic Security:** As an example, an accident blocking the San Juan Channel has the potential paralyze the island's economy. State-licensed maritime pilots ensure the uninterrupted, safe flow of commerce that is vital to public welfare.

The importance of state-licensed pilots to Puerto Rico is a matter of declared public policy. The Statement of Motives from House Bill 2329, dated August 12, 1999, articulates the critical importance of this role in Puerto Rico, noting that "Over ninety percent (90%) of the goods imported to Puerto Rico arrive by sea...The Legislature of Puerto Rico, in recognition of this fact, has the utmost interest, for public policy, health and safety reasons, to create a law to regulate the activity performed by the harbor pilots... in order for the natural resources, the

Case 3:25-cv-01462-SCC    Document 33-6    Filed 09/23/25    Page 5 of 17

**Expert Report of Capt. Anne L. McIntyre**                *Elstrom et al v. NFEnergia LLC et al*

environment, the lives and the property of the citizens to be fully protected…The Port of San Juan has a very hazardous access which requires special control of port traffic, as well as very strict security measures, and a Harbor Pilot service of excellence." It is my professional opinion that the Statement of Motives deserves thoughtful consideration as it articulates the intent of the legislature when establishing the statutory framework of the Puerto Rican pilotage system.

### 3. The Role and Importance of State Pilot Commissions

In the United States, a state pilot commission is the governmental body charged with regulating the pilotage profession. In my professional opinion, an engaged, informed and well-run pilot commission is the most important feature of a compulsory state pilotage system. De facto, through their actions, they define the system. Commissions act as the guardian of public trust by providing competent oversight, accountability and creating a regulatory system that ensures the state has a highly skilled cohort of pilots and that pilotage rates are sufficient to support the pilotage system.

Generally, core commission functions include training and licensing, rate-setting, incident investigation, discipline, and ensuring independent, safe and reliable pilotage service. In Puerto Rico, *23 L.P.R.A. 361* grants the Puerto Rico Harbor Pilot Commission (the Commission) broad and specific powers to fulfill its public safety mandate. Per *361b,* the Commission is created to "authorize, regulate, supervise and impose sanctions on pilotage." Its explicit duties include establishing disciplinary and traffic rules, fixing pilotage rates, adopting maritime traffic regulations, determining the number of pilots necessary for each port (*361g*), setting the qualifications for pilot candidates (*361h and 361i*) approving training programs (361l), and conducting disciplinary proceedings for misconduct or negligence (*361m*). The law empowers the Commission to act autonomously and gives it the capacity to sue and be sued, underscoring its role as a distinct, empowered regulatory authority charged with protecting the public interest.

The statutory structure of the Commission, as defined in *361c,* is similar to other state pilot commissions in that it is specifically designed to balance the interests of all stakeholders and prevent capture by any single group. It is configured as a collegial body of seven commissioners, appointed by the Governor with the advice and consent of the Senate. The composition is mandated to include: two licensed, active harbor pilots; two representatives from the shipping industry who are users of pilotage services; two members representing the public interest with no financial ties to the maritime industry; and one government representative from the Ports Authority. This structure ensures that the expertise of active pilots and the commercial concerns of the industry are heard but are balanced by the impartial perspectives of public and government members.

Case 3:25-cv-01462-SCC    Document 33-6    Filed 09/23/25    Page 6 of 17

**Expert Report of Capt. Anne L. McIntyre**               *Elstrom et al v. NFEnergia LLC et al*

Also similar to other state pilot commissions, the Commission's operations are required to be transparent and deliberative. *361e* mandates that the Commission must hold regular quarterly meetings, and that special meetings can only be called by a majority of the Commissioners. A majority of members constitutes a quorum (*361c*), meaning no single member, including the president, can act unilaterally on behalf of the whole. It must establish bylaws pursuant to the Uniform Administrative Procedures Act, provide proper notice for all meetings, and, significantly, issue a written report to pilots within 14 days of any meeting detailing actions taken that affect pilotage conditions. These procedural safeguards are designed to ensure that the Commission functions as an accountable public body.

**4. The Role and Importance of the Recognized Pilot Association**

Generally, the practice of state pilotage commissions is to recognize only one pilot association for a given port or jurisdiction. It is a foundational principle designed expressly to promote safety, reliability, and regulatory efficiency. This principle is not arbitrary; it is a deliberate policy choice rooted in the understanding of pilotage as an essential public service, not a competitive commercial enterprise. Typically, state pilot associations are organized as business entities, operate under agreed upon administrative and operational bylaws and policies that include vessel movement standards and revenue and expense sharing agreements. Most pilot associations elect officers, have employees, hold common assets, and function democratically, making decisions by consensus or vote.

The public policy rationale for this model is threefold. First, it ensures undivided responsibility. A single, recognized association can be held accountable by commissions to provide continuous, non-discriminatory pilotage service 24/7/365 to all vessels, regardless of size, weather, or difficulty of the job. A competitive system with multiple associations could lead to "cherry-picking" of profitable assignments, potentially leaving less desirable but equally critical vessel movements without timely service.

Second, it promotes standardization of safety and training. A single association ensures all pilots within a jurisdiction are trained to the same high standard, operate under a unified set of procedures, and maintain a consistent standard of care. This is essential for the predictable, safe vessel movements that complex ports require.

Third, it provides regulatory efficiency. It is far more practical and effective for a commission to oversee, communicate with, and regulate one unified body than to manage multiple, potentially competing factions with differing standards and operational protocols. This single point of contact is crucial for establishing and enforcing uniform safety regulations.

The legislature of Puerto Rico explicitly adopted this model in *23 L.P.R.A 361u (b),* which states, "the Commission shall never recognize more than one group or association for each port." This

**Expert Report of Capt. Anne L. McIntyre**                           *Elstrom et al v. NFEnergia LLC et al*

is further reinforced in *Section 3 of Act Aug 12, 1999, No. 226 (b),* "economic regulation, rather than competence in the market, is better served to protect the public health, safety and benefits." Recognizing only one association is the most effective way to implement this non-competitive, safety-focused regulatory model.

Pilot associations are critical to the safety of their jurisdictions and the advancement of the piloting profession. They advocate for maritime safety, uphold professional standards, create professional development programs, support the development and utilization of emerging navigation technologies and provide network and support systems for state-licensed pilots. As evidenced by SJBPC's work with NFEnergia LLC, they also support economic development by providing expert advice on waterway, port and terminal development.

It is my understanding that the Commission has recognized the San Juan Bay Pilots Corporation (SJBPC), as the entity to represent the collective professional interests and expertise of the pilots of the pilots licensed in San Juan Harbor.

**5. The Role and Importance of Simulation in Waterway Safety and Safety Standards**

It is my professional opinion that the use of simulation, particularly Full Mission Bridge Simulators (FMBS), is considered a best practice by state-licensed pilot associations. The use of FMBS has become a standard practice in pilot selection, training, continuing education, and risk analyses for new classes of vessels, waterway improvements and terminal development.

When a new vessel class, terminal, or waterway modification is proposed, pilot associations view these proposals through the lens of operational safety. Simulation technology, especially FMBS, has become an indispensable tool for the profession, not as a replacement for real-world experience, but as the most effective platform to apply specialized knowledge to de-risk the movement of vessels in challenging environments. Simulation provides the critical bridge between theoretical design and operational reality. In a FMBS, pilots can "test drive" a new vessel, proposed channel deepening or a new berth configuration long before any physical work begins. These types of simulations assist in answering the fundamental question: "Can this proposed operation be conducted safely, not just in ideal conditions, but under a full range of adverse conditions?".

From a waterway safety perspective, simulation provides the critical ability for pilots to test, validate, and optimize several critical areas:

- Vessel Evaluation (i.e. size, maneuverability)
- Waterway Design (i.e. channel, turning basins, navigation aids and terminals)
- Operational, Tug, Environmental Requirements (i.e. number of pilots, tug hp, visibility, tide, current, wind)

6

Case 3:25-cv-01462-SCC    Document 33-6    Filed 09/23/25    Page 8 of 17

**Expert Report of Capt. Anne L. McIntyre**                    *Elstrom et al v. NFEnergia LLC et al*

- Pilot, Tug and Vessel Training (i.e. new procedures, emergency response protocols)

The pilot association's involvement begins with the development of the simulation itself. They work closely with technicians to ensure the digital model of the waterway is accurate, including its unique environmental conditions, bathymetry, and hydrodynamics. Virtual vessel models must also be rigorously tested to confirm they handle as they would in the real world. This validation process is vital; if the simulation does not "feel right" and react realistically to their inputs and the environmental forces, the results of any study are invalid. The development of these simulations is complex and requires a robust cohort of pilots and many iterations to confirm.

Once the virtual environment and vessel models are developed, the precise environmental conditions under which a vessel can be handled safely must be determined. It is not enough to know that a new, larger ship can physically fit in a channel; performing simulation allows dynamic assessments to be done methodically and without real-world risk.

The principal outcome for the pilot association in performing simulations is to determine the safe operational limits and emergency response protocols for new operations or a new class of vessel. Pilots representing a range of skill sets and experience levels should participate so that operational standards developed are appropriate across the cohort. In the case of small pilot associations like SJBPC, all pilots should participate to ensure a sufficient range of data and information is developed. Typically, these pilots will conduct many simulated transits, methodically increasing the wind speed, current velocity, or wave height. This systematic approach allows them to identify the exact threshold where a maneuver becomes unacceptably risky or where the vessel's control systems and assist tugs are no longer sufficient to maintain control. The data-driven results replace subjective judgment with objective, verifiable evidence. These findings, for example, "Vessels over 250 meters cannot safely navigate the turn at Buoy 1 if the flood current exceeds 2 knots", form the empirical basis for new operating procedures. These limits provide clear, defensible safety parameters that protect the pilot association, pilots, the port, and the public interest.

Simulation is also a very effective communication tool. It allows the dynamic demonstration of the operational realities of a proposed maneuver or design to other stakeholders, such as port authorities, engineers, and regulators, who may not have experience in these areas. An engineer's plan might show that a turning basin appears sufficiently wide on paper. In a properly designed simulation, it can be empirically demonstrated how a strong crosswind on a high-sided LNG ship effectively makes the size of the turning basin dangerously insufficient. This shared, interactive experience is compelling and fosters a deeper, more holistic understanding of the proposal's complexities among all parties.

**Expert Report of Capt. Anne L. McIntyre**                              *Elstrom et al v. NFEnergia LLC et al*

In my review of the documents, the simulations and subsequent vessel movement standards developed in SJBPC's Houston simulations appear to be developed in accordance with normal customs and practices of state-licensed pilot associations. Regarding Capt. D. Montes' decision to depart from the association's LNG standards, the lack of information in *Exhibit 4* regarding his rationale makes it difficult to ascertain his reasoning. It is not unheard of for an individual pilot to deviate from association operational guidance on a single assignment. For example, departing a berth on a highly maneuverable vessel with low-risk cargo in ideal environmental conditions, a pilot might opt to reduce assist tug requirements. When these one-off situations occur, the individual pilot typically discusses the matter in advance with both the pilot association and the vessel operator to develop consensus on the decision. It is, however, unusual for a state-licensed pilot to deviate from association standards involving high-risk vessels in challenging maneuvering conditions; particularly when the standard is as stringently developed as the Houston simulations are.

It is also not unusual for vessel operators and shipping interests to request pilot association and pilots deviate from established safety standards for commercial reasons. State pilot associations have a professional duty to independently review and consider these requests; but ultimately must develop and enforce a standard that ensures safety under a full range of adverse conditions. *Exhibit 2* is an example of SJBPC attempting to engage NFEnergia regarding their safety standards. I find it troubling that rather than engage the SJBPC in further discussion regarding their safety concerns, NFEnergia appears to have circumvented agreed upon safety standards by contracting with assist tugs that don't meet agreed upon standards and then appealing to the pilot commission to support their actions *(Exhibit 7).* Generally, in reviewing the communication chain documents provided, I have the impression that commercial concerns may have influenced NFEnergia's withdrawal from further engagement with SJBPC and may have also influenced Capt. D. Montes' decision to perform the piloting assignment, as evidenced by his request to directly receive the profitable revenue generated by the assignment (*Complaint, 54).* Given the zero-risk environment associated with the movement of LNG vessels, I also find it unusual that the USCG Captain of the Port is not actively engaged in this matter (*Exhibit 1, Complaint 26*).


**6. The Prohibition of Direct Communication by the President of the Commission**

Based on my review of the provided documents, it is my professional opinion that the Puerto Rico Harbor Pilot Commission's "Cease and Desist" order prohibiting the San Juan Bay Pilots from communicating directly with maritime interests is contrary to established maritime safety practices and the stated goals of effective pilotage regulation.

**Expert Report of Capt. Anne L. McIntyre**              *Elstrom et al v. NFEnergia LLC et al*

The Commission's order, as outlined in Exhibit *8*, declares that any unauthorized communication from SJBPC to the maritime community, regulatory agencies, or other interested parties is "null and void." In my maritime career, I cannot recall a circumstance where a state pilot commission has imposed such a directive on a state pilot association. I believe it is highly unusual and fundamentally problematic as it directly interferes with the ongoing, critical and routine exchange of information essential for safe pilotage operations. Maritime piloting is an inherently collaborative and high-stakes profession. In my professional opinion, regular and open communication between all maritime stakeholders, to include pilot associations, pilots, regulatory agencies, and ship and terminal interests is fundamental and essential to safe port operations. Direct communication between a pilot or pilot association and a vessel's owners or crew, a shipping agent, terminal or a tug operator is not a matter of "imposing unauthorized conditions" but the foundation of a pilot's professional duty to ensure the safety of the vessel, its crew, and the port environment. An important nuance of maritime communication is that vessel crews and their representatives are multi-national and are often not fluent in the local operational language. When on board a vessel, pilots serve as interpreters to ensure that operational communications are accurately conveyed.

*Exhibit 2,* written by the SJBPC, demonstrates the nature of this essential communication. The letter details the complexities of maneuvering large LNG vessels and the need for comprehensive feasibility studies and safety protocols. This type of technical and operational exchange is a professional responsibility, not an act of overreach. Prohibiting such direct communication could create dangerous delays and misinterpretations in time-sensitive situations, thereby increasing the risk of accidents.

To suggest state licensed pilots will be referred to the Department of Justice for fulfilling their professional duty to warn is a concerning overreach. The timing is also concerning. SJBPC sent their letter to Captain Montes (*Exhibit 5*) at 2:38 PM on August 15. At 5:42 PM, lawyers for McAllister Towing, a commercial beneficiary of the deviation from the safety standard, sent a cease-and-desist letter to the pilots (*Exhibit 6*). Just a few hours later, at 9:28 PM, the Commission's President issued her own, similar order. This sequence suggests the Commission acted not as an independent regulator safeguarding public interest, but as an enforcement arm for commercial interests. This action has a "chilling effect,"(*Complaint, 131*) gagging the very experts the state entrusts to mitigate risk. Additionally, the unilateral issuance of this order, without deliberation by the full collegial body as required by *23 L.P.R.A 361*, likely renders it procedurally invalid.

As the regulator, the Commission has a duty to engage directly with the recognized pilot association to explore, establish and review operational standards. This ensures that regulation is informed by the most comprehensive local expertise available. By circumventing the SJBPC

9

Case 3:25-cv-01462-SCC    Document 33-6    Filed 09/23/25    Page 11 of 17

**Expert Report of Capt. Anne L. McIntyre** *Elstrom et al v. NFEnergia LLC et al*

and validating a deviation from the established consensus based on the willingness of a single pilot, the Commission undermined the role of the recognized association and abdicated its responsibility to regulate based on collective, data-driven expert judgment. An effective regulatory process would require the Commission to work with the pilot association to set the standard of care, which individual pilots are then responsible for implementing and exercising their discretion within.

Furthermore, a critical distinction should be made between an individual pilot's authority and a pilot association's role in setting standards. While ultimate authority and legal responsibility for a specific transit rests with the individual pilot on the vessel, the establishment of baseline operational safety standards, especially for new or high-risk operations, is properly a matter for the collective body of experts. The recognized pilot association is the appropriate vehicle to develop, maintain, and advocate for these standards.

The Commission's order is a direct impediment to the established practices of maritime safety and cooperation. It creates a barrier between the professionals who are most knowledgeable about a port's specific navigational challenges and the maritime interests they serve. Such a restriction is not in the best interest of public safety, environmental protection, or the efficient flow of commerce.

### 7. Deficiencies in Pilot Commission Oversight

It is my professional opinion that there appear to be profound and systemic deficiencies in the governmental oversight of pilotage in Puerto Rico that stem from the failure of the Commission to adhere to its core statutory duties. Critical statutory directives have not been met. These deficiencies can be categorized into three areas: the failure to promulgate regulations, the failure to maintain a fully constituted and functioning commission, and the failure to operate with transparency.

First, the Commission has failed to fulfill its most basic statutory duty to create a regulatory framework. *23 L.P.R.A 361r (b)* gave the Commission an unambiguous deadline of February 1, 2000, to "adopt Regulations" to administer the act. It is my understanding that this deadline has been missed by over two decades, and no such comprehensive regulations exist. A statute provides a framework, but it is the detailed regulations that provide practical, enforceable tools for oversight. Without them, standards for core oversight functions such as rate setting, pilot qualifications, discipline, and operational safety remain ambiguous and potentially subject to arbitrary interpretation. This regulatory vacuum compromises the safety and effective oversight administration of the Puerto Rico pilotage system.

Second, this failure of regulatory action is compounded by a failure of executive and administrative oversight:

10

Case 3:25-cv-01462-SCC     Document 33-6     Filed 09/23/25     Page 12 of 17

**Expert Report of Capt. Anne L. McIntyre** *Elstrom et al v. NFEnergia LLC et al*

*23 L.P.R.A. 361c (a)* mandates a seven-member commission. It is my understanding that the Governor has only appointed three of the seven required commissioners. A commission with less than half its members cannot function as the balanced, deliberative body the legislature intended and, critically, lacks the four-member quorum required by Section 6 to legally conduct business. The specific composition that balances pilots, industry, the public, and government—was designed to ensure the Commission acts as a competent, deliberative, and impartial body. When a commission is not fully constituted it undermines the entire safety framework it was created to uphold.

*23 L.P.R.A. 361e (b)* requires, in that the Commission "shall hold one or more regular quarterly meetings" with proper notice delivered to all commissioners and interested parties. It is my understanding that the Commission does not conduct the statutorily required public meetings and instead operates on an ad-hoc basis. This lack of procedural regularity directly erodes public trust and compromises safety. When a public regulatory body operates without transparency by failing to hold regular open meetings that provide a forum for public input it can foster suspicion that its decisions are driven by private interests rather than the public good. This opacity can prevent the open, deliberative discussion of important issues thereby forcing stakeholders to address critical concerns through informal channels rather than in an accountable, public forum. A non-transparent approach is the antithesis of proactive safety management and leaves the public's interest in maritime safety without the full, balanced, and legally constituted representation mandated by law.

Together, these deficiencies represent a systemic failure of oversight that has left the pilotage system in Puerto Rico vulnerable to the exact safety compromises that *23 L.P.R.A. 361* was enacted to prevent.

### V.    SUMMARY OF OPINIONS:

1. SJBPC's simulations and assist tug standards appear to be developed in accordance with normal customs and practices of state-licensed pilot associations.
2. Departure from SJBPC's established "4 X 80T Escort Class" standard without thorough re-evaluation and strong consensus agreement within SJBPC's membership and maritime stakeholders degrades safety and increases risk.
3. The manner of Capt. Montes' deviation from the assist tug guidance and compensation demand is not in alignment with the normal custom and practice of state-licensed pilots or members of state licensed pilot associations.

Case 3:25-cv-01462-SCC    Document 33-6    Filed 09/23/25    Page 13 of 17

**Expert Report of Capt. Anne L. McIntyre**                     *Elstrom et al v. NFEnergia LLC et al*

4. Commercial concerns may have influenced NFEnergia's withdrawal from further engagement with SJBPC and may have also influenced Capt. D. Montes' decision to perform the piloting assignment
5. The limited inclusion and participation restriction of SJBPC in the "Spain Simulations" is contrary to best practices typically observed when developing and conducting simulations relevant to the pilotage grounds of the recognized pilot association.
6. The Puerto Rico Pilot Commission's prohibition on communications is highly unusual, detrimental to safety and likely unlawful.
7. There appear to be profound and systemic deficiencies in the governmental oversight of pilotage in Puerto Rico that stem from the failure of the Commission to adhere to its core statutory duties.

### VI.    SIGNATURE

I certify that I have reviewed the materials in Sections II and III of this report and these materials were used in forming my opinions. I reserve the right to supplement this preliminary report.

_____

Capt. Anne L. McIntyre

Case 3:25-cv-01462-SCC     Document 33-6     Filed 09/23/25     Page 14 of 17

**Expert Report of Capt. Anne L. McIntyre**　　　　　　　　　　　*Elstrom et al v. NFEnergia LLC et al*

**Appendix A**

# Capt. Anne L. McIntyre

188 King St, Suite 308
San Francisco, CA 94111
annelouisemcintyre@gmail.com
415-966-6702 mobile

## Professional Summary

Capt. Anne L. McIntyre is a nationally recognized maritime leader with over three decades of experience in pilotage, maritime operations, and regulatory administration. She has held senior roles in both the Columbia River Pilots and the San Francisco Bar Pilots and served as a Commissioner on the Oregon Board of Maritime Pilots. Her career is distinguished by her leadership in pilot association governance, commission oversight, and her pioneering work in promoting diversity and inclusion in the maritime industry.

## Areas of Expertise

Pilot association administration and governance
Pilotage operations and safety standards
Pilotage regulatory compliance and pilotage rate setting
Maritime incident investigation involving pilotage
Pilot commission oversight and policy development
Legislative, stakeholder and media relations
Diversity and inclusion in maritime professions

## Professional Experience

### San Francisco Bar Pilots – Business Director
San Francisco, CA | 2019–Present

Oversees business, financial, regulatory and administrative operations of the 175-year-old pilotage organization
Leads external affairs, including public, legislative and regulatory engagement

### Columbia River Pilots – State-Licensed Maritime Pilot
Portland, OR | 1996–2019

First woman licensed by the Oregon Board of Maritime Pilots
Served as Vice President and Business Manager of the pilot association
Chaired the Training and Professional Development Committee
Represented the association to regulators, legislators, and media
Advocated for diversity in pilotage

**Expert Report of Capt. Anne L. McIntyre**                                          *Elstrom et al v. NFEnergia LLC et al*

**Oregon Board of Maritime Pilots – Commissioner**
Oregon | 2005-2014

Oversaw pilot selection, licensing, training, and setting of pilotage rates
Contributed to policy development and enforcement
Developed and implemented statute and regulations
Conducted incident investigations

**Instructor, CSU Maritime Academy, Sponsored Projects & Extended Learning**
Vallejo, CA| 2017-2020
Responsible for development and instruction of classroom and ship simulator courses for state licensed maritime pilots.

**Member, NOAA Hydrographic Services Review Panel   2016-2022**
USA| 2016-2022

Member of Federal Advisory Panel responsible for advising development of hydrographic services and products.

**Chevron Shipping Co**.
Global | 1988–1996
Served in sea-going, terminal and shoreside roles in the U.S. tanker fleet

## Education

M.S. in Transportation and Engineering Management
California State University Maritime Academy, 2013

B.S. in Nautical Industrial Technology
California State University Maritime Academy, 1988

## Licenses & Certifications

U.S. Coast Guard Unlimited Master's License (inactive)

U.S. Coast Guard First Class Pilot Licenses:  Columbia & Willamette Rivers, San Francisco Areas A&B, El Segundo Offshore Moorings (inactive)

OR State Licensed Pilot: Columbia and Willamette Rivers (inactive)

## Professional Affiliations & Service

International Maritime Pilots' Association (IMPA) – Speaker and Contributor
American Pilots Association (APA) – Speaker and Contributor
Pilot Trainee Examiner – Oregon, San Francisco and Los Angeles, CA
Propeller Club of Northern California – Board Member
Portland Merchants (Marine) Exchange Board – Former Member
Lower Columbia Harbor Safety Committee – Former Board Member
CSU Maritime Academy Foundation - Trustee
CSU Maritime Academy Alumni Association – Former Board Member
Women in Maritime Leadership Conference – Frequent Panelist
Women Offshore – Featured Guest and Advocate

**Expert Report of Capt. Anne L. McIntyre**               *Elstrom et al v. NFEnergia LLC et al*

Oakland Promise – Mentor to first-year college students
San Francisco Maritime National Park Association – Trustee
Columbia River Maritime Museum – Former Board Member

### Awards & Recognition

Lifetime Achievement Award, Cal Maritime Alumni Association
Honoring significant contributions to the maritime industry and pilotage profession

Recipient of California Senate and Assembly Resolutions for professional contributions and achievements in the maritime industry

**Expert Report of Capt. Anne L. McIntyre**  *Elstrom et al v. NFEnergia LLC et al*

**Appendix B**

# Fee Schedule
for
## Capt. Anne L. McIntyre

**Effective Date: Jan 1, 2025**

---

Mailing Address:
188 King St
Suite 308
San Francisco, CA
94107

415-966-6702 (mobile)
annelouisemcintyre@gmail.com

---

**Review records, research, analysis, prepare written reports, travel**
The lesser of **$410** per hour or **$2,950** per day

**Provide testimony (trial or deposition) / attend courtroom proceedings**
**$610** per hour or **$3,350** per day

The **daily rate** will be the minimum billed for all work (including travel) outside the Greater San Francisco area.

**Travel expenses** will be included on each invoice for reimbursement at cost. Receipts provided upon request. Reasonable local travel time will be billed at the hourly rate.

Fees are billable on a quarterly basis unless otherwise requested.

Invoices will be submitted to attention of the
hiring entity unless other billing details are
provided in advance.

16