UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| CAPT. JAKE ELMSTROM; CAPT. TOMAS BUSTO; CAPT. CARLOS E. RAMOS; CAPT. KENNETH DÍAZ; CAPT. RICHARD FLYNN; CAPT. CARLOS GUTIÉRREZ, CAPT. PATRICK LÓPEZ SNA JUAN BAY PILOTS CORPORATION<br><br>Plaintiff<br><br>Vs.<br><br>NFENERGIA LLC, A NEW FORTRESS ENERGY SUBSIDIARY; PILOTAGE COMMISSION OF PUERTO RICO; ATTORNEY JESSICA ÑECO MORALES, IN HER OFFICIAL CAPACITY AS ACTING PRESIDENT OF THE PILOTAGE COMMISSION.<br><br>Defendants | CASE NO. 25-CV-01462<br><br>RE: COMPLAINT; PRELIMINARY AND PERMANENT INJUNCTION; DECLARATORY JUDGMENT<br><br>**IN ADMIRALTY** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER

TO THE HONORABLE COURT:

Come now Plaintiffs, Captain Tomas Busto Álvarez; Captain Carlos E. Ramos; Captain Ray Díaz; Captain Jacob Elmstrom; Captain Richard Flynn Caro; Captain Carlos Gutiérrez; Captain Patrick López; and the San Juan Bay Pilots Corporation (collectively, "Plaintiffs"), by and through the undersigned counsels and very respectfullly state, allege and pray:

# I. **PRELIMINARY STATEMENT**

The Plaintiffs urgently request a temporary restraining order ("TRO"), preliminary and permanent injunction against Defendant, NFEnergia, LLC ("NFE"), enjoining them from breaching the agreement reached with the San Juan Bay Pilots and ordering NFE to call back the 80 metric ton bollard pull escort-rated tug boats that it chartered from Edison Chouest Offshore ("ECO") to perform the maneuvers of the Large LNG tankers scheduled for **September 28 and 29, 2025**;[1] or in the alternative, ordering NFE to retain another company which can provide the much needed 80-metric ton bollar pull escort-rated tugs to transit in and out of the San Juan Bay Large liquefied natural gas tankers ("LNG") scheduled for **September 28 and 29, 2025**.

The Plaintiffs also seek a TRO, preliminary and permanent injunctive relief againts the Pilotage Commission of Puerto Rico ("Commission") and its President, attorney Jessica Ñeco, ordering them to:

1) set aside the cease-and-desist order of August 15, 2025, issued against the Plaintiffs as the same is null and void because it was taken unilaterally by its President, without convenining the other two (2) Commissioners or notifying them that any communication or order would be issued in violation of the Puerto Rico Harbor Pilotage Commission Act, Act August 12, 1999, No. 226, 23 L.P.R.A. § 361 et. Seq., ("Law 226");

2) set aside the cease-and-desist order of August 15, 2025, specifically the gag order that was imposed upon the Plaintiffs as said sanction is not contemplated in Section 16 of Law 226; was issued violating the equal protection clause and without providing the require due process to the Plaintiffs; and in a clear violation of the constitutional rights of the Plaintiffs to safely conduct their job and freely communicate with the stakeholders of the maritime industry, including but not limited to the vessel

---

[1] **In the first day of the preliminary injunction hearing, brother counsel for NFE stated in open court answering to a question made by the Honorable Presiding Judge that said tugs can be called back and return to Puerto Rico**.

owners and agents, the tug boat operators, the United States Coast Guard ("USCG") and any other state or federal agency;

3) set aside any other Resolution, Order and or communication issued by the Commission during the tenure of attorney Jessica Ñeco as she has not convened, notified and/or informed all the members of the Commission, including Commisioner Capt. Carlos E. Gutierrez who is a plaintiff in this litigation, in a clear violation of Law 226;

4) refrain from issuing unilateral determinations and from usurping the powers of the Commission in a clear violation of Law 226;

5) refrain Commisioner Mr. Javier Figueroa-Sosa ("Mr. Figueroa"), from taking illegal decisions for the financial benefits of Moran Towing Corporation ("Moran") and himself;[2] and,

6) prospectively render its determinations as a collegial body in accordance with Law 226.

## II. STATEMENT OF FACTS

Over ninety percent (90%) of goods imported to Puerto Rico arrive by sea. The port with the greatest activity is San Juan, where seventy-five percent (75%) of the Island's commerce is concentrated. The Port of San Juan has a hazardous approach that requires special traffic control in the port, as well as stricter safety measures and excellent pilotage service.[3]

Entering the San Juan Bay itself is a complex task, and past errors have ensnared the San Juan Bay, imposing a considerable burden on the Puerto Rico population. Safety, of course, is the paramount concern, particularly in light of the nature of the cargo. Pilots, while preparing to conduct their job, take

---

[2] Mr. Figueroa is the General Manager of Moran, one of the three active Commissioner, and Vice President of the Puerto Rico Shipping Association. Mr. Figueroa was instrumental in getting the Plaintifffs expelled from the the Shipping Association, and has used his position as Commissioner to obtain a contract with NFE, among other conflicting decisions. https://www.linkedin.com/in/javier-figueroa-sosa-173169295/?originalSubdomain=pr

[3] See Law 226.

into consideration potential marine hazards, such as narrow channels, engine or rudder failure, loss of control, squalls, strong gusts, etc.

The movement of Large LNG tankers in and out of the San Juan Bay is a daunting task not only because of the nature of the cargo, but because of the contingencies that must be in place to ensure the integrity of the vessel and the safety of the San Juan Bay and the people of Puerto Rico in the event of an emergency such as those listed previously.  The fire and explosions hazard of a large LNG tankers is "very large" and in the event of a fire and explosion accident, "the hazard area is 51365.4m2, and 83% of the facilities in this region will be destroyed."  Thus, the property, environment, marine species and life within the area, including the life of the Plaintiffs, are at a "very large risk" if a large LNG tankers is not properly maneuver.[4]

When NFE proposed to the San Juan Pilots Harbor Corporation and its pilots bringing large LNG tankers with capacity of approximately 145,000 cubic meters,[5] into the San Juan Bay, it took almost two years of simulations, technical analyses, and consultations with experts, numerous advisors, and several entities, for the harbor pilots of San Juan Bay, NFE and its consultants.  All San Juan Bay Pilots conducted hundreds of computer-based simulations at the Seamen's Church Institute ("SCI") in Houston, Texas, reproducing real-life scenarios with similar LNG vessels, tugs, and the conditions of the San Juan Bay. The simulations conducted by all pilots and NFE included propulsion failures, rudder failures, sudden changes in wind direction and intensity, human errors by the bridge team, tug operators, and even the loss of one or more assisting tugs. Several types of tugboats, with varying power and

---

[4] See, LI Jianhua and Huang Zhenghua, 2012 International Symposium on Safety Science and Technology Fire and explosion risk analysis and evaluation for LNG Ships, Procedia Engineering 45 (2012) 70-76, enclosed as **Exhibit 1**.

[5] No cargo vessel with such capacity and characteristics has ever called the port of San Juan before March 20, 2025, the GASLOG SINGAPORE.

capabilities, were tested to determine the most suitable configuration.[6] All the findings were part of a "WSA Risk Assessment" of the "Navigation Simulations" commissioned by NFE. NFE reported said findings to the Shipping Association in a presentation. The most relevant facts are:

- "60 bollard tugs were significantly limited in capacity in higher wind and current conditions";

- "It was determined that the 60t bollard tugs were insufficient for handling large vessel of the proposed size primarily fud to operating at maximum power when underway in the Army Channel and while stopping and turning/maneuvering vessels at berth";

- "Combining runs graded as "passess" and "limits" resulted in only 5 failures for a sucess rate of 94%";

- "The small percentage of failures were attributed to:

    - Pilot familiarization with the simulator
    - Getting accustomed to maneuvering the larger LNG ships using 4 support tugs
    - Operating in strong wind and environmental conditions";

- "A primary challenge for the port safety system is managing available tugs, and balancing wind conditions. The 80T bollard tugs proved to be acceptable, but many of the runs were graded as "limits", so operating at lower enviromental conditions (up to 20 knots of wind) proved feasible. Operating above those threshold if tugs are at near maximum power (between 75% and 90%) was challenging"; and,

- "Increasing the tug power by a margin of 10% would allow for an additional safety factor where tug power requirements are an issue".[7]

Moreover, all pilots visited Corpus Christi, Texas, and rode along with the local pilots to observe real-life transits on similar vessels firsthand.

After hundreds of simulations and voyages with other pilots, NFE and the Plaintiffs reached to the following agreements: the repositioning of buoys after dredging in the Army Terminal channel; modifications to aids to navigation and alignment lights; the use of two pilots aboard the LNG vessel for

---

[6] Capt. Tomás Busto-Álvarez testified in the first day of the preliminary injunction hearing that escort rated tugs with capacities of 60, 80 and 90-metric-ton bollard pull capacity were tested; and that bollard tugs with capacity of less than 80 metric tons were insufficient for handling large LNG vessels in the San Juan Bay.

[7] See NFE's presentation to the Shipping Association enclosed as **Exhibit 2**.

the maneuvers; the establishment of environmental operational parameters such as wind limits over which the maneuvers would not be executed; the use of four 80-ton bollard pull escort-rated tugs for maneuvers; and, the tug operators would be required to receive specialized training to be able to execute the pre-agreed-upon maneuver, ensuring coordinated and effective support.

In accordance with the agreements reached, NFE contracted tugs from ECO and brought four units with such specifications to Puerto Rico.

Since the arrival of the GASLOG SINGAPORE on March 20, 2025, all maneuvers of large LNG vessels have been carried out by all of the pilots using the same equipment and employing the planned maneuver, taking into account the risks identified in prior simulations and studies. Eighteen (18) such maneuvers were successfully completed, including an emergency maneuver on July 12, 2025, when in transit, NFE requested to cancel the berthing and to have the vessel removed from the port; INSERT JAKE ELMSTRON'S INCIDENT.

It is of public knowledge that NFE is experiencing financial difficulties. As a matter of fact, it has been reported that it is "on the brink of bankruptcy."[8] Several months ago, the San Juan pilots received information that NFE would not be renewing the contract with ECO, the owner of the four escort-rated tugs with the required capacity to conduct the maneuvers safely, and instead would replace them with lower- capacity tugs. At a meeting held on July 31, 2025, NFE and its consultants confirmed to several pilots NFE's intention to replace the existing ECO tugs with others of lesser capacity.[9]

---

[8] https://seekingalpha.com/article/4823678-new-fortress-energy-on-the-brink-of-bankruptcy?mailingid=41619699&messageid=energy_investing&serial=41619699.29075&source=email_energy_investing&utm_campaign=Energy+investing+2025-09-18&utm_content=energy_investing&utm_medium=email&utm_source=seeking_alpha&utm_term=Energy+investing

[9] Capt. Tomás Busto-Álvarez also testified to that effect in the first day of the preliminary injunction hearing.

On August 3, 2025, seven (7) of the eight (8) San Juan Bay pilots sent an extensive letter to NFE and its consultants expressing their grave concern about the intention to use lower-capacity tugs for an operation of such high risk to public safety and in contravention of the agreed standards.[10]

On August 14, 2025, at 10:35 a.m., the agent for the natural gas-carrying vessel notified the San Juan Bay pilots that they planned to use four replacement tugs belonging to two different towing companies for the departure of a gas vessel scheduled for August 16, 2025.[11]   The owners of the tugs are McAllister Towing and Moran Towing.  None of the replacement tugs proposed by the vessel's agent possesses the escort rated tug with 80-metric-ton bollard pull capacity specified in the designed maneuver, nor do they have equivalent maneuvering characteristics that would allow them to be interchanged in the predetermined positions. Furthermore and pursuant to the extensive simulations conducted at SCI in Houston, and Corpus Christi, Texas such tugs are significantly limited and insufficient for handling large LNG tankers primarily due to operating at maximum power when underway in the Army Channel and while stopping and turning/maneuvering at the berth.[12]

Captain Daniel Montes, one of the eight (8) pilots in San Juan Bay, who actively participated in the simulations and agreements with NFE, issued a brief response which suggested he was willing to perform the pilotage service with the replacement tugs.[13]

Subsequently, at 2:38 pm on August 15, 2025, seven (7) pilots sent a letter to the sole pilot willing to perform the service with the proposed tugs.  Those pilots informed Captain Daniel Montes of their concerns regarding maritime safety, citing the use of lower-capacity equipment, a deviation from the standards agreed upon after hundreds of technical simulations, and the severe consequences that could

---

[10] See Docket No. 1, Exhibit 2.

[11] See Docket No. 1, Exhibit 3.

[12] See NFE's presentation to the Shipping Association enclosed as **Exhibit 2**.

[13] See Docket No. 1, Exhibit 4.

occur in the event of an accident. That letter was forwarded to, among others, the Commission and all its Commissioners,[14] the USCG, and the vessel owners.[15]

That same day, at 5:42 p.m., a law firm representing McAllister Towing,[16] one of the owners of the tugs to be used on the August 16, 2025 maneuver, sent a cease-and-desist letter to the pilots because the letter addressed to Captain Daniel Montes allegedly interfered with its client's economic interests. That letter was copied to the Commission.[17]

About an hour and a half later, at 7:17 pm, Mr. Carlos Faris, Terminal Manager/FSO of New Fortress Energy, addressed a letter to the Puerto Rico Pilotage Commission requesting assistance to "ensure that the normal established procedures are followed..."[18]

That same day, at 9:28 p.m., the President of the Commission, attorney Jessica Ñeco, issued a cease-and-desist order (the "Order") to the seven (7) pilots who had expressed legitimate safety concerns to Captain Montes—the only pilot willing to perform the maneuver on Saturday, August 16, 2025.[19] When issuing the Order, the President of the Commission did not convene the other two (2) Commissioners or notify them that any communication or order would be issued. In the cease-and-

---

[14] Section 17 of Law 226 imposes upon the pilots a duty to report any maritime incident to the Commission immediately.

[15] See Docket No. 1, Exhibit 5.

[16] That same law firm currently represents NFE; and until last Wednesday, September 17, 2025, represented the Commission and its President, attorney Jessica Ñeco. It is important to note, that the attorney who decided to stay in the case representing NFE is being assisted by the paralegal for the two attorneys that withdrew from the case. Furthermore, said law firm also represents the vessel agent, Ayala Colón, and the Puerto Rico Shipping Association.

[17] See Docket No. 1, Exhibit 6.

[18] See Docket No. 1, Exhibit 7.

[19] Attorney Ñeco does not have any education, training or experience in navigation, much less of the San Juan Bay Harbor and in maritime law. Throughout her professional career, she has been a public official in the House of Representatives of Puerto Rico, the Municipality of Naguabo, ACAA, and currently in the Puerto Rico Ports Authority as "Executive Coordiantor". See Senate of Puerto Rico Report as **Exhibit 3**.

desist letter, the President prevents the pilots from communicating with the maritime industry and even threatens to refer them to the Puerto Rico Department of Justice. In other words, the President ordered the experts charged with safeguarding port safety to refrain from communicating with maritime entities and vessel owners that they serve to alert them of potentially dangerous or inadequate situations.[20]

On August 16, 2025, Captain Daniel Montes maneuvered the LNG vessel out of San Juan Bay. The maneuver was performed by only one (1) pilot using four tugs with lower capacity of 80 ton. The replacement tugs of Moran and McAllister assisted with the actual maneuver. However, the four ECO tug boats were standing nearby.

Following this maneuver, Captain Daniel Montes communicated with the San Juan Bay Pilots Corporation administrator, instructing the corporation that the pilotage monetary proceeds from this operation, as well as from any future maneuver he performed on LNG vessels, should be paid solely to him and not shared with the other seven pilots, as it is currently done with all jobs performed by the San Juan Bay Pilots.

On August 20, 2025, the San Juan Bay Pilots received an "invitation" to attend simulations at Siport21 in Madrid, Spain, scheduled for August 28–29, 2025, in an "observer" capacity. Puerto Rico Maritime Group, the consulting firm representing NFE, was designated as the entity responsible for coordinating all travel and lodging arrangements. The extremely short notice for these simulations was highly concerning, particularly when compared to prior simulations that took months to set up because creating a computer model of the San Juan Bay is an enormous undertaking, and which were conducted over nearly two years span in Houston and Corpus Christi, Texas. Those simulations in Houston, which involved extensive planning, took place with the active participation of a broad range of stakeholders, including, but not limited to all San Juan Bay Harbor Pilots, representatives for NFE, various technical consultants, and representatives from the ship's and tug's owners.

---

[20] See Docket No. 1, Exhibit 8.

On August 21, 2025, the President of the Puerto Rico Pilotage Commission, once again, issued a resolution without the participation or approval of Commissioner Carlos E. Ramos, in a manner that exceeded the President's statutory authority under the applicable law. The resolution purports to authorize Captain Daniel Montes to attend the Spain-based simulations, accompanied by his brother, Captain Cesar Montes who, while holding a license for the San Juan Harbor, is not an active pilot at the Port of San Juan and is not a member of the San Juan Bay Pilots Corporation as he instead provides pilotage services along Puerto Rico's southern coast. The referenced resolution constitutes an overreach of statutory authority and is an attempt to exert unlawful control over the San Juan Bay Pilots, who are not government employees, but independent contractors with a constitutionally protected right to association, consistent with the rights recognized in all coastal states of the United States.

On August 22, 2025, the San Juan Bay Pilots submitted a formal letter to the Commission requesting the postponement of the scheduled simulation. The request was based on the extremely short notice provided and the lack of adequate time to prepare for international travel. The Pilots also underscored the vast difference between these "new" simulations and the extensive simulations conducted two years prior, which required substantial logistical planning and the collaborative involvement of all relevant parties. Said letter was ignored and remains unanswered by the Commission and its President.[21]

NFE has decided to rescind all agreements reached with the pilots and remove the ECO's tugs, which the parties previously agreed were required for the safe entry and exit of large LNG vessels in and out of the San Juan Bay. In doing so, NFE is placing the safety of San Juan Bay and the broader Puerto Rican economy at risk for its own gain.

The Commission, through its President, has placed a gag order on the pilots, forbidding them from communicating with agents, vessel owners, dock operators, etc. In doing so, the Commission has placed

---

[21] See Docket 1, Exhibit 9.

the safety of the San Juan Bay and the Puerto Rico economy at risk to protect its own political interests and maintain control.

The Puerto Rico Pilot Commission has acted to silence the Pilots at the state level, even though their professional qualifications and pilotage endorsements are federal in origin and serve as a condition for holding a state license that itself does not require any testing or verification of competency. Ships under the control of the Pilots navigate through federally controlled channels, and ensuring their safe passage is their essential duty. The pilot's responsibility is individual, non-transferable, and carried out as independent contractors who are not subject to political or economic pressures.

**On September 15, 2025, at 12:00 a.m., the four ECO tug boats left Puerto Rico**.[22]

Since the Order was issued by the President, the National Oceanic and Atmospheric Administration Administration ("NOAA"), vessels' Master and even, the USCG have contacted several times the Plaintiffs requesting information about safety measurements in the San Juan Bay and assistance for repositioning the buoys in the Army Terminal channel for the next maneuver of a large LNG tanker. **However, because of the gag order imposed by the President of the Commission upon the Plaintiffs, the San Juan Bay Pilots have not been able to provide any information and/or assist the USCG**.[23]

**The next large NLG tanker maneuver is scheduled to depart the San Juan Bay on September 28, 2025 and inbound on September 29, 2025**.[24] NFE is planning to conduct the maneuvers without the required 80-metric ton bollar pull escort-rated tugs in a clear breach of the agreement reached with the San Juan Bay Pilots and the industry standards, puttting in danger the life of the pilots, residents and

---

[22] Capt. Tomás Busto-Álvarez also testified to that effect in the first day of the preliminary injunction hearing. Also, the attorney for NFE confirmed that the 4 escort rated tug boats from Eco are no longer stationed in Puerto Rico.

[23] See communicatios attached as **Exhibit 4.**

[24] The vessel's agent, Ayala Colón, changed the departure date from the 25th to the 28th of September 2025.

visitors of Old San Juan; the safety in the maritime traffic in the San Juan Bay; endengering the marine species of the stuary of San Juan; and threatening the economy of Puerto Rico, all for the financial well being of NFE who just want to lower the costs of its operations by using lower capacity tug boats for handling the large NLG tankers. Also, as of today, the Commission maintains its cease and desist order, which prevents the San Bay Harbor Pilots from conducting their job.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(b)(1)(A) states that a TRO may issue if the Court based its ruling on, inter alia "specific facts in an affidavit or verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition [.]" Fed. R. Civ. P. 65(b)(1)(A).

A TRO, contrary to a preliminary injunction, may be issued ex parte and is of limited duration. Further, a TRO is intended, inter alia, to maintain the status quo and prevent irreparable harm until a hearing is held. See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & AutoTruck Drivers Local No. 70 of Alameda Cnty., 415 U.S. 423, 439 (1974).

The framework for considering whether to grant or deny a preliminary injunction has four elements. The Court must gauge the movant's likelihood of success on the merits; must evaluate whether and to what extent the movant will suffer irreparable harm if injunctive relief is withheld; must calibrate the balance of hardships as between the parties; and must consider the effect, if any, that the issuance of an injunction (or the withholding of one) will have on the public interest. Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020).

The facts stated in the Second Amended Complaint along with the documents attached to the same; and the testiomony heard in the first day of the prelimiary injunction hearing clearly show that immediate and irreparable injury, loss, or damage will be suffered by the public interest, if this Honorable Court witheld the injunctive relief requested.

## IV. ANALYSIS

### A. Breach of Contract

The record shows that there is an agreement between the Plaintiffs and NFE and that the agreement included the use of of four 80-ton escort-rated tugs. The evidence is supported by:

a) the hundred of simulations in a two year span;

b) the fact that NFE retained ECO to provide the four 80 Metric Ton bollard pull escort-rated tugs;

c) the presentation made by NFE to the Puerto Rico Shipping Association which contained the agreement reached, specifically the findings that four 80-ton bollar pull escort-rated tugs were required for maneuvers large LNG tankers in the San Juan Bay;

d) the testimony of Capt. Tomás Busto in the first day of the preliminary injunction hearing;

e) the fact that the standard in the industry is to use 80-ton bollar pull escort-rated tugs for maneuvering large LNG tankers;

f) the facts that the Amended Complaint and Second Amended Complaint is verified; and,

g) the testimony and the report of the expert in this case, Capt. Anne L. McIntyre ("Capt. McIntyre").[25]

The evidence of the breach is also uncontested. ECO's four escort-rated tug boat **left Puerto Rico on September 15, 2025**, and NFE intents to replace them with lower capacity tug boats from McCallister and Moran Towing. These facts were confirmed by NFE's attorney in open court and that clearly constitutes a breach of the agreement reached between NFE and the Plaintiffs.

**The next large NLG tanker maneuver is scheduled to depart the San Juan Bay on September 28, 2025 and inbound on September 29, 2025**, and Plaintiffs are seeking a TRO to enforce and maintain the agreement reached between the SJBHPC and NFE (status quo). Specifically, using two pilots aboard the LNG vessel for the maneuvers; and using four 80-ton bollard pull escort-rated tugs for

---

[25] See Expert Report of Capt. Anne L. McIntyre, attached as **Exhibit 5**.

maneuvers, among the other agreements reached with NFE to safely transport Large LNG vessels in the San Juan Bay. The empirical data collected in the hundreds of simulations; the sea trials conducted in Corpus Christi, Texas; and the 18 maneuvers conducted by the Plaintiffs at the San Juan Bay Harbor shown that "60t bollard tugs were insufficient for handling large vessel of the proposed size primarily fud to operating at maximum power when underway in the Army Channel and while stopping and turning/maneuvering vessels at berth".[26]

It is well known that the Plaintiffs provide an essential service to Island. The pilotage profession has become indispensable to maritime safety worldwide: protecting port infrastructure, preventing maritime accidents with catastrophic environmental consequences, ensuring uninterrupted commerce, and safeguarding human life. The irreparable damage to the Plaintiffs is that they can not exercise their duty to keep the marine safety of the San Juan Bay as NFE is pretending that they conduct the next **<u>NLG tanker maneuver that is scheduled to depart the San Juan Bay on September 28, 2025</u>**, without using of four 80-ton bollar pull escort-rated tugs for maneuvers in a clear violation of the safety agreements reached and well below the industry standards. By doing so, the pilots can lost their federal license; lost their way to earn a living; be exposed to civil and criminal actions; and lost their life in the event of an accident.

Furthermore, the irreparable damage goes beyond the Plaintiffs as NFE's actions by breaching the agreement with the Plaintiffs poses an imminent risk to life, property, and navigation within San Juan Harbor and the broader Puerto Rican economy. The fire and explosions hazard of a large LNG tankers is "very large" and in the event of a fire and explosion accident, "the hazard area is 51365.4m2, and 83% of the facilities in this region will be destroyed." Thus, the property, environment, marine species and life within the area, including the life of the pilots and crew aboard a large LNG tankers, are at a "very

---

[26] See NFE's presentation to the Shipping Association enclosed as **Exhibit 2**.

large risk" if said vessel is not properly maneuver.[27]. The expert in this case, Capt. McIntyre, is of the opinion that the "[d]eparture from SJBPC's established "4X80T Escort Class" standard without thorough re-evaluation and strong concensus agreement within SJBPC's membership and maritime stakeholders degrades safety and increases risk."

    Plaintiffs have filed this suit, on behalf of the public interest, to comply with its duty to safeguard the maritime transportation in the San Juan Bay and avoid a natural and economic disaster.  On the other hand, NFE's interest is to lower its operational costs of bringing liquified natural gas to the San Juan Bay in an unsafe way, well below the industry standards.  Thus, this Honorable Court should grant the TRO ordering NFE to: a) abstein from breaching the agreement reached with the San Juan Bay Pilots; b) call back the 80 metric ton bollard pull escort-rated tug boats that it chartered from ECO to perform the maneuvers of the Large LNG tankers scheduled for **September 28 and 29, 2025**; or in the alternative, retain another company which can provide the much needed 80-metric ton bollar pull escort-rated tugs to transit in and out of the San Juan Bay the Large LNG tankers.

### B. Unilaterally and Usurped Powers of the President of the Pilotage Commision

    Article 6 of Law 226 provides, in relevant part:

> (a) Composition.- The Commission shall be composed of seven (7) Commissioners, one of whom shall be its Chairperson, appointed by the Governor of Puerto Rico, with the advice and consent of the Senate. The members of the Commission shall be United States citizens, and residents of the Commonwealth of Puerto Rico. The Chairman of the Commission shall be its executive officer, and may designate an Associate Commissioner to act as chairman in his/her absence. The presiding Commissioner shall have the discretion to assign areas of work, in the adjudicative as well as the quasi legislative and/or operational areas of the agency, to one or more Commissioners. It shall be composed as follows:
>
> Two (2) of the members shall be licensed harbor pilots, who are actively practicing their profession; one to represent the San Juan Harbor Pilots, and the other, the harbor pilots of the Commonwealth, who are nominated by each harbor pilotage association;

---

[27] See, LI Jianhua and Huang Zhenghua, 2012 International Symposium on Safety Science and Technology Fire and explosion risk analysis and evaluation for LNG Ships, Procedia Engineering 45 (2012) 70-76, enclosed as **Exhibit 1**.

> two (2) of whom shall be actively involved in their professional or business capacity in the shipping business, who are users of the pilotage services and are nominated by the Puerto Rico Shipowners Association; two (2) who are not or were involved financially interested or related to the pilotage profession, shipping business or maritime industry who shall represent the public interest; and one who represents the Government of Puerto Rico, who shall be a Ports Authority employee. For the purposes of this section, a 'user of the pilotage services' is any person who is an agent or representative of any person with a proprietary interest in a business that regularly employs harbor pilots with a Puerto Rico license, with the purpose of providing pilotage services, or any person who is a direct employee thereof. (Emphasis ours). (§ 361c Commissioners- Composition and term of office)

As the statutory text makes plain, the Commission is a collegial body of seven (7) Commissioners, and the President's role is limited to administrative tasks such as assigning areas of work—i.e., an administrative role concerning agenda and assignment of tasks. The President does not have the authority to act unilaterally; she is only one vote among equals. The President's unilateral action bypassed and usurped the powers of the other Commissioners, who have equal rights to vote, deliberate, and speak on Commission matters.

Articles 8(b) and 8(c) of Law 226 reiterate the collegial nature of the Commission:

> (b) The Commission shall hold one or more regular quarterly meetings in a convenient place in the Commonwealth, on the day or days selected by the Commission. The special meetings may be called by a majority of the Commissioners. The Secretary of the Commission shall deliver a notice of all the regular and special meetings to all the Commissioners, and also to any person who should be notified by law.
>
> (c) Within fourteen (14) calendar days following each meeting of the Commission, it shall issue a written report to each harbor pilot explaining any action taken by the Commission at the meeting, if any determination is made that affects pilotage conditions.

Section 16 of Law 226 enumerates conduct that may be sanctioned by the Commission (by a majority of Commissioners). Said article lists fourteen (14) types of conduct subject to discipline.

Article 16(b) provides, in relevant part:

> (b) When the Commission determines that a pilot or apprentice pilot

>committed any of the acts indicated in subsection (a) of this section, upon notice to the said pilot, giving him/her the opportunity to be heard.

The record shows that the cease and desist order was issued unilateraly by the Acting President of the Commission without consulting with the other commisioners. Also, the gag order imposed upon the Plaintiffs is not a sanction that is contemplated by Section 16 of Law 226. Finally, the action taken was done without following the due process established in Law 226.

It is the principle of security that prevails, and governs the profession of practice. The gag order on the pilots, forbidding them from communicating with agents, vessel owners, dock operators, etc. In doing so, the Commission has placed the safety of the San Juan Bay and the Puerto Rico economy at risk to protect financial interest of a private party. Since the Order was issued by the President, the USCG has contacted several times the Plaintiffs requesting information about safety measurements in the San Juan Bay and assistance for repositioning the buoys in the Army Terminal channel for the next maneuver of a large LNG tanker. **However, because of the gag order imposed by the President of the Commission upon the Plaintiffs, the San Juan Bay Pilots have not been able to provide any information and/or assist the USCG**. Based upon the fact that the next large NLG tanker is scheduled to depart the San Juan Bay on **September 28, 2025 and inbound on September 29, 2025**, the Commission should set aside and let the Plaintiffs do their job of safeguarding port safety immediately so they can communicate with vessel owners and agents; and maritime entities such as the USCG to alert them of potentially dangerous or inadequate situations. As stated above, the effect, of withholding an injunction on the public interest are catastrophic.

Pursuant to the evidence received, the Court should agree that an essential and operational duty of Pilots is to communicate with agents, the Commission, boat owners, regulatory agencies, other Pilots, and to make such safety warnings as they deem appropriate; and that the cease and desist

order does not permit the pilots to fulfill their duties. As such, the cesist and desist order should be declated null and void, and shall be set aside.

## V. **PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing, the plaintiff respectfully requests that this Honorable Court:

(i) Grant the requested TRO, preliminary and permanent injunction ordering NFE to:

-abstein from breaching the agreement reached with the San Juan Bay Pilots;

- call back the 80 metric ton bollard pull escort-rated tug boats that it chartered from ECO to perform the maneuvers of the Large LNG tankers scheduled for **September 28 and 29, 2025**;[28],or

-in the alternative, retain another company which can provide the much needed 80-metric ton bollar pull escort-rated tugs to transit in and out of the San Juan Bay the Large LNG tankers.

(ii) Grant the requested TRO, preliminary and permanent injunction ordering the Commission and its President to:

-set aside the cease-and-desist order of August 15, 2025, issued against the Plaintiffs as the same is null and void because it was taken unilaterally by its President, without convenining the other two (2) Commissioners or notifying them that any communication or order would be issued in violation of Law 226;

-set aside the cease-and-desist order of August 15, 2025, specifically the gag order that was imposed upon the Plaintiffs as said sanction is not contemplated in Section 16 of Law 226; was issued in violation of the equal protection clause and without providing the require due process of law to the Plaintiffs; and in a clear violation of the constitutional rights of the Plaintiff to safely conduct their job and freely communicate with the stakeholders of the maritime industry, including but not limited to the vessel owners and agents; the tug boat operators; the USCG and any other state or federal agency;

-set aside any other Resolution, Order and or communication issued by the Commission during the tenure of attorney Jessica Ñeco as she has not convened, notified and/or informed

---

[28] In the first day of the preliminary injunction hearing, brother counsel for NFE stated in open court to a question made by the Honorable Presiding Judge that said tugs can be called back and return to Puerto Rico.

all the members of the Commission, including Commisioner Capt. Carlos E. Gutierrez who is a plaintiff in this litigation, in a clear violation of Law 226;

-refrain from issuing unilateral determinations and from usurping the powers of the Commission in a clear violation of Law 226;

-refrain Commisioner Mr. Figueroa from taking illegal decisions for the financial benefits of Moran and himself; and,

-prospectively render its determinations as a collegial body in accordance with Law 226.

(iii) Enter judgment in favor of the Plaintiffs, declaring that:

- Defendant NFE is enjoined from withdrawing the 80-metric-ton bollard pull escort-rated tugs until replacement tugs are demonstrated to meet or exceed equivalent safety and maneuverability standards.

- Declaring that the cease-and-desist letter of August 15, 2025, issued by the President of the Commission, is void and ultra vires because it was issued unilaterally and in violation of Law 226; and

- Declaring that all fees generated by pilots are to be paid to SJBPC.

(iv) Award the Plaintiffs a reasonable amout of attorneys for forcing them to file this action; and

(v) Award the plaintiff any other relief not specifically requested but to which they are legally entitled.

I HEREBY CERTIFY that I filed this pleading through the CM/ECF of the Court.

RESPECTFULLY SUBMITTED.

San Juan, Puerto Rico, this 22nd day of September, 2025.

S/Giancarlo Font García
GIANCARLO FONT
USDC-PR NO. 210612
306 Calle Coll y Toste
San Juan, PR 00918
TEL. (787)622-6999/
(787)647-1876
gfont@drcprlaw.com

S/ FRANCISCO E. COLÓN-RAMÍREZ
Francisco Colón-Ramírez, Esq.
Bar No.: 210510

E-mail : fecolon@colonramirez.com
COLÓN RAMÍREZ LLC
PO Box 361920
San Juan, PR 00936-1920
Tel.: (787) 425-4652
Fax: (787) 425-4731

s/LUIS MANUEL PAVÍA-VIDAL
LUIS MANUEL PAVÍA-VIDAL S/
USDC-PR NO. 227205
pavialaw@gmail.com
URB. BALDRICH
COLL Y TOSTE ST. #306
SAN JUAN, PR 00918
*TEL. (787)622-6999*

s/MIGUEL A.NAZARIO, JR
MIGUEL A. NAZARIO, JR
USDC PR No. 214502
man@nblawpr.com
NAZARIO BRICEÑO
LAW OFFICES, LLC
Cervantes 82,
San Juan, Puerto Rico
00907
Tel. No. 787-449-2717