**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| |
|---|
| CAPT. BUSTO-ALVAREZ, et al<br><br>Plaintiff,<br><br>vs.<br><br>NFENERGIA LLC, et al<br><br>Defendants |

**Civil No. 25-cv-1462 (SCC)**

**OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION AT DOCKET NO. 152 AND MOTION REQUESTING ORDER DIRECTING PILOTS TO ATTEND TRANSIT PLANNING MEETINGS**

**TO THE HONORABLE COURT:**

**COMES NOW,** Defendant NFEenergía LLC ("NFE"), through undersigned counsel, respectfully states and prays as follows:

**I. INTRODUCTION**

Plaintiffs' emergency motion at Docket No. 152 rests on a fundamental misunderstanding of both maritime law and maritime practice. Their claim that harbor pilots are "in command" of a vessel during pilotage, and that NFEenergía's participation in coordination meetings constitutes an interference with pilot authority, is contrary to centuries of admiralty law and common-sense port safety. Even more remarkably, plaintiffs now complain about being *invited* to operational meetings—meetings that they have regularly attended for months and that exist solely to ensure that all parties involved in the movement of LNG vessels through San Juan Bay operate with maximum coordination and safety.

1

The record demonstrates that such meetings are not new inventions, but standard, recurring operational briefings convened before and/or after many vessel movements. The prevoius pre-arrival and pre-departure meetings related to the entry, docking and departure of the *M/V Gaslog Singapore*, *M/V Energos Maria*, and *M/V Energos Princess* included the very same pilots who are plaintiffs in this action, along with tug operators, terminal representatives, and vessel masters.  See **Exhibits 1 through 8**, Meeting Invitations.

The subject matter of these meetings has always been directly relevant to the safe conduct of the same LNG vessel movements about which the pilots now complain— covering topics such as pre-arrival readiness, tug assignments, weather and tide conditions, berth readiness, and post-transit debriefs. Operational plans shared in connection with those meetings included information about pilot boarding times, tug configuration, VHF communication channels, and NOAA weather updates, all of which are standard components of coordinated port operations.

That the pilots would now characterize their own participation in these long-standing safety coordination meetings as improper is, therefore, incredible. NFEenergía's efforts to include all stakeholders—pilots, terminal operators, tug masters, LNG vessel masters and vessel representatives—are entirely consistent with prudent maritime safety practice and the shared objective of ensuring safe and efficient port operations.

## II. THE PILOTS' CLAIM OF COMMAND IS CONTRARY TO LONGSTANDING MARITIME LAW

The pilot's duty is to ensure the safe navigation of the vessel and the safety of the environment and to assist and advise the vessel and the master of the vessel. Sea Star Line, LLC v. M/V SEA RACER, 2003 A.M.C. 2641, 2002 WL 32348254 (M.D. Fla. 2002). Plaintiffs' assertion that they "take command" of a vessel during pilotage misstates the law. As summarized in *American Jurisprudence (Second Edition)*:

A vessel's master has the responsibility to monitor the compulsory pilot's decision making.  Even though being obliged by law to take on a compulsory pilot, the master retains the ability to countermand the pilot in exceptional or limited circumstances and does not relinquish all right of control over the vessel to the pilot.  While the pilot is on board, the master is still in command of the vessel, except as to the vessel's navigation, and must cause the ordinary work of the vessel to be properly carried on and the usual precautions to be taken.  Indeed, both the docking pilot and the vessel captain bear responsibility for bringing the vessel safely through a federal navigational channel to the ship berth, and the captain as the master of the vessel has the authority to countermand any of the pilot's orders which places the vessel in a position outside the channel.

The master has the same discretionary power to displace the pilot that the master has to remove any subordinate officer of the vessel.

70 Am. Jur. 2d Shipping § 219, *Master's duty of navigation and management of vessel—Authority and responsibility when pilot is on board.*

Similarly, <u>Rivera v. M/T Fossarina</u>, 663 F. Supp. 544, 546-547 (D.P.R. 1987), in discussing the regulations promulgated under the Dock and Harbor Act of 1968, 23 L.P.R.A. § 2101 et seq.[1], recognized that while the pilot is at the vessel's bridge he acts solely as an advisor to the captain and the crew. The distinction between *navigational assistance* and *vessel command* has been a cornerstone of maritime law since <u>The China</u>, 74 U.S. (7 Wall.) 53 (1868), and has never been altered by Puerto Rico's Act 226 or the Dock and Harbor Act.  See, e.g., <u>Crowley Am. Transp., Inc. v. Double Eagle Marine, Inc.</u>, 208 F. Supp. 2d 1250, 1259 (S.D. Ala. 2002) ("The pilot is there as an advisor to the captain of the tug and does not relieve the tug captain of his responsibilities as master.") and <u>Spokane, P. & S. Ry. Co. v. The Fairport</u>, 116 F. Supp. 549, 552 (D. Or. 1953) ("the master is in command of the vessel, the pilot is his technical adviser and, when the master and the pilot are on the bridge, the pilot's orders, acquiesced in by the master, are the orders of the master."). Even United States Naval

---

[1] Although the *Rivera* case discusses the Port Authority's regulations of pilotage in effect before the enactment of Act 226, it nevertheless recognizes the prevailing principle that the role of a pilots is an advisory one and that the master is always and ultimately in command of the vessel.

Regulation recognize this long standing principal: "The mere presence of a pilot, licensed or unlicensed, does not normally relieve the commanding officer of responsibility for the safe navigation of his ship. Navy Regulations provide, inter alia, that… A pilot is merely an adviser to the commanding officer." LT Harry Lee Hall, USN, The Commanding Officer and Negligent Pilotage-Liability Aspects, 17 JAG Journal 123 (1963) (citing Articles 0751 and 0752, Navy Regulations (1948)).

The pilot's assumption of control for navigational purposes does not displace the master's authority. The master remains the ultimate authority on board, retaining command of the vessel at all times. When the master entrusts certain navigational duties to subordinates or to external professionals such as pilots, he is not relinquishing his command, but rather exercising it through delegation—a legitimate extension of his responsibility, not a surrender of it.

### III. NFE'S CONDUCT IS CONSISTENT WITH ESTABLISHED MARITIME PRACTICE AND SAFETY COORDINATION

NFE's request that all parties involved in the movement of LNG vessels—pilots, tug masters, terminal personnel, and vessel representatives—attend pre-movement coordination meetings is a standard, prudent, and well-established safety practice.  It is, therefore, surprising that the pilots now object to meetings that they have attended and participated in for months. The subject matters discussed in the *Gaslog Singapore* and *Energos Princess* meetings confirm that these sessions were conducted openly, respectfully, and with pilot participation.

These meetings are operational briefings designed to ensure alignment on matters such as weather, tug readiness, timing, and emergency contingencies. They are not attempts to "direct" pilotage maneuvers but to facilitate safe coordination among all stakeholders to ensure safety in all transits. If, as plaintiffs assert, the movement of LNG vessels constitutes one of the most difficult and dangerous operations in San Juan Bay, then the inclusion of

terminal, LNG vessel masters, vessel representatives and tug operators in safety planning meetings should be <u>welcomed</u>, not resisted. The essence of maritime safety here is communication—not isolation.

## IV. PLAINTIFFS' INTERPRETATION OF ACT 226 IS OVERBROAD AND UNSUPPORTED

Act 226 of August 12, 1999, while recognizing the pilots' expertise and public function, does not supersede the master's authority or preclude collaboration with other maritime professionals. The statute merely establishes that licensed harbor pilots perform pilotage services within Puerto Rico's ports; it does not make pilots the exclusive decision-makers for all operational matters affecting port safety or terminal logistics.

Plaintiffs' reading of Act 226 would effectively bar advanced coordination among the very entities—pilots, tug operators, terminal safety officers, LNG vessel masters and vessel representatives—whose cooperation is essential to the LNG vessels transits in question.

## V. NFE'S ACTIONS COMPLY WITH THE INTERIM STIPULATION AND PROMOTE SAFETY

Plaintiffs' suggestion that NFE's recent coordination meetings violate the Interim Stipulation (Docket No. 124) is unfounded. The Interim Stipulation—entered into jointly by the pilots and NFE and approved by this Honorable Court—was designed precisely to allow the safe continuation of LNG vessel operations under controlled conditions while the case remains stayed. It does not restrict NFE's ability to plan or coordinate the upcoming maneuvers; to the contrary, it mandates such coordination.

Paragraphs 1 through 4 of the Stipulation specifically require NFE to mobilize and maintain in San Juan two 70 + metric-ton escort-rated tugs—one from Moran and one from McAllister—to be used along with the *Audrey McAllister* and *Maxwell P. Moran* in assisting LNG vessels during port movements for at least forty-five (45) days after their arrival. These

5

paragraphs further provide that the use of those tugs will be dedicated to LNG tanker maneuvers.

In practical terms, this means NFE—who is obligated to provide those tugs—must necessarily coordinate with the pilots, tug operators, terminal staff, LNG vessel masters, and vessel representatives before each maneuver to ensure compliance with the very conditions the Stipulation imposes. The preparatory meetings plaintiffs now challenge are part of that coordination process: they confirm tug readiness, berth conditions, weather forecasts, communications channels, and timing for each vessel movement. These are ordinary operational matters required to safely implement the Court-approved arrangement.

Far from violating the Stipulation, NFE's actions fulfill it. The Stipulation entrusts NFE with mobilizing and making available the required tug capacity to facilitate the LNG maneuvers within the agreed parameters. It could not do so responsibly or lawfully without convening meetings among the parties who will physically execute the operation. The pilots' attendance at those sessions does not constitute interference with their professional discretion—it demonstrates transparency and cooperation.

Thus, the upcoming movement scheduled for Thursday, assisted by the newly arrived 70-ton Moran and McAllister escort tugs, is precisely the type of operation the Interim Stipulation authorized. NFE's advance coordination with the pilots and other stakeholders ensures that this movement will occur in full compliance with the Court's order and in furtherance of navigational safety—the very objectives the Stipulation was crafted to achieve.

Plaintiffs' claim that NFE demanded a proposed operational plan or attempted to instruct pilots on maneuvering is misplaced. The email correspondence cited in Exhibit B of Plaintiffs' motion reflects NFE's routine effort to ensure that tug operators, pilots, and

6

terminal personnel are aware of sequencing, assignments, and communication channels before the scheduled operation. No directive, instruction, or condition was imposed on the pilots' navigational decisions. NFE has consistently deferred to the pilots' professional discretion once on board, as required by law.

Likewise, the participation of NFE's regulatory and operations advisors such as Ms. Natallia López and Mr. José Martí-Rosario from PR Maritime is confined to administrative coordination—tug scheduling, Teams meeting setup, and document distribution—and not to navigational decision-making. Their role is operational and regulatory—not navigational—and their presence helps to ensure compliance with applicable local and federal safety conditions without infringing upon the pilots' independence.

## VI. CONCLUSION

Plaintiffs' emergency motion is based on an incorrect legal premise and a mischaracterization of ordinary safety procedures. Under centuries of maritime law, the vessel's master retains command, while the pilot serves as a navigational expert and advisor. NFE's facilitation of coordination meetings—where pilots are invited and participate—does not usurp pilotage authority; it promotes the very safety plaintiffs claim to defend.

**WHEREFORE**, NFEenergía LLC respectfully requests that the Court:

1. DENY Plaintiffs' Emergency Motion at Docket No. 152 in its entirety;

2. CLARIFY that NFE's coordination meetings and communications are consistent with the Interim Stipulation and lawful under Act 226; and

3. ORDER the San Juan Bay Pilots Association and its members to attend and participate in good faith in all pre-movement coordination meetings convened pursuant to the Interim Stipulation, including those necessary for the safe operation of LNG vessel movements assisted by the 70 + ton escort-rated tugs now in port.

**Respectfully submitted,** in San Juan, Puerto Rico, this 4th day of November, 2025.

s/ *Alberto J. Castañer-Padró*
Alberto J. Castañer-Padró
USDC 225706
**Castañer & Cía PSC**
MAI Center
Marginal Kennedy
771 Calle 1, Ste 204
San Juan PR 00920
Fax 1 888 227 5728
Tel 787 707 0802
alberto@castanerlaw.com

s/ *J. Ramón Rivera-Morales*
J. Ramón Rivera-Morales
USDC-PR 200701
Midtown Building 4th Floor
420 Ponce de León Ave., San Juan, PR
00918
Tel. 787-510-8090
email: rrivera@jgl.com

s/ *Thomas N. Lightsey III*
Thomas N. Lightsey III
By Admission Pro Hac Vice
Fed. ID: 84829
Holman Fenwick Willan USA LLP
3040 Post Oak Blvd.
Floor 18, Suite 129, Houston, Texas
77056
Tel. (713)917-0888
Email: tom.lightsey@hfw.com

s/ *Christopher R. Hart*
Christopher R. Hart
By Admission Pro Hac Vice
Fed. ID: 12517
Holman Fenwick Willan USA LLP
3040 Post Oak Blvd.
Floor 18, Suite 129, Houston, Texas
77056
Tel. 713-917-0888
chris.hart@hfw.com

8

Attorneys for NFEnergia LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Puerto Rico by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: S/*Alberto J. Castañer*
  **Alberto J. Castañer**
  USDC-PR No. 225706