# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

BUSTO-ALVAREZ, ET AL., )          CASE NO. 25-CV-1462 (SCC)
Plaintiffs,          )
)                    MOTION HEARING
vs                   )
)
NFENERGIA LLC, ET AL.  )
Defendants.          )

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE JUDGE SILVIA L. CARRENO-COLL
SAN JUAN, PUERTO RICO
Friday, October 31, 2025

APPEARANCES:

For the Plaintiffs:        FRANCISCO E. COLON-RAMIREZ, ESQ.
                           GIANCARLO FONT-GARCIA, ESQ.
                           LUIS M. PAVIA-VIDAL, ESQ.
                           MIGUEL NAZARIO-BRICEÑO, ESQ.


For the Defendants:        ALBERTO CASTAÑER-PADRO, ESQ.
                           JOSE RAMON RIVERA-MORALES, ESQ.
                           THOMAS LIGHTSEY, ESQ.
                           CHRISTOPHER R. HART, ESQ.


Produced by mechanical stenography; computer-aided transcription

Joe Reynosa, CSR, RPR
Official Court Reporter

(PROCEEDINGS COMMENCED AT 2:05 P.M.)

THE COURT:  Call the case.

THE COURTROOM DEPUTY CLERK:  Busto-Alvarez and Others versus NFEnergia LLC and Others, Civil Case No. 25-1462, for a Motion Hearing before Judge Silvia Carreño-Coll.

On behalf of the Plaintiffs are Attorneys Francisco E. Colon-Ramirez, Giancarlo Font-Garcia, Luis M. Pavia-Vidal, and Miguel A. Nazario-Briceño.

On behalf of the Defendants are Attorneys Alberto Castañer-Padro, Christopher R. Hart, Jose Ramon Rivera-Morales,  and Thomas Lightsey.

THE COURT:  Good afternoon, everyone.

MR. COLON-RAMIREZ:  Good afternoon, Your Honor.

THE COURT:  Mr. Colon, you filed an informative motion at docket 140.  Together with the motion, we have six exhibits.  NFE opposed the informative motion at docket 143, and you filed your reply, after asking leave of the Court, at 146.

So I believe the appropriate order is that you state on the record why you move the Court.  Because even though it's labeled "Informative Motion", it contains some information that is concerning in terms of compliance with the stipulation on interim measures.

Joe Reynosa, CSR, RPR
Official Court Reporter

MR. COLON-RAMIREZ:  Yes, Your Honor.  For the record, Attorney Francisco Colon-Ramirez.

Before we start, Your Honor, I do want to bring to the Court's attention, there are witnesses in the courtroom present whose testimony has commenced on the stand, and they are under the rules.  So I may be wrong, but I believe they should be excluded from the proceedings.

THE COURT:  Are you going to be discussing any factual issues?

MR. COLON-RAMIREZ:  Yes, Your Honor.

THE COURT:  Then they need to be excused.

Thank you.

(Whereupon, the Defense witnesses exited the courtroom.)

THE COURT:  Go ahead.

MR. COLON-RAMIREZ:  So, Your Honor, we filed the motion at docket 140.

THE COURT:  Yes.

MR. COLON-RAMIREZ:  We are informing several things.  One -- and I want to backtrack a little bit.  Around October --

THE COURT:  The stipulation was entered on October 9th.

MR. COLON-RAMIREZ:  Yes.  And about almost two weeks thereafter we received an email.  "We" being counsel

for the Plaintiffs.  We received an email from Mr. Tom Lightsey following up on a prior email that was attempting to coordinate the pilots' attendance of a simulation at an October 17 simulation in Madrid.  That email was not copied --

And just to put in context, September 28 was a Sunday.  That was the day the First Circuit denied the emergency motion for relief on the appeal of the TRO.  So we were in the middle of litigation.

That email had been sent I believe by Puerto Rico Maritime to the pilots directly.  Counsel were not copied, even though this is a case in litigation.  So I had no knowledge of it.  We had not seen it.

So when Mr. Lightsey followed up on us asking --

THE COURT:  When was the follow-up?

MR. COLON-RAMIREZ:  I believe it was about the 17th or 18th of October.

So it could have --

THE COURT:  And this is a follow-up of the September 28 --

MR. COLON-RAMIREZ:  -- email, yes.

Actually, I believe it was a little later.  I think it was on October 20th.

Anyway, in response to that, my response to Mr. Lightsey was, "Look, we have agreed to discuss the

parameters of the simulation, and we have discussed to agree the location of the simulation in good faith." So why am I getting a follow-up when on October 8, when we were here -- and I still remember Mr. Lightsey's words when he wanted to change language on the stipulation for interim measures, and he said, "We just want to be sure that Madrid is still on the table." And that was in response to my concern that it sounded like it was *fait accompli.*

He said, "No, no. We are going to discuss it in good faith, but we want it to be on the table."

THE COURT: Yes, I agree with your recollection.

MR. COLON-RAMIREZ: So the follow-up email seemed very inconsistent with that because it seemed like *fait accompli.*

So the response to Mr. Lightsey, which was mine, was, "Look, Tom, the parties have agreed to discuss this in good faith, but we haven't discussed. We haven't even started. We haven't discussed the parameters of the simulation. Forget even where. I think the first thing we need to do is a stock."

So we set up a zoom, which was I believe October 23rd. We had a zoom that I organized. Mr. Hart connected. Mr. Lightsey connected. And during that zoom, the Plaintiffs mentioned, "Look, this starts -- this should start with a conversation between the experts. Who is your

expert?

"Oh, we don't know yet.

"Okay.  So hire someone soon."

Actually, there was an email the day before that said, "Look, we don't know who our expert is going to be."

THE COURT:  You attached documents at docket 131 and then at 140.  I believe that some of these references that you are making --

MR. COLON-RAMIREZ:  They are in those exhibits, yes.

THE COURT:  -- are in the exhibits, yes.

MR. COLON-RAMIREZ:  But the point is, it was at that moment, around October 23rd, that we were informed that NFE had hired Captain Christopher Bordas as their expert.  So great.

So, finally, about 48 hours later --

THE COURT:  So this is two weeks after the interim stipulation.

MR. COLON-RAMIREZ:  Yes, Your Honor.

THE COURT:  What happened in those two weeks?

MR. COLON-RAMIREZ:  Nothing.

Well, if I were to answer, I felt that I was being roped into an attempt to paint the pilots as noncooperative with the simulations.  All we received in those two weeks was that follow-up email.

Anyway, so on the call with counsel from NFE, we agreed that the pilots' expert, Mr. George Burkley, needed to first discuss this with the expert for NFE.

THE COURT:  With Mr. Bordas.

MR. COLON-RAMIREZ:  Captain Christopher Bordas, who, by the way, is a ship handling expert.  He is a pilot out of Kent in the United Kingdom.  A very qualified pilot.  Not a simulation expert, but that's okay.

So that conversation was had between the attorney -- between the experts, between the experts and other people from NFE who were present.

THE COURT:  And now you are talking about one of the exhibits at 140 which has all the conversations.

MR. COLON-RAMIREZ:  140-1, Your Honor, exactly.  That's the transcript -- and that transcript was sent by Attorney Lightsey to us.  And, apparently, it is the product of a -- from what I understand, Natalia Lopez, who was present on the zoom, had an AI assistant.  That's a feature of zoom.  Some AI tool.

THE COURT:  It's an AI generated transcript.

MR. COLON-RAMIREZ:  Yes.

THE COURT:  How accurate are these things?

MR. COLON-RAMIREZ:  Well, I will confess, Your Honor, I read the 31 pages of the transcript.  There are some typographical mistakes, some mispronunciations or that

it misinterpreted, but for the most part, it seemed like a very legitimate transcript.  I was actually quite impressed.

So during the call there is a conversation by Mr. Burkley, and he is explaining, look, we need to start looking at the WAS.  And in particular, there is a part of the WAS, the Waterway Suitability Assessment, that has what they call the Haz ID, or hazard identification.  It's just pointing out the different dangers.  And there is also an emergency response plan, or ERP, separate from the WAS, but it's two separate documents.

And, briefly, Your Honor, the ERP, so it is a list of proposed measures of what is going to be done in the event of any particular emergency.  It could be -- theoretically, it could be a hurricane coming in.  It could be a fire at the pier.  And it's going to propose, or it's going to explain that in those cases, the way to manage the LNG vessel is to do this.

Now, I don't know what it says because I haven't seen it.  But it's important because for the simulations, you have to simulate what you are proposing, because that is your emergency response plan.  Right?  So, otherwise, the emergency -- if what you are proposing cannot be done according to the ERP, then what you are proposing is a pipe dream.  You have to be able to do what you are saying is going to be the response in the given emergency.

So it starts from both of those areas, the hazard ID and the ERP. And as Mr. Burkley said, and sit down with the pilots to flesh all the hazards. And then from there, on the simulation side, you prepare a run matrix, which after reading the transcript, it sounds fancy, run matrix. All it is is a -- as I understand it, it's a list of the different conditions you are going to simulate. The different runs. And great. So it seemed very -- it seemed -- as I read the transcript, it seemed very sensical to me, commonsense. And Mr. Bordas, according to the transcript, agreed. He said, "I agree with everything Mr. Burkley is saying." Great.

So with that -- so that conversation ends, but NFE's response was that it was not going to disclose the WSA. I did not see a mention of the ERP. So we are at a situation where if the experts agreed that step 1 is X, meaning, start with the WSA, the hazard identifications, look at the ERP, sit down with the pilots, flesh out all the hazards so that we can start preparing a run matrix.

Now, separately, at the facility that's selected, then we have to validate the model day, the boats, whatever. That's a simulation validation exercise elsewhere. But at least conceptually, let's prepare the run matrix.

So despite that agreement, there is an objection to produce the WSA. It seemed that Ms. Natalia Lopez's response to Mr. Burkley was they did not agree to produce it.

Mr. Lightsey sent counsel --

THE COURT:  And Mr. Burkley made it clear that he wasn't asking for the whole thing.  Just the hazard ID.

MR. COLON-RAMIREZ:  The hazard identification portion.

THE COURT:  That was really clear.

Actually, he said, "I am going to save you 800 pages."

MR. COLON-RAMIREZ:  Yes.

So with that, the response -- Mr. Burkley understood the response from Ms. Lopez was they weren't going to produce it.

We get an email from Mr. Lightsey that said that Ms. Lopez does not agree to produce it.

So at that moment there is a significant level of frustration because there is a meeting of the minds between Captain Bordas, who is the expert for NFE, and Mr. Burkley that this is where it starts, with the hazard ID, with the ERP, and then a meeting with the pilots to then flesh out all the hazards and prepare the run matrix.

THE COURT:  And decide on the location, where the simulations are going to take place.

MR. COLON-RAMIREZ:  And that's separately.  I am handling the issue separately because it's not sequential, but it's another issue that's happening at the same time.

THE COURT:  Okay.

MR. COLON-RAMIREZ:  So that's where we are with regards to starling the conversation to prepare the run matrix and how the simulations are going to be conducted.  We are not even -- so we have -- there is an agreement as to what step 1 is, and step 1 has not even been executed.

THE COURT:  Among the experts.

MR. COLON-RAMIREZ:  Yes.

There is an agreement among the experts, and step 1 has not even been executed.  And, Your Honor, the interim measures was agreed to over 20 days, three weeks ago.

THE COURT:  Okay.

MR. COLON-RAMIREZ:  Now, separately, on the issue of where the simulations are going to be -- where they are going to be performed, first of all, Your Honor, I want to start by saying that, even though theoretically the simulation exercise is not something that should be done under the Court's purview, it should be handled by the experts, and so forth, we cannot deny that there is litigation ongoing.  There is a stipulation for interim measures.  The preliminary injunction has been consolidated with the permanent injunction and the trial on the merits per Rule 65.  There is an active case going on.

And when we came up with a list, "we" meaning the Plaintiffs, when we came up with a list of potential

facilities at which the simulation could be run, one of them was Mr. Burkley's facility.  But I would not propose our expert's facility to conduct the simulation when I believe that for the purity, right, of the process and because the parties should be focused on seeking a truly independent third-party simulation facility, we did not propose Mr. Burkley's facility.  We gave others, including Houston, which is where NFE chose to conduct the first round of simulations.  At least the ones that were part the WSA. That's at docket 34-2, the simulations.  And at the top of that docket 34-2, it says WSA or WS Assessment.  It's part of the WSA.

Now, in that -- so when we -- on that October 9, when we are discussing the proposal for interim measures.

THE COURT:  October 9th.

MR. COLON-RAMIREZ:  Yes, 9.

Now I come back to Mr. Lightsey's words when he said, "No, no.  It's not decided.  We just want to be sure it's on the table."

The follow-up message that we get is not consistent with an agenda to discuss where it's going to be.  I personally felt that our clients were getting railroaded into Madrid.  Okay.

The response to that was, it's premature to talk about the location and dates.  We have to first discuss how

we are going to do this, which the experts have already agreed on.  WSA, ERP, meet with the pilots, flesh out the hazards, prepare the run matrix.

So recently we received an email, which is -- that's attached at docket 140.  I forgot which one, but it's an email from Mr. Ramos-Rivera, one of the attorneys for NFE.  And he refers to NFE -- he refers to Siport 21, which is the facility in Madrid, Spain, that they had proposed the simulations take place, as NFE's simulation experts.

So the response to that -- there was other language in that email that I was concerned with.  I highlighted, or I cited every passage I was concerned with, and I responded and I had questions.  But in particular as it pertained to the identification of Siport 21 as NFE's simulation experts or NFE's simulation team, my question was at that moment, "Look, I would expect that the parties focus on finding an independent facility who is no one's expert."

So I didn't get a response to their email in that regard.  That email we brought it up in the motion at docket 140.  Of all the things that NFE answered in their motion at docket 143, I didn't see anything addressed as to NFE -- as to our objection in light of NFE not being an independent facility.

In fact, what was mentioned -- with Siport not being an independent facility.  In fact, the motion said --

the motion suggested that -- or not suggested.  It actually explicitly said, and we mentioned this in the reply, that Siport was an independent facility.  But then why -- I have still yet to receive an explanation as to why NFE calls Siport 21 NFE's simulation expert, and then we are told in an opposition at docket 143 that it's an independent facility.

At least -- I mean, I acknowledge that all I have done mostly in my life as a lawyer is litigate.  But in the context of litigation, one thing, being someone's expert and being an independent facility are mutually exclusive.

So, going forward, we need two things.  We need that step number 1 to take place.  We need to see the hazard ID, see the ERP, sit down with the pilots who are the experts in San Juan bay, flesh out all the hazards, and prepare the run matrix.

Simultaneously, we also need to examine facilities.  But, Your Honor, I have serious reservations of running simulations at a facility that is someone's expert.  You are either an expert, or you are an independent facility.  But, you know, we cannot go into the wolf's den.

So with that -- and then, as I look back, I have a lot of other red flags that then pop up in my head.  I will share a couple of them.

There seems to be an absolute hesitance on behalf of NFE to conduct the simulations at Houston.  Houston was

hired by NFE to begin with.  So they had at one point said, they had the -- the whole San Juan bay was already simulated. They just had to go back and review and make sure it was up to date.

These were exercises that took months to make sure that the Houston facility at SEI, Seamen's Church Institute, could host and run the simulations at NFE's request because it was NFE who hired them.

For some reason, there has been an incredible amount of hesitance on behalf of NFE to even consider Houston.  Never mind doing it there.  Just --

THE COURT:  There was argument that the facility was unavailable.

MR. COLON-RAMIREZ:  No, Your Honor.

THE COURT:  Then Mr. Nazario provided I think by way of email information regarding the availability of Seamen's Church in Houston.

MR. FONT-GARCIA:  Not only that, Your Honor -- may I interject?  This is Attorney Font, for the record -- during the initial proceedings, I said on multiple occasions for the record, after calling Houston, that the facility was available.

THE COURT:  Yes, you had.

MR. COLON-RAMIREZ:  And, Your Honor, and in particular, they are widely available to run the simulations

at night, which is no big issue because the prior simulations at Houston were run at night.  The last time NFE hired them, they were run at night.

So the facility is available.  Unlike any other facility, Seamen's Church Institute, SCI, has four-man tug bridges simulated.

Just to give Your Honor an example, when you are proposing to use four tugs and you only have two-manned tug simulators, you are going to simulate the other two on a desktop computer.  But you are not going to simulate a tugboat.

What you are going to do is you are going to apply a vector force, a vector, a force, depending on what is requested.  So it doesn't even behave like a tugboat.

Anyway, Houston has the four-man tugboat simulators -- four-man tugboat bridges for use in the simulators.  Now, the data -- all the work to prepare the data, the San Juan bay marina in the simulation, was already done.  It was already done in Houston.  So we just need to double check it, validate it, and then ensure that the vessels that are going to be modeled and simulated are valid as well.

So it would seem -- at least it would seem that Houston makes sense because there was already an enormous amount of effort and time spent there that we could save.

And instead, we are being proposed, when we were followed up in October, first time they wanted to tell us simulations on October 17.

And by the way, Your Honor, it would appear -- but I don't want to get ahead of myself. But it would appear, for many reasons, including the transcript, that NFE's insistence on Madrid is because what they are proposing to do in Madrid is not a true simulation study. It's what we say in Spanish an *encargo*. It's just tailormade to seek a particular outcome. That's the difference between a risk assessment simulation and a Madrid simulation. The Madrid simulation does not seem to be a risk assessment simulation.

But, again, I am not asking at this point that the Court order be done in Houston. But, certainly, if Madrid is not an independent facility, as it was represented in the opposition at docket 143, but rather the folks at Siport 21 are indeed simulation experts, then definitely Madrid is out of the question.

THE COURT: Let me hear NFE. Who is going to speak on behalf of Mr. NFE? Mr. Castañer?

MR. CASTAÑER-PADRO: Yes, Your Honor. Thank you.

For the record, Alberto Castañer on behalf of NFE.

Your Honor, first of all, I would like to say that I am sorry we are taking the Court's time today because had we met and conferred prior to this, a lot of this would have

been resolved.  And, as a matter of fact, the motion at 140 doesn't even have a certificate of meeting and confer.  They moved for --

THE COURT:  The motion is titled "Informative Motion".

MR. CASTAÑER-PADRO:  Yes, but they are requesting relief.  In their order to show cause, they are basically moving for an order to produce documents, in essence.  And this could have been ironed out very easily, Your Honor, between counsel and the parties had we net before this.

I would like to address the issues in the same order as they did.  First of all, Your Honor, I wish that the WSA and the Haz ID and the ERP production was as simple as it's being portrayed to be, but it's really not, Your Honor.

Under -- upon further inspection of the CFR with all these issues that have surfaced, we have come to the conclusion that this information is considered SSI under the regulations.

THE COURT:  What portion?

MR. CASTAÑER-PADRO:  All of it, Your Honor.  All of it.

THE COURT:  All of the WSA?

MR. LIGHTSEY:  One hundred percent of it, Your Honor.

THE COURT:  So you are saying that the experts

can't see this.

MR. CASTAÑER-PADRO:  Well, Your Honor, it's a very touchy situation.

If we go to the regulations, which we can go through, they are fairly simple, just a few sections, I think Your Honor will be convinced that we have no option as a covered person under the regulations but to withhold the information until they get clearance from the Coast Guard or Homeland Security.  That's in black and white on the regulations, Your Honor.  And we can go through them --

THE COURT:  Give me the CFR you are reading from.

MR. CASTAÑER-PADRO:  Yes, Your Honor.

If you 49 CFR, section 1520, that's the chapter on Sensitive Security Information.  And only covered persons are allowed access to that information and on a need-to-know basis.  Right?  And the need-to-know basis is, even if you are a covered person, you can only have --

THE COURT:  Okay, okay.  I know this regulation.  I understand what it says.  But from where do you gather that the whole WSA is covered or has sensitive security information?

MR. CASTAÑER-PADRO:  Because it's been designated as such.

THE COURT:  Where?  Now, that's portion of the CFR that I want to see.

MR. CASTAÑER-PADRO:  Well, it's been stamped as such by Homeland Security.  So we don't have a saying on that.

And what I am saying is that, if we get a request, the regulation requires us to first go --

THE COURT:  Do you have that document with you right now?

MR. CASTAÑER-PADRO:  Which document?

THE COURT:  Do you have the stamp?

MR. CASTAÑER-PADRO:  Your Honor, we provided you the original and the...

THE COURT:  Okay.  So today you brought me a flash drive.  That flash drive contains a document which contains that stamp?

MR. CASTAÑER-PADRO:  Bear with me, Your Honor.

Your Honor, the flash drive has two folders. Right?  The order said that we need to provide the Court with the original documents.

THE COURT:  The redacted and the originals.

MR. CASTAÑER-PADRO:  Exactly.

So, as you will see, Your Honor, there are over 3,000 page.  Within 24 hours, we couldn't work on the whole redaction, but we provided a significant portion of redacted documents.

Those documents had been stamped as SSI.  And we

have a duty under the regulations to go to the Coast Guard when we get a request to tell the Coast Guard we have been requested this information, and they take action upon it.

As a matter of fact, Your Honor --

THE COURT:  Let me ask you something, back in 2023, when everyone, before litigation, was in agreement that a risk assessment had to be made and all the stakeholders sat down, and everyone was in agreement that four 80 metric ton bollard pull tugboats were necessary, the WSA was considered, right?  Because it's part of the assessment to make the simulations and to be able to do the assessment.

MR. CASTAÑER-PADRO:  Well, Your Honor, let's be clear.

THE COURT:  No, no.  Tell me.  The WSA was considered back in 2023, from 2023 to 2025 --

MR. CASTAÑER-PADRO:  For what purposes?

THE COURT:  For the simulations that were conducted in Houston.  Because if that is the case, this was shared back then.  And now for the first time, now it's --

MR. CASTAÑER-PADRO:  I don't think it was, Your Honor.  And if it was, it didn't follow proper procedures.

THE COURT:  Stop there.  We are going to find out if it was not or was not.

Can you verify this for me?

MR. FONT-GARCIA:  Yes, Your Honor.  And I would like to make one comment, Your Honor.

MR. CASTAÑER-PADRO:  But, Your Honor --

THE COURT:  Hang on.  I need to know this.

Tell me, was the WSA considered at the time the initial simulations were conducted in 2023?

MR. COLON-RAMIREZ:  Your Honor, docket 34-2, it's the navigation simulations on the NFE letterhead.  The document is titled "WSA Risk Assessment".  So if I look at that document on its face, the navigation simulations at docket 34-2 are part of the WSA Risk Assessment.

THE COURT:  I cannot fathom doing simulations without the WSA.

MR. CASTAÑER-PADRO:  Your Honor, if I may.

The WSA is dated May 2024.  So it was not contemplated.

THE COURT:  Because it had not been finished. That's another document that is part of this record.

MR. CASTAÑER-PADRO:  If the parties -- if the pilots were privy, and at some point they were because they signed an NDA with the Coast Guard, to that information, that information could not have been disclosed to the simulators without consent of the Coast Guard because they would be in breach of the NDA.

MR. NAZARIO-BRICEÑO:  That is not correct,

Your Honor.  There is no NDA here.  None.

THE COURT:  What NDA?

MR. NAZARIO-BRICEÑO:  It does not exist.

My clients never signed an NDA.  And they were hired by NFE as experts to prepare the WSA.  The pilots were the experts for the WSA.

MR. LIGHTSEY:  Your Honor, if I may.  Can we -- I would like to object so we can have one lawyer handling the argument for each side, please.

THE COURT:  I need you to speak up a little bit, Mr. Lightsey.

MR. LIGHTSEY:  I apologize, Your Honor.

I am just objecting.  If we could get a ruling from the Court that we have only one lawyer for each side arguing this motion.

THE COURT:  No, not today.  I need to hear from everyone.  I need to get to the bottom of this.  We don't have witnesses today.  I mean, it has to be in an orderly fashion, but I need to hear everyone.

Mr. Lightsey, do you have the answer to this?  When the original simulations were conducted, was the WSA part of what all the stakeholders considered back then?

MR. LIGHTSEY:  I was not part of that.  So my understanding is, Your Honor, I don't think -- my understanding is, the pilots were never given copies of the

WSA.  And as a general rule -- I just got an email from somebody else on this subject matter -- they generally do not have access -- the WSAs are not produced to pilots.

THE COURT:  Okay.  So not introduced.  What about the information contained therein?

MR. LIGHTSEY:  Again, I think there is -- I think what -- we could have resolved prior to this, but I do believe there is a process by which, with approval of the Coast Guard prior to, we can -- and if I am wrong, I am sure my technical people will tell me -- that the documents or the information can be shared, but the custody cannot be transferred to the pilots.

THE COURT:  Right.

MR. CASTAÑER-PADRO:  Your Honor, if I may.

Joint Exhibit No. 2 of the proceedings during the hearings that were held before is a letter from the Coast Guard dated --

THE COURT:  What document?

MR. CASTAÑER-PADRO:  Joint Exhibit 2.  It's a letter from the Coast Guard denying access to the WSA to the Plaintiffs.  I mean, the Coast Guard has already ruled on the matter, that they would not give access to the Plaintiffs to the WSA.

MR. NAZARIO-BRICEÑO:  Once again, you are being deceiving to the Court.  This is the second time.

THE COURT:  Hang on.  Hang on.  Calm down.

MR. CASTAÑER-PADRO:  I would like some respect.

MR. COLON-RAMIREZ:  I am going to read the last paragraph of Joint Exhibit 2.

THE COURT:  First, is there an NDA anywhere in this picture?

MR. NAZARIO-BRICEÑO:  No.

THE COURT:  So it doesn't exist.

MR. CASTAÑER-PADRO:  Your Honor, there is an NDA.

MR. FONT-GARCIA:  An executed NDA?

MR. COLON-RAMIREZ:  I want to be clear, Your Honor, there is an NDA at docket 140-7.  And this is part of -- my frustration today is that in docket 140-7 there was a representation that if there was an NDA signed, and that docket 140-7 is an NDA for the Department of Homeland Security, and the motion at docket 140 states that the disclosure had to be done under that NDA.

But now NFE, Mr. Castañer now is here saying that the WSA cannot be produced, which is inconsistent, which is what is stated in the motion, it says, it can be produced with this NDA, separately.

What he is mentioning regarding the Coast Guard's position on the WSA is not true.  Joint Exhibit 2, which is in the court records, the last paragraph says:

"You may appeal this determination to the District

Commander pursuant to 33 CFR.  I further note that the information you requested pertaining to the WSA does involve matters of pilotage, but it also contains sensitive security information which requires scrutiny prior to disclosure."

That's not a bar to disclosure.

In fact, it says, "While the limited denial of the requested WSA material is not subject to appeal, my office will contact you to address how to request its disclosure."

Your Honor, I can represent to the Court that I have since followed up on two occasions with Mr. Collazo, with Commander Collazo, which is who they mention, because the last sentence says, "If you are uncertain of anything herein, please reach my point of contact, CDR Alejandro Collazo."

I have written to Alejandro Collazo twice after this letter, copying both times the captain of the port. They still have not reached out, and they still have not provided any indication.  But the representation here that the WSA cannot be disclosed, that's inconsistent with 140-7 and it's inconsistent with Joint Exhibit 2 in the last paragraph.

MR. CASTAÑER-PADRO:  Your Honor, what counsel just read confirms what I said.  They need to go through the Coast Guard, and their request was denied.  It said, "You may have access to some."

THE COURT:  Right, to some, to the portions necessary to conduct the simulations and the risk assessment.

So what are you proposing?  Tell me, what's your proposal to the Court?  That they don't have access to the WSA and that they do what?  Because this is necessary to do the simulations and the risk assessment.

MR. CASTAÑER-PADRO:  Your Honor, I will do what the Coast Guard says with the information.  I don't have a problem producing it, but I am held -- I am tied to the Coast Guard's decision on what to do with the information.

THE COURT:  This is the situation, this is the situation:  October 9, the parties reached an agreement, a stipulation on interim measures.  Everyone agreed here to take off the fighting gloves, and to sit down and go back to the table and in good faith see what's going on.

Maybe, and I even said that at that time, maybe, after the simulations, the pilots are convinced that maybe 80 metric ton bollard pull tugboats are not required.  Maybe not.  I don't know that.  But it was necessary for everyone to go back to the drawing board and do the simulations, and see if any of the circumstances have changed so that the experts can decide what's safe and what's not safe.

The problem that we are having, and I am looking now at the exchanges between the experts in this transcript prepared by artificial intelligence, but according to the

parties, it's pretty accurate as to what happened, is that this goes back to the drawing board, this attempt to everyone in good faith reassess the need for the 80-ton tugboats is not really what's happening.

And you can see in this exchange that Mr. Burkley says that he received a letter from an attorney detailing NFE's position and telling Mr. Bordas that the lawyers should let them do the thing and should then go to the pilots and then have, you know, either have a joint opinion or have different opinions.  But it seems to me that these conversations are driven by attorneys.

And if you were here telling me, listen, we cannot produce a WSA, but we are going to make efforts to produce the portions, or to share the information that they need to be part the simulations, but you are being obstructive.  You are telling me, "We can't.  Our hands are tied."

MR. CASTAÑER-PADRO:  Your Honor, I am more than willing to meet with counsel and the Coast Guard and go through it and cooperate, as a matter of fact.  But we are not the ones who make the call about what will be produced, Your Honor.  We will be subject to civil penalties.

As a matter of fact, because of their request, we have to walk outside this courtroom today and let the Coast Guard know because of the regulations that we have been asked to produce these documents.  We have to let them know.  And

we are more than willing to produce --

THE COURT:  But you knew this.  You knew this since October 9.

MR. CASTAÑER-PADRO:  No, Your Honor.

THE COURT:  You didn't?  You didn't think that the WSA was necessary for the task that we had ahead in these 45 days that we have stayed the litigation?  Isn't it crucial for everyone to consider the WSA?

MR. CASTAÑER-PADRO:  No, Your Honor.

The WSA, Your Honor, if I may, with all due respect, has tangential matters to the pilotage.  And let me explain.

THE COURT:  But I am talking only about the portions that pertain to the safety of the transit of the vessels.  That's all.  And Mr. Burkley made it clear to Mr. Bordas.

MR. CASTAÑER-PADRO:  Yes.  But, Your Honor, Mr. Burkley -- neither Burkley nor Bordas have read the WSA or the emergency response plans.

THE COURT:  How do you know this?

MR. CASTAÑER-PADRO:  Because they have not been provided.  They have not signed the NDAs they have to put in place.  That's a fact.

MR. NAZARIO-BRICEÑO:  Your Honor, if I may. Mr. Burkley is available.  He is on call, and he can testify

as to the whole process of trying to conduct the simulations. He can testify as to the process that has to be conducted and has to be respected, and all the hurdles that he has faced throughout the whole process.

This process shall be conduct between experts with minimum intervention from their attorneys. And that is the issue that we have been facing throughout the whole process, since October 9th.

You made a question here, what has happened since October 9th? And the answer is nothing.

First of all, the tugs have not come to Puerto Rico. We specifically --

THE COURT: Where are the tugs?

MR. NAZARIO-BRICEÑO: We don't know. We specifically --

MR. CASTAÑER-PADRO: The tugs are --

MR. LIGHTSEY: That's not true, Your Honor.

THE COURT: The tugs are what?

MR. CASTAÑER-PADRO: They had to take shelter because of Hurricane Melissa.

MR. LIGHTSEY: I think they will both be there on the 2nd.

MR. NAZARIO-BRICEÑO: Your Honor, if I may.

THE COURT: I don't know who is speaking right now.

MR. LIGHTSEY: Tom Lightsey, Your Honor.

Your Honor, I undated Plaintiffs' counsel, I believe it might have been yesterday, and I gave the same update to the Court, which is that, now that Hurricane Melissa has passed by, the tugs have come out of their ports of refuge and are en route to San Juan.  And I believe we said they are anticipated to be there on November 2nd.

THE COURT:  November 6?

MR. LIGHTSEY:  November 2nd.

THE COURT:  Because, according to the stipulation at paragraph 9, the 45 days begin to run from the date of arrival of the tugboats.

MR. LIGHTSEY:  Correct.

MR. HART:  Your Honor, if I may.  This is Chris Hart.

If I may address this proposal -- or, actually, the notion that how do things move forward to get the simulations underway and plan.  There is actually a proposal to do that, and the experts, between the two of them, at least for Captain Bordas, he has tried to move that process forward with Mr. Burkley.

Captain Bordas has already emailed with Mr. Burkley a couple of times since their meeting on October 23rd.  And in the most recent one, in response to Mr. Bordas' email where Mr. Bordas said on Monday of this week, when he was asked to meet during this week to move forward with the

discussions, continue what they discussed on the October 23rd meeting, he said he was awaiting to get guidance from the Plaintiffs' lawyers before he could meet again.

THE COURT:  Why do we need the lawyers?

MR. HART:  I am at a loss to understand that, Your Honor.  I think the experts do not need the lawyers.  I am simply letting the Court know what the parties' experts are --

THE COURT:  Yes.  But NFE sent Mr. Burkley a letter stating, "This is our position."  NFE did not allow Mr. Bordas to communicate with Mr. Burkley.  But, rather, a lawyer sent a letter to Mr. Burkley stating the position of NFE.

MR. NAZARIO-BRICEÑO:  And not only that, Your Honor --

MR. HART:  The lawyers for NFE, I do not believe have sent a letter to Mr. Burkley.

MR. LIGHTSEY:  But Burkley and Bordas have been in direct contact, and that is what we've encouraged.

MR. COLON-RAMIREZ:  Your Honor, the letter from Mr. Lightsey was --

MR. HART:  Captain Bordas asked on Wednesday this week, October 29th --

THE COURT:  Wait, wait, wait.  One at time.

Finish what you were saying, Mr. Hart.

MR. HART:  Captain Bordas asked Mr. Burkley on Wednesday of this week, October 29th, to continue their discussions.  And he said, we can work in parallel with whatever the lawyers are doing because us technical experts can get together and we can work on preparing the run matrix and the hazard ID list.  And that's what we believe -- that's what we propose should happen.

THE COURT:  There should not be anything parallel.  The lawyers need to be doing nothing right now.  No lawyers.  The experts have to do their thing.  Because if this is guided by litigation, it's not -- there is going to be an outcome that the Court will be able to rely on to move forward, either to try the case or to reach an agreement and dispose of the case.

MR. NAZARIO-BRICEÑO:  And, Your Honor, further to that --

MR. HART:  We agree, Your Honor.

If I may respond.  We agree one hundred percent with that.

MR. NAZARIO-BRICEÑO:  And we agree also, Your Honor.

MR. HART:  If I could finish, counsel.

That's what we proposed, is get the experts --

THE COURT:  Let me -- listen.  Yes, that's what you propose, that the lawyers step out and that the experts be

allowed to do their thing.

MR. HART:  Yes.  Yes, Your Honor.

MR. NAZARIO-BRICEÑO:  Your Honor, if I may.

Listen, we completely agree with that, and Burkley is on call basically to testify and to let the Court know that this process has to be conducted between the attorneys -- between the experts.  It is a scientific process that has to be conducted with minimum intervention from the attorneys.

But the fact of the matter, Your Honor, is that this process has been conducted by a person who doesn't have any knowledge at all, which is Ms. Natalia Lopez, who doesn't have an expertise on anything.  And if this process needs to be conducted, and, of course, shall be conducted, shall be conducted between our expert, Mr. Burkley, and the expert from the Defendant, Mr. Bordas.  And they have many -- at least two discussions.  They have been in agreement.  So let them talk and let them finish.

But this process has been very contentious, and it doesn't need to be that way.  And that is the main reason for us to let the Court know, listen, this is what's going on.

And if this keeps going on, the 44 days that was agreed upon, all the parties are going to be gone without moving forward.  And that's the whole purpose of taking the time of this Honorable Court.

Again, as to the talks, all that we ask from the part of the attorneys, and we are going to be sitting in the back, is good faith and be truthful.

THE COURT:  Is Mr. Bordas available, Mr. Hart?

MR. HART:  Not at this moment, Your Honor.  We did not -- in fact, we didn't think this was an evidentiary hearing.

THE COURT:  It's not.  We are arguing here -- I mean, you are arguing here.

MR. LIGHTSEY:  If I may, Your Honor.

Mr. Hart, we did just receive an email from Captain Bordas a few minutes ago.  Captain Bordas is in the UK, Your Honor, so he is on quite a different time zone.  But if the Court would like to speak to him, it's possible we might be able to get ahold of him.

THE COURT:  That would be useful.

MR. COLON-RAMIREZ:  One thing, and I think this goes to the -- if this is going to work going forward, things have to change.

For example, I am dismayed that there is a representation to the Court that Mr. Bordas wrote to Mr. Burkley on the 29th and that he is waiting for an answer, when on the 28th I had to file a motion with this Court saying that NFE wouldn't even let the experts get to the first step that they both agreed on.

So it's very disingenuous to argue that on the 29th they sent an email that, "Oh, Mr. Burkley has not answered."

MR. CASTAÑER-PADRO:  Your Honor, first thing, I take offense on the comments by brother counsel as to Natalia Lopez.  Natalia Lopez is our consultant, has worked with the Coast Guard and is very knowledgeable with everything that's going on here, perhaps more than anyone in this room.

THE COURT:  We don't need to get into that.

MR. CASTAÑER-PADRO:  Yes, Your Honor, but I have to put it on the record.

THE COURT:  I am sure she took no offense.

Go ahead.

MR. CASTAÑER-PADRO:  Again, Your Honor, the first step, the so-called first step of producing the information, we have to make it clear, crystal clear, we have no opposition of producing it, but it has to be done through the Coast Guard, with their cooperation and their approval.

THE COURT:  My question is, why wasn't this addressed since day one, since October 9th?

MR. CASTANER-PADRO:  The experts just agreed on it when they had their first meeting about -- I don't know. When was this?  A week ago --

MR. COLON-RAMIREZ:  More than a week ago.

MR. CASTAÑER-PADRO:  -- or so?

It's been an issue.  It's been brought to the

Court.  It's been recent.  This was not discussed back when the stipulation was entered, Your Honor.

MR. COLON-RAMIREZ:  It would have been a great answer a week ago, Your Honor, and not get the response that we got, that NFE had decided not to produce it.  Because that's what we were told a week ago.  That's why we are here.

MR. CASTAÑER-PADRO:  Your Honor, I am going to be perfectly honest and candid with the Court.  At first we were under the impression that it could be disclosed with a simple NDA because we are a covered person, and we would as a covered person provide an NDA to the Plaintiffs that would allow them to see the relevant information.

However, when this became an issue with these motions, upon further inspection of the CFR, we found out, "Listen, this is not so simple."

THE COURT:  Right.  But at that moment, instead of saying, "Let's go to the Coast Guard.  Let's go to the drawing board.  Let's get this going," it was, "We are not going to disclose because we can't."

MR. CASTAÑER-PADRO:  No, Your Honor.  This was yesterday.

MR. LIGHTSEY:  It's the Plaintiffs' obligation to go to the Coast Guard and get the NDA, Your Honor.

MR. CASTAÑER-PADRO:  We were not aware of this until just recently, Your Honor.  This has all happened very,

very -- this week.

THE COURT:  A lot of time has been wasted.  It's been two weeks.

MR. CASTAÑER-PADRO:  Well, the expert just came up with the first step, as they call it, last week, if I am not mistaken.  Right?  And the issue just surfaced this week.  So -- I mean, I know the time frame is short, but by no means are we trying to obstruct this.

On the contrary, Your Honor, we want to move this forward and get it over with.

THE COURT:  What was the purpose of sending Mr. Burkley a letter stating NFE's position, sent by lawyers and not by Mr. Bordas?

MR. CASTAÑER-PADRO:  I don't know, Your Honor.  I haven't read that email.

THE COURT:  Regarding the location, why don't we let Mr. Burkley and Mr. Bordas discuss it and decide what's the optimal place to conduct these stimulations.

MR. CASTAÑER-PADRO:  I would like to address that, please.

First of all, Siport 21 is an expert in simulations.

THE COURT:  What's your response to their position that Siport has become NFE's expert?

MR. CASTAÑER-PADRO:  That it's nonsense.

THE COURT:  Nonsense.

MR. CASTAÑER-PADRO:  Nonsense.

I mean, the interim stipulation says that NFE will take care of the cost of the simulation, whoever does it.  If we pay Siport 21, that cannot be held against us.  We have absolutely no relationship other than what any other client would be, as if -- it's the same as if we go to Seamen's Church, we have absolutely --

THE COURT:  Then why are you not even considering Seamen's Church that has the original data and has --

MR. CASTAÑER-PADRO:  That's a very good question.  They don't have the updated data.

THE COURT:  I said the original, the background data.

MR. FONT-GARCIA:  Your Honor --

MR. CASTAÑER-PADRO:  Your Honor, I haven't finished, please, if you may.

THE COURT:  Go ahead.

MR. CASTAÑER-PADRO:  I have an email here from October 28, this week, from Stephen Polk, who is the director of Seamen's Church's Maritime Training Center.  I will read it out loud.

It's directed to Jessie Reijskens from New Fortress.  It says, "Good afternoon, Jessie.  Before we can provide dates for our simulator availability" -- they don't

have dated available yet as of October 28.

MR. NAZARIO-BRICEÑO:  No.

MR. CASTANER-PADRO:  Please let me finish.

MR. NAZARIO-BRICEÑO:  You are misrepresenting the truth.

MR. CASTAÑER-PADRO:  I am reading out loud.

MR. NAZARIO-BRICEÑO:  No, no, no, you are not.

MR. CASTAÑER-PADRO:  You will have your turn.

"We are still waiting on a few items.  We previously conducted the study using variables that changed after the report was completed."  So the variables have changed.  They are not the ones they have on record.

"As some of the additional dredging was not funded or completed and the permit for the STS lightering alongside the dock was denied by the U.S. Coast Guard.  Because some of the parameters are now different, we are confident that Seamen's Church can revalidate this study with a fresh perspective.  But we still need to define the following: Precise simulation objectives and what harbor tugs to be used and do they need to be modeled."

Your Honor, this is all done in Siport.  They have everything.

MR. NAZARIO-BRICEÑO:  Your Honor --

MR. CASTAÑER-PADRO:  We have --

THE COURT:  Wait.

MR. CASTAÑER-PADRO:  We have a turnkey, plug-and-play simulation at Siport, which by the way has a lot more experience in LNG type of movements.

Seamen's Church is a training facility.  Siport is a much more sophisticated and can provide the capabilities that are needed and what we are looking for here.  We want the better venue.

And, by the way, Your Honor, by admission of Mr. Burkley, docket 140-1, at page 7, on the very first paragraph, Mr. Burkley says, "Guys, call me crazy.  I don't have a dog in the hunt.  By the way, where these simulations happen, immaterial to me.  I think the argument that you need four bridges is silly," which counsel have been referring to today and during the proceedings throughout.

Their own expert doesn't care about the facility, number one, and is saying that the four bridges requirements is silly, quote.

"I have done many waterway suitability assessments for lots of different major oil companies with two tug bridges, one main bridge and vector tugs."

So, Your Honor, we have a turnkey, plug-and-play, more sophisticated and better facility that if we work on a matrix can start immediately, Your Honor.  By their own admission, Seamen's Church -- and I can -- this is not an evidentiary hearing, but I can provide a copy to the Court if

they want.  It should have a copy for everyone.

THE COURT:  Let me hear, Mr. Colon, why do you believe that Siport has become their expert?

MR. COLON-RAMIREZ:  A couple of things, Your Honor. First of all, I agree with Your Honor that the location of the simulation, that's something ultimately, personally, I think let the experts figure it out.  So I agree with Your Honor.

My main issue is that we are getting railroaded into Siport 21, who brother counsel here said on the record that it was nonsense that NFE -- that Siport 21 was NFE's expert.  That is how NFE referred -- that's how NFE's counsel referred to Siport 21.  Docket 140-6.  And the language is highlighted in yellow.  They call Siport 21 New Fortress Energy's simulation team, and in the next paragraph they call Siport 21 NFE's simulation experts.  So it is not nonsense.

And when I wrote in response to that email -- by the way, Your Honor, that was an email dated October 28 from Attorney Ramon Rivera to the Plaintiffs' legal counsel.  I immediately reacted to that and other language, and I said, "Wait a minute.  What's this deal with calling -- you know, with Siport being NFE's expert?"  I got no response.

I brought it up in the motion.  And of all the things that they answered in docket 143, on this one, the Puerto Rico frog, *coquí*, zero.  They mentioned nothing.

The whole point about Siport 21 being intrinsically a better facility, "Oh, because SCI is a training facility," if anything, Your Honor, if anything is nonsense is that. They run the same hardware.  They run the same software.  And if it was nonsense, and to prove that it's nonsense that SCI Seamen's Church is just a training facility, NFE hired them already.

But, again, like Your Honor said, let the experts decide.  Let them prepare the run matrix.

THE COURT:  This email dated October 28 was written by Mr. Rivera.

Mr. Rivera, you refer to Siport as NFE's simulation experts.  Can you explain to me why.

MR. RIVERA-MORALES:  Your Honor, the mention of Siport as a simulation expert is that they are the ones --

THE COURT:  As NFE's simulation experts.

MR. NAZARIO-BRICEÑO:  The one that they are contracting to undertake the simulations, but it would be with -- because they are an expert in simulations.  They are not a retained expert by the Defendant to come and be an expert report.  Their report will be the report on the simulations.  And that would be what each party will bring to that exercise with the tugs and all the computer equipment and come to the conclusion.  They would produce a report.

MR. HART:  If I may add to that, Your Honor?  Chris

Hart speaking.

I just wanted to point out that Siport is, indeed, expert with simulations, but they are not NFE's retained litigation expert. Certainly, somebody has to hire them if they are going to provide simulation services. And the stipulation that's in place on interim measures, it requires NFE to pay for the simulation.

So the fact that NFE would pay Siport to do the simulation services does not make them --

THE COURT: That is clear. But we have a document here, it's an email, that refers to them as New Fortress Energy's simulation team and NFE's simulation experts. That's why this conversation, we had to engage and discuss it, because one thing is someone has to pay, but it's an independent, it's not a partisan, and they are just going to do the simulations, and render whatever report and conclusions they reach.

MR. PAVIA-VIDAL: Plus, Your Honor, there is one thing to point out -- Attorney Pavia, for the record.

Before reaching any kind of agreement as to venue, two represents of Siport 21 were present at the meeting where it was supposed to only be between Captain Bordas and Burkley. So that goes to the topic that now they are contending that they are just retaining them as an expert facility, but why were there two representatives of Siport 21

in the experts' meeting?

THE COURT:  So that's a good point.

MR. LIGHTSEY:  Your Honor, I can answer that question.

THE COURT:  When the Court approved the stipulation, it was agreed that both facilities would be considered, Siport and Houston.  It was left open for discussion.  And it seems to me that NFE assumed that it was *fait accompli*, as Mr. Colon has stated.  And that is problematic.

MR. LIGHTSEY:  Your Honor, if I may.  Two things.  One, I have no less than half a dozen times told Plaintiffs' counsel --

THE COURT:  The record is not --

MR. LIGHTSEY:  My point is, if we are going to do the simulations timely, we have to get the information to Siport.  We need to work with them.  We need to know when their dates are available.  We need to coordinate at the same time the Plaintiffs' counsel to see when their clients are available.  And we -- I say when the experts had their meeting, it was closed that the Siport people would be on that call so they could ask technical questions because it seemed that the pilots had some concerns about the technical capabilities of Siport.  And, therefore, we thought the person who should address that would be the Siport people.

And we told them in advance in an email, in writing, that they would be on that call.

THE COURT:  Okay.  All right.

MR. NAZARIO-BRICEÑO:  Your Honor, the first thing that had to happen is that the experts have to agree the scope of services to be conducted.  Once that happens, then any party -- NFE can go to an institute and then request a quotation.  There is no responsible institute that can make a quotation for the services that they are going to perform if they don't have a scope of services.  None.  None.

You have to specify the process that's going to be conducted, the simulations, the running matrix, every process before making a quotation.  So, to me, it rings a bell and it raised a red flag of tailoring when you are bypassing the first step.  "I want to go at all costs to Madrid."

MR. COLON-RAMIREZ:  I want to add also, Your Honor, Mr. Castañer here today on behalf of NFE argues that it's Siport 21 because it's a superior facility.  Yet on October 10, when we were here, when -- 9th, when I was concerned that it appeared to be at that moment already decided that it was going to be Siport 21, and Mr. Lightsey's response is they just want to keep it on the table, my question then, why the insistence in Siport 21?  "Oh, because we already paid $300,000."  That was mentioned here.

So, at that moment, back in October, in the

beginning of October, October 9, there was no mention of it being a superior facility.  It was an issue of financial commitment.

And, by the way, it turned out to be false because what we received was a purchase order that said that NFE would pay Siport 21 within 45 days of providing the service.  At least we have not been provided with any evidence that there was --

THE COURT:  Okay.  Can we get Mr. Burkley and Captain Bordas on the screen, both of them.

MR. NAZARIO-BRICEÑO:  Yes, Your Honor, at least from our side.

MR. CASTAÑER-PADRO:  If I may, while they do that.

MR. PAVIA-VIDAL:  Your Honor, may I step outside and call Mr. Burkley?

THE COURT:  Yes.

MR. CASTAÑER-PADRO:  Your Honor, Siport was not retained -- was not contracted to advocate for anyone.  It was to run the simulation according to the matrix agreed to by the parties.  And the meeting was not between Siport and our expert.  It was between Siport and both parties' expert.  They were not advocating for anyone.  They just wanted to be familiar with the process and work on the matrix that would result in the actual simulation.  They are not advocating for anyone.  They have no interest or no stake in the case.  They

may be experts in simulations, but they are not our experts in simulations.

MR. NAZARIO-BRICEÑO:  Your Honor, I would like to correct myself when I said before that nothing has transpired since October 9th.

The only thing that has transpired is that NFE retained another counsel, Mr. Castañer.  And that is -- to me, it raises as flag, because when you get to a stipulation, you are supposed to go in good faith and negotiate.

MR. CASTANER-PADRO:  Objection, Your Honor.

MR. NAZARIO-BRICEÑO:  If I may.

MR. CASTAÑER-PADRO:  Your Honor, I have an objection.  That's totally out of place.

THE COURT:  Let him finish his sentence, and then I will rule on your objection.

Finish your sentence.

MR. NAZARIO-BRICEÑO:  Thank you, Your Honor.

When you get into a stipulation and specifically about this type of stipulation which entails conducting a scientific process in which, quite frankly, any attorney, not even myself, has something to do in this process, and instead, all of a sudden, the first things that happened through the docket is the filing of a notice of appearance of an attorney who has filed numerous cases against my clients, that's what tells you that we are doing this process to

prepare for further litigation.

THE COURT:  What's your objection?

MR. CASTAÑER-PADRO:  Your Honor, they are accusing me of doing my job.  I mean, this is completely out of place and unprofessional, to be honest.

I was engaged to work on the case.  I am a maritime lawyer, and I am known to be a maritime lawyer.  I have experience in the field.  And, yes, I have had multiple cases against the pilots.  And, thank God, most of them have been successful.  I am being accused of being my job.

MR. FONT-GARCIA:  That's not true.

THE COURT:  Stop it right now.  Stop it right now.

I think the point is that there is a stay of litigation, and NFE chooses to hire an additional attorney. That's all I am making out of his comments.  That's all there is to that.  No further bickering on this issue.

I am going to take five minutes.  When I come back to the courtroom, I want to have Captain Bordas and Mr. Burkley on that screen.  And I don't want to hear a word from the lawyers.  Sometimes I feel like an elementary school teacher.

MR. NAZARIO-BRICEÑO:  Nothing from our side.

MR. COLON-RAMIREZ:  Just to apprise the Court, Mr. Burkley is driving.  So he was already told to be available.  And --

THE COURT: How long will it take for him to park?

MR. COLON-RAMIREZ: That's what it is.

MR. PAVIA-VIDAL: I just talked to him, Your Honor. He is parked, and he was just awaiting for the new link that the court secretary is --

THE COURT: Mr. Lightsey, how about Captain Bordas? How long for him to connect?

MR. LIGHTSEY: I will defer that to Mr. Hart, Your Honor.

THE COURT: Mr. Hart.

MR. HART: This is Chris Hart speaking.

I have just been emailing to Captain Bordas twice while we are in the hearing here, and I have not heard back from him yet. He is in England. So for him it is now --

THE COURT: -- quarter after 9:00 p.m.

MR. HART: So I have not heard back from him yet. He did not have any heads up that we might want him to attend this hearing today. So I am trying to get in touch with him. I really do not know whether we will be able to have him on the screen in five minutes.

THE COURT: All right. Keep trying.

THE COURT SECURITY OFFICER: All rise.

(PROCEEDINGS SUSPENDED AT 3:13 P.M.)

(PROCEEDINGS RESUMED AT 3:32 P.M.)

MR. COLON-RAMIREZ: Your Honor, we would just like

the record to reflect that Mr. George Burkley is connected to the court's VTC link.

THE COURT:  I see him.

Good afternoon, Mr. Burkley.  Can you hear me?

MR. BURKLEY:  Yes, hello.  Yes, Your Honor, I can hear you.

I am coming through?

THE COURT:  Yes, you are.  And thank you for making yourself available.

MR. BURKLEY:  Thank you, ma'am.  I am in a vehicle, but I am not moving.  I am stopped and safe.

THE COURT:  Where is Captain Bordas?

THE COURTROOM DEPUTY CLERK:  I spoke with Attorney Hart.  He is on a Teams call with Bordas.

MR. HART:  Your Honor, this is Chris Hart speaking.

THE COURT:  Yes.

MR. HART:  I'm sorry.  My video will not turn back on.  I think it's because I have got Captain Bordas on the other line from a Teams call, and he is trying to -- he has clicked on the link for the court's video connection, but it will not let him join.

I just had a call from I think someone in your clerk's court staff who thought that the problem might be, since he is international, this link is not letting him join. And so your court staff told me they were going to see what

could be done about that from herein.

THE COURT:  Okay.

MR. HART:  So that Captain Bordas would be able to join.

THE COURTROOM DEPUTY CLERK:  Judge, maybe we can call him.

THE COURT:  Yes, let's try that.

Very well.  We have attempted to include Captain Bordas in this call which we are conducting via zoom. We are not able to connect Captain Bordas because he is in the United Kingdom, and the system doesn't provide access to international calls.

So we are going to move forward.

Mr. Burkley...

Are you connected?

MR. HART:  He is on my second screen, Your Honor, on a Teams call.

THE COURT:  Captain Bordas, are you connected to this call?

MR. HART:  He can only hear my microphone because he is on my second screen on a Teams call.

MR. COLON-RAMIREZ:  Your Honor, if I may.

I think if Mr. Bordas would hang up the Teams call and then click on the VTC link, he will be able to join.

THE COURT:  Mr. Hart, if you disconnect from the

zoom call that you have right now, will Captain Bordas be able to click on the link provided by the court and connect?

MR. HART:  He might be.  I will ask him to do that.

THE COURT:  Let's try that.

MR. HART:  I assume the Court heard my instructions to Captain Bordas, for him to try to click on the link.

THE COURT:  Any progress, Mr. Hart?  Mr. Lightsey?

MR. LIGHTSEY:  Yes, Mr. Lightsey here.

THE COURT:  Any progress?

MR. HART:  Your Honor, Chris Hart here.

Captain Bordas has just called me just now.  I just answered his call, and he said that it is not working.  He has clicked on the link again, but I am not sure what's happening, but it is not connecting him to the court.

THE COURT:  Let's move forward.  I think that we need to do this in a different fashion, and I don't think we are going to believe able to accomplish that today.

But this is what we are going to do:  Can I have Mr. Burkley back on the screen, please.

MR. BURKLEY:  I am here and waiting.  I can see my own picture.

THE COURT:  Can you see me now?

MR. BURKLEY:  I don't see you, ma'am.  I just see an icon.  It's good though.  I can see myself and you can hear me, so I am ready.

THE COURT:  I can hear you.  I wonder why.

MR. BURKLEY:  Can you see me?

THE COURT:  I can see you, and I can hear you.

MR. BURKLEY:  All right.  We are in good shape. Thank you.

THE COURT:  So, as you know, on October 9th the parties reached a stipulation for interim measures with a little nudge from the Court.  And the purpose is to have you and Captain Bordas -- at the time that the stipulation was entered into, we didn't know who NFE would hire as its expert.  Now we know it's Captain Bordas.  So the purpose is to have you and Captain Bordas meet and make an assessment on what you need for the safe movement of the LNG vessels into and out of the San Juan bay.  So that's the purpose of this.

It seems to me that you have tried and Captain Bordas has tried, but I find today that the interventions on the part of the attorneys have made it difficult for you and Captain Bordas to accomplish that.

So this is the order of the Court:  Before November 4, you are going to reach out to Captain Bordas, and you will set up a meeting.  It can be by zoom, any technology that you deem appropriate.  And in that meeting, you are going to decide on what you need, what portions of the WSA you need, what other documents, anything that you need to start this process.

Today, I have encountered that NFE has basically refused to produce this on the basis of CFR regulations that provide that only some people can access SSI-type information.

The CFR, Title 49, section 1520.11, provides that some individuals have a need to know.  I believe you and Captain Bordas fall within that section.  Actually, under A1 and under A4, which states that when the person needs the information to provide technical or legal advice to a covered person regarding transportation security.  I think it also falls within the purview of when the person requires access to specific SSI to carry out transportation security activities.

So what I need to you do with Captain Bordas is find out what portions of the WSA you need and the ERP, if it's the whole ERP or portions of the ERP, decide on what facility is the optimal facility to conduct the simulations based strictly on what's the best, to obtain an untainted outcome, unbiased, because you are hired by the parties, but you are not parties.  You are experts.

So once you make those decisions, what we need and where should we conduct the simulations, then I want you to reach out to the pilots.  And then you obtain their input.  And we will see one another again.  And hopefully the situation with Captain Bordas will be fixed, and I can hear

from both of you on November 20th as 2:00 p.m. in the afternoon, and I will hear what the plan is. And from there, we will take it.

And this will constitute steps 1 and 2 towards getting the simulations underway and having you fulfill the duty that was assigned to both of you in terms of conducting simulations to ultimately report to the Court and to the parties what is the appropriate -- the appropriate talks that we need for the movement of these LNG vessels.

Do you have any concerns or doubts regarding what I am tasking you to do?

MR. BURKLEY: No. I understand what you are asking and tasking me to do, and I will make it happen.

THE COURT: I need you to communicate to Captain Bordas. And I have specifically instructed the attorneys to stay out of this. Okay? I don't want the attorneys --

MR. BURKLEY: Yes.

THE COURT: And the reason why I am having you connect again on the 20th of November is because I want you and Captain Bordas to report directly to me. Otherwise, it would be by way of motion from the lawyers, and I really don't want to hear from them. Okay?

MR. BURKLEY: I understand.

THE COURT: I also checked the time zone, and it's

only -- the United Kingdom, at least London, is only four hours ahead. So if we do it at 2:00 in the afternoon here, it will be 6:00 in London. I am not sure where he is located, but I don't think that's that inconvenient, and that's the time I have available.

It will be conducted in a hybrid fashion. So the attorneys that are here in Puerto Rico will come in person to court. The attorneys that are not will connect remotely, like they have done today. I am going to work with Pablo and our information technology people to make sure that we at least try in a more efficient fashion to connect Captain Bordas.

And, again, whatever you decide with Captain Bordas, the location that you deem the optimal, is just guided by the best and most independent outcome. All right?

And thank you for making yourself available.

MR. BURKLEY: Understood.

THE COURT: So that's the plan, counsel.

We will reconvene on November 20th at 2:00 p.m.

MR. HART: Your Honor, may I say a few words? Chris Hart speaking for NFE.

THE COURT: Go ahead.

MR. HART: I just had -- I have Captain Bordas on my cell phone here, and I think that he heard what the Court

just instructed.

THE COURT:  That's excellent.

MR. HART:  And I think he is saying that that works for him to proceed.

THE COURT:  Tell him that I thank him for at least trying to connect and that I hope that we can work things out so that I can hear it directly from him on the 20th.

MR. HART:  Great.

There is one more thing, Your Honor, and it still relates to this SSI, because the fact is that some of this information, particularly if it's information that comes out of the WSA, it is already designated SSI, and it would at minimum have to be disclosed only pursuant to a nondisclosure agreement.  And that's what's written into the regulation.

THE COURT:  You are right, because I covered the portion regarding the regulation that states that they are people that I believe have a need to know, but I did not mention and I should have that both him and Captain Bordas need to make the necessary arrangements directly with the Coast Guard.  I am not sure if it's some sort of communication requesting a waiver, or if they need to sign a nondisclosure agreement.  Whatever it is.

So what we will do is, the minutes of today's proceedings will reflect that I instructed and asked Captain Bordas and Mr. Burkley that they need to meet and

confer and everything else I stated, and also that they must reach out to the Coast Guard to make sure that they are compliant with the CFR regulation pertaining to access.

The Court already has the report, the WSA.  So once they come forward and say, well, we already obtained the permission or we signed the NDA, or whatever it is that the Coast Guard requires for the disclosure under that section of the regulation of people that need to know, then I can even put it out there for the experts, or NFE can provide it, so we will see, depending on what the requirement is.

MR. HART:  Thank you for that clarification, Your Honor.  Because, really, for NFE's protection and our perspective for them, NFE is required to comply with those regulations and is not permitted by the regulations itself.

THE COURT:  I should have mentioned that, and I didn't, but now the minutes will so reflect.  And the minutes of proceedings will be notified to both Mr. Burkley and Captain Bordas for their guidance and just to have a very clear record.

MR. HART:  I presume there is a transcript of today's hearing, isn't there, Your Honor?  There will be.

THE COURT:  Well, a party need to order the transcript, and then it can be prepared, yes.

MR. NAZARIO-BRICEÑO:  Your Honor, if I may.

I completely understood the order, but I just want

to make the record very straight.  No intervention, aside from the attorneys -- excuse me -- the experts, no intervention from the attorneys, Ms. Lopez or retired pilots that have been retained by NFE.  Just Mr. Bordas and Mr. Burkley, correct?

THE COURT:  That's the order of the Court.

If Captain Bordas and Mr. Burkley decide that they want to hear from someone else, if they want to hear from Captain Anavitae or from anyone else, they choose to do so.  It cannot be imposed by the attorneys.  So I am giving the experts free reign to choose who they want to hear from and how they are going to go about doing that.

MR. NAZARIO-BRICEÑO:  Thank you, Your Honor.

THE COURT:  Thank you.

Thank you for the clarification.

MR. FONT-GARCIA:  I have one housekeeping matter.  We sent a -- the pilots sent an email on Wednesday to have a meeting with the crew of the new tugs that are coming, and it remains unanswered.  And it's very important that the crew comes to the -- the meeting was set up.  It's supposed to happen in the offices of San Juan Bay Pilots.

THE COURT:  Any objection that they meet?

This is all related to the simulations.  This is related to the interim measures that involve the movement in the 45 days after the arrival of the tugboats.

MR. FONT-GARCIA:  Correct, Your Honor.

MR. LIGHTSEY:  Mr. Hart, have you seen that email?  I have not.

MR. HART:  I have seen no such email, Your Honor.

MR. LIGHTSEY:  If Plaintiffs' counsel resends that to us, we will take a look at it, Your Honor.

MR. FONT-GARCIA:  Okay.  Perfect.  I will send it to you.

MR. NAZARIO-BRICEÑO:  Your Honor, I don't know if particularly to that, we asked for assurance of the charter agreement with the tug company.  Brother counsel for Defendant basically rejected to provide us with that.  I believe that it's in good faith to all be -- have knowledge that, in fact, those tugboats were retained and that they were retained for set amount of time, at least.

THE COURT:  Well, according to the stipulation, it has to be for 45 days after arrival.

MR. NAZARIO-BRICEÑO:  Exactly.  But we did as specifically for the chartered agreement.

THE COURT:  Hang on.

MR. NAZARIO-BRICEÑO:  And we specifically asked brother counsel Lightsey --

MR. LIGHTSEY:  We talked about this before the stipulation that personal details were not going to be provided.

MR. NAZARIO-BRICEÑO:  -- as to the fact if he can attest that those tugboats were chartered.  He said that he didn't have knowledge at all, and he wasn't able to provide the charter agreement as well.

THE COURT:  Mr. Lightsey, what's your response?

MR. LIGHTSEY:  My response is, Your Honor, we discussed this before the hearing ended in Puerto Rico.  We agreed that the commercial terms were not going to be provided.  The Court has our assurances that the tugs have been chartered for a minimum of 45 days, and that is all that is required by the stipulation.  They have no right to see our charter.

THE COURT:  I need you to file an informative motion on the date of arrival of the tugboats stating that they are compliant with the terms and conditions of the stipulation.  Okay?

MR. LIGHTSEY:  We will do that, Your Honor.

MR. NAZARIO-BRICEÑO:  Including the capacity of the tugs and power.

THE COURT:  Yes, of course.  That's part of the stipulation.

MR. LIGHTSEY:  We have already provided the bollard pull certificates, Your Honor.

THE COURT:  Right.  But what I want you to do is to file an informative motion telling me they have arrived and

they have this capability which comports with the stipulation.

MR. LIGHTSEY:  Will do, Your Honor.

THE COURT:  Actually, the tugs were identified by name.

MR. COLON-RAMIREZ:  There was a substitute, Your Honor.

MR. LIGHTSEY:  One of the tugs that -- or maybe both of them.  The tug companies had to move tugs around. The informative motion we filed -- the first one we filed advised the Court of that.  And we subsequently, when we got the new names of the new tugs, we sent that information to Plaintiffs' counsel along with the new bollard pull certificates.

THE COURT:  Can you kindly file an informative motion letting me know that they arrived and they are those identified, and they comport with the capabilities and characteristics stated in the stipulation.

MR. LIGHTSEY:  Yes, Your Honor.

MR. COLON-RAMIREZ:  Your Honor, on that point, for Your Honor's benefit, the tug that was originally identified, James D. Moran, it's been substituted with the Hayley Moran. We were provided a bollard pull certificate that was about 11 years old, which by industry standards is stale.  I told him.

He sent me a newer one from 2019.  But I sent an email.  I haven't received a response yet.  I sent an email that the 2019 certificate appeared to be a reissue of the 11-year-older certificate to correct a mistake on the stated horsepower, not that the bollard pull test was done again in 2019.

So I am just waiting on clarification because I don't want to go ahead of myself, but it's something that we need to address.

MR. LIGHTSEY:  I can address that if you would like, Your Honor.

THE COURT:  Yes, please.

MR. LIGHTSEY:  The bollard pull certificates were issued by I believe ABS.  They are valid bollard pull certificates.  There are -- ABS bollard pull certificates do not, as I understand it, expire.  There are some other agencies in Europe that do things differently is my understanding, but these are valid, current, operational bollard pull certificates.

Mr. Hart, did you have something from the captain that you wanted to add?

MR. HART:  I do not think so, except that ABS is the American Bureau of Shipping.  It's the classification society that did these bollard pull tests, and that's the certificate they have issued.  So it's certified.

MR. COLON-RAMIREZ:  And industry standards, Your Honor, recognizes that a tug -- unless it's retested, that a tug will lose about 1 percent power every year.  This being 11 years ago, that means 11 percent power.  And the problem is that the bollard pull certificate certifies 70.  So if, in fact, it has lost 11 percent power, then it would fall below the 70 agreed threshold.

Again, I am finding out now, today --

MR. LIGHTSEY:  Your Honor, I would disagree with that being the industry standard.  From what I understand, that is not the industry standard.

I know you can Google it and AI will tell you it is the industry standard, but that's not the industry standard as I understand it.

MR. COLON-RAMIREZ:  I don't use AI, sir.

MR. HART:  It's the classification society's certificate.  It certifies what it certifies.

THE COURT:  When you file the informative motion, Mr. Lightsey, can you please include the certificates for the Court to review.

MR. LIGHTSEY:  Absolutely, Your Honor.

THE COURT:  Thank you.

Good weekend, everyone.

MR. LIGHTSEY:  Thank you, Your Honor.

(PROCEEDINGS ADJOURNED AT 4:03 P.M.)

REPORTER'S CERTIFICATE


          I, JOE REYNOSA, Official Court Reporter for the United States District Court for the District of Puerto Rico, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct computer-aided transcript of proceedings had in the within-entitled and numbered cause on the date herein set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.


                              S/Joe Reynosa
                              _____
                              JOE REYNOSA, CSR, RPR
                              United States Court Reporter
                              Federico Degetau Federal
                              Building, Room 150
                              150 Carlos Chardon Street
                              San Juan, Puerto Rico 00918-176
                              (787) 772-3480