# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

BUSTO-ALVAREZ, ET AL., )          CASE NO. 25-CV-1462 (SCC)
Plaintiffs,         )
                    )              MOTION HEARING
vs                  )
                    )
NFENERGIA LLC, ET AL.  )
Defendants.         )

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE JUDGE SILVIA L. CARRENO-COLL
SAN JUAN, PUERTO RICO
Thursday, November 20, 2025

APPEARANCES:

For the Plaintiffs:      FRANCISCO E. COLON-RAMIREZ, ESQ.
                         GIANCARLO FONT-GARCIA, ESQ.
                         LUIS M. PAVIA-VIDAL, ESQ.
                         MIGUEL NAZARIO-BRICEÑO, ESQ.


For the Defendants:      ALBERTO CASTAÑER-PADRO, ESQ.
                         JOSE RAMON RIVERA-MORALES, ESQ.
                         via Zoom THOMAS LIGHTSEY, ESQ.
                         CHRISTOPHER R. HART, ESQ.


Produced by mechanical stenography; computer-aided
transcription

Joe Reynosa, CSR, RPR
Official Court Reporter

(PROCEEDINGS COMMENCED AT 10:15 A.M.)

THE COURT:  Call the case.

THE COURTROOM DEPUTY CLERK:  Busto-Alvarez and Others versus NFEnergia LLC and Others, Civil Case No. 25-1462, for a Motion Hearing.

On behalf of the Plaintiffs are Attorneys Francisco E. Colon-Ramirez, Giancarlo Font-Garcia, Luis M. Pavia-Vidal, and Miguel A. Nazario-Briceño.

On behalf of the Defendants are Attorneys Alberto J. Castañer-Padro, Christopher R. Hart, Jose Ramon Rivera-Morales, and Thomas N. Lightsey III.

THE COURT:  Good morning, again.

So I am in receipt of the bollard pull test certificates for the AVA McAllister and the Hayley Moran.  I believe that this was given to my courtroom deputy.

Has this been shared with the Plaintiffs?

MR. RIVERA-MORALES:  Yes, Your Honor.

There is an informative motion to that effect in the docket.  On the same date that Your Honor issued the order, that was provided to the Plaintiffs, and there is a motion there.

In the informative motion, Your Honor, we did not --

THE COURT:  Can you tell me which docket number.

MR. RIVERA-MORALES:  Yes, I can.

MR. COLON-RAMIREZ:  148.

THE COURT:  Yes.  Duly noted.  Thank you.

MR. RIVERA-MORALES:  Yes, Your Honor, 148.

THE COURT:  In view of the informative motion at 160, can we deem the filing at 152 moot, Mr. Colon?

MR. COLON-RAMIREZ:  If I am going by memory, the 152 related to the upcoming meeting.

THE COURT:  Yes.

MR. NAZARIO-BRICEÑO:  Yes, Your Honor, 152 would be moot at this moment.

THE COURT:  Very well.  So I am mooting 152.

Now, can either side report on the status of the meetings, proceedings, what progress has been made.

MR. COLON-RAMIREZ:  So, for the Plaintiffs, Your Honor, we will report there was a meeting that the experts for the parties agreed to hold between Captain Bordas, Mr. George Burkley, and Mr. Carlos Ramos, Captain Carlos Ramos, who was designated as the representative to speak on behalf of the San Juan Harbor Pilots, to avoid having many people talking at the meeting.

THE COURT:  Only the three of them met?

MR. COLON-RAMIREZ:  Well, that was the purpose of the meeting.  My understanding is that Mr. Castañer had Mr. Daniel Montes show up at the meeting.  You know, we -- I

don't think it was appropriate, but we are trying to move things forward.

THE COURT:  Did he participate?

MR. COLON-RAMIREZ:  He sat there.  He said some things.  Yes, he had input in the meeting.  He talked.  He witnessed what was discussed.

But, Your Honor, our point yesterday, particularly since Captain Bordas had come from England here, we just wanted to get the meeting forward.  So, you know, I didn't bother filing a motion.

THE COURT:  When was this meeting?

MR. COLON-RAMIREZ:  Yesterday.

THE COURT:  It was yesterday.

Who is Captain Bordas?

MR. HART:  Your Honor, Chris Hart here for NFE.

THE COURT:  Good morning, Captain Bordas.  Welcome.

MR. BORDAS:  Good morning, Your Honor.

THE COURT:  Would you characterize the meeting as being a successful meeting?

MR. COLON-RAMIREZ:  I was not present at the meeting.

THE COURT:  No, but what was conveyed to you.

MR. COLON-RAMIREZ:  I understand.  I think Captain Bordas and Mr. Burkley can better discuss or better inform the Court what they shared --

THE COURT: Okay. Thank you.

MR. COLON-RAMIREZ: -- since we did follow Your Honor's instructions, as attorneys, to stay out.

THE COURT: Good.

MR. HART: I would propose the same, Your Honor. That's why Captain Bordas is here --

THE COURT: And I appreciate that.

MR. HART: -- to talk to the Court about it.

I would simply point out that the meeting yesterday was supposed to be in compliance with the Court's order that said the two experts must meet with the pilots.

THE COURT: Yes.

MR. HART: So that's what they did yesterday.

THE COURT: Excellent.

Let me hear first from Captain Bordas.

Can you tell me how much progress was made yesterday and in which areas.

MR. BORDAS: Yes, Your Honor.

A lot of progress has been made throughout the interaction I have had with Mr. Burkley since your order for 31st of October.

Mr. Burkley and I found that we have had a lot of in common. We get on well together. We work well together, and we are going to progress this matter. I think we have more or less complied with every part of your order because,

really, and I daresay this in your court, but, really, because we haven't had the interference of lawyers dealing with us, which I apologize to all the lawyers around me.

We have made a great deal of progress on all points. And, really, if I went through the points, yes, we have had a meeting. Initially, after the Court's order, I emailed Mr. Burkley, and he got back to me. We agreed for a Teams meeting. And in that Teams meeting, we found that we got on very well. We were very cordial with each other.

THE COURT: Okay.

MR. BORDAS: And we found that we could discuss a lot of points, quite frankly. And as part of that meeting, we initially discussed the Siport 21 simulations.

Siport 21, based in Madrid in Spain, they modeled all the vessels, the tugs, they were already skilled with simulations. But Mr. Burkley articulated to me why the pilots weren't happy to use Siport 21, and in fact, they wouldn't be using Siport 21.

This initial barrier was fairly quickly overcome. I articulated to NFE these concerns, and I proposed another venue, a completely independent venue based in England known as the Hydric Alan Resource Center at Wallingford. For short, it's known as HR Wallingford.

Mr. Burkley has worked with them before, and we both agreed -- I think I am right in saying that we were both

in agreement that this is probably the best center in the world at simulating.

THE COURT:  Do you think it has the capability to conduct the appropriate simulations?

MR. BORDAS:  There is absolutely no doubt about it. None at all.

THE COURT:  Let me hear...

Mr. Burkley, good morning.

MR. BURKLEY:  Good morning.

THE COURT:  Can you add some more information or clarifications?

MR. BURKLEY:  I do.

I completely agree with Captain Bordas.  He and I are a good fit, and we have had good meetings.  We jointly chose HR Wallingford as a venue for this.  And I do agree with him partially.  We were going to continue to have some professional disagreement on things, which is normal, about lawyer interference.

Unfortunately, the documents that are the base for our decision-making, which is the previous Waterway Suitability Assessment, and the documents that were -- the reports from the previous simulations that supported that were finally -- we were allowed to see them yesterday.

THE COURT:  Okay.

MR. BURKLEY:  They are fully redacted, Your Honor.

So, you know, it's strange to me, as just a professional sailor who does research for a living, that I would like to see the hazards, but they are blacked out.  I would like to measure these -- fundamentally here, the pilots are being asked to relax their tug standards.  I would like to know which ship was tested before.  That's blacked out of this document.  It's all just blacked out.

THE COURT:  Who did the redactions?  Do you know?

MR. BURKLEY:  I don't know.  I was given these by NFE's attorney, Ms. Lopez.

THE COURT:  Which attorney?

MR. BURKLEY:  Ms. Natalie Lopez.

THE COURT:  Ms. Lopez, why were these redactions made?

MS. LOPEZ:  They were in accordance with the request we submitted to the Coast Guard on what evidence we could give to them regarding the WSAs.  And so we sent them the portions for them to review, and they concorded that what we submitted was correct.

MR. COLON-RAMIREZ:  Your Honor, I have a problem with, first of all, the way it was mentioned.  This was what was submitted in response to, if I understood, what the Coast Guard said.

Your Honor, I can tell you that before the experts met, and in the effort of trying to speed things, I submitted

a FOIA request.

THE COURT:  Okay.

MR. COLON-RAMIREZ:  It's pending.

But, in the meantime, I am going to read an email from Alejandro M. Collazo-Gonzalez from the U.S. Coast Guard, San Juan sector, for the Department of Commercial Law Compliance and Waterway Navigation.

It says -- and this was in response to the experts trying to get information.  It says, "Good afternoon, Chris and George," referring to Captain Bordas and Mr. Burkley.

"My agency did not mark the document as SSI."

THE COURT:  Did not?

MR. COLON-RAMIREZ:  "NFE did.  I suppose that NFE does not want to disclose it per 49 CFR, part 1520.5."  I won't read the rest of the letters.

"If your inquiry is pursuant to FOIA, I have carbon copied Eric and Michael.  They should be able to help you through the process.  One of the legal representatives has already asked for this."  That would be me.

"Nevertheless, sensitive security information, SSI, is exempt from public disclosure under laws like the FOIA.

"I want to lead you in the right direction, but this is an atypical request.  The information you are asking for is unlikely to contain data that could constitute an unwarranted invasion of privacy and very limited information

that could be detrimental to security."

THE COURT:  It could or could not?

MR. COLON-RAMIREZ:  Could not.

It say, "The information you are asking for is unlikely to contain data that would constitute an unwarranted invasion of privacy and very" -- in other words, it is unlikely to contain -- "very limited information that could be detrimental to security.

"Have you asked NFE for a copy of the WSA with anything they deem trade secrets or privileged or confidential information redacted out?

"NFE can always redact the portions they deem to be sensitive and provide you a copy.  After all, NFE has planned multiple navigational simulations before the WSA was even submitted.

"As a last resort, under 49 CFR, part 1520.5, my agency could determine if the information provided by NFE does not constitute SSI.  You need to explicitly state if this is what you pursue."

Now, I am hearing today that the experts were provided with information, but as Mr. Burkley said, redacted out, to the point that they redacted out the vessel that was used in the simulations, if I understood Mr. Burkley correctly.

Now, I fail to see how the vessel they used in the

simulations would be a trade secret or privileged or confidential information, which is what the Coast Guard said, "Fine. NFE can redact that, but they should give you everything else."

So we are -- I knew this was going to be an issue today. And I was really hoping we wouldn't waste the last almost two weeks on the WSA. And that's why we have requested, we have tried to work with NFE to get the WSA. We have gotten the run around. "Oh, it's the Coast Guard." Now we have the Coast Guard saying, "NFE can give it."

So it's frustrating, Your Honor. And, you know, there was a filing by NFE at one point, I believe -- I can look for the docket. But there is an attachment 7 to the motion, which is a Department of Homeland and Safety NDA. It's used by the department. It's form I think 11000.

And in the motion, there is a statement that says, "Look, you know, if anything, this could be disclosed, but it would have to be under the DHS NDA."

Fine. I mean, we can do that.

But then Mr. Hart sent us an NDA that was a separate NDA that looked -- that mentioned NFE or whatever. It wasn't the DHS form 11000. And I asked Mr. Hart, "What is it that NFE intends to produce under this NDA?" And I was referred to the motion which mentioned the WSA, which then mentioned the DHS form 11000.

So I said -- and back and forth, I said, "Well, apparently you didn't read my motion."

He said, "No, I read it.

"But you attached a Department of Homeland and Safety NDA to the motion.  What is this NDA intending to cover?"  Never got a response.

So I think we are running in circles.  We are trying very hard to make efficient use of our time so that we don't eat up the days going by without, you know, doing the work that needs to be done.

THE COURT:  All right.  So I am a little bit confused here because during the last hearing we discussed the specific statutes that apply, and it was my understanding that Captain Bordas and Captain Burkley would be the ones requesting the documents.  And then it was up to the Coast Guard to decide what was appropriately disclosed, what required an NDA, and what needed to be redacted.

So now I am hearing that it was NFE that requested these documents and redacted them and produced --

MR. HART:  No, Your Honor.  If I may respond.

MR. COLON-RAMIREZ:  NFE has the document.  There were two requests that were made.  I made a FOIA request just trying to, separately --

THE COURT:  Right, from the Coast Guard.

MR. COLON-RAMIREZ:  From the Coast Guard.

THE COURT: Right.

MR. COLON-RAMIREZ: Separately, from the email that I just read, Captain Bordas and Mr. Burkley, apparently, they made a request to the Coast Guard.

THE COURT: Yes.

MR. COLON-RAMIREZ: In fact, it was Captain Bordas who wrote copying Mr. Burkley.

THE COURT: Okay.

MR. COLON-RAMIREZ: And I read you the response that they both received jointly from the Coast Guard. It was a response addressed to both of them.

So NFE has not requested the WSA. NFE has the WSA. NFE brought the WSA to Your Honor.

THE COURT: Right. I have it.

MR. COLON-RAMIREZ: And the Coast Guard is saying, "Look, you know, they can produce it. They made it."

THE COURT: Why doesn't the Coast Guard produce it in accordance with the statute?

MR. COLON-RAMIREZ: That's a wonderful question, Your Honor. I wish I knew the answer.

THE COURT: Yes.

MR. HART: Your Honor, I just wanted to clarify that it was the two experts who requested it from the Coast Guard. And when they met, Mr. Bordas and Mr. Burkley met, one of their tasks was to identify what information do they

need to move forward with setting up the simulations.

THE COURT:  Right.

MR. HART:  They did identify, and it was two specific portions of the WSA and the Emergency Response Plan, is what they requested from the Coast Guard.

I can read what it is they asked for.  And this is, as I understand it, what they identified as what they wanted to see.  And, of course, Captain Bordas can explain that directly.

But they asked the Coast Guard to see the Haz ID table and associated risk matrix contained in the safety and security risk assessment section of the current follow-on waterways suitability assessment for the NFE LNG terminal in San Juan, Puerto Rico, item 1.

Item 2, they asked for the navigation assessment portion of the current Emergency Response Plan for the NFE LNG terminal in San Juan, Puerto Rico.

So that's the information they got together and agreed and identified they wanted to see.  They asked the Coast Guard for it.  The Coast Guard responded to them with the message that counsel just referred to and read.

And from there, NFE took action to prepare the materials to be produced to them.  And to be safe, to avoid violating these SSI regulations, NFE sent the proposed redacted documents to the Coast Guard to ask, "Are these okay

to produce, to disclose?"

And the Coast Guard -- my understanding is, the Coast Guard responded to NFE's agent, and I believe that was Ms. Lopez, that said, "Yes, we reviewed that.  Basically, it's okay to produce."

And so with that -- and that response just came very recently.

THE COURT:  But who made the decisions to make the redactions?  Who redacted the document?

MR. HART:  We can ask -- I believe it was Ms. Lopez who made the redactions.

THE COURT:  But within what discretion would she do that?

MR. HART:  It was what the Coast Guard said.

THE COURT:  I don't think so.  I don't think that's what the Coast Guard said.

Let me hear Captain Burkley.

She is making a decision of what constitutes SSI information, and she is not a Coast Guard employee or official to make these decisions.  She is a representative of a covered person, according to the statute, correct?

MR. HART:  Yes.

THE COURT:  Let me hear Captain Burkley.

MR. BURKLEY:  Thank you.

They had me sign an NDA.  They gave me documents

that are nothing.  They just are blacked out.  And the documents are needed because we want to evaluate the ships using the same standards we did before, we used before.

So our expectation is -- and in the documents that were mentioned, there is actually a third document set that we requested, which are the reports from the simulations from Seamen's Church that were the simulations that supported the WSA so we can see how the 80-ton tugboats were used and chosen.  And then we can use the same method to evaluate the tugs that aren't 80 tons.  It's not that complicated.

But we don't know what happened before because of interference and this obstruction.  And I feel for Captain Bordas, his customer who he is working for.  And when we talk together as colleagues on this project, he is in the dark as well.  And so this is last minute information.

We really would love to just do our work and produce a good answer, but at this point, I feel that we have been frustrated intentionally.

MR. COLON-RAMIREZ:  Your Honor, as Mr. Burkley mentioned, they were asked to sign an NDA.  They signed one, and then they were given documents that he mentioned that were useless.

Although we are committed to a process where we are going to let the experts deal with this, I would ask for the courtesy that next time that an expert of ours is asked to

sign an NDA, that counsel be informed first.  Because, personally, I have an issue with the NDA.  It's not a DHS NDA.  It's not form 11000.

And when I read the NDA, it seems to be very broad and applied to anything that NFE may produce.  And, in fact, there is a section of it -- and I am going by memory here -- that says, "Confidential information is an overarching term."

So, I think going forward, if the experts are going to be asked to sign anything, at least share it with us.  We are not trying to insert ourselves into the process between the experts.  But now, you know, NDAs -- especially when it's not the DHS NDA.  It's not form 11000.  It's something house-made.  Come on.

MR. HART:  If I may, Your Honor.

I would like to suggest that, as Captain Bordas was beginning to explain, the two experts have made a lot of process and a lot of agreements on all these steps to get ready for the simulations.  They are very far along.  I would like for the Court to hear from Captain Bordas on all the agreements they have made, all the progress that has been made.

On this business about the WSA, I humbly suggest that if Mr. Burkley or the experts believe there is more information they want to see from the WSA, if they just specify what it is, then that could be worked on to determine

what else there is to give them.

But beyond that, they have made a lot of progress. I would like for the Court to hear from Captain Bordas.

THE COURT:  All right.  But we need to resolve the issue of the documents that are needed to continue moving forward and progressing on this matter.  And you are covered by the statute and you have to comply with SSI regulations, but you don't decide what is SSI and what is produced.  And it seems to me that is what's happening here.

How long will it take for the Coast Guard to make this production under the FOIA?

MR. COLON-RAMIREZ:  Your Honor --

THE COURT:  Hang on.

MR. COLON-RAMIREZ:  -- I believe it could be up to three months.

So I have three FOIA requests.  Two of them I submitted -- there is a part within a FOIA request that you can ask for it to be managed expedited.  Now, for the full WSA complete, I did not submit it expedited because several weeks after I submitted the FOIA request, the request to have it handled expedited was still under review.

So I said, "Let me see what happens if I don't ask for it to be expedited."  And what happened was, the WSA was actually -- since I made no request for it to be expedited, it was actually forwarded rather quickly to the Coast Guard

office, which is why Collazo had mentioned that one of the attorneys had already requested it.

So, you know, I -- and, again, I was trying to do this not in lieu of.  I am trying to open up a parallel mechanism to get what we know the experts need to get this moving forward.

MR. NAZARIO-BRICEÑO:  Your Honor, and pursuant to the communication made by the Coast Guard that was read by brother counsel, there is no sensitive security information.  There isn't anything.

And then, if in fact the Coast Guard already authorized the release or the disclosure of the documents, what's the matter?

And, obviously, the Coast Guard authorized it based upon either two things.  There is no SSI, or in this case, the experts are covered persons that need to know the information and have to have access to conduct the simulations.

And, quite frankly, brother counsel has stated that they have made a lot of things.  But the truth of the matter is that, other than meeting between the experts and agreeing upon which documents need to be reviewed by them and choosing the venue, nothing else has been done.  And nothing else has been done because they have been withholding documents.

And, as a matter of fact, they need those documents

to produce it to the venue so they can get a quotation of the costs and also, besides the costs, how many days it's going to take them to conduct those simulations.

So, truth of the matter is that, quite frankly, again, since the last hearing, 20 days, nothing has been accomplished.

THE COURT:  All right.  Let me hear Mr. Castañer.

MR. CASTANER-PADRO:  Your Honor, I wanted to clarify something about the redactions and whether or not it's NFE's call to do that.  What was done was, after receiving the Coast Guard's correspondence --

THE COURT:  What correspondence?

MR. CASTANER-PADRO:  The email brother counsel was referring to.

We submitted to the Coast Guard what we thought was relevant, meaning Natalia Lopez, with the redacted version and said, "Listen, this is what we are proposing for redaction.  Please advise."  They, of course, compared it with the unredacted version and said, "We see no problem with you sharing" --

THE COURT:  Well, they don't see a problem because they were looking to see if there was something that should not be disclosed.  So they see a redacted version and say, "Go ahead."

MR. CASTANER-PADRO:  They had the unredacted

version, Your Honor.  The Coast Guard does.  That's number one.

Number two, the statement that everything is blacked out is disingenuous, Your Honor.

THE COURT:  But you provided to the Coast Guard a redacted version, and you said, "Is this okay to be produced?"  And of course they are going to say "yes" if it's redacted.  They are not going to say, "No.  You need to give it unredacted."

They are the ones that decide what's SSI, what's classified, if anything, and you were doing the redactions.

MR. CASTANER-PADRO:  Your Honor, the WSA, by definition, from the cover to the last page, is SSI, completely.  It is.

THE COURT:  I don't think that's correct.

MR. CASTANER-PADRO:  It can be disclosed.  It does not lose its SSI nature because it may be disclosed under certain circumstances.  It is still SSI that has been disclosed under the parameters of the regulations.  That's number one.

Number two, I have a pen drive here, like we did last time, Your Honor, with the redacted versions to show you that the description that everything has been blacked out is not true.

THE COURT:  What do you mean it's not true?

MR. CASTANER-PADRO:  It is not true.  It's not totally blacked out.

THE COURT:  But portions that are necessary and crucial for the work of the experts was blacked out.

MR. CASTANER-PADRO:  That's -- I have to disagree with that statement.

THE COURT:  So now you are deciding what's crucial for the evaluation.

MR. CASTANER-PADRO:  No, I am not.  I am saying that how can they say, how can he genuinely say that that blacked out information is necessary.

THE COURT:  But that's not your call, counsel. That is the expert's call, what is necessary and what's not. You are controlling the information.

MR. CASTANER-PADRO:  If the Court will kindly let me finish.

He is saying that, "What's blacked out I need to see."  He doesn't know what's blacked out because he hasn't read it in the first place.  So they are speculating as to what has been blacked out.

Your Honor, they --

THE COURT:  That's a circular argument.  He knows what he doesn't have, and he needs to conduct the assessment to be able to do the simulation.

Are you in agreement with my statements,

Captain Bordas?  Do you agree with what I am saying, that you need to see this?  And I know I am putting you in a horrible position since your attorneys are arguing otherwise, but you are independent.  You are a professional.

Do you need to see this information with Mr. Burkley, Captain Burkley?

MR. BORDAS:  I have heard what Mr. Burkley has said, and I do share to a large extent your frustration --

THE COURT:  Thank you.

MR. BORDAS:  -- Your Honor, with this.

But, as far as I am concerned, as a practical ship's pilot, I will be climbing up the side of a ship on Saturday morning when I get home and taking that ship to wherever it goes.  I do this every day of my life.

If you want, I can give you the hazard analysis for my area off the top of my head.  And what really -- there are a lot of things being said here, much more being made out of it than really warrants.

The most important thing, as far as I am concerned, is to get the information on hazard analysis from the pilots themselves rather than from a WSA document that might contain information; it might not.  And what really is essential is that the independent simulators, HR Wallingford, are allowed to say, "Yes, we might need this information."

But HR Wallingford, in our joint Teams call with

Mr. Burkley, they have stressed that they need information from all stakeholders, but in particular the local pilots. And I really do truly believe that this is the best source of information that we are going to get in order to conduct simulations.

MR. COLON-RAMIREZ:  Your Honor, in one of the filings we made, one of the things we mentioned, in addition to the WSA, was the ERP or the Emergency Response Plan.  And like I mentioned the last time, if the Emergency Response Plan, if the representations being made to the Coast Guard and community of Puerto Rico are that, "If X event happens, this is how we are to going to handle it and move the vessel in such manner," then we have to simulation that movement to make sure that the equipment that's being considered can perform the emergency maneuver.  Because that is the maneuver that is being represented to address a situation.

You know, we are getting -- I mean, we are talking about the WSA here.  I already read the Coast Guard's comments.  I still have -- I have not received any response from NFE regarding the ERP.

I haven't brought it up before, but I also know that -- or maybe -- I don't know if it's a part of the WSA or separate to or an attachment to the transit management plan that proposes how the vessels are going to be handled in the bay and in the channels.

Again, these are items that are neither confidential, and they are not trade secrets, and they are not privileged.  And those are the three items that the Coast Guard said, "Look, NFE can produce the WSA and they can redact these portions."  They already said, "There is no SSI there."

They said, "NFE can produce this.  NFE can always redact the portions they deem to be sensitive -- NFE can always redact the portions that they deem trade secrets or privilege or confidential information."

In fact, the question was, "Have you asked NFE for a copy of the WSA with anything they deem trade secrets or privileged or confidential information to be redacted out?"

Now, I think -- I hate to burden the Court with this, but at the impasse that we are, maybe it's an in-camera review of the document that was redacted.  And Your Honor can compare it to the original and say, "This is neither trade secret, nor confidential, nor privileged," and, you know, strike the redactions.

But I hate to burden the Court --

MR. NAZARIO-BRICEÑO:  Your Honor, if I may.  Something that the Court needs to know.

The experts have agreed upon a schedule based upon seeing and having access to those documents.  And based upon that, the simulations are going to take place in March.  So

if they don't have access to those documents, the process is going to be way delayed, unduly delayed.

So the fact of the matter is that they need to see -- they have to have access to those documents as soon as possible.

THE COURT: Mr. Hart.

MR. HART: Yes, Your Honor.

I would like to say, there is no impasse here, despite counsel's suggestion of an impasse about these documents. What has happened is, the two experts have met and they have made a lot of progress. It was the experts who identified and asked for two things, and they are the two things, the two portions of the WSA and the ERP that I read into the record a few minutes ago. That's what the experts asked to see. That is what NFE has tried to give them. That is what --

THE COURT: What's your position regarding these additional items that are clearly necessary for the assessment, at least for Mr. Burkley?

MR. HART: Our position is, if the experts identify or request and say what else is it from these portions that were given to them that they want to see, then NFE can work on getting that to give to them.

But in the meantime, as Captain Bordas just said, I understand, the preparations for the simulations can proceed,

can and should proceed.  And the hazard ID information would come from the pilots.

I would like to ask Captain Bordas to be able to -- give him time to finish saying, talking about the progress that has been made largely because of the lack of lawyer involvement.  He and Mr. Burkley, working together, have made a lot of progress, and I would like for him to tell the Court what that is and also the timing that's in place right now for simulations at the agreed venue in HR Wallingford.

THE COURT:  Mr. Burkley, what's your response to that statement?

MR. BURKLEY:  It's disingenuous, ma'am.

It's just so unusual for me to be dealing with this type of inference when I am trying to set up simulation.  For Captain Bordas and I to establish the work we need to do, we need to have a foundation.  This is our process, and it is the respect of that process that's just being ignored here. And it is just so normal.

In all of my experience, I have never experienced resistance from a company to explain this.  One of the conversations we had yesterday, Your Honor, was what ship should we use in the simulation, and this would logically make sense to you because if you pick a small ship, you need small tugs.  If you pick a big ship, well, you need big tugs. The ship that's coming in may not be the biggest ship that

that dock would ever service.

So I would like to know what the design vessel is for the simulation.  That's one of a number of typical questions someone like me when we are setting up a simulation need to have.  I can't find that.

This document is blacked out.  They didn't send me the correct simulation reports that supported the WSA.  They sent me their favorable reports from their follow-on simulations in Spain.  This is intentional.

From my end, I want to get past this and just do the work.  It's just lawfare that's happening in the midst of us trying to do real work.

As far as the schedule is concerned, I agree this is a failure to the start.

THE COURT:  Do you think that you could itemize specifically what documents or portions of the WSA and the ERP you need and have been redacted?

MR. BURKLEY:  I could try.

I see from the redactions they leave, the top hazards, which are very general.  They are like, you know, discussion about, we need to have open documentation about the port and navigation, like broad detail.  And then anything that was meaningful is just blacked out.

But, also, you know, the track plots, any of the actual ships that have been used, the stuff that we do is

blacked out.  And they didn't give us the reports from the previous simulations.

We are simulation people.  That's what we do.

THE COURT:  Are you opposing to produce these previous reports?

MR. HART:  Your Honor, I would like to make it very clear, that has been produced to Mr. Burkley and Captain Bordas.  All three simulations.

THE COURT:  He is saying that it has not.

MR. HART:  I am aware that they have been sent --

MR. BURKLEY:  It's the Siport simulation, sir.  It's not the ones from Seamen's Church.  It's a PowerPoint of the report.

The documents, Your Honor, are --

MR. HART:  I am sorry to be talking at the same time.

THE COURT:  Hang on.  Hang own.  One at a time.

He is saying that he has not received this.

MR. HART:  But I am saying it has been sent to him.

MS. LOPEZ:  I sent it to him last night.

THE COURT:  Last night?

MR. HART:  Your Honor, the previous simulations were not sent last night.  My understanding is they have been sent a long time ago.

MR. COLON-RAMIREZ:  Your Honor, instead of talking

about what Mr. Hart understands, have Mr. Burkley explain exactly what he received.

MR. NAZARIO-BRICEÑO:  And, Your Honor, I quite frankly don't understand.  If they have already an expert, which is Captain Bordas, why don't they let him review the document.  And if nothing needs to be redacted, he redacts it.

But then why -- and this issue came in in the last hearing.  Ms. Lopez, once again, what is her expertise to redact the document?  Once again.  And we basically put the Court on notice that Ms. Lopez is basically delaying the whole process and controlling the process without any knowledge at all.

MR. HART:  Your Honor, may I --

THE COURT:  How are you going to resolve this and move forward?  This is what I want to hear.

MR. HART:  There is absolutely no objection to proving the experts with all three of those simulation reports.  I thought that it had been done.  Captain Bordas has them.

MR. BORDAS:  I have them, Your Honor.

THE COURT:  The previous simulations?

MR. HART:  All three; the Army Corps of Engineers, the Seamen's Church, the Siport, all those power simulations. The intention is to give them to him.

MR. COLON-RAMIREZ:  Let's ask Mr. Burkley what he --

MR. HART:  Your Honor, if I could finish talking before counsel interrupts.

I would also ask the Court to hear from Captain Bordas on what he has to say about these points to move this process forward.

THE COURT:  We need to resolve the issue of the documents and the production to Mr. Burkley.  We need to resolve that.

MR. HART:  My suggestion would be then, Your Honor, that Mr. Burkley do specify.  He said in response to the Court's question that he can try to specify what else it is that he wants.  If he does that, then we can move forward trying to get him what it is he wants to see.

THE COURT:  You were going to say something?

MR. PAVIA-VIDAL:  Mr. Burkley is having his hand up requesting to talk, Your Honor.

THE COURT:  Yes.

MR. BORDAS:  Yes.  I will specify now.

So the WSA was written by Accutech.  That is in the documents you have.  Those simulations were done at Seamen's Church in Houston.  They were done over multiple days.  A report must have been generated.  In my experience, it is a weighty report.

The reports that are being referred to, kind of a smokescreen here.  The reports from the simulations that were done at Siport in Spain are not relevant, and so they don't need to be discussed.  They are not part of this discussion.

The Army Corps of Engineers report is ten years old.  Well done.  It's part of a larger study for channel work or something, but it's not relevant.  It's not what we are looking for.

We are very particular here.  Your Honor, we are looking to see how did they pick 80-ton tugboats.  What did they use?  It's all blacked out.

I want to know what ship they used, what their evaluation metric was, and I want to share that with Captain Bordas.  He also agrees with me.  He wants to hear this logic.  Our people at HR Wallingford would like to hear this logic.  In the absence of this, as Captain Bordas has indicated, he would rely on the pilots.  And pilots would say, "We have to do the WSA over again," which they are kind of tedious.

So, essentially, we have to go back to the risk assessment process.  The people at HR Wallingford are willing to sell us that service.  We don't really want to do that.

Let's just look at the documents and see what they have.

MR. COLON-RAMIREZ:  Your Honor, just to clarify, in

the request for the simulation reports from Seamen's Church Institute, I sent Mr. Burkley the document that's in docket 34-2.  That is the one that ends with the link to videos.  Because I thought that was what he was looking for, and he explained to me that it was not.  That that is like a final presentation, kind of like a power -- he even called it privately to me, he said, "Ah, that's a PowerPoint.  It glosses over things," right.

He was talking about the full simulation report, which, as he mentioned, it could be thick.  I only mention it to clarify that -- because I know Your Honor has seen, right, and we have discussed here at length docket 34-2 -- that is not the simulation report that Mr. Burkley is referencing from Seamen's Church.  That appears to be an extract or just a brief summary of -- like an overview or a presentation.

MR. HART:  Your Honor, may I ask, would the Court be willing to listen to Captain Bordas to have him respond to what Mr. Burkley just talked about on what else to be done and the next steps to move this process forward?

THE COURT:  So what's your position regarding the disclosure of these documents?

MR. HART:  I truly believe they have already been disclosed.  Captain Bordas has them.  And if Mr. Burkley really doesn't have them, they will be provided to him.  The Seamen's Church's report, the Army Corps of Engineers report

and the Siport report.

THE COURT:  He says that it's not relevant.  That it's an old report that doesn't shed light to the actual situation.

MR. HART:  In that case he doesn't need to see them, but they are indeed relevant, Your Honor.  They are simulations of the port.

THE COURT:  No, no, no.

MR. COLON-RAMIREZ:  At this moment, Your Honor, if attorneys are going to be arguing whether the documents that they turned over are relevant, then at this point I would request that they be shared with us.

THE COURT:  All right.  I am going --

MR. HART:  He can have them, Your Honor, but I would ask the Court to listen to Captain Bordas further on this rather than the lawyers.

THE COURT:  I will take ten minutes, review the statutes again, review the two irregulations, because I am thinking of issuing -- the Court issuing a subpoena duces tecum to the Coast Guard and have the Coast Guard tell me what's SSI, what's classified, because we are running in circle here.

MR. NAZARIO-BRICEÑO:  Your Honor, will the Court need to see the email that was sent by the Coast Guard to Captain Bordas?

MR. COLON-RAMIREZ:  I can forward it to the courtroom deputy.

THE COURT:  Forward it to my staff.

All right.  Ten minutes.

MR. CASTANER-PADRO:  Your Honor, if I may.  I can provide the Court with the pen drive where you would be able to see the redacted and unredacted versions of what was produced to Mr. Burkley.

THE COURT:  You can provide it to my courtroom deputy.

THE COURTROOM DEPUTY CLERK:  All rise.

(PROCEEDINGS SUSPENDED AT 11:01 A.M.)

(PROCEEDINGS RESUMED AT 11:52 A.M.)

THE COURT:  Please be seated.

During the recess, I asked Attorney Rivera-Bayón, my career law clerk, to address the issue of the reports that Captain Bordas represented that he has and Mr. Burkley did not.  So I asked her to ask NFE representatives to make this production to Mr. Burkley.

It was also stated to her during the recess that a Dropbox was created for the production of these documents.

Mr. Burkley, did you receive a notice for access to a Dropbox of documents?

MR. BURKLEY:  Yes.

THE COURT:  And are you able to access those

documents?

MR. BURKLEY:  Yes.

THE COURT:  Even though the Court's order that the attorneys will not interfere with this process stays in place, there has to be some sort of log on the part of both sides in terms what is being produced so that the attorneys are aware of what was produced.  That doesn't mean that they can interfere with the process, or they can go into the contents of the documents, or they should reach out to the experts regarding contents of documents produced.  Just a log of production.  Like a discovery notice kind of exchange.

MR. COLON-RAMIREZ:  Your Honor, I would request -- I would go further.  Subject to any confidentiality order that Your Honor wants to -- wishes to enter, I would ask that we be allowed to look at the contents of the documents.

For example -- and, again, this is really respecting to not get involved in the process.  We do not want to inert ourselves in the process.  But if we see a transmittal, for example, there is a list of documents that I believe -- I'm assuming that that's what the Dropbox has.  "Oh, no, the SCI report was produced."  Well, if we see it, it's, like, okay, I am content that what they are claiming was the SCI report being produced, I am content that it is being produced.  I am satisfied, right.  And we can do that exercise.

But that is not to mean that if we disagree, then we are going to get between the experts.  No.  If there is an issue, we think the document is incomplete, we should manage it separately, outside of the realm of the experts, first among counsel, before even bothering Your Honor.

THE COURT:  I don't have a problem with that.  That comports with the Court's order regarding noninterference, but there is need to be some accountability regarding what documents have been produced and if the documents listed in any specific discovery log is in fact what was produced and if it's complete.

Now, I have reviewed the redacted version of what was produced to Mr. Burkley, and I believe that it's really absurd to delete portions that include navigational hazard exposures, fuel handling facility information, inbound transit maneuvering and transferring of LNG terminal information.  That's the core of this matter.  And whole pages were blacked out.

So how can they possibly conduct this assessment if they don't have that information?

So we have reviewed in the previous hearing, and I have reviewed today again, 49 CFR, part 15, 1520.5 and 1520.11, which provides that people with the need to know should be provided access to SSI.

So even saying that all those redacted portions

constitute SSI, which I am not saying because I am not the one making that determination, it should be the Coast Guard, they are persons with need to know.

What is NFE's response to that? Why has that been redacted in this fashion, Mr. Hart, Mr. Castañer?

MR. HART: Your Honor, my understanding is that the redactions were done to take out SSI that some people thought were not what was requested, not included within the scope of what the experts had identified that they needed to see. And that was the reason for the redactions.

If that was more, if should be revisited, it could be revisited.

THE COURT: Well, I think that key portions of these documents, like crucial portions of this document was redacted. I also don't think that, even if it's construed as SSI, Captain Bordas and Mr. Burkley should be excluded from reviewing that pursuant to the regulation, which states that people that need to know may be privy to this information.

Furthermore, why was a nondisclosure agreement signed? Because SSI information may be produced under the protection of a non-disclosure agreement. So a nondisclosure agreement is signed and then a redacted document is produced. How does that make any sense?

MR. HART: It's to avoid any further disclosure of whatever information does get produced, it's what subject to

the DNA.

I would like to add, Your Honor, that on the Emergency Response Plan, that ERP plan is what applies to emergencies occurring at the terminal.  It is not a plan that applies to emergencies occurring on the ships or, say, when they are in-transit in the harbor.  It's not an Emergency Response Plan that applies to those ships.  It only applies to emergencies at the terminal.

So I think that's a big reason why much of the ERP plan would have been redacted, because it does not fall within the scope of what was requested about the ERP.  That's one explanation for the redactions in the ERP.

But whatever is produced pursuant to this process would be appropriate to do it under an NDA so that it's not further disclosed.  But if the experts need to see more information, I am suggesting that this be revisited and show them more information, for whatever is specified that ought to also be -- that ought to be unredacted among these documents that have been sent to them.

I would suggest that Captain Bordas could describe more.

THE COURT:  We will get to that.

Regarding the production with the Dropbox, I think that Captain Bordas and Mr. Burkley should meet -- it can be a virtual meeting -- and go over all the documents and make

sure that you both have the statement documents.  We have need to start with that.

Now, regarding the redacted production, what would be the criteria for reviewing what was redacted and deciding if it will be produced or not?

MR. HART:  It would be to look at the document and the request, the identified request from the experts, Mr. Burkley and Captain Bordas, and just decide if this particular portion fits within that description of what's specified to be --

THE COURT:  Okay.  I think it's been made clear this morning that at least Mr. Burkley wants to see everything that was redacted in this document, which I have reviewed and I believe it's on point, like navigational hazards, inbound transit maneuvers, transferring at the LNG terminal.  It seems to me that it's extremely pertinent and relevant.

So if the redactions are not going to be erased or removed, then I will enter an order.  I am trying to decide if at this point I need to enter the order, or if I am willing to give NFE a little bit more time to reconsider this position.

Furthermore, I need Mr. Burkley -- and I understand it's hard because you were not ready to do this -- to try to tell me which other documents you feel are crucial so that we

can learn of NFE's position regarding production, and then I will craft an order to the Coast Guard, which I will issue if it's necessary.

So can you tell me.

MR. BURKLEY:  Yes, Your Honor.

The unredacted WSA, I would like to see that.  I would like to see the simulations that were conducted at Seamen's Church Institute that supported that WSA in their entirety, which is -- it's a large document.  Not just a --

THE COURT:  Okay.

MR. BURKLEY:  There may be a number of those.  I am not privy to the dates of those.  I just know they occurred prior to this, to the construction of that.

And then for the Emergency Response Plan, I agree with counsel, it's the elements that are relevant to navigation.  So there is a piece in there about these tugs would need to assist the ship in an emergency.  So we are here to test tugboats.  I would like to see what those criteria are in the ERP.

THE COURT:  Mr. Hart, what's your position regarding the production of these items?

MR. HART:  I am a little unsure, Your Honor, whether it can be revisited, or I am not sure what the Court had in mind for ordering to be produced.  I am a little unsure what our position would be at this stage, Your Honor.

THE COURT:  So then this is what we are going to do:

So there is going to be a log on both sides regarding what's produced.  The lawyers can look at the contents of the documents and decide if it comports with the title in the list and if it's complete.

There is going to be a meeting between Captain Bordas and Mr. Burkley to make sure that they have the same documents.

The Court will issue an order to the Coast Guard under 49 CFR, sections 1520.5C, 1520.9 and 1520.11.  And it will be the Coast Guard that decides if in fact this is SSI information, if there is any reason why it not be disclosed under 1520.11 to persons with a need to know, and if there is an additional NDA that needs to be signed, because I do believe that the confidentiality is owed to NFE but also to the governmental agency.

I will copy the U.S. Attorney's Office.  I will comply with the two irregulations.  And I am going to give the Coast Guard ten days to make this assessment and report to the Court.

MR. COLON-RAMIREZ:  My offer stands, and I understand that it's in the spirit of the order, the documents that we review -- that we receive and that we review, we'll maintain confidential.

THE COURT:  Very well.

MR. NAZARIO-BRICEÑO:  Your Honor, and if the Coast Guard issues a statement that there is no SSI, will we expect the document that is going to be disclosed unredacted?  It should be unredacted.

THE COURT:  Well, if that is the Coast Guard's statement.  And the Coast Guard will be reporting to the Court.  So then at that moment I can issue additional orders, if necessary.

MR. NAZARIO-BRICEÑO:  Your Honor, Mr. Burkley would like to say something.

MR. COLON-RAMIREZ:  He raised his hand.

THE COURT:  Yes.

MR. BURKLEY:  Your Honor, the Coast Guard will not have some of the documents that we need, which are those simulation reports.  Generally, the Coast Guard doesn't have them.  They are only provided by reference in the WSA.  And these would be on file at --

THE COURT:  Yes, I am aware of that.  But I am assuming that these reports, the simulation reports are already in the Dropbox.

Is my assumption correct?

MR. HART:  Yes, Your Honor, that is correct.

THE COURT:  Okay.  You will need to review the Dropbox.

You may report to your attorneys if there is something missing.  So you may contact the attorneys only for the purpose of saying, "I am missing a document," or "This document is listed and wasn't produced," for that sort of thing.

Now, moving forward, this is an issue that is important, it's a key issue, but we need to keep moving forward regarding the venue.

Is everyone in agreement that the venue has been decided on?

MR. NAZARIO-BRICEÑO:  Yes, Your Honor.

MR. HART:  Yes.

THE COURT:  What are the next steps moving forward?

And I will allow now Captain Bordas to address the Court because it seems to me that he has additional information that he wants to share.

MR. BORDAS:  Your Honor, myself and Mr. Burkley have discussed this inasmuch detail as we can.  We have agreed with HR Wallingford in a private meeting we had with them that the most likely start of any simulations at HR Wallingford would be in late January.

THE COURT:  Late January?

MR. BORDAS:  Late January.

THE COURT:  Okay.

Are you aware of this, Mr. Burkley?

MR. BURKLEY:  Yes.  That would be our chance to look at the database, the ship models, and we would have a ship pilot come and look at this.

I think it furthers my other concern, Your Honor, that the interference we have had so far, if it were to continue, would really frustrate things.  So in a process like this simulation, in the case of this one, Captain Ramos is the pilot in charge -- he is representing the ship pilots -- is typically the first person involved in any edits to a document, is receiver of the data from the simulations, is integral to the process.  And I would like the Court, if it's possible, to recognize Captain Ramos as the state pilot who is in charge of this work.  Because, at the end of the day, it is the state pilots who are in -- they are responsible for the safety of the navigation.

THE COURT:  Also, Captain Bordas mentioned that the input from the pilots is for him crucial.  So I believe that that request is appropriate, and he should be made privy to all the information incoming also, in addition to the two experts.

MR. BORDAS:  Your Honor, I really do believe that the input from all the pilot, individually, is very important.  And that was well set out in our meeting yesterday.

One of the pilots wasn't in complete agreement with

the point about simulating larger vessels that were coming into the -- that would be possible to -- that would be actually impossible to use the army channel and berth there.

So I would seek, to save coming back and wasting all our time again, further guidance from you about -- we would use the existing vessels that are using the channel to be modeled for the simulations.  Not anything bigger.  Because if --

I am sorry, George.  I am going to finish in a minute.

MR. BURKLEY:  I am going to follow up and disagree with you, sir, because you know I have a strong position about this.

MR. BORDAS:  No problem.  I won't be very long.

THE COURT:  Finish your train of thought.

And then I will hear you, Mr. Burkley.

MR. BORDAS:  So that there was a worry from the senior pilot at the meeting we had yesterday that if we only looked at the vessels that were currently using the terminal, that NFE could at some stage come along and say, "Look, we have made a contract with another supplier with other substantially larger vessels.  We want to bring that in."

And I was saying that my understanding was that anything different, anything substantially different from the vessels that are being transited into that terminal at the

moment would have to go through a completely separate process, and that we start from base A again, reviewing and conducting a risk analysis for any larger vessels once again. And that's my understanding of what normally happens at a port.

THE COURT:  Mr. Burkley.

MR. BURKLEY:  So we use a design test vessel for our research simulations, and that design test vessel is chosen typically because it fits.  It's the largest vessel that can fit at that berth.  And it may fit at that berth for the variety of reasons.  It could be the navigation channels, the limitation, the offshore conditions of the limitation, the tugboats are the limitation, the berthing.  You know, all these technical reasons.  But that design test vessel is the one that we use for our evaluations, and it's usually the largest vessel.

And even though we know and practice, a smaller vessel is going to regularly come.  And that has happened. In the example here in our Gulf region, we test our LNG terminals.  Some of them have said they can handle very large vessels, but their stock and trade vessels, maybe 75 percent of that capacity.  Yet their WSA and the research work is done for the worst-case scenarios so that the terminal has the option to do a charter for a larger ship that can fit at their dock.  Without doing this work that Captain Bordas has

said, essentially anything larger, we would have to go back through this whole process again.  It just doesn't make sense to me.

THE COURT:  It doesn't make sense to me either.  It doesn't.

MR. BURKLEY:  So there we are.

It's just not conventional, Your Honor.  With the corp of engineers in particular, the design test vessel is not just about navigation.  It's also the vessel that's used for the economic analysis for a cost benefit of the vessel coming into a channel and using its waterway.  So they would have an entire economic institute that just defines these ships.

So that's in another -- in the diaspora of this argument, you can see how important it is.  And then back to our beginning of the conversation, you pick a smaller ship, you need smaller tugs.  That's the truth.  You pick a larger ship, you need bigger tugs.  And that's why the argument is on the floor right here, because NFE doesn't want to consider a larger ship, because I think they are worried that the tugs' standards being relaxed won't fit that -- won't do the job, or there will have to be further restrictions in weather or some other term to keep the safety high.

And I think they've sensed that coming, and that's why these documents are redacted.  That's why the wool is

over my eyes. So I can't work with this.

THE COURT: The thing is that we are trying to find common grounds here. We are trying to see if the parties can agree. But if the parties cannot agree, this is going to end with a trial. And if these simulations and if these tests are meaningless because they are not using possible real scenarios, they are not going to have any probative value. And we are going to have wasted a lot of money and time and effort from everyone. So it needs to make sense.

And I am no expert, but it would seem logical to think that you do your simulations with the largest possible ship, with the most difficult conditions and scenarios so that we can understand what is the risk involved, and provide for the highest risk down, not midlevel. Because then, if we do that, then we don't know what are the appropriate parameters for larger ships or for harsher conditions.

So what would be the reasoning for not doing the simulations with, you know, larger ships that are coming in or may be coming in the channel?

MR. BORDAS: Firstly, Your Honor, the first time I have heard this argument was yesterday at 1300 hours. I have never heard this argument before.

Secondly, I believe I understand we did talk about much larger vessels, and we were in agreement that much larger vessels could not be accommodated onto the berth as a

matter of -- or come down the army channel as a matter of federal law. The beam of a Q-Max gas tanker, which I regularly conduct as a pilot myself, the length is 345 meters long. The beam is 54 meters, which I believe is around about 180 feet, which puts it outside the parameters for that berth.

The vessels that are transiting are coming in partly loaded and leaving in ballast. They arrive at around about 9 meters, around about 29 feet, and leave at 29 feet because of the parameters and the draft restrictions at the berth and for the army channel.

So, my argument is, why not test this on our simulations? Test what is in actual fact the reality of what is being done, rather than some hypothetical situation which can't happen in reality. Not at the moment, anyway.

THE COURT: Mr. Burkley.

MR. BURKLEY: I hear many references to regulation and law that limits the channel, and these or may not be true. I don't have the facts, which is one of the bases for our research here in our plan. I am not aware. Is it in our U.S. Coast Pilot, in our CFR, that there is a beam restriction in the channel? There very well may be, but I am not aware of it. And does the dock have a design standard that is the largest ship that's supposed to be in there because of its mooring system and its capacities, et cetera?

Again, we are not aware of it.

And Captain Bordas mention the drafts.  Again, the pilots are the ones that normally set these safety standards.  In the ports I work in, it is not the Federal Government that is restricting the size of ships that transit the Houston ship channel, for instance, or Sabine, or any of the other waterways I work in regularly here.  It's the ship pilots that have it.  It's free and open on their website, to go to their guidelines.

This ship is daylight restricted because it's so big.  Can't transit the ship at night.  This one can't meet another ship.  They have a beam to beam restriction in their channel.  These are the pilots' rules.

Again, the rules that are going to happen about NFE should also be pilot guidelines.  Not Federal laws and CFRs or some external source.  It's the pilots that need to set their safety guideline for this.  And this simulation should respect that.

Therefore, I believe that we need to have our worst-case scenario.  That NFE should be free to charter a ship that's the large that could fit at their terminal, and the pilots should have considered the full navigation of that ship in and out of there.  And that should be what our answer is for setting the guidelines for it.

THE COURT:  Thank you.

MR. CASTANER-PADRO:  Your Honor, if I may.

Your Honor, it is the U.S. Army Corps of Engineers who has put in place these vessel size restrictions.  A vessel of the size that Mr. Burkley is proposing to simulate would never be allowed into the San Juan Harbor.  That's number one.

Number two, the infrastructure on the terminal is tailormade to the current vessel they are using.  It could not be -- they cannot bring a larger vessel tomorrow.  They wouldn't be able to unload it.  The terminal is designed to be connected into this type of vessel.

So what's being proposed is to simulate a vessel that would never enter the San Juan Harbor.  So we are -- we were always under the impression with Mr. Bordas that, until yesterday, the simulations will take place with the vessels that are actually being used and that the Plaintiffs are complaining about.

So it would be a futile exercise and a waste of money to do simulations on vessels that would never enter the harbor.  It's just impossible.  They are so large that they cannot come into the bay.

It's like, for example, if they want to bring an air carrier into the -- it wouldn't happen.  It doesn't fit.  It's not doable.

So, Your Honor, that is what we have to say about

that.

First of all, even if they want to simulate, the terminal is not built for that type of vessel. It wouldn't take it. So there are no plans to use it, and they couldn't plan to use it because it's just not doable. It's not going to happen.

So why simulate something that will never happen?

THE COURT: Mr. Burkley.

MR. BURKLEY: Thank you, Your Honor.

To this gentleman's suggestion that I have made a suggestion of a vessel size, I haven't. I haven't suggested a larger size. I just asked a simple question. What's the biggest ship the terminal can handle? What is it? And is it the one that's in -- if the suggestion is it's the one in play here, then NFE should inform the pilots that their dock is designed for this class of vessel. And if they have analyzed the waterway, usually using the services of someone like ourselves to analyze it, and they think that this is the biggest ship that can come in here.

The one that's servicing there today, I don't know if it's the largest ship that can be at the dock. And I am not making a suggestion that it's an impossible ship. That's silly. We don't do research on impossible ships. We do research on the one the terminal says, "This is the largest charter or that I can charter to get into this berth." And

that's their option.  They may use the smaller one.  That's their commercial business.

That's where we are at, Your Honor.

THE COURT:  I am sure that Captain Bordas would agree with that, that the simulation be done with the largest possible ship that could be accommodated in that dock.

Wouldn't you agree with that?  Because the lawyer is talking about impossible ships.  And, of course, that doesn't make sense.  But if it's a ship that could come in that in theory is the largest ship that could be accommodated through the channel and at the dock, wouldn't it make sense to use that and from there down the level of bollard pull required?

MR. BORDAS:  I think it's of great assistance to the pilots and the port if we say, "Here is our point.  Here are the largest vessels that are coming to this berth.  They are the existing vessels that the berth has been designed for."  If they want anything else, they are going to have to start redesigning the berth and also make adjustments to the channel.  And that is part of a separate risk analysis completely.

Why not do -- we have been arguing about these present vessels --

MR. BURKLEY:  Captain Bordas, you and I are together --

MR. BORDAS:  -- and suddenly now there are new arguments that come into the sphere --

MR. BURKLEY:  -- just like on the Thames River, you have a ship -- you have a dock that's --

THE COURT:  Hang on a second.

MR. BURKLEY:  We are not asking and we are not proposing to do any simulation, Your Honor, that would require a dock change and dredging.  That's not the point here.

If NFE says, "This is what our maximal ship is," it may be there right now, the ship that's there might be it, but I have to ask the right question.  What is the design vessel?  And this weird pushback that we are going to need to choose something that's impossible is ridiculous.

MR. COLON-RAMIREZ:  Your Honor, if may.

MR. NAZARIO-BRICEÑO:  Your Honor, we submit --

THE COURT:  Hang on.  Let me hear Mr. Colon.  He has been waiting.

MR. COLON-RAMIREZ:  Mr. Castañer said -- when he said Mr. Burkley wants to simulate ships that are larger than what the terminal allows, and he mentioned the largest ships that can use that terminal are the ones that are being brought in now, which I understand the Energos Maria and Energos Princess, Mr. Burkley, all he wants is information as to what is the largest ship for which that terminal is

designed.  And like he said, the pushback is kind of eye opening.

Now, Mr. Castañer made the representation, he seems to be representing that the maximum vessel by design that terminal can accommodate is the Energos Maria and the Energos Princess.  Mr. Burkley just wants the information.  "Let me see that."  Let's show it to him.

MR. CASTANER-PADRO:  Your Honor, we submit those are the larger ships that will operate.  The terminal is designed specifically for those ships.  And we submit right now --

THE COURT:  Then produce the information for Mr. Burkley's consideration.

MR. CASTANER-PADRO:  What information, Your Honor?

THE COURT:  That, in fact, that's the largest size that that pier or dock can accommodate.  That's all.

MR. CASTANER-PADRO:  I don't know.  I would have to ask what the technical information is.  But it's mostly engineering, I would guess.

THE COURT:  But produce the information.

MR. CASTANER-PADRO:  The terminal is built --

MR. COLON-RAMIREZ:  How can he say he doesn't know, but yet he is representing to the Court that the largest ship that can use that terminal is the Energos Maria and Princess? I don't think --

MR. CASTANER-PADRO:  Your Honor, because --

MR. COLON-RAMIREZ:  Let's be transparent here. Let's share the information.  It's NFE's terminal.  They must have some design parameter that says, "This is the largest ship we can accommodate."

THE COURT:  I am sure that exists.

MR. COLON-RAMIREZ:  Yes.  And all Mr. Burkley is asking for is that he be told.

MR. CASTANER-PADRO:  Well, Your Honor, what I am saying that I don't know is the specific information that would be provided would be engineering-type of documents, which we will be provided.  But NFE has submitted that that terminal -- that this charging facility, the infrastructure that wasn't there a few years ago before NFE started, there was a discharging facility made specifically for this, does not allow larger vessels.

THE COURT:  But we need some form of document.

MR. CASTANER-PADRO:  It can be provided, Your Honor.

THE COURT:  Maybe the blueprints for the design.  I don't know what it is, but there is something that must exist.

MR. HART:  Or simply the confirmation, Your Honor.

THE COURT:  From the lawyers?  No.

MR. BURKLEY:  It's such a common document.

THE COURT:  It doesn't matter.  Aren't we trying to have open communication?  Didn't we agree that we would take off the gloves for a while, not continue litigating?  And it seems to me that you continue to obstruct the process.  I am sorry I have to say that.  This redaction was ridiculous.

I have been trying to allow you to talk it out, but it gets to the point that now you don't want to produce the document that says what size vessel this dock can accommodate.

MR. CASTANER-PADRO:  Your Honor, I have just stated that we would.  And the request was made today for the very first time.

THE COURT:  But that is fine.  That is fine.

MR. CASTANER-PADRO:  That is not an issue, Your Honor.  That is not an issue.  We will produce it.  It was just requested.  It is not an issue.  There is no problem with that.

THE COURT:  Why are we arguing?

MR. CASTANER-PADRO:  That request was just made.

MR. FONT-GARCIA:  That is a different position that you took two minutes ago.  You said that -- you were expressing to the Court that that is the maximum length of a vessel, and now you are providing it.

THE COURT:  All right.  All right.

Have you heard you the term "open file discovery"

ever?  Is this a possibility here?  The lawyers just produce what they have.  Let the experts do their job.

MR. CASTANER-PADRO:  Well, Your Honor, the attorneys don't have it because it has not -- it was not an issue until today.  We will talk to our clients and get the information and provide it.  It's not an issue.  It's a nonissue, Your Honor.

THE COURT:  Okay.  Thank you.

MR. COLON-RAMIREZ:  Then I am glad we are all in agreement.

MR. NAZARIO-BRICEÑO:  Your Honor, why impose limitations to the experts if along the way they deem that they need to see more documents?  They need to see more documents.  Let's be truthful here.  Let's make representations to the Court, inform representations to the Court.

THE COURT:  It's an ongoing obligation.

MR. CASTANER-PADRO:  If you asked for it yesterday, we are saying we are producing it today.  If you ask for something else next week, then we will deal with it next week.  You are anticipating it's not being produced.

THE COURT:  Stop arguing among yourselves.

Yes.

MR. COLON-RAMIREZ:  We have been asking for the WSA for almost a month.

THE COURT:  I am going to be issuing this order this afternoon.  I am going to give the Coast Guard ten days.  Let's see what their position is.

It's very unfortunate that we have to take this route because you could reconsider and you can produce this unredacted document, but you choose not to do so, unfortunately.

Regarding the simulations and the parameters that are going to be used by the experts, I am not going to order anything.  The experts have to agree on what are the appropriate parameters.

My only concern is that if the parameters do not make sense, if they don't provide meaningful information to the Court, and this goes to trial, then it would be meaningless.  So just saying that.

Yes, Captain Bordas.

MR. BORDAS:  One last thing, Your Honor, which I would ask for a little bit of guidance on this.  I agree with much of what George Burkley has got to say in terms of the largest vessel.  I think if NFE produced or said, "We do not anticipate any larger vessels coming to this berth at any stage, that this is the size of vessel which is going to be the largest vessel at the berth," then I think that is fairly logical and allows us to move forward with the simulations as we have always envisaged them with the vessels that are

presently using the berth at the moment.

If we have a statement saying, "This is the largest that's going to come," then it's only logical that we use those vessels.

In addition, I just seek your guidance in moving forward with the simulations that we are able to -- the information that we get, I believe the more information we get, even if it's worthless information, we can use that. And HR Wallingford can use it.

Mr. Burkley has said that the Siport 21 simulations should not be used at all.  And I would beg to differ with that.  They do provide information.  And Wallingford have also said they are happy to look at those simulations and make a decision on whether those simulations should be completely redone.  So that information is not only benefit of CFE --

THE COURT:  All the reports that exist need to be produced to both experts.  And then you may give whatever weight they deserve and make further decisions.  But everything should be produced and considered.  And if it's worthy, then you use it.  If it's not, you don't.  I don't have a problem with that.  Everything needs to be produced.

MR. BORDAS:  One other thing, under the guidance of myself and Mr. Burkley, in particular the pilots as well, and tug masters and NFE, the terminal operators, they will all

want their input into HR Wallingford's simulations.  And I think HR Wallingford should be allowed to produce their independent simulations.

If it's got to be governed by either the lawyers, or one party in particular, then HR Wallingford have already said they will not put their stamp on any report that is not completely independently conducted.  And I think that's for the benefit of not only all the stakeholders.  It brings a lot of benefit to the whole process of bringing ships safely alongside this berth, which is what myself and Mr. Burkley are all about.

THE COURT:  Okay.

MR. COLON-RAMIREZ:  We agree, Your Honor.

At this point -- and I am not going to address the size of the vessel simulations because without knowing what the design is, because it could be moot.  Maybe the Energos Maria and Princess are the largest it's designed to handle.

THE COURT:  Maybe.

MR. COLON-RAMIREZ:  Yes, as Captain Bordas mentioned, this should be an independent process.  That's actually what we fought for, and we want this to be a joint effort between Captain Bordas and Mr. Burkley.

Now, there will be, since this -- we cannot divorce ourselves from the fact that this is occurring within the context of litigation.  So there is already an order, right?

We will see the documents that come and go, whatever.  So we will be able to track and double check if the information that's being represented to be in fact it is, if it's complete.  But we are not going to interfere with Mr. Burkley's and Captain Bordas' process.  That's their process.

And I am pleased that they have agreed at a facility.  That's great.  And moving forward, then they will decide the process.  And I am sure that they will -- I mean, like Mr. Hart said at the beginning, they have made a lot of progress so far.  He wanted Captain Bordas to express the process.  I am confident that between those two they will continue to make a lot of progress.

THE COURT:  All right.  We will convene in 30 days for a further status conference, and let's see where we are.

MR. NAZARIO-BRICEÑO:  Your Honor, what we want is transparency and good faith.

THE COURT:  Wait, wait, wait.

What?

MR. NAZARIO-BRICEÑO:  What we are seeking for is good faith and the process to be transparent.

THE COURT:  Mr. Hart, you were going to say something?

MR. HART:  Two points, quickly, Your Honor.

One is, I thought counsel for Plaintiffs just

suggested that counsel would be reviewing some of these documents that would be produced to the experts pursuant to the NDAs the experts have signed, and HR Wallingford will be signing one also.

My comment is, if that is the case, if that's what's contemplated, that the lawyers would look at these same documents, the lawyers themselves would also have to sign the NDAs to commit to keeping that information non-disclosed further.

Second is, if the next conference is in 30 days, we are concerned. That's right around Christmastime.

THE COURT: Also, the stay will have expired. We need to meet before that.

MR. COLON-RAMIREZ: Your Honor, regarding the NDA, first of all, I don't believe Mr. Hart ever answered my question when I asked him -- when we were provided with the NDA that was NFE's NDA and I asked him, "What information is NFE intending to produce under this NDA?"

THE COURT: That's a fair question.

MR. COLON-RAMIREZ: Now, I will not sign that NDA because that NDA is overbroad. I stated before, and maybe he didn't hear me, I will agree to any confidentiality order that Your Honor provides or wishes to enter. And I even said, even though we haven't talked about it, that I understand that the spirit of this includes the duty to

maintain everything confidential.

But the NFE NDA that they sent was overbroad.  And, again, they have yet to answer my question as to what information would be produced.  It's not the WSA.

THE COURT:  Mr. Hart, what information are you protecting with this NDA that was already signed by the experts and now you want the lawyers to sign?

MR. HART:  I believe the documents that were produced to Captain Bordas and Mr. Burkley, the experts.

THE COURT:  The redacted document?

MR. HART:  Yes.

But then further documents that may come to them, subject to this SSI, or other confidential information.

THE COURT:  What other confidential information?

MR. HART:  We don't know what else it might be that needs to be produced.

THE COURT:  But there needs to be specificity because the regulation talks about protected -- the words were used before, protected proprietary interests or corporate trade secrets.  That sort of thing.

MR. COLON-RAMIREZ:  Yes.  And usually -- I mean, in litigation, we are used to NDAs and confidentiality orders. And usually the producing party says, "Look, I am producing this under the understanding that it's covered by the confidentiality agreement."  And if some party disagrees,

then that's brought up to the Court.

But I am not going to agree *a priori* specifically to an NDA that is not the Department of Homeland Security NDA.  This is something that NFE drafted.  And when I read it, it's very broad because it does not define what is confidential information.  It actually says, "Confidential information is overarching."  And it reads as if it could be anything.  And I don't think that is -- quite frankly, Your Honor, in 31 years of litigation, I have not even seen an NDA or confidentiality agreement like that.

MR. HART:  Your Honor, this NDA that we sent them, it is based on the DHS form NDA for disclosing SSI.  There are a couple of modifications.  The major one being to make NFE a party to it, not just the DHS Government and the signer of the NDA.  So it's a very appropriate NDA.

The experts did not have any trouble with it, and they have signed it.  HR Wallingford has now signed one.  So that's why information and further information could be disclosed to them.

If we need to talk about the terms it, we can of course talk about it.  If we need to instead get a protective order from the Court to prevent further disclosure of the information, that's all.  The point is simply to preserve confidentiality, avoid public disclosure of NFE's property.  It's confidential information.  There is nothing usual about

that, I would suggest.

MR. NAZARIO-BRICEÑO:  The premises that brother counsel is basically arguing are based upon the assumption that the WSA contains SSI.  But if the U.S. Coast Guard determined that there is no SSI in those documents, that point becomes moot.

THE COURT:  I am going to enter the order this afternoon.  And it is my understanding that Mr. Burkley has stated that he needs an unredacted version of what was produced and also that he needs the ERP.  So that's what the order is going to include.

Regarding the simulations, all of them will be produced.  All of them.  The complete reports of all the simulations conducted in Siport or Seamen's Church, or any additional simulation that I am not aware of.  I don't believe there is any other one, but everything needs to be produced for the experts' consideration.

The further status conference will be December 12.

Just for purposes of clarity, I believe, Mr. Burkley, that you mentioned that the ERP, it's the portions pertaining to navigation that you are concerned with.

MR. BURKLEY:  That's correct.  Anything the tugboat might be involved in.

THE COURT:  So I can tailor this order with

specificity and make it easier on the Coast Guard to make the assessment.

MR. BURKLEY:  Yes.  I stated it previously as the navigation elements of the ERP.

MR. COLON-RAMIREZ:  The ERP, it's the terminal ERP. But there are navigational components in the terminal ERP.

THE COURT:  Right.

MR. BURKLEY:  I don't know what's in it.  I am assuming that the terminal has a problem and the ship has to leave and there is an emergency departure plan for that, and it uses the tugboats.  I am just guessing, but I haven't seen it.

MR. COLON-RAMIREZ:  The time?

THE COURTROOM DEPUTY CLERK:  2:00 p.m.

THE COURT:  It's going to be in a hybrid fashion. Whoever can be in person, please do so, otherwise we will connect by VTC.

MR. HART:  Your Honor, may I request -- sorry -- a request about the time.  Could it possibly be in the morning so that Captain Bordas, from London, could dial in, assuming the experts need to participate.

THE COURT:  10:00 a.m.

(PROCEEDINGS ADJOURNED AT 12:42 P.M.)

REPORTER'S CERTIFICATE

I, JOE REYNOSA, Official Court Reporter for the United States District Court for the District of Puerto Rico, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct computer-aided transcript of proceedings had in the within-entitled and numbered cause on the date herein set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

S/Joe Reynosa

_____
JOE REYNOSA, CSR, RPR
United States Court Reporter
Federico Degetau Federal
Building, Room 150
150 Carlos Chardon Street
San Juan, Puerto Rico 00918-176
(787) 772-3480

Joe Reynosa, CSR, RPR
Official Court Reporter