**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

BUSTO-ALVAREZ, ET AL., )          CASE NO. 25-CV-1462 (SCC)
Plaintiffs,        )
                   )              STATUS CONFERENCE
vs                 )
                   )
NFENERGIA LLC, ET AL.  )
Defendants.        )

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE THE HONORABLE JUDGE SILVIA L. CARREÑO-COLL
SAN JUAN, PUERTO RICO
Friday, December 12, 2025

APPEARANCES:

For the Plaintiffs:      FRANCISCO E. COLON-RAMIREZ, ESQ.
                         GIANCARLO FONT-GARCIA, ESQ.
                         LUIS M. PAVIA-VIDAL, ESQ.
                         MIGUEL NAZARIO-BRICEÑO, ESQ.


For the Defendants:      ALBERTO CASTAÑER-PADRO, ESQ.
                         JOSE RAMON RIVERA-MORALES, ESQ.
                         via Zoom THOMAS LIGHTSEY, ESQ.
                         CHRISTOPHER R. HART, ESQ.


Produced by mechanical stenography; computer-aided
transcription

Joe Reynosa, CSR, RPR
Official Court Reporter

(PROCEEDINGS COMMENCED AT 10:13 A.M.)

THE COURT:  You may call the case.

THE COURTROOM DEPUTY CLERK:  Busto-Alvarez and Others versus NFEnergia LLC and Others, Civil Case No. 25-1462, for a Status Conference.

On behalf of the Plaintiffs are Attorneys Francisco E. Colon-Ramirez, Giancarlo Font-Garcia, Luis M. Pavia-Vidal, and Miguel A. Nazario-Briceño.

On behalf of Defendant NFEnergia are Attorneys Alberto J. Castañer-Padro, Christopher R. Hart by VTC, Jose Ramon Rivera-Morales, and Thomas N. Lightsey III.

THE COURT:  Good morning.

MR. NAZARIO-BRICEÑO:  Good morning, Your Honor.

THE COURT:  Good morning, Captain Bordas, Mr. Burkley.

CAPTAIN BORDAS:  Good morning, Your Honor.

THE COURT:  We have a few pending motions, and I would like to start with docket 140.  I believe that informative motion can be just noted, but --

MR. COLON-RAMIREZ:  Refresh my memory on the prayer, Your Honor.

THE COURT:  It had to do with the simulations and the advances that had been made regarding the production of the WSA.  I believe the issue is moot.

Anyone has any issues with the matter?

MR. COLON-RAMIREZ:  I have plenty to speak on the ongoing production of documents, but since I know Captain Bordas is five or six hours ahead, I am happy to let the experts talk to the Court and then come back to the ongoing production of documents.

THE COURT:  All right.  But 140 was just a report of what was happening at the time.  I just want to have like a clear record of the disposition of the different issues.

MR. COLON-RAMIREZ:  Very well.

THE COURT:  140 we can note and move onto the other matters, which now is docket 185.  And docket 185 is the one concerning the execution of the NDAs, and that is the issue now that you want to bring forward regarding the actual production and the manner in which this production occurred.

MR. COLON-RAMIREZ:  Yes.

THE COURT:  So you want me to hear from -- it's titled "Motion in Compliance".  And it has to do with the -- let me open the motion.

185 is the motion in compliance with the Court order at 182 that has to do with the execution of the NDAs.

MR. COLON-RAMIREZ:  Yes, Your Honor.

THE COURT:  And you want Mr. Burkley to address...

MR. COLON-RAMIREZ:  No.  I just think that since part of today's hearing, the purpose was for the Court to

hear from the experts as to where they were, given the time difference, I will give deference to Mr. Bordas so that Mr. Bordas and Mr. Burkley can inform Your Honor. And then I will bring up the matter --

THE COURT: Then you will go into the matter.

MR. COLON-RAMIREZ: Yes, Your Honor.

THE COURT: That's what you propose?

MR. COLON-RAMIREZ: Yes, Your Honor.

THE COURT: All right. So I guess it's good afternoon for Mr. Burkley.

MR. BURKLEY: Yes.

THE COURT: Good morning.

MR. BURKLEY: Good morning, Your Honor.

MR. COLON-RAMIREZ: I will briefly get into it, Your Honor.

So one of the things that Mr. Bordas asked at the November 20 hearing was for the full simulation run done at Seamen's Church Institute. In fact, he wanted them for all simulations.

The simulation run for Seamen's Church Institute we obtained yesterday, if not the night before. It's rather lengthy. We produced it.

I also did not sleep. I went through it, along with another couple thousand pages. And Mr. Bordas and -- Captain Bordas and Mr. Burkley can talk about what they can

do with it.  But, unfortunately, as much as I have tried to make progress, this was given last night, you know, within a day.

So I am going to do my best to behave, but I am very frustrated, Your Honor.  I am very frustrated.  The November 20 orders that you issued to the Coast Guard, the first one, as to whether the experts, meaning Mr. Bordas and Mr. Burkley, would be able to see the WSA and ERP, Your Honor issued an order to the Coast Guard to them to express themselves.  And they complied.  And then there was a request for an amendment of that, that it would only be the experts, not the attorneys.  We addressed it.  We have it now.

My frustration, Your Honor, is, you issued the order on November 20.  On November 7, I proposed to counsel for NFE that we come to court and ask the Court for an order to the Coast Guard to do what it did on November 20.  And after some back and forth, at one point I was even told to "sit tight".  Because I said, "Look, if I don't hear from you, I am going to go file a motion."

I said, "If I don't hear from you by noon," at 11:55 in the morning I was told to "sit tight".

Then we went through, quite frankly, what has been a pulling teeth in getting the WSA documents.  First, although the order from Your Honor was for NFE to produce the documents, there was no production.

What they sent was a link for us to view the documents on their system.  Could not download them.  Could not print them.

This is even worse than when Your Honor, if you know, when we had the old productions at someone's office where we said, "I will make the files available in my office, and when you come, you take the copies that you want."  No, we could not even take anything.

And on top of that, the portal track what we were looking at.  And, of course, I raised hell.  And I said, you know, that's unacceptable.

The other thing is that what we were allowed to view -- again, not what was produced, what we were allowed to view -- were Word documents.  And I told them, "Come on!  You did not submit this in Word to the Coast Guard."

And I went through the metadata of each Word file, and every single Word file had a creation date of December 4.  So these documents were created for purposes of putting on the platform.

Then I was told that that was done because the PDFs were password protected.  I said, "I want to see the PDFs."

They put the PDFs on their platform.  They allowed us to download it.  I downloaded them.  And then they also gave us the password files, a Word document with the passwords to each file.  I inputted the password, and I was

able to open the document.

And I tell them last night at a conversation we had, I said, "Look, by the way, this is pretty easy.  Once you open the document, you go to 'file', you go to 'document properties', and where says 'password protect', you can change it to 'none'.  That's it.  Then we don't have to go through this."

And then I am told, "Ah, but it's password protected because it's SSI."

I said, "Really?  You gave it to me in Word without any password protection."

So I get it, and what I get is a file name that says, WSA update, 13 August 2025, but it has a March 17 date.  That document references prior submissions to the Coast Guard.

So I tell them, "Look" -- so I say, I have learned now the WSA is not a single document.  It's a process.  It starts with a Letter of Intent.  Then it continues with a pre-WSA.  And after that there were follow-on submissions, and all that becomes the WSA -- or forms part of the WSA file, but the WSA is not a single document.

So yesterday I get the complaint that we are asking for things by drips.  I tell them no.  I said, "Look, you have an expert who prepared the WSA submissions, Natalia."

I said, "NFE knows what it submitted to the Coast

Guard.  Produce it."

We got further documents last night.  Again, some of them are a thousand pages.  I didn't sleep because I did not want to waste this Court's time, and I wanted to be sure I saw them before coming here.

And I know that Attorney Castañer said he wasn't going to go through them.  I said, "Don't worry because I am going to show you today what it says."

So what's in it, Your Honor?  The SCI report, the full report that we finally got -- and I am going to pull the -- I am sorry.  I let him do it since he is more technically inclined than I am.

So if Your Honor can see it on the screen, that's the full submission for Seamen's Church Institute.  And Your Honor will see where it says, "Customer, Riben Marine. Vendor, Seamen's Church Institute.  CME contact, Center for Marine Education."

Riben Marine was who NFE paid for this.  We will get into that in a moment.

THE COURT:  Can you show me the yellow.

MR. COLON-RAMIREZ:  I' going -- that's exactly what I want to show you.

If Your Honor looks at the nomenclature used.  You see very particular wording.  "The purpose of this simulation project is to provide an operational analysis of the New

Fortress Energy dock for its intended use where there will be a 293 floating service reserve unit," I think, "ship alongside the berth, with a 285 meter LNG service vessel to be used as a resupply ship to be berthed alongside," and so forth.  But it's very particular language.  And the importance of that we are going to see.

I noted the next word, it says, "During the initial phase of the -- in the initial stage of the project, phase one, we learned that 60-ton tugs are insufficient for handling LNG ships of this size."  Again, Commissioned, this is by Riben Marine.  This was who NFE paid.

It continues on the next page.  "The 87 simulations performed," so and so, "for a success rate of 94 percent."

MR. LIGHTSEY:  Your Honor, if I may?

MR. COLON-RAMIREZ:  Not yet.  Not yet.  I am not done.

I am sorry, Your Honor.  My words are few.  I want to make sure they count.

MR. LIGHTSEY:  I thought we were here for a status conference, what status the documents that we produced would the experts need.  I am just trying to move it along.

THE COURT:  I am trying to understand if NFE has complied with the orders of the Court in terms of production. That's why he is going into the contents.

You may continue.

MR. COLON-RAMIREZ:  So the 87 simulations were performed as part of the second phase.

Your Honor will see in the paragraph preceding, at the top of the scene, "During the second phase of the project, using five simulated bridges manned by competent mariners, we tested 80-ton tugs."

So here we have Seamen's Church reporting that it did phase one where it learned that 60-ton tugs were insufficient, and it did phase two with 80-ton tugs, and then it had a success rate of 94.

So part of the NFE --

THE COURT:  What's the problem with this production?

MR. COLON-RAMIREZ:  No, nothing.

THE COURT:  Okay.

MR. COLON-RAMIREZ:  Not yet.

So we finally get this document that's called "WSA update 24" signed here.

MR. CASTAÑER-PADRO:  I am sorry, Your Honor.  If this is a WSA, there's a protective order.  It can't be shown off in court like that.  In open court.  There is people here who haven't signed NDAs, and someone can walk through the door at any moment.

MR. FONT-GARCIA:  We can ask the people who are not parties to the case to leave.

MR. CASTAÑER-PADRO:  It has to be in-camera, Your Honor.

THE COURT:  Tell me what the problem is.  Don't show the document.

MR. COLON-RAMIREZ:  Well, Your Honor...

THE COURT:  They didn't produce the document.  What was the issue?  That it was not complete?  What it is that you want to tell me?

MR. COLON-RAMIREZ:  I was given a document, Your Honor, that is -- on the face of this document -- I am not going to pull it off.  On the face of this document, it's titled 17 of March of 2025.  But when you go into the metadata, it was created on August 20, 2025.

Now, August 20, 2025, happens to be the month --

MR. LIGHTSEY:  I am sorry.  I couldn't hear what date he said the metadata said.

MR. COLON-RAMIREZ:  August 20, 2025.

So that document, which the metadata also says it's a PDF from a Word document, bear in mind the actual document is dated March 17, and it's referenced in one of the submissions as a WSA document to the Coast Guard, we haven't seen that yet.

Now, I didn't walk you through it, but in the beginning --

THE COURT:  So the production is defective.

MR. COLON-RAMIREZ:  Oh, it is.

THE COURT:  It's not complete.

MR. COLON-RAMIREZ:  But it goes beyond that, Your Honor.

So, after the Seamen's Church, NFE is reporting to the Coast Guard the same verbiage.  Phase one, 60-ton tugs, insufficient; 80-ton tugs, pass rate of 94 percent.  Consistent with the Seamen's Church.

I get to this document created on August 20, 2025, and to put it a little context here, on July 31st was the meeting between the pilots and NFE when NFE told the pilots that the 80-ton tugs were going to go.  And the pilots wrote a letter that led to a gag order, you know, that we have addressed in court.

Anyway, the document I am referencing that was produced by NFE was created August 20, 2025.  And in the simulation part where previously it had been reported that the simulations found that 60-ton tugs were insufficient, the word "insufficient" was magically changed to "sufficient".

And then, the second part where it describes phrase two, 80-ton tugs lead to a pass rate of 94, the reference to the 80-ton tugs miraculously disappears.

So when you read that document that was created shortly before we filed this lawsuit, you see a document that says 60-ton tugs were sufficient with a pass rate of

94 percent with no mention of 80-ton tugs.

Your Honor, I don't take this lightly. This is the fraud on the court that the First Circuit talked about in *Aoude v. Mobil* and *Hull v. Municipality of San Juan* where in those cases the Plaintiff was defaulted for having committed fraud. Here it's the Defendant. And I intend to find out if that falsified document was in fact submitted to the Coast Guard. Because that, Your Honor, would be a crime under 18 U.S.C. 1519 punishable by up to 20 years.

So my words are few, but like they say in Spanish, today *boto chispas*, because I was very upset when I saw this last night.

THE COURT: Response.

Mr. Colon, can you please allow counsel to use the podium?

MR. COLON-RAMIREZ: Yes. I am picking up. I was doing that. They speak at their peril, but I will let them.

MR. LIGHTSEY: Tom Lightsey on behalf of NFE.

So, Your Honor, as to the last comment about different documents, this is the first I have ever heard of this right now. I don't know -- I am certainly not a metadata expert. I would suspect that the date of August 25th is perhaps the date it was saved, but let's go back to what we have done.

We uploaded everything into the link so it would be

secure and sent notice to Plaintiffs' expert and/or Plaintiffs' counsel, I don't recall, on December 5th. We didn't hear any issues at all from them until December 10th, that they had some problems opening them, that they didn't want the Word documents, they wanted the PDF.

They were created PDFs originally. Our IT department says they are password protected. We can't load them as PDFs, so they converted them to Word. So we did produce them. If they want to compare the Word documents to PDFs, as far as I know they are exactly the same. That's all they did.

So on the 10th they say, "We've got some issues with these documents." On the 11th we had all those issues resolved.

There are two more documents they were looking for. We've found them. We are in the process of having them watermarked and Bates labeled so that they can be produced. We are there. We have given them everything that we don't even think is necessary.

They are looking for prior simulations. The document that he just read, the WSI -- excuse me -- the Seamen's Church Institute talks about the prior method, the FRSU, floating regasification storage unit, ship. That's old. That's outdated.

So, as far as the status of the documents, and I am

sure Mr. Burkley and Captain Bordas will tell us that they have some documents.  They may be looking for others.  We have expressly reached out to them a number of times.  "If you have something specific that you don't have, let us know."

There is one thing that I know that they might want, and it's from Jay Rivera Riben Marine.  And so I personally reached out to Captain Rivera and said, "Hey, Jay, do you have this?"

And he says, "Hey, talk to my lawyer."

I corresponded with his lawyer.  His lawyer says, "It's Jay's data.  You can't have."

I believe we have reached out to Seamen's Church Institute twice asking for -- maybe only once, but we did again yesterday, I believe, asking for this data.  We don't have it.

So there is one piece of data that we don't have that nobody has given to us despite our request.  And everything else that they have asked for, even though we don't think it's relevant, we have produced it.  And we worked around the password protection and the Word document versus PDF.

So, as far as I know -- and, again, Captain Bordas and Mr. Burkley will tell us -- they are getting documents that they need.  And they have sufficient documents, as I

understand, to keep the process moving along, which I believe is what the Court wants.

THE COURT:  I would like to hear from Mr. Burkley now and Captain Bordas.

MR. LIGHTSEY:  Thank you, Your Honor.

MR. COLON-RAMIREZ:  For clarity, Your Honor, not everything was produced.  We were informed yesterday that NFE had documents for which it had lost the passwords.  And before coming in court today, Attorney Castañer told me that they had found the passwords and they would be uploading the documents.

MR. CASTAÑER-PADRO:  Today.

MR. COLON-RAMIREZ:  Today, yes, like he just said.

So not everything has been produced.

And, by the way, this was made available December 8 at night.  December 9, I was asked to confirm that I had submitted DHS forms for everyone.  And, yes, December 10, you know, there were a lot of documents, thousands of pages, that I had to review.  And then on December 10, when I do say something, you know, it should come of no surprise that within 36 hours of getting what I told the Court before, which is just access to a Word document that I can't even document, yes, I complained within 36 hours.  That's how long it took me to review all of them.

THE COURT:  You mentioned in your filing at 187

that the manner in which these documents were produced allows NFE's attorneys to see how much time you spent reviewing these documents and when you reviewed these documents.

MR. COLON-RAMIREZ:  Well, when they enabled the download feature, they said they were going to delete the tracking data.  I am taking them at their word.

But in the portal that we had, there was a tab that allowed or through the portal tracking of the document.  What exactly they were tracking, I don't know.

MR. LIGHTSEY:  If I may, Your Honor.

THE COURT:  You could not download or print the documents.

MR. COLON-RAMIREZ:  I have not printed those documents.  I have downloaded them.  And I am happy to accommodate Mr. Castañer and walk the Court through in-camera of what I found.  But, yes, I did download the documents.

MR. LIGHTSEY:  So, Your Honor, we were advised that there were some tracking from IT.  We said, "We will just make it available so you can download them."  So whatever they do on their computers, we have no idea who is looking at what, when.  So that issue, as far as I know, is resolved.

THE COURT:  You know the problem that I have with this, if this were the first incident, I would say, "Well, you know, it's something that happened that NFE didn't realize," but this is part of the same pattern of not being

forthcoming, not wanting to produce.  And I said this in the last hearing, that there has been an obstruction of the process.

And when we agreed and the parties stipulated to consolidate the preliminary injunction with the permanent injunction and to try to reach an amicable solution, I believed, I truly believed that there would be a cooperative effort, but that's not what has happened at all.

MR. LIGHTSEY:  I think that Captain Bordas and Mr. Burkley would think otherwise, Your Honor.

THE COURT:  Well, let me hear them then.

MR. COLON-RAMIREZ:  By the way, what I have downloaded, I have given to Mr. Burkley.  Yes, I have provided that.  So he has seen them, but he hasn't had much time to review the thousands of pages, because I am sure he's --

THE COURT:  That's a separate issue, because you have made a very tall accusation, which I intend to follow up with.  Let me hear Captain Bordas and Mr. Burkley, and I will make some decisions regarding how I am going to go about doing that.

Mr. Burkley, can you report to the Court from your point of view what's happened with the production that was ordered by the Court?

MR. BURKLEY:  Yes, Your Honor.

I have received documents. And I understand that the same has been provided to my colleague, Captain Bordas. And we had a chance to look at -- it's a lot. It's a lot, and so I haven't looked at all of it. But I did -- the WSA was exactly as expected. It's an unredacted document. And it lacked the key parts that I find interesting in order for us to do the good work in the simulator that's coming. But the Seamen's Church documents provided exactly what I was looking for.

And I really -- and I think it points to, Your Honor, some of the disagreement that was actually between Captain Bordas and I, clearly alludicated in the Seamen's Church's documents about limits and reserve capacities and how we evaluate tug performance in a simulator. They have a pass limit and a fail.

By the way, these were also the elements that were missing from the Siport simulations that were produced in evidence later on and I had umbrage with. So I said, "Hey, you know, we didn't have any pilot opinion in here, and we didn't have any metrics of limits, and we didn't have any requirements for reserve tug power. Yet the Seamen's Church documents clearly have all of these elements."

Those are the things that I was looking for because, as I work with Captain Bordas to do a good, fair and equitable job of evaluating this, we would like to benchmark

the previous work just to make sure that there is no, you know, what was found before worked again in the same new system, and then we are going to move forward and test a relaxed tug standard, if that's the case.

So I looked at that. There was pilot questionnaire, which didn't exist in a previous report. There was a description of the tug failure, which I liked.

Also, as previously mentioned, there was some 90 percent, 94 percent, which I really personally feel is only relevant to the things analyzed in that report.

But overall I feel like I have enough information to work with Captain Bordas on crafting a way forward here, but it's going to take a bit because I need to dig through this big stack of information.

And I was very uncomfortable, ma'am, with the portal that was provided for me by the HFW. It was a tracking -- it only let you see one page at a time. There was no facility to sort it. And when I am given many thousands of pages, I use my software to find things. I think a lot of people do, right, but I couldn't do this. So it was really cumbersome to go through the data. I use keyword searches in the PDF. I think it's the modern way of us to dig through big sifting parts of data. So those are the things.

And then lastly, if I could end, you know, one

thing that's notable to me throughout this entire proceeding is that there this focus on the amount of power that a tugboat has, yet the Seamen's Church report starts to pull that thread a little.  And I think you will notice, Your Honor, that there is more to it than that.

We have an offshore section in the open ocean that the tugs need to provide service in, which means they need to be an ocean-type tug.  I brought my little paper model so I could be no clearer about this.  Here is an old style tugboat.  You see, this (indicating) is the back part where the propellers are, and this (indicating) is the front part that goes through the ocean.  And it's a harbor tug, ma'am.

So you see how it's really narrow and small.  They will go out in the ocean, but they will never do it this way (demonstrating).  They will never go that way (demonstrating).  Because when they do, it buries underwater, and all this water comes on deck, and everyone gets scared, rightfully so, because the tug can get in trouble.

This kind of tug can be upgraded with new power, and it can be given all kinds of Power.  So the tug design matters quite a bit.

One of the things that Jay Rivera and Riben Marine and Seamen's Church were looking at, in addition to whether it's irrelevant at the dock and there's -- we're docking to another ship, and those parts of it, we were also looking at

the offshore towing part.  Could we save -- can the tug provide the power?  Can it get out in front of the ship and work out there?  Can it work behind the ship?  Can it do that in the harbor?

I would say that some of the replacement tugs may not be of that type of design, but it's something we should look at.  But we are not just looking at whether it's a 60-ton tug or an 80-ton tug, and all this bad behavior I am seeing in documents, switching of words and things, I mean, that's another issue altogether, from the practical side, really -- and I think Captain Bordas and I will agree, because he also has the same issues where his tugs have to work around the ship in different ocean conditions.  And we cannot just replace them with a high powered harbor tug. They need to be an escort tug.

So that's where I am at, Your Honor.

THE COURT:  What about the January date for the simulations?  Are we still looking at January as a possible date?

MR. BURKLEY:  I don't know.  There is work to be done.  And it's very slow to get information that's been asked for.  For us to really get into, quote, simulation in January, really, the researchers that have been chosen at the facility in England should -- if they are going to have an honest and open look at this, they should look at the WSA.

They should look at this SSI information, which is quite ridiculous, by the way. I don't find anything to be particularly sensitive about it, but that's for them to argue. And they should be included in this information.

And Captain Bordas and I should be able to sit down with our ship pilots. Because I think another thing that's not mentioned here is that Captain Bordas and I, we are not establishing the safety standards for the port. The pilots do. It is their guideline in the end of the day that's going to matter. And so this research work should inform their knowledgeable subject matter expert in defending the safety of the port to make sure it works. It's really, I believe, their call at the end of the day. And we need to craft that for them.

So what can we do in January? Well, they can get Moran and McAllister to give up all the data on their tugs. We see the design of them. We have all the specifications. And we can put that data in the simulator, and that takes time. And we should probably model the port. That takes a little time. And we should have a conclave of our experts. We should be free and open to talk to each other. The only time we get to talk right now is in court.

We should be able to have our normal research process, do our hazard analysis, look at out run matrix, establish our baselines, look at our designs, make sure that

these tugs are safe when it's rough outside and we can run our boats in the rough open ocean and in the calm inner harbor.  They have to work in both places.  And make sure everyone is comfortable with what they are doing.  That would probably be January.

Then from there, HR Wallingford would build all these things, and say, "We've vetted it, and we're ready."  Then we'd go look at it.  Usually one of the pilots would go and look at it.  And that might be, say, a February, March kind of thing.  And then I would expect -- that's just my normal way of working, Your Honor.  Then I think simulations would happen somewhere.

THE COURT:  Where do you propose that meeting be scheduled for?  Here in San Juan would make most sense?  You can meet with Captain Bordas and the pilots and have this exchange that you believe is useful and then submit that to the -- where you decided, where the experts have decided the simulations are going to take place.

MR. BURKLEY:  Right.

THE COURT:  Would that make sense?

MR. BURKLEY:  Your Honor, we do it virtually if we had our data provided.  So these tugs -- you know, all this high level regulatory filings are interesting, but at the end of the day, we want -- there are words like "general arrangement", it's a big drawing of the tugboat.  The trial

data, that's what we work in day in and day out.  The meat and potatoes of this, they need to give it to us.  And I don't want to be looking at it one page at time and struggling to tease it out of a server in Houston.  That's just ridiculous.

Captain Bordas and I should be just working with an NFE project manager, quite frankly, who just free and openly -- we have a share file.  This is how I always do it.  We are just exchanging data.  And then we all get together and we lay this out, and the process just starts clicking.  But we are not going to click right now.  We are not clicking.  I hate to say it, we are really not clicking, Your Honor.

THE COURT:  Let me hear Captain Bordas now.

MR. BURKLEY:  Thank you.

THE COURT:  Thank you.

CAPTAIN BORDAS:  Your Honor, as usual, grateful thanks to George Burkley for putting his point of view.

In general, I hear where he is coming from.  And, first of all, I think it's worthwhile me putting to bed this argument about the provision, the late provision of data.  I share everybody's frustration with this.  I only got the documents last night, and I too have to review them.  And there is a lot of information involved.

The thing to realize is that NFE are quite a large

administration or a big company.  And I have worked with Shell, Exxon, ConocoPhillips, BP, on all sorts of projects in the USA and all over the world.  And when you are working with these companies, it takes a lot of time to produce data.  And this is a perfect example of it.  Not only NFE, but also the U.S. Coast Guard as well.

And in my experience of doing this over a long period, yes, it's very easy for -- I am calling him George Burkley -- Mr. Burkley and the pilots' representatives to say that it's terrible, but they are a single entity.  And in my experience, I think that both the pilots, the representatives, NFE and their representatives, George Burkley and myself, could actually, in my experience, turn around and pat each other on the back for the amazing time that we have managed to do this in, which is fairly unprecedented, in my view.

Moving on from that, I feel that we have now got the information to hand for George, myself, the pilots and all the other stakeholders, in particular, tug masters as well, because they will be able to tell us what conditions they are allowed to work in, what conditions they get worried about, how fast they are going to be able to maneuver in front of an incoming LNG vessel when they secure to the center lead forward position.  So all stakeholders will have an input in this.

And although we haven't set a date in particular, I am still looking at the end of January, perhaps even mid-January, for us all to get together perhaps virtually and decide upon these matters.  And then I am hoping that we will be able to go to HR Wallingford at the end of January and look at what they have modeled in terms of the vessel and in terms of the tugs, and be able to question them, and use the vessels and the tugs over -- not a very long period, maybe a day, a day and a half, and say what actual works needs to be done, or otherwise say that this is good and we can move on from this to conduct the simulations.  And I think -- generally, I think Mr. Burkley and I will be in agreement with that sort of planning proposal.

At the moment, I understand that there is a memorandum of agreement between NFE and HR Wallingford.  And, again, it's late in the day, but in general terms, in my experience, this has all moved forward fairly quickly.  But in the meantime, HR Wallingford have other customers as well, and they have got to squeeze us in somehow.  And I think they will be able to do that.

So I am quite happy that we will certainly be able to ratify the models, the tug models, and use perhaps senior pilots and tug masters to say, "Yes, we are ready to go forward with simulations, which may consist of" -- well, we will decide on what exactly they will consist of and in what

conditions we will be using.  That's something that Mr. Burkley and I have still yet to closely look at and decide upon, Your Honor.

THE COURT:  So you are comfortable having this meeting mid-January, and you are comfortable doing it virtually with the pilots and Mr. Burkley and yourself?

CAPTAIN BORDAS:  I am very comfortable doing it virtually.  If they want me to come out there, I will, but for me it's 24 hours of travel.

THE COURT:  Thank you.

Mr. Colon.

MR. PAVIA-VIDAL:  I think Mr. Burkley is trying to address the Court.  I see him raising his hand.

THE COURT:  Oh, I'm sorry.  I didn't see you.  Go ahead.

MR. BURKLEY:  Yes, Your Honor.

I would agree to the meeting if we had our data. But I would prefer not to meet with everybody and just have a conclave of people that say, "We need data," which means that I would like to have the tugboat information and all of the design particulars provided prior to us gathering to do design, because it will move very quickly if we have our data.  But if we are just working in a vacuum of assumption --

THE COURT:  Yes, understood.

Also, you want the restrictions removed from the way you can review the WSA.

MR. CASTAÑER-PADRO:  They have been.

MR. LIGHTSEY:  That's been done, Your Honor.

THE COURT:  It's been done?

MR. BURKLEY:  And any further data.

MR. CASTAÑER-PADRO:  It's been done.

THE COURT:  And, also, was the tracking of how long people spend reviewing these document removed?

MR. LIGHTSEY:  Because it's been set up so they can now download in their personal computers, once they have downloaded it, there is no tracking of anything on it of any type.

THE COURT:  All right.

MR. COLON-RAMIREZ:  Attorney Colon for the record.

The tracking tab is still present on the portal, but I no longer have to view the document on the portal page by page.  I can now download it.

THE COURT:  I see, because you were able to download it.

MR. COLON-RAMIREZ:  Yes, Your Honor.

I do want to mention that at the November 20 hearing, one of the things that was mentioned was that Mr. Burkley wanted to simulate sizes of ships that would not berth at the NFE berth, and Mr. Castañer at that moment said,

"There is nothing that's larger that's going to berth there. That won't hold anything larger," meaning the Energos Maria that has an LOA of 985 feet.

Well, in one of the WSA documents that we received and that I found last night, NFE is proposing to the Coast Guard to use vessels of up to 1,100 feet in length.

THE COURT:  Okay.

MR. COLON-RAMIREZ:  And the other thing is --

THE COURT:  But this is something for the experts and the pilots to consider in the January meeting.

MR. COLON-RAMIREZ:  Yes.

But regarding the review in-camera of all the SSI, I can, I am ready to do it.

I do have a question.  Is counsel for NFE, did they sign DHS forms 11000-6?

MR. LIGHTSEY:  Yes.

MR. COLON-RAMIREZ:  Okay.  Because they were not submitted to the Court.  We submitted ours.

THE COURT:  Regarding Mr. Burkley's ask pertaining to the design of the tugboats and the information pertaining to the tugboats, where would that be contained and how can that be produced?

MR. COLON-RAMIREZ:  So I did request certain information, and based on the answer I received to that information, I think I know where the answer to this will be.

In the beginning, I showed Your Honor the full Seamen's Church report, and it mentioned the customer Riben Marine.  This is the entity that NFE paid, and then they took charge of doing all the logistics of getting everything ready.

So the Seamen's Church Institute report says that after each simulation there is going to be a simulation questionnaire put to each pilot, nine questions.  Separately it says, simulation data will be exported into Excel.

So I asked NFE for the questionnaires, the pilot questionnaires, because I know that's something -- Mr. Burkley is nodding his head.  I know it's something that he wants to see.  And I asked for the Excel export.  And NFE answered by email that, "Oh, that's Riben" -- they asked the information from Seamen's Church, and Seamen's Church said, "Well, the client who paid for this is Riben Marine, so you need their approval for me, Seamen's Church, to release it to you."

So I told counsel this morning, "Well, this should be easy.  Riben Marine was your agent."

THE COURT:  Right.

MR. COLON-RAMIREZ:  But the response I got suggested that it was not so easy.

So there is information that SCI has stated that it will release pending Riben Marine's approval.  There are

comments by attorneys for NFE that that approval may not be coming.  So our request would be that the Court issue an order to SCI to produce to NFE the information that we are requesting, or alternatively, an order to Riben Marine so that Riben Marine asks Seamen's Church Institute to produce the information to NFE.

But, again, Your Honor, this has been a lot of jumping through hoops.  And Mr. Bordas, Captain Bordas said that he just reviewed the -- he got the information yesterday when this was uploaded the night of December 8.  And I think I have done a monumental task of wrapping my arms around all this information to be here to argue this today.

MR. LIGHTSEY:  Your Honor, if I may.

THE COURT:  Yes.

MR. LIGHTSEY:  We would be fine with -- if the Court wants to issue an order to both Riben Marine and Seamen's Church, that would be great, as the Court has the authority to do that.  They have told us -- Riben Marine has said, "It's my data.  You can't have."  Their lawyer said that when I reached out to Jay.

THE COURT:  That you can't have it?

MR. LIGHTSEY:  Cannot have it.

I reached out to Captain Rivera directly, and he referred me to his counsel.  And I corresponded with his counsel, and he said, "Nope."

We have also corresponded with Seamen's Church. And so if the Court has the authority to order that produced, we are one hundred percent fine with that.

MR. COLON-RAMIREZ:  My understanding is that Riben Marine is owed money from NFE, which is driving this.

MR. CASTAÑER-PADRO:  Your Honor, first, regarding the large vessels, we provided all the information.

THE COURT:  That's for the experts and the pilots to discuss.  I am not going to enter into that.

MR. CASTAÑER-PADRO:  Counsel discussed it.

MR. COLON-RAMIREZ:  It's okay.

MR. CASTAÑER-PADRO:  Okay.

And about the questionnaires, we, in fact, provided the emails from Seamen's Church in response to NFE's request for that information stating, "This is the property of Riben Marine."  And Riben Marine was approached, in fact, to get their permission to have Seamen's Church release the information.  The response was, "Contact my lawyer," which was done.  And the lawyer said, like Mr. Lightsey said, "We are not giving it."

THE COURT:  What was the reason?

MR. LIGHTSEY:  So, to clarify, I did not reach out to Captain Rivera to ask him to authorize Seamen's Church's release.  I just said, "Since Captain Rivera has it, can you give it to me directly?"

He told me to contact his lawyer. I contacted his lawyer. His lawyer says -- let me back up. I had sent a portion of the terms and conditions that NFE applied to Captain Rivera showing that this data would be owned by NFE.

THE COURT: Right.

MR. LIGHTSEY: And counsel responded and said, "Oh, no, that was never signed. Here are the terms and conditions, and it says it belongs to Riben Marine."

So what happened was -- in reality was, NFE sends to Captain Rivera the terms and conditions signed by NFE. Captain Rivera never signs it. Captain Rivera sends NFE his terms and conditions signed by him. NFE never signs it. So there is no signed agreement, unfortunately.

So counsel's position --

THE COURT: Who paid for this?

MR. LIGHTSEY: We did. So I would think -- I would argue strenuously that it belongs to us. But counsel for Riben Marine is saying, "Nope. Here it is."

MR. COLON-RAMIREZ: NFE paid for it.

THE COURT: Hang on.

Is this counsel based in Puerto Rico?

MR. LIGHTSEY: No, Houston.

MR. COLON-RAMIREZ: So NFE paid for it except for what they still owe.

MR. LIGHTSEY: There is an allegation from counsel

that Captain Rivera is owed some moneys for other work, not this work.  That's one of the reasons he says he's holding a no.  He said, "If you pay that, maybe I will talk to you."

THE COURT:  All right.  So this has been like pulling teeth, and we wasted a lot of time when the WSA was not produced.  I said a couple of hearings ago, or maybe it was in the last hearing, that the pilots are people that need to know and, obviously, the experts, and you refused to take that path.  And I had to go to the Coast Guard twice to obtain their input, and they agreed that they were people that needed to know.

I mean, the record is clear in terms of the difficulties in getting NFE to produce.  So if this is still what you want, you want this to be considered by the experts in terms for the experts to render an opinion to the Court and perhaps avoid litigation, then this is not the way to go.  And I have made that clear every time we meet.  And I continue encountering this, you know, resistance to be forthcoming, to produce, to help the experts review the data, and I have to question why.

Do you want to litigate this?  Because if this is not going to work, then we just, you know, schedule the case for trial, and we save everyone a lot of aggravation and frustration.

MR. LIGHTSEY:  I think it's my understanding from

listening to Captain Bordas and Mr. Burkley that they have the vast majority of what they need.  I think I heard for the first time today that Mr. Burkley wants the tug information. I don't know where that comes from.  I am sure Mr. Burkley and Captain Bordas know how to get that, or it's also possible that that tug information is already at HR Wallingford and/or Seamen's Church.

THE COURT:  They don't know where to get it because it has to be produced by you.  You have been controlling the data, the information, the documents all along.

MR. LIGHTSEY:  I just want to be clear, we don't have the tug particulars.  That is owned by the tugs.  So we would have to go out to them.  Somebody has to go out to them.

I see Mr. Burkley smiling, but we don't have it.

MR. BURKLEY:  I am here.  I am ready to speak about this.

MR. LIGHTSEY:  Sure.

THE COURT:  Go ahead.

MR. BURKLEY:  Your Honor, there is a missing link here, and the missing link is, this is completely irregular to the way these things happen.  In a general situation, our energy company is trying to please our pilots so that they can do commerce in their port.  And they are producing everything in the most timely fashion possible to someone

like me who is working kind of as a bridge between the two of them.  And this is the same thing that Captain Bordas would deal with if he was doing research.

Also, I have a project standard that I establish early on in these projects that solve the problems that are in the courtroom right now.  And I would ask the Court, Your Honor, if they would consider adopting the same ideas so that these problems don't happen again.

The data that's required we produce on a little USB key, and the pilots have that.  I will be in simulation on Monday in Houston, and my pilots will have that record data. I am paid to protect it for them.

So it doesn't become contractual and a bunch of attorneys involved in this.  It is very irregular.

Those reports, I would ask that, as I spoke of before, that the final resolution of the safety of the port will rely on the pilots and that the pilot in charge of this project moving forward should be Captain Ramos.  And Captain Ramos should be the first to have all information.  And it is his privilege to edit it, review it and to approve it, that of any -- any of what we are going to do, if we are going to approve a tug model for use and we are going to analyze the design of it, Captain Ramos, who is the eventual arbiter of safety, who has to accept the information, should be the person in the beginning who is making the decisions whether

or not to use this information or other.  So he is not being bamboozled by an entire army of attorneys and special interests.

No, that's not the way we do this.  It is a lack of respect for the process.

So I would ask if the Court would please establish granny law on this project and give us a pilot in charge that we are going to have to trust in the end.  We have to trust our local pilots.  We have to trust them.  They have the commission of trust from the state.  They have the commission of the trust from the legislature.  We have to trust them.  They need to be provided this information early.

This, what is happening in here, this fracas, is very disappointing.

I stand.

MR. LIGHTSEY:  So, Your Honor, if I understand, Mr. Burkley says he has everything he needs except some tug information, which I thought he was going to tell us how to get that, but that didn't come out, and this appendix from Seamen's Church, which the Court is considering perhaps issuing an order to.

As far as the final arbiter being one sole pilot of the group, that's not the way it works.  Every individual pilot has their discretion, as the Court knows, and they make their decisions as a group.  And that's why he may be there

as a representative of the group, but he is not the final arbiter of this by any stretch of the imagination.

I would love to hear Captain Bordas' response to that.

MR. COLON-RAMIREZ:  Mr. Burkley is raising his hand.

MR. LIGHTSEY:  I think Mr. Burkley has had his chance to speak.  That's why I would ask Captain Bordas --

THE COURT:  I want to hear Mr. Burkley finish his thought.

Go ahead.

MR. BURKLEY:  Yes.  The pilot group will elect one of their pilots to represent them, especially in a small pilot group where it's a big burden to pull them out and go overseas for simulation.  So they can elect one person who is going to -- so I had no intention of saying, "This is the arbiter."

And there is absolutely no reason why a big energy company can't ask the tug provider, that, again, wants to please them, "Hey, give me the data for your tugboats." Boom, it just pours in.

Never have to pull teeth on any of this.  It's just, I have a project manager that I worked at at the energy company, usually a senior marine engineer.  They are very knowledgeable.  The tug company people are providing data.

That all goes into a share file.  We are all on the same page.

We always have a pilot in charge.  We always have a pilot in charge that's representing the pilot group because they are the final arbiter of this.

And to Mr. Lightsey, he is better at this than me.  My words come out wrong, because this is not what I do.  I do tugboats, right, and I do simulation and research.  But I see, from my perspective as a layperson in your court, that there is just massive roadblocks to the normal way we do things, yet there is pressure to do it quickly.  And, really, those two things are not compatible.

Even in a normal -- and my colleague, Captain Bordas, he said, "You know, HR Wallingford is trying to book time for us in January."  I can't get you in my simulations for four or five months right now.  We are booked out, which is normal.  That's what we are supposed to do.  Otherwise, we would go out of business if we weren't booked out.

So just trying to horn us in and rush the process, try to get us in there.  If we look back at the work from Seamen's Church, 87 simulations -- I haven't dug into exactly when they were done.  I just know when the dates were done, but I would suspect they would done over multiple visits.

And also the thoroughness.  If you look at the quality of the report, it's excellent.  And they were very

thorough, and they had full data. They had the design engineers from the tug company there, from Robert Allan from Vancouver. They brought their engineers. I know this. And they were working. The tug models were very sophisticated because they wanted a tug that could work in the ocean and in the port. So they have a new design for that. That's what they built for Puerto Rico.

And not a panacea 80 tons. Read the reports. The ships go aground and block the channel in the wind, and the wind was maybe above guideline. I am not sure what guideline is. That's a good question. Yet there are still hazards that can cause the entire port of Puerto Rico to be unavailable from that part forward because it's a really big ship.

So I feel the gravity of this is real, and I want to do a very proper job. And this is all very irregular. And I very much would like to have Captain Ramos, who has been elected by his pilot group, to be declared in our circles, as we call it, the pilot in charge, and that he has the privilege of this information first. He has the loudest voice in the room for guiding it, and he has people working for him. Captain Bordas and I would work for him in a sense to propel the project forward in order to get the pilots the best data they can get so that they can make a safety decision.

They can set the guidelines, and then NFE can adhere to those guidelines. And that's the common friction, or they will be calling for an above-guideline move of their ship, and the pilots will have to make the call.

And, Tom, you are absolutely right, each individual pilot, that's why we call them guidelines, because they are guided by this information that their group has said, "This is the suggestion. If you are going to go above guideline, make a choice."

You have to know you are breaking the guidelines, so therefore you are going to have substantiation for it. That's what we are setting up for the future. It's very important. This is the pivotal moment. I find no better pivotal moment than right now. This is -- we are here. We have finally gotten here.

So I stand down.

THE COURT: Thank you.

Captain Bordas.

CAPTAIN BORDAS: I will agree with a lot of the rhetoric of George Burkley. And, yes, we are being rushed forward, no doubt about it at all. And we are all doing our best to comply with the various requirements of this job.

I am happy that Captain Ramos is representing the pilot. That's the right way to go. But I am not -- I don't think he is in the best position to be the pilot that has

complete charge of the simulations and workshops, because that's what HR Wallingford do quite independently and will be doing. They will gather all the information, and Captain Ramos can review that information and say whether he is happy with it on behalf of the pilots. That's the correct way to go forward with this. And it's the usual way that we do deal with this.

As an example, I have been through this process just recently. In the tankers that we have access to, my district, we have increased length by approximately 20 meters. And to do that, we have gone out to, once again, HR Wallingford. Gone through a completely different risk management process, the sort of process that Mr. Burkley describes. And HR Wallingford come back with their report, and we review it. And then the pilots and the other stakeholders get together around the table and review those proposals and decide whether they are going to accept the process, or whether there needs to be a risk mitigation strategy in place about whether we do it in the daylight or at nighttime, or whether we use a particular state of tide to approach the berth or not, in order to make all those risks much easier for the pilots who have to do it, so that a pilot doesn't go onboard a ship and feel pressured into completing a maneuver he wouldn't normally conduct.

THE COURT: Thank you.

MR. COLON-RAMIREZ:  So, Your Honor, I don't know why this has been like pulling teeth.  I do know that in the process we found a March 17, 2025, follow-on WSA with the date of creation of August 20, 2025, that changes the words from the SCI report, the 60-ton tugs were insufficient, to state "sufficient".  And in describing the phase two trials, which the Seamen's Church Institute reports involved 80-ton tugs and had a 94 percent pass rate, there is no mention in that WSA follow-on that was created on August 20 in phase two of the 80 tons.

So when you read it, it reads like they used 60 tons, they were sufficient, and they had a pass rate of 94 on phase two.

THE COURT:  All right.  Stop there.

Have you seen this, Mr. Castañer?

MR. CASTAÑER-PADRO:  Have I seen what, Your Honor?

THE COURT:  The difference in these documents.

MR. CASTAÑER-PADRO:  No, Your Honor, I have not.

THE COURT:  Have you, Mr. Lightsey?

MR. LIGHTSEY:  No, Your Honor.  This is the first I've heard of it.

MR. COLON-RAMIREZ:  I saw it last night.

In our conference call yesterday, Mr. Castañer said he wasn't going to review the documents.

MR. CASTAÑER-PADRO:  I did not say that,

Your Honor.  I didn't say that.  I would like to clarify.

Mr. Nazario suggested that I go through the whole pack of documents, the thousands of pages that everyone has been referring to, and identify any reference to other documents that should be produced so we can produce them to them.  And I said I would not do that.  To put things in context.

MR. NAZARIO-BRICEÑO:  If I may, now that brother counsel has mentioned my name.  Miguel Nazario, for the record.

Well, Your Honor, the injunction hearing was held by this Court on September 16.  So it's very troubling that attorneys haven't seen documents and that appear before this Court and allege that they haven't seen any documents at all, or at least these documents that need to be produced.

I believe that -- Mr. Burkley can also testify.  He hasn't said anything yet in this regard, but he received probably two days before the last hearing a package of all the documents, including what appeared to be the WSA.  And he was copied along with the counsels from NFE.

All of a sudden, that email was pulled back.  And when he tried to look at them, it disappeared.  So telling the Court or misrepresenting to the Court that they do not know about these documents is troubling.

Indeed, in the meeting that we had yesterday, I

mentioned to all the counsels who participated in that zoom meeting that in order to expedite this process, everyone, please examine those documents. And if in those documents there is reference to others, instead of waiting for us to ask for those documents, just upload them into the system and put us in advice that there are other documents that need to be seen. And that was all that I mentioned to all the brother counsels over there.

And, yes, indeed, Mr. Castañer said, "I am not going to go through thousands of documents."

THE COURT: So this is what we are going to do:

NFE will compile a production log, and this production log is going to be submitted to the Court under penalty of perjury by a representative of the company. And this production has to be complete, and the log has to reflect that. And if there are different versions of one document, or if this was work in progress, like Mr. Colon suggested, that one is submitted, then it's reviewed, everything needs to be produced.

MR. LIGHTSEY: May I ask for one quick clarification, Your Honor?

Production logs starting maybe on the date of the last hearing? I am just trying to make sure that we have to go back to the beginning of the case. That's all I am trying to understand, what time frame the Court is looking for so we

can comply.

THE COURT:  Since it was ordered that the WSA and the ERP were produced and thereafter, and any subsequent document.

MR. LIGHTSEY:  Thank you.

MR. CASTAÑER-PADRO:  We are referring to the documents related for the simulations exercises, right?

THE COURT:  Yes.

MR. CASTAÑER-PADRO:  Okay.  Not the injunction and all that.

THE COURT:  I am still concerned with the issue, the allegation that documents were altered.  So they are going to compile this log.  It's going to be under penalty of perjury.  And if some documents were not produced, they need to be produced and included in the log.

The production of documents has to be without restrictions, without passwords, or tracking.  Nothing that would complicate the way in which our experts review these documents.  They need to be free to go back and forth, to put, you know, any way of moving comfortably throughout the document and find what they need.

Mr. Colon is going to put together -- I don't know if you can submit this by way of a USB, or I don't know, with the documents, with evidence that there are two documents which appear to be altered.  And that's going to be produced

to Chambers for me to review.

MR. COLON-RAMIREZ:  Following the request of Mr. Castañer, if the Court will excuse anybody who is not entitled to review SSI, I can show it right here.  I have it on my computer.

And, by the way, this whole thing now -- in the process of me learning that there is no such thing as a WSA document but that the WSA file is a conglomeration, right, it's a living file, it starts with an LOI, and so forth, I also wonder what Your Honor was delivered when you saw -- I am just saying, I don't know.  I am not saying I want to look at it.  I am just saying, you know -- because, Your Honor, from my understanding, and based on Your Honor's review, you were given one file on a USB.  So if that's true, if you were given one file on a USB, then at some point we are going to find out what selectively was given to you.

But I have both versions up on my laptop -- not both versions.  It's one version because I do not have the original March 17, 2025, version.  I have the document that's dated March 17 that was created on August 20, according to the metadata, and that I can show the Court right now.

THE COURT:  And if you don't have both documents, how can you compare it to one that says it's insufficient?

MR. COLON-RAMIREZ:  Well, when you read the description of the simulations, it's clearly referencing the

simulations at Seamen's Church Institute, phrase one, phrase two. They use the same verbiage, that there is an 885 meter floating surface unit. The whole thing. The 87 simulation runs. Everything tracks.

And, in fact, there is a WSA submission, a follow on, that predates the March 17 document. And by that, I don't mean the one that was created on March 17 that I have never seen. But the one that predates that to the Coast Guard that does mention that the 60-ton tugs were insufficient. So there was a change.

And, by the way, the documents I received from the WSA, the representation is that this is the WSA. This is what was submitted to the Coast Guard. If that is true, the Coast Guard received that document created on August 20 with the false information. Because it's false, Your Honor. That I can say. I can't say who did it. I can't say why. But it goes from "insufficient" to "sufficient" and erases any mention of the 80-ton tugs in phrase two.

MR. LIGHTSEY: If I may, Your Honor.

First off, this is obviously an extremely serious allegation.

MR. COLON-RAMIREZ: Absolutely.

MR. LIGHTSEY: We are not prepared obviously to review the documents and comment substantively at this time.

I want to make sure I understand the Court's order

about opposing counsel putting together a packet, if you will, of what he thinks is off kilter and make sure that we get a copy of that.  I wasn't clear if the Court said it's only going to the Court in-camera.

THE COURT:  It's only going to the Court at this time.  I want to make sure that there is a basis before I put you through the process --

MR. LIGHTSEY:  Okay.

THE COURT:  -- of responding to this.

MR. LIGHTSEY:  Great.

And we would ask that anything given to the Court and maybe subsequently given to us, all metadata is preserved so we can have experts, unlike us lawyers, who can delve into it and see if there is something fishy or not.

MR. COLON-RAMIREZ:  I will show the Court right now.

MR. LIGHTSEY:  We are not ready to address this, Your Honor.  It's inappropriate.  This is the first we have heard of it.  We don't know what the documents are.

THE COURT:  I would rather see it before we share it.

MR. LIGHTSEY:  Thank you, Your Honor.

THE COURT:  So how long do you need to put together this log under penalty of perjury?

MR. LIGHTSEY:  This time next week, Your Honor.

THE COURT:  So a week from today?

MR. LIGHTSEY:  Yes, Your Honor.

THE COURT:  Now, at docket 185, the executed NDAs, yours, Mr. Colon, is missing a signature.  Can you resubmit it.

MR. COLON-RAMIREZ:  Yes.  I am sorry, Your Honor. I will take a look at it.

THE COURT:  It's the witness signature.  Resubmit it by the end of the day.

MR. COLON-RAMIREZ:  Yes, Your Honor.

THE COURT:  And I am noting that filing at 185.  I am also noting 186.

At 187, I want to make clear, it's been represented to the Court that all the restrictions and the controls and the tracking has been removed.  I want, in five days, a certification from the experts through their lawyers that that has been removed and that's not the case and that they can freely move through the different pages of the documents.

Also, I am going to issue an order to Seamen's Church Institute and to the tugboats company, I need the specific names and information to issue the order for production.

MR. LIGHTSEY:  Names of the tugs?

THE COURT:  Of everything that needs to be produced that you claim you can't get directly.

MR. LIGHTSEY:  We will have to rely on Captain Bordas and Mr. Burkley to provide us that information, if that's acceptable to them.

MR. CASTAÑER-PADRO:  The name of the tug companies?

MR. LIGHTSEY:  The name of the specific tugs.

MR. FONT-GARCIA:  I believe they are talking about Riben Marine.

MR. LIGHTSEY:  She said --

MR. FONT-GARCIA:  According to them, they are the entity that is supposed to have the information about the tugs.

MR. CASTAÑER-PADRO:  No, no, no, no.  That would be the questionnaires and the appendix.

MR. LIGHTSEY:  And the appendix.

MR. FONT-GARCIA:  I believe they have all the information.

MR. LIGHTSEY:  Well, whatever.

And I would ask the Court to order both Riben Marine and SCI for the same information.

THE COURT:  So it is your position that you can't get this.

MR. LIGHTSEY:  We have tried, and we have been told no.

THE COURT:  I need you to submit a motion telling me specifically who to address the order to because I don't

have the information.

MR. LIGHTSEY:  Fair enough.

THE COURT:  I don't have the information.

MR. COLON-RAMIREZ:  Regarding what you want from me, Your Honor, do you want a written motion that I send to them and I send to your Chambers, or how would you like that?

THE COURT:  I want you to put together -- I don't know if you can print this or if you can download it to a USB, whatever way you can find to produce this in Chambers so that I can review the different submissions or review the -- if I can see the metadata.  I am not sure how you are seeing this.  I want to see what you saw and what's your basis for claiming that these documents were altered.

MR. COLON-RAMIREZ:  So when you go to Adobe, far left file, you go to "document properties".  It pulls up a metadata screen.

THE COURT:  I will find out how to do it.

MR. COLON-RAMIREZ:  So what I will do -- what I am suggesting is, I can prepare a binder for Your Honor with the source documents, and in addition, I can type up with screenshots what it is.

THE COURT:  Deliver that to Chambers on Monday, and file a motion stating it's been delivered, so that we have a clear record of what's been happening.

MR. COLON-RAMIREZ:  Yes.  And I will send it to

them as well.

THE COURT:  The documents?

MR. COLON-RAMIREZ:  The binder that I deliver to Your Honor, I will send it in PDF to them.

THE COURT:  All right.  Very well.

Now, the --

MR. NAZARIO-BRICEÑO:  Mr. Burkley would like to say something, Your Honor.  He is raising his hand.

THE COURT:  Yes, go ahead.

MR. BURKLEY:  Yes, your Honor.

In my experience with projects like this, in order to even replicate the work that Seamen's Church did, I would be provided engineering drawings of the dock, the mooring plan for the dock, the customs survey that gives me the depths outside the federal channel, because usually those are truncated by our Corps of Engineers.  Even though they survey out there, they black them out.  But usually a company like NFE will have a customs survey done at their location, so we know all the water around the dock.

THE COURT:  And where are those documents?  Who has them?  Who has control over them?

MR. BURKLEY:  Yes, Your Honor.

There is a legion of this type of information that we ask for, and it seems very clunky to go through the Court. I hesitate to ask you for it, but in my normal course of

business of working with a marine expert, the engineer at their company, this is our normal talk.  I need tugboats.  I have a 20-item list, model of tugboat, extensive data, and we build a file for it.  Modelers exchange data.

I don't believe this information is going to -- it all flows freely through a production log.  But if it has to happen that way, then I will bear down and I will send you a full and complete list of everything that HR Wallingford needs to stand up the simulation.  It is not just these federal filing documents.

THE COURT:  You are saying that you will be sending that list.

MR. BURKLEY:  If you would like to require to be done that way, or can we just have it required that they work with us.

THE COURT:  Listening to you, I kind of realize what the issue is.  You are used to the open file, flow of information, companies just producing everything they believe is relevant and useful.  In this case, NFE has been the opposite.  We will block.  We will not produce.  We will say it's confidential.  And that's where that frustration stems from.

So they want a list.  They want itemize.  You want them to just produce, and they are not going to do it.  They are not going to do it.  It has been to be itemized.  It has

to be listed.  And it's going to continue this way.

Which brings me back to the question I posed before, do you really want to go through with this?

MR. LIGHTSEY:  Yes.

THE COURT:  Or should we schedule the case for trial?

MR. LIGHTSEY:  Your Honor, I think the process is moving forward.

I think the whole point of having the experts was so Captain Bordas and Mr. Burkley can get together and determine what information they needed.  I don't know if Mr. Burkley has expressed his needs of these specific documents to Captain Bordas before, but this is certainly the first we've heard of them.

The whole point was, they get together.  They tell us because we have an obligation, they sued our client, right, that, "We need these documents."  And we do the best to provide them.

So we are happy to do it.  We just -- I mean, this is the first we have heard.

THE COURT:  Let's get this moving along.

You need to compile this list with the help of Captain Bordas.  All right?  And submit it to the Court.

And then you will state your position regarding the production, or if you don't have these documents, or like

with Seamen's and the tugboats descriptions, if you need the assistance of the Court to get the documents.

By the way, please file this motion by this afternoon with the names so that I can issue --

MR. LIGHTSEY:  Which motion, so I am clear, Your Honor?

THE COURT:  The one containing the information for the Court to issue the orders.

MR. LIGHTSEY:  Yes, Your Honor.

MR. HART:  Your Honor, if I may.  I think Captain Bordas wanted to say something.

THE COURT:  Go ahead.

CAPTAIN BORDAS:  May I just comment on the -- I am in agreement with George, certainly about channel depths, berth depths.  This is something HR Wallingford need to know to conduct simulations, but this is also information that must be available to the pilots already.

I don't step onboard a ship without having a detailed knowledge of all the channel depths, meter by meter, right up to the berth I proceed.  And this might be -- this is commonly over a 30-mile period for me, 30-mile distance. I have all the channel depths, and I know exactly how much water is underneath my ship at any particular stage.

I don't think that information will be difficult to come across at all, Your Honor.

THE COURT:  I think it's been made clear by both experts that the pilots need to see everything that they see.

MR. LIGHTSEY:  Everything that we are producing to make it available to the experts, the pilots, we are sending it to them at the same time, Your Honor.

THE COURT:  So, as per the stipulation at docket 124 entered on October 9, this case would be stayed for 45 days from the date on which the tugboats arrived to Puerto Rico.  They arrived on November 2nd, according to docket 148 and NFE's motion stating so.  So the 45 days began to run on that date.  So this is set to expire next Wednesday, December 17.

If this meeting is going to take place in January, and from there we will see when the simulations are going to occur, I want to hear the parties regarding the stay, and if they are willing to stipulate an additional period by which this -- and it brings me back to my question.

Where are we?

MR. LIGHTSEY:  NFE has discussed this, discussed with opposing counsel.  We are in agreement to extending the stipulation, Your Honor.

MR. COLON-RAMIREZ:  Your Honor, I was sent a draft motion with -- I didn't even read it.  I will tell you why.  Proposed extended deadlines.  And my response to NFE was, "I will not even bring it to my client's consideration until you

produce the documents that I have been asking for."

And, Your Honor, quite frankly, I believe that's the reason that all of a sudden NFE in the last 18 hours has produced a slew of documents on the website.  That continues to be my position.

If we are going to be obstructionists, if that's the way NFE wants to litigate, then, you know, I might even consider just moving for entry of default based on fraud on the court under *Aoude v. Mobil* and *Hull v. Municipality of San Juan*.

THE COURT:  We are not there yet.  We are not there yet.

MR. COLON-RAMIREZ:  I know.  That's why I say I may consider.

But we will take it under advisement between now and Wednesday.  But this pulling teeth has to stop.

THE COURT:  Let me see the rate of compliance and the quality of that compliance, because you have things to do, they have things to do.  I need to review these documents that you are going to produce in Chambers, and we have until Wednesday.

MR. CASTAÑER-PADRO:  Your Honor, I would like to add, counsel stated, Francisco Colon, that they would consider an extension of the stay if they are provided all the documents that they have requested.

Is that correct?

MR. COLON-RAMIREZ:  No.  What I said is that I would consider mentioning it to my clients --

MR. CASTAÑER-PADRO:  Okay.  Fair enough.

So, Your Honor --

MR. COLON-RAMIREZ:  -- if they comply.

MR. CASTAÑER-PADRO:  -- we have provided every single thing that has been requested.

THE COURT:  No.  No.

MR. CASTAÑER-PADRO:  Your Honor, please.  The only --

THE COURT:  That's why I am issuing orders today again.

MR. CASTAÑER-PADRO:  Your Honor, this new list, that's the thing, when they get the chance to review documents, they become aware of the existence of other documents, they request it, we upload them.

THE COURT:  I think you are going back to one hour ago or more when this hearing started.  I think we have covered that.  So this is not useful.

MR. CASTAÑER-PADRO:  No, Your Honor, but I was going to address because Captain Burkley, Mr. Burkley has stated a new set of documents.  So it would be beneficial to have a definite list.

THE COURT:  No.  There is no definite.  Did you

hear me when I stated that he used to open production, open flow, nothing behind other than a pure interest in understanding what the situation is so that the experts and the pilots can opine on what's the safest way of doing these travels?  Didn't you hear me when I said all of that?  And that's not what's happening because you keep controlling the information, the manner in which the production is done, and there is no collegiality between you and the attorneys and the pilots.  There is none.

Actually, and this is a little bit editorial, you kind of tend to refuse to understand the role of the Plaintiffs, which are the pilots, in the San Juan bay. That's the problem.

MR. CASTAÑER-PADRO:  I respectfully disagree, but...

THE COURT:  Of course.  It's your right, and that's your role.

Anything else?

We have a plan.  Let's see if that plan can be executed properly by everyone involved.  And if the deliverables are done and if there is a little bit of a shift in the attitude towards the Plaintiffs and the flow of information and the flow of information to the experts, we may then get something accomplished here, and see if January can be productive and that we can get the simulations

underway.

MR. LIGHTSEY:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. NAZARIO-BRICEÑO:  Thank you.

THE COURT:  Thank you.


(PROCEEDINGS ADJOURNED AT 11:40 A.M.)

REPORTER'S CERTIFICATE

I, JOE REYNOSA, Official Court Reporter for the United States District Court for the District of Puerto Rico, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct computer-aided transcript of proceedings had in the within-entitled and numbered cause on the date herein set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

S/Joe Reynosa
_____
JOE REYNOSA, CSR, RPR
United States Court Reporter
Federico Degetau Federal
Building, Room 150
150 Carlos Chardon Street
San Juan, Puerto Rico 00918-176
(787) 772-3480

Joe Reynosa, CSR, RPR
Official Court Reporter