THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CAPT. JAKE ELMSTROM et al., <br><br> Plaintiff <br><br> V. <br><br> NFENERGIA LLC, A NEW FORTRESS ENERGY SUBSIDIARY et al., <br><br> Defendants | CIVIL NO.:   25-1462 (SCC) |

**MOTION REQUESTING HEARING, AND TO ORDER JESSICA ÑECO MORALES TO TESTIFY IN COURT AND SHOW CAUSE WHY SHE SHOULD NOT BE HELD IN CONTEMPT FOR BREACHING SETTLEMENT AGREEMENT**

TO THE HONORABLE COURT:

COME NOW Plaintiffs, through their undersigned attorneys, and very respectfully state, allege and pray as follows:

**BASIS FOR THE MOTION**

The basis for the motion is straightforward: in the settlement reached on October 10, 2025 between plaintiffs, the Commission, and its President Jessica Ñeco Morales, the Commission and President Ñeco agreed that they would notify Commissioner Captain Ramos of all resolutions, letters and meetings, including (and therefore not limited to) matters concerning LNG vessels. See docket 125, p. 3, ¶ 5. Despite this promise, late last week Commissioner Captain Ramos and the rest of the plaintiffs learned that President Ñeco has held multiple meetings in furtherance of a draft bill she is working on **to repeal Law 226, dismantle the Puerto Rico Pilotage Commission,** and have the Ports Authority control the budget and operation of the pilots as a group (which among other things would deprive the pilots of the means to pay for necessary legal services, effectively silencing them). All this, behind Commissioner Captain Ramos' back, even while she

has been working and meeting with Commissioner Javier Figueroa (who represents the Shipping Association in the Commission).

**DISCUSSION**

This lawsuit was filed originally against NFE, the Puerto Rico Pilotage Commission, and its President attorney Jessica Ñeco Morales. See docket 1. On October 10, 2025 plaintiffs reached an agreement with the Commission and its President, pursuant to which the Commission and its President agreed, among other things, that "The Commission will notify Commissioner Capt. Ramos of all resolutions and letters, and notice of meetings in accordance of Law 226, including those involving all matters related to LNG vessels." See docket 25-1, p. 3, ¶ 5. In exchange for the Commission's and President Ñeco's promises, plaintiffs agreed to dismiss the present case against them.

The stipulation was filed with the court with the request to dismiss the case against the Commission and President Ñeco. See docket 125. The Court entered an Order granting the request, but not without first admonishing the Commission and President Ñeco:

> moving forward the Puerto Rico Harbor Pilotage Commission and its Commissioner, Atty. Jessica Neco Morales position, should be more aligned with the San Juan Bay Pilots, since, ultimately, they are all entrusted with the safety of the San Juan Bay, in accordance with Law #226. Furthermore, the Court notes that, while the Commissioner was duly represented by counsel, she did not attend any of the proceedings. Her presence at the proceedings could have facilitated a quicker resolution of the matters concerning the Commission and herself.

See docket 126.

On October 15, 2025, the Court entered Partial Judgment dismissing the complaint against the Commission and President Ñeco, with the clarification that it would "retain jurisdiction to enforce the terms of the Settlement Agreement 'until the matters agreed upon are performed.'" See docket 128. Since the Court's Partial Judgment, President Ñeco has not once ever met with the

pilots (nor did she ever meet with the pilots before) nor with Commissioner Captain Ramos (although she has met on several occasions with the U.S. Coast Guard, the Ports Authority, members of the Shipping Association and the private sector). She has also failed to be "more aligned with the San Juan Bay Pilots" as urged by the Court. In fact, the President of the Commission, that is Ms. Ñeco, has been working on a previously undisclosed proposed bill to **eliminate** the Commission and eliminate independent state pilotage, and instead make pilotage a part of the Ports Authority again as it was before Law 226. Indeed, she sent the proposed bill to the U.S. Coast Guard via email on April 10, 2026, after a meeting with the U.S. Coast Guard that reads: "Greetings, As agreed to during the meeting this morning, included herein is the draft of the legislative piece related to the Pilotage Commission and Harbor Master.". See **Exhibit A**, p. 3, email sent April 10, 2026 at 10:52 AM (translation ours).[1] Ms. Ñeco sent the email to Commander Alejando Collazo and Lieutenant Commander Rachel Thomas at the Coast Guard, Commissioner Javier Figeroa (javierf@morantug.com), **as well as Puerto Rico Shipping Association members** Hernán F. Ayala Jr., President of  Luis A. Ayala Colon Sucrs, Inc. (hfayalajr@ayacol.com), Eduardo Pagan, VP of Tote Marine (epagan@totemarine.com), Clarivette Diaz, General Manager of San Juan Cruise Port (clarivetted@sanjuancruiseport.com). Ms. Ñeco even included Captains Daniel Montes (capitanmontes@yahoo.com) and his brother Cesar Montes (cmontes1428@yahoo.com), **who are witnesses for NFE.** See docket 51-1, p. 1, ¶¶ 6-7.

Commissioner Captain Ramos only found out about the draft bill and the Coast Guard's meeting with Ms. Ñeco and at least one other commissioner because Lieutenant Commander Thomas wrote to Commissioner Captain Ramos attaching the draft bill and asking when the

---

[1] The April 10, 2026 email is in Spanish; leave is requested to submit the email as is, with a certified English translation to follow.

Commission was meeting to discuss it. See **Exhibit A**, p. 2, email sent April 17, 2026 at 16:05. **She furthermore alludes to a meeting that Jessica Ñeco and Commissioner Javier Figueroa were at**, but stated she wanted to meet with all commissioners. *Id.* About an hour and a half later, Commissioner Captain Ramos answered surprised as he had never been informed that there was a draft bill in the works, much less one that proposed to dismantle the Pilotage Commission. See **Exhibit A**, p. 1 bottom, email sent April 17, 2026 at 5:38 PM.

Without a doubt, President Ñeco and the Commission have breached their obligations under the Settlement Agreement and the Partial Judgment by not informing Commissioner Captain Ramos of all meetings. The court expressly retained jurisdiction to enforce the terms of the settlement, and therefore has jurisdiction to order Ms. Ñeco to appear in Court and testify why she should not be held in contempt of court for her and the Commission's failure to comply with the Settlement Agreement. The offense is compounded given the topic of what Ms. Ñeco and the Commission tried to keep secret: a proposed bill that would dissolve the Pilotage Commission that Ms. Ñeco presides, and put the pilots back inside the Ports Authority. The draft bill forwarded by Lieutenant Commander Thomas to Captain Ramos, and an unofficial translation thereto, are attached as **Exhibits B** and **C.**[2] The draft of the proposed bill is October 2025, which suggests it was in retaliation for the pilots having filed this lawsuit on August 31, 2025. See docket 1.

To understand the profound impact the draft bill would have if enacted, which in turn demonstrates the nefariousness of Ms. Ñeco's efforts to keep it under wraps, a background review of pilotage in Puerto Rico is in order. Prior to 1999, the Ports Authority oversaw pilotage. Thus, pilotage was not independent, and the profession suffered at the hands of government. In 1999

---

[2] Leave is requested to submit the unofficial translation of the draft bill as **Exhibit C**, with a certified English translation to follow.

Law 226 was passed to remedy this. As this Court is well aware, the Statement of Motives of Law 226 explains that its purpose was to create an <u>independent</u> commission, for two principal reasons: first, because the Ports Authority historically "has not had the means to supervise harbor pilotage" (which the creation of the Commission "is intended to solve"), and second, because the Legislature recognized "the need to have a Harbor Pilotage Commission to bring Puerto Rico in line with all other jurisdictions of the United States and allow us to keep our ports as highly competitive as other similar ones in the world. See **Exhibit D**, Act 226, Statement of Motives, p. 2, second and third paragraphs.

Pilotage is a very serious endeavor. As explained by Justice Curtis of the U.S. Supreme Court:

> . . .A pilot, so far as respects the navigation of the vessel in that part of the voyage which is his pilotage ground, is the temporary master charged with the safety of the vessel and cargo, and the lives of those on board, and intrusted with the command of the crew. He is not only one of the persons engaged in navigation, but he occupies a most important and responsible place among those thus engaged….

> *Colley v. Board of Wardens for the Port of Philadelphia*, 53 U.S. (12 How.) 299, 316 (1851).

> In 1947 Justice Black added:

> Studies of the long history of pilotage reveal that it is a unique institution and must be judged as such.8 In order to avoid invisible hazards, vessels approaching and leaving ports must be conducted from and to open waters by persons intimately familiar with the local waters. The pilot's job generally requires that he go outside the harbor's entrance in a small boat to meet incoming ships, board them and direct their course from open waters to the port. The same service is performed for vessels leaving the port. Pilots are thus indispensable cogs in the transportation system of every maritime economy. Their work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects the safety of lives and cargo, the cost and time expended in port calls, and in some measure, the competitive attractiveness of particular ports.

> *Kotch v. Board of River Pilot Com'rs for Port of New Orleans*, 330 U.S. 552, 557-558 (1947).

International organizations have long recognized the need for pilots' professional independence. *See* International Maritime Pilot's Association Press Release of March 17, 2026.[3] (stating that systemic risks arise from negative impact of competition on pilot's professional independence.) Professional independence entails pilots having the liberty to exercise their profession on how to move a vessel safely, and under what conditions (including environmental) a vessel can be moved safely, without political or economic pressures to compromise their judgment. This follows the doctrine of *salus populi suprema lex* (which the Supreme Court has invoked in the past), meaning "the welfare of the people should be the supreme law.[4]

The commercial and ecological importance of the San Juan Bay to Puerto Rico cannot be overstated. According to the 2026 Annual Report on Port Performance Statistics prepared by the U.S. Department of Transportation, the port of San Juan ranks twelfth in the volume of containerized cargo[5] and 46th in total tonnage.[6] The port is Puerto Rico's lifeline; according to the U.S. Army Corps of Engineers, it handles more than 75% of the marine commerce (excluding fuel).[7] It is the only port in Puerto Rico that handles containerized cargo. The ecological significance of the bay is huge too; according to the Environmental Protection Agency, the San Juan Bay Estuary makes up **33 percen**t of the remaining mangrove population of Puerto Rico.[8]

---

[3] https://www.impahq.org/sites/default/files/content-files/Press%20Release-Deregulation%20and%20Competition-FOR%20RELEASE%20ON%2017%20MARCH%202026.pdf

[4] *See Thurlow v. Commonwealth of Massachusetts*, 46 U.S. (5 How.) 504, 632 (1847) (invoking *salus populi suprema lex* to support state regulation of liquor).

[5] See https://www.bts.gov/sites/bts.dot.gov/files/2026-01/BTS_Port-Performance-2026_Annual-Report_Final%2011326.pdf, p. 26 of pdf (measured in TEU's, or Twenty-Foot Equivalent Units, which is a measure of containerized cargo).

[6] *Id.*, Appendix B, p. 63.

[7] See https://www.saj.usace.army.mil/Missions/Civil-Works/Navigation/Navigation-Projects/San-Juan-Harbor/

[8] https://www.epa.gov/sites/default/files/2015-09/documents/2009_05_28_estuaries_inaction_collaborative_sanjuan.pdf, p. 1.

Navigating the San Juan Bay is no small feat. To the untrained eye it may seem like a sizable body of navigable water, but in reality, as far as large ships are concerned, the navigable channels, depicted in gray overlaying the water in the following image, are narrow and represent only a fraction of the bay:



Entering the harbor from the sea also challenging as well. Pilots board vessels three miles north in open sea, where they navigate the ships into the harbor unassisted. Once in the harbor, tugboats provide assistance. **The current fleet of tugboats is unable to provide assistance outside the harbor.** This means that, if a vessel were to lose power (or steerage) just north of El Morro (say 500 meters just outside the Anegado Channel), it would run aground either in Isla de Cabra or in front of El Morro (as did the *Defiant* barge a couple of months ago). Vessels losing

power (or steering ability) are not uncommon; it is a recurring happenstance, and most recently occurred with the *Gulf Fanatir*, a tanker carrying fourteen million gallons of gasoline which fortunately lost power immediately after it entered the harbor and therefore was within reach of the harbor tugs. Another close call happened with the LNG tanker *Titan Unicom*, which suffered a main engine failure while leaving the San Juan Bay, leaving her reliant solely on her anchors and the emergency actions undertaken by the pilots to avoid a catastrophe (this is not hyperbolic; a grounding at the entrance would essentially close the port for an extended period of time with dire consequences for the Puerto Rico population, not to mention the environmental damage and potential loss of property and life if the vessel involved is transporting LNG or other fuel).

Because the current fleet of tugboats is unable to provide assistance outside the harbor, Puerto Rico continues to face a risk that remains completely unmitigated (i.e., for which no plan exists): the loss of power (or steerage) just outside the entrance to the harbor. For a brief while, Puerto Rico had the means to address such a contingency, when NFE had in place the four 80-metric ton escort-rated tugs that it had agreed to provide after the simulation study it had commissioned indicated were the required minimum. According to NFE's affiliate Genera, NFE dismissed the 80-metric ton escort-rated tugs because "Facing financial pressures, [NFE] decided to use less expensive alternatives." See docket 85, p 5, third line. Moran and McAllister, who supply the current fleet of underperforming harbor tugs, have a financial interest in NFE having its way: they do not have the 80-metric ton escort-rated tugs that are capable of providing assistance in open sea. In short, they make a lot of money from NFE using their underperforming tugs, which they will lose if NFE were to obtain suitable tugs (which NFE would have to procure from another source).

Following NFE's dismissal of the tugs that its own studies said were required, seven of eight San Juan Bay Pilots wrote to NFE with their objections. Retribution was immediate and extreme economic and political pressures were swiftly applied: the Pilotage Commission issued a gag order to the pilots, and allowed other pilots to substitute the San Juan Bay Pilots. This lawsuit was filed; less than 45 days later, the Commission, and Ms. Ñeco agreed to rescind the gag order, and other retaliatory actions. The case continued against NFE. NFE was quite uncooperative in producing documents, resulting in the Court ordering NFE to produce to plaintiffs without restrictions or tracking. See docket 213, p. 2, third paragraph, p. 3, last paragraph. In discovery counsel for the pilots also found that NFE had submitted altered documents to the US Coast Guard, which were submitted in a binder to the Court. See docket 213, p. 1, bottom paragraph, docket 195, and docket 196.

For the pilots, this case is not about money, but about safety: the safety and well-being of Puerto Rico. The San Juan Bay Pilots gain nothing financially in pressing this case: the pilotage fee for bringing in an LNG ship is the same whether the proper 80 metric-ton escort-rated tugs are used, or whether the cheaper, underpowered tugs are used. From a financial perspective the San Juan Bay Pilots' fight makes no sense: they stand to gain nothing financially, yet pay out from their pilotage fees the costs of litigation. **Pilotage fees are even used to pay for the Commission's and Ms. Ñeco's attorneys in fighting the pilots.** In sum, the San Juan Bay Pilots' sole interest is protecting the people of Puerto Rico, even if it hurts them financially on both ends. No one else however will stand up for the people of Puerto Rico.

The pilots can defend Puerto Rico only because they are independent. But this independence has ruffled feathers. This has led to the preparation of a draft bill that will undo Law 226 and eliminate independent pilotage (see **Exhibits B** and **C**), and according to the document's

metadata, the draft was apparently created shortly after the pilots' response to NFE's dismissal of the four 80 metric ton escort-rated tugs. At first glance the draft bill reads as if its motive was to enhance the pilotage profession, and its stated public policy is drafted accordingly. This disguise starts to unravel upon taking a closer look at what the draft bill actually proposes. For example, despite the Ports Authority's proven inability to supervise pilotage, which was one of the main reasons for enacting Law 226 in the first place, the draft bill proposes returning oversight of pilotage to the Ports Authority through the creation of an Office of Pilotage Affairs whose Director would be appointed by the Ports Authority and who would answer to the Ports Authority. See Exhibit C, p. 5, sections 4.03 and 4.04, and p. 4, section 4.01, third bullet.  The proposed Office would be free to increase the number of pilots and pack the San Juan Bay with pilots who will not speak out (Exhibit C, p. 5, section 4.06), and the Director of the Office, a position for which no qualifications are prescribed, would be empowered with passing judgment on whether a pilot's professional judgment was deficient. See Exhibit C, p. 8, section 4.12. In other words, the Director of the Office of Pilotage Affairs, who need not have ANY pilotage experience, would judge whether a pilot failed to make adjustments for wind, currents and tide, failed to "properly use all available information", failed to "navigate cautiously," "agreeing to do something that does not meet acceptable pilotage standards," among others. And if anyone thinks it would be a stretch that a person with no pilotage or maritime experience would be named as the Director of the Office of Pilotage Affairs, think again: Ms. Ñeco, who has zero pilotage or maritime experience of any kind, is the appointed President of the Pilotage Commission.

In addition to the above, the draft bill would also effectively prevent the Pilots from taking legal action to protect Puerto Rico and the profession of pilotage by removing their ability to retain and pay for counsel. This may not be readily apparent at first, but the draft proposes that the Ports

10

Authority (as opposed to an independent Pilotage Commission) determine the pilotage rates to be charged by the licensed pilots. See **Exhibit C**, p. 10, section 4.19, third paragraph. The draft bill would also require all pilotage fees to be collected and deposited by the proposed Office of Pilotage Affairs (and not an independent Pilotage Commission) which would oversee how the funds may be used. *Id.* Thus, the Ports Authority, through rate setting, and the proposed Office of Pilotage Affairs, in controlling the purse strings, could easily leave the pilots unable to afford legal actions that the Ports Authority (or tug companies or Shipping Association members who lobby the Ports Authority) did not agree with even when required to protect Puerto Rico and the pilotage profession, like the instant case. This would explain why Ms. Ñeco kept the draft bill from Commissioner Captain Ramos and why he was not even informed of meetings with the Coast Guard to discuss the draft bill, while at the same time the draft bill was shared with members of the Shipping Association and NFE's witnesses, as well as Commissioner Javier Figueroa (who happens to be the general manager for Moran Towing).[9]

In sum, President Ñeco and the Commission failed to inform and include Commissioner and Captain Ramos of meetings as agreed. The severity of their breach of their promises is exponentially amplified by what they tried to keep hidden from Commissioner Captain Ramos: meetings to discuss a draft bill to eliminate the Pilotage Commission that Ms. Ñeco presides and that Captain Ramos serves on, that would profoundly impact the pilotage profession in Puerto Rico by effectively eliminating pilot independence, and returning Puerto Rico pilotage to Ports

---

[9] The members of the Shipping Association include Hernán F. Ayala Jr., President of Luis A. Ayala Colon Sucrs, Inc. (hfayalajr@ayacol.com), Eduardo Pagan, VP of Tote Marine (epagan@totemarine.com), and Clarivette Diaz, General Manager of San Juan Cruise Port (clarivetted@sanjuancruiseport.com); NFE's witnesses include Captains Danny Montes (capitanmontes@yahoo.com) and Cesar Montes (cmontes1428@yahoo.com). See docket 51-1, p. 1, ¶¶ 6-7.

Authority's oversight despite its documented, historical inability to oversee pilotage. At the very least, this Honorable Court should order Ms. Jessica Ñeco to appear in Court and testify as to why she should not be held in contempt for failing to abide by her (and the Commission's) agreement with the pilots.

WHEREFORE it is respectfully requested that this Honorable Court grant this motion and order Ms. Jessica Ñeco to appear in Court and testify as to why she should not be held in contempt for failing to abide by her (and the Commission's) agreement with the pilots.

In San Juan, Puerto Rico, this 27th day of April, 2026.

I HEREBY CERTIFY that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notice of its filing electronically to the attorneys of record.

Respectfully submitted,

**S/ FRANCISCO E. COLÓN-RAMÍREZ**
FRANCISCO E. COLÓN-RAMÍREZ, ESQ.
USDC-PR Bar No.: 210510
E-mail: fecolon@colonramirez.com
**COLÓN RAMÍREZ LLC**
PO Box 361920
San Juan, PR 00936-1920
Tel.: (787) 425-4652
Fax: (787) 425-4731

**S/GIANCARLO FONT GARCÍA**
GIANCARLO FONT GARCÍA, ESQ.
USDC-PR Bar No. 210612
E-mail: gfont@drcprlaw.com
**GIANCARLO FONT**
306 Coll y Toste St.
San Juan, PR 00918
Tel. (787) 622-6999
    (787) 647-1876

12

**S/ MIGUEL A. NAZARIO, JR.**
MIGUEL A. NAZARIO, JR., ESQ.
USDC-PR Bar No. 214502
E-mail: man@nblawpr.com
**NAZARIO BRICEÑO LAW OFFICES, LLC**
82 Cervantes St.
San Juan, PR 00907
Tel. (787) 449-2717

**S/ LUIS MANUEL PAVÍA-VIDAL**
LUIS MANUEL PAVÍA-VIDAL, ESQ.
USDC-PR Bar No. 227205
E-mail: pavialaw@gmail.com
Urb. Baldrich
306 Coll y Toste St.
San Juan, PR 00918
Tel. (787) 622-6999