THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CAPT. TOMÁS BUSTO ÁLVAREZ et al.,<br><br>Plaintiffs<br><br><br>v.<br><br>NFENERGIA LLC et al.,<br><br>Defendants | CIVIL NO.:   25-1462 (SCC)<br><br><br><br><br>JURY TRIAL DEMANDED |

**THIRD AMENDED COMPLAINT FOR INJUNCTIVE RELIEF,
BREACH OF CONTRACT, AND DECLARATORY JUDGMENT**

TO THE HONORABLE COURT:

Come now Plaintiffs, Captain Tomas Busto Álvarez; Captain Carlos E. Ramos; Captain Ray Díaz; Captain Jacob Elmstrom; Captain Richard Flynn Caro; Captain Carlos Gutiérrez; Captain Patrick López; and the San Juan Bay Pilots Corporation (collectively, "Plaintiffs"), by and through the undersigned counsels and very respectfully state, allege and pray:

## I.    THE PARTIES

1.    Plaintiff, San Juan Bay Pilots Corporation ("SJBPC") is a non-profit Puerto Rico corporation organized under the laws of Puerto Rico with its principal place of business within Puerto Rico, that associates state and federally licensed harbor pilots  authorized to provide compulsory pilotage services within the navigational waters of the Port of San Juan.

2.    Plaintiffs, Captain Tomas Busto Álvarez; Captain Carlos E. Ramos; Captain Ray Díaz; Captain Jacob Elmstrom; Captain Richard Flynn Caro; Captain Carlos Gutiérrez; Captain

Patrick López, are all federal and state-licensed pilots and members of the SJBPC, and are all domiciled in Puerto Rico.[1]

3.     Defendant, NFEnergía LLC, (referred to herein as "NFEnergia" or "NFE") is a Puerto Rico Limited Liability Company, registered number 402298 before the State Department, with legal personality and capacity to sue and to be sued. The only member of NFEnergia LLC is Atlantic Energy Holdings, LLC, and the only member of Atlantic Energy Holdings, LLC is New Fortress Energy, Inc., which per its SEC filings is a corporation organized under the laws of the State of New York with its principal place of business within said state. Thus, NFEnergia LLC is deemed a citizen of the State of New York.

4.     ABC Company and John Doe are natural persons or entities that have assisted, participated, or colluded with the defendants, or independently acted to harm or deprive the plaintiffs of their rights, all domiciled in a place outside of Puerto Rico.

## II.     JURISDICTION AND VENUE

5.     Per the facts alleged herein, this case falls within this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Federal maritime jurisdiction exists because the agreement between NFE and plaintiffs involves pilotage, harbor navigation, docking, undocking, tug assistance, and vessel-movement services, all of which are classic maritime activities that are directly concerned with the navigation and movement of vessels on navigable waters.

6.     Federal maritime jurisdiction also exists because the relevant federal regulatory scheme also frames NFE's WSA and LOR process as a waterfront LNG/waterway-suitability

---

[1] See Statements Under Penalty of Perjury submitted at docket no. 33-2.

2

process, including review of safety and security matters relevant to the waterway. See, e.g., 33 C.F.R. § 127.007 and 33 C.F.R. § 127.009.

7.  Separately, this Court also has subject matter jurisdiction under 28 U.S.C. § 1332 and *BRT Management LLC v. Malden Storage LLC,* 68 F.4th 691 (1st Cir. 2023). On the plaintiffs' side, all individual plaintiffs are domiciled in Puerto Rico, and plaintiff San Juan Bay Pilots Corporation was incorporated under the laws of Puerto Rico and has its principal place of business in Puerto Rico. Defendant NFEnergia LLC is a limited liability company, and according to *BRT Management LLC v. Malden Storage LLC, supra,* its domicile is dependent on the domicile of its members, without regard to where it was organized or where it has its principal place of business. The only member of NFEnergia LLC is Atlantic Energy Holdings, LLC, and the only member of Atlantic Energy Holdings, LLC is New Fortress Energy, Inc., which per its SEC filings is a corporation organized under the laws of the State of New York with its principal place of business within said state. Accordingly, for purposes of § 1332, pursuant to *BRT Management LLC,* NFEnergia LLC is domiciled in the State of New York, and hence there is full diversity between plaintiffs and defendants. Additionally, the amount in controversy exceeds $75,000 exclusive of interest and costs, as more fully explained herein.

8.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiffs' federal law claims, and has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

9.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as all relevant events giving rise to the claims occurred in this district and the relevant conduct and injuries occurred in this District.

### III.    THE FACTS

**The Pilotage Profession**

10.    Since ancient times, dating back to the Greek civilization and the Roman Empire, fishermen and mariners with local knowledge have assisted vessels in docking and navigating safely. Over time, this vital safety service evolved into a highly technical and specialized profession known worldwide as pilotage, and its practitioners are commonly referred to as "pilots" or "marine pilots."

11.    The term "pilot" refers to a person with specialized knowledge of local conditions and navigational hazards who is generally taken on board a vessel at a specific place for the purpose of navigating or guiding a ship through a particular channel, river, or other enclosed waters to or from a port.

12.    The specific functions performed by a pilot are (1) conning a vessel from the open sea into a port or from a port to the open sea; (2) conning a vessel from anchorage within a port to a berth; (3) conning a vessel from one berth or terminal to another within a port; and (4) docking or undocking maneuvers within a port". T. Shoenbaum, *Admiralty and Maritime Law* § 13–1 at 267 (3d ed. 2001).

13.    "Pilots are a meritorious class, and the service in which they are engaged is one of great importance to the public. It is frequently full of hardship, and sometimes of peril; night and day, in winter and summer, in tempest and calm, they must be present at their proper places and ready to perform the duties of their vocation". *Ex parte McNiel*, 80 U.S. 236, 238–39, 20 L. Ed. 624 (1871).

14.    As explained by Justice Curtis of the U.S. Supreme Court:

. . .A pilot, so far as respects the navigation of the vessel in that part of the voyage which is his pilotage ground, is the temporary master charged with the safety of the

4

vessel and cargo, and the lives of those on board, and intrusted with the command of the crew. He is not only one of the persons engaged in navigation, but he occupies a most important and responsible place among those thus engaged….

*Colley v. Board of Wardens for the Port of Philadelphia*, 53 U.S. (12 How.) 299, 316 (1851).

15.    In 1947 Justice Black added:

Studies of the long history of pilotage reveal that it is a unique institution and must be judged as such.8 In order to avoid invisible hazards, vessels approaching and leaving ports must be conducted from and to open waters by persons intimately familiar with the local waters. The pilot's job generally requires that he go outside the harbor's entrance in a small boat to meet incoming ships, board them and direct their course from open waters to the port. The same service is performed for vessels leaving the port. Pilots are thus indispensable cogs in the transportation system of every maritime economy. Their work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects the safety of lives and cargo, the cost and time expended in port calls, and in some measure, the competitive attractiveness of particular ports.

*Kotch v. Board of River Pilot Com'rs for Port of New Orleans*, 330 U.S. 552, 557-558 (1947).

16.    International organizations have long recognized the need for pilots' professional independence. *See* International Maritime Pilot's Association Press Release of March 17, 2026.[2] (stating that systemic risks arise from negative impact of competition on pilot's professional independence.)

17.    Professional independence entails pilots having the liberty to exercise their profession on how to move a vessel safely, and under what conditions (including environmental) a vessel can be moved safely, without political or economic pressures to compromise their judgment. This follows the doctrine of *salus populi suprema lex* (which the Supreme Court has invoked in the past), meaning "the welfare of the people should be the supreme law.[3]

---

[2] https://www.impahq.org/sites/default/files/content-files/Press%20Release-Deregulation%20and%20Competition-FOR%20RELEASE%20ON%2017%20MARCH%202026.pdf

[3] *See Thurlow v. Commonwealth of Massachusetts*, 46 U.S. (5 How.) 504, 632 (1847) (invoking *salus populi suprema lex* to support state regulation of liquor).

18.     The pilotage profession has become indispensable to maritime safety worldwide: protecting port infrastructure, preventing maritime accidents with catastrophic environmental consequences, ensuring uninterrupted commerce, and safeguarding human life.

19.     Modern large vessels must transit narrow channels, rivers, bays, and challenging ports, and pilots—who possess extensive and localized expertise—are entrusted with overseeing such operations as safely and efficiently as possible.

20.     Each port, bay, river, and navigable channel is distinct due to its geographic and topographic features. Accordingly, a group of properly trained, licensed professionals, free from commercial, political, or economic pressure, must safeguard the public interest to prevent accidents and promote the safe operation of commerce.

21.     The pilotage profession is crucial to Puerto Rico, particularly in the San Juan Bay area. According to the 2026 Annual Report on Port Performance Statistics prepared by the U.S. Department of Transportation, the port of San Juan ranks twelfth in the volume of containerized cargo[4] and 46th in total tonnage.[5]

22.     The port of San Juan is Puerto Rico's lifeline; according to the U.S. Army Corps of Engineers, it handles more than 75% of the marine commerce (excluding fuel).[6] It is the only port in Puerto Rico that handles containerized cargo. The ecological significance of the bay is huge too; according to the Environmental Protection Agency, the San Juan Bay Estuary makes up **33 percen**t of the remaining mangrove population of Puerto Rico.[7]

---

[4] See https://www.bts.gov/sites/bts.dot.gov/files/2026-01/BTS_Port-Performance-2026_Annual-Report_Final%2011326.pdf, p. 26 of pdf (measured in TEU's, or Twenty-Foot Equivalent Units, which is a measure of containerized cargo).

[5] *Id.*, Appendix B, p. 63.

[6] *See* https://www.saj.usace.army.mil/Missions/Civil-Works/Navigation/Navigation-Projects/San-Juan-Harbor/

[7] https://www.epa.gov/sites/default/files/2015-09/documents/2009_05_28_estuaries_inaction_collaborative_sanjuan.pdf, p. 1.

**NFEnergia's LNG operations in Puerto Rico**

23.    On or around May of 2018, NFEnergia leased from the Puerto Rico Ports Authority a pier in the San Juan Harbor.

24.    In March of 2019, NFE entered into a contract with the Puerto Rico Electrical Power Authority for the supply of natural gas and conversion of units 5 and 6 of the San Juan Combined Cycle Power Plant.

25.    Upon leasing the pier, NFEnergia began constructing a Liquefied Natural Gas "LNG" import terminal on the pier. However, NFEnergia did so without requesting authorization from the Federal Energy Regulatory Commission (FERC). Consequently, on June 18, 2020 FERC issued an order directing New Fortress Energy to show cause why the LNG handling facility it had constructed in the Port of San Juan was not subject to FERC's jurisdiction under Section 3 of the Natural Gas Act (the proceeding was assigned number CP20-466-000).

26.    A month later New Fortress Energy argued its facility was not subject to FERC's jurisdiction. On March 19, 2021, after over 10 non-profit, community and labor groups intervened, FERC issued an Order finding that the LNG facility built by New Fortress in the Port of San Juan fell within FERC's jurisdiction, and ordered New Fortress to file, within 180 days, an application of authorization with FERC. However, FERC gave New Fortress a reprieve, allowing it to continue to operate the LNG facility in the Port of San Juan during the pendency of an application. The Order is published at 174 FERC ¶ 61, 207.

27.    While an application process usually commences with a pre-filing process followed by filing an application, the publishing of a Notice of Application, and then allowing comments by the public, NFE started its operations in Puerto Rico bypassing this entire process. As history

would eventually show, this would not be the first time NFE was allowed to operate while failing to comply with the law or its promises.

28.    As described by FERC order at 174 FERC ¶ 61, 207, LNG was brought to the San Juan Harbor with shuttle vessels that first conducted lightering operations with ocean-going, bulk-carrier LNG tankers anchored off the coast of Puerto Rico, and out of Puerto Rico territorial waters. The shuttle vessels entered the bay and delivered the LNG to a floating storage unit (FSU) semi-permanently moored at the leased pier via a ship-to-ship transfer.

29.    The vessel used as an FSU was the Coral Encanto, with a capacity of 30,000 cubic meters, an overall length (LOA) of 181.3 meters and a beam of 36 meters. The shuttle vessel mainly used to supply LNG to the FSU was the Coral Anthelia, which had a capacity of 6,500 cubic meters, a length of 115 meters, and a beam of 16.8 meters.

30.    The transport of LNG using the method described in the preceding paragraphs had been approved by the Coast Guard, who had issued a Letter of Recommendation ("LOR") following a Waterway Suitability Assessment ("WSA"). However, the U.S. Coast Guard revoked the permission it has previously granted for the previously described ship-to-ship transfer after deeming such operation unsafe given all factors involved (including the challenges presented by the physical dimensions of the waterway.

**NFE looks to expand its LNG operation**

31.    Following the revocation of the initially granted U.S. Coast Guard permission for ship-to-ship transfer operations, NFE decided to use larger LNG vessels.

32.    The San Juan Bay Pilots were first approached by an NFE representative, Mr. Andrew Murray, on May 16, 2023, regarding expanding NFE's LNG operation.

33.    Sometime thereafter NFE communicated that it planned on replacing the Coral Encanto FSU with the large LNG tankers with a capacity of 125,000 to 155,000 cubic meters, an LOA of over 280 meters, and a beam of 43 meters. They furthermore are over 80,000 tons deadweight, and have an average draft of 11.5 meters and a 6,518 square meter sail area, both of which vary depending on load.

34.    The large LNG vessels are over twice as long and twice as wide as the shuttle vessels, with twenty times the cargo capacity of the shuttle vessels that regularly entered the harbor.

35.    The use of vessels that were over twice as long and twice as wide as the shuttle vessels, with twenty times the cargo capacity of the shuttle vessels, came with significant risk, as the fire and explosions hazard of a large LNG tanker is substantial.

36.    Under a maximum-credible worst-case scenario, the catastrophic ignition of the Energos Maria — the larger of the two LNG carriers NFE has used exclusively to serve the San Juan facility since October 2025[8] — would produce a fireball with a radius of approximately 1,127 meters (3,696 feet, or seven-tenths of a mile), persisting for nearly three minutes (on the order of 175 seconds).[9] The resulting fireball would span a diameter of roughly 2,253 meters (7,392 feet) — approaching a mile and a half. Centered on the vessel's transit and berthing corridor within San

---

[8] Since October 2025, NFE has mainly used two LNG carriers to serve the San Juan facility: the Energos Maria (IMO 9320374; approx. 145,700 m³) and the Energos Princess (IMO 9253715; approx. 138,000 m³). This analysis models the Energos Maria, the larger of the two and thus the operative worst case. Applying the fireball methodology of Li & Huang, supra note 9 — which computes a radius of 1,130.4 meters for a marginally larger 147,200 m³ vessel — the Energos Maria's cargo yields a fireball radius of approximately 1,127 meters (diameter approximately 1.40 miles); the smaller Energos Princess yields approximately 1,106 meters (diameter approximately 1.38 miles). The analysis is therefore materially insensitive to which operative vessel is modeled.

[9] See Li Jianhua & Huang Zhenghua, *Fire and Explosion Risk Analysis and Evaluation for LNG Ships*, 45 Procedia Engineering 70, 75 (2012) (2012 Int'l Symposium on Safety Science and Technology) (submitted at docket no. 33-1, at 6).

Juan Bay, a thermal event of that scale would reach the containerized cargo terminals, a substantial portion of Cataño, the Metropolitan Detention Center, the fuel depots south of the bay (bounded by State Road 165 to the east, State Road 2 to the west, and State Road 22 to the north), and the automobile dealerships along Kennedy Avenue, among other densely developed and critical sites. It is precisely this proximity that sets San Juan apart: even the handful of LNG terminals worldwide sited near urban areas occupy outer-harbor or cross-river zones adjacent to industrial land — not the active commercial-and-cruise channel of a capital city, as San Juan's does.

37.    According to the literature referenced in the preceding paragraph, with a three-minute (90 second) fireball, the death radius is over 2,000 meters (1.25 miles) (which includes Fort Buchanan), and the first degree burn radius is about 3,500 meters (over 2.1 miles). *Id.* **This is over fourteen square miles, and is an area that extends to Plaza Las Americas to the East, Garden Hills to the South, all of Cataño to the West, and all of Isla Grande, including the Convention Center District, to the North.**

38.    NFE is fully aware of the risks inherent to LNG vessels, and is fully aware of the risks of bringing large LNG vessels into the harbor to its pier.

39.    Given the risks associated with LNG, Puerto Rico's dependence on the Port of San Juan, and presence of the port in the middle of the capital of Puerto Rico, the safe transit of LNG vessels in and out of the San Juan Bay Harbor is paramount, and the transit of LNG vessels in and out of the bay has to be a zero-fail mission.

40.    Navigating the San Juan Bay is no small feat either. To the untrained eye it may seem like a sizable body of navigable water, but in reality, as far as large ships are concerned, the navigable channels, depicted in gray overlaying the water in the following image, are narrow and represent only a fraction of the bay:



41.     Entering the harbor from the sea is also challenging as well. Pilots board vessels three miles north in open sea, where they navigate the ships into the harbor through a challenging entry that is narrow with a blind turn (meaning pilots must start turning the vessel before they can even see the turn). Pilots perform these navigations not only facing the challenges inherent to the harbor and its narrow channels; they must also overcome unexpected events such as engine or rudder failure, loss of control, squalls, strong gusts, etc.

42.     For all the reasons above, upon learning of NFE's intent to switch to larger LNG vessels, the plaintiff Pilots explained to NFE that, due to the complexity of the navigation channels in the San Juan Bay estuary, the hydrodynamic effects in narrow channels with vessels that exceed limits recommended by international authorities (e.g., PIANC  & USACE ), and the heavy

dependency of the public on this port, a specific inbound/outbound maneuver was necessary, particularly in light of other port infrastructure deficiencies such as the absence of a harbor master to supervise, control, and prioritize traffic according to the state's needs and to coordinate with local agencies; the lack of contingency areas for safe anchorage or transit; missing or obstructed navigational aids, including the relocation of buoys after dredging and blocked or absent range lights; the presence of floating debris; the absence of adequate seaside firefighting equipment and arrangements; and the lack of escort-rated tugs for transiting vessels. The most critical shortfall was the insufficient number of assist tugs required to safely direct and control the passage of large LNG carriers. These large LNG vessels carry dangerous cargo and are well-known to be highly dependent on such tug assistance, which is essential and routinely relied upon by the pilots.

43. Notwithstanding the above, the San Juan Bay Pilots were committed to assisting NFE in its endeavor to rely on large LNG vessels. NFE engaged the San Juan Bay Pilots as experts and hired the Seamen's Church Institute Center for Maritime Education for conducting simulations (which have been referred to as the Houston simulations).

44. Conducting the simulations required the daunting task of first creating a simulation of the San Juan Bay, as well as of the LNG vessels and different tugs.

45. The simulation models at Seamen's Church Institute were reviewed by the pilots, and the simulation exercise was vetted by the U.S. Coast Guard. Over a period of five months in the first half of 2024, all of the San Juan Bay pilots (and captains from various tug companies who would be conducting the tug maneuvers in San Juan) conducted over 100 total simulation runs, and included reproducing real-life scenarios with similar LNG vessels, tugs, and the conditions of San Juan Bay.

46.     The Houston simulations conducted by all pilots and NFE included propulsion failures, rudder failures, sudden changes in wind direction and intensity, human errors by the bridge team, tug operators, and even the loss of one or more assisting tugs.

47.     During the Houston simulations, several types of tugboats, with varying power and capabilities, were tested to determine the most suitable configuration. Moreover, all pilots visited Corpus Christi, Texas, and rode along with the local pilots to observe real-life transits on similar vessels firsthand.

48.     The Houston simulations, commissioned and paid for by NFE, revealed that 60-ton bollard pull tugs were **insufficient**. See docket no. 34-2, p. 6. 80-ton bollard pull tugs however proved to be acceptable, although an extra 10% margin was recommended. According to NFE, "the simulation team concluded that the project is feasible if the pilot and tug masters receive integrated training and operations to support operating in sustained winds of 25 knots." See docket no. 34-2, p. 8.

**Plaintiffs' contract with NFE**

49.     With the benefit of two years of study, technical analyses, simulations, and consultations with experts, numerous advisors, and several entities, and given the needs to safely respond to emergencies that could arise while the LNG vessels were in transit or berthed, NFE and the San Juan Bay pilots came to an agreement on how the large LNG carriers would be transported in and out of the harbor, and which also contemplated and managed foreseeable contingencies, including possible emergency scenarios identified above. Specifically, NFE and the pilots agreed, among other things:

a)     that the large LNG vessels would be brought in and out of the San Juan Bay using four escort-rated tugs with minimum bollard pull of 80-metric-tons to escort and

maneuver the large LNG vessels safely (this matches the equipment used in other ports where such vessels typically operate; their power and handling characteristics are essential to manage foreseeable emergency scenarios, and ensure that each tug can be interchanged among the predetermined positions thereby providing redundancy as needed including in the event of the failure of one of the tugs);

b)      that NFE would procure and provide, at its expense, such tugs;

c)      that LNG vessels would be brought into the harbor at a speed of no less than ten knots; that LNG vessels would only be brought in or out of the harbor during the daytime;

d)      that LNG vessels would be brought in or out of the harbor only if sustained winds did not exceed ten knots (with gusts not exceeding twenty knots sustained);

e)      the use of two pilots aboard the LNG vessel for maneuver;

f)      repositioning of buoys after dredging in the Army Terminal channel;

g)      modification to aids to navigation and alignment lights;

h)      installation of an anemometer on NFE's premises; and

i)      that any time a vessel were to transit through Puerto Nuevo Channel while the LNG vessel was berthed at NFE's pier, two tugs, provided by NFE at its expense, would be on standby next to the LNG vessel.

50.     NFE furthermore agreed with plaintiffs that the San Juan Bay Pilots would adopt navigational safety guidelines for port users and vessel operators that among other things would include procedures for routine conditions as well as maximum operating parameters, the use of a tug matrix, and establish speed restrictions in certain areas of the port.

14

51.     In addition to the above, a maneuver was explicitly developed to address the unique geographic conditions of the San Juan Bay estuary, the critical overreliance of the people of Puerto Rico on this port for essential goods, the regular presence of vessels exceeding recommended dimensional limits, prevailing climate and weather patterns, and additional port infrastructure deficiencies.

52.     The developed maneuver was deliberately structured to ensure the safety of every transit, as these operations constitute a zero-fail mission due to the hazardous nature of the cargo involved and the severe consequences of any incident.

53.     NFE agreed with plaintiffs that the LNG vessels would be piloted according to the developed maneuver.

54.     As it pertains to the escort-rated tugs NFE agreed to provide, an "escort-rated" tug is a vessel specifically designed, built, and certified to perform escort operations, meaning it can assist, control, and, where necessary, stop or redirect the movement of a larger vessel during transit. Such tugs have greater stability, maneuverability, and bollard pull; they are equipped with propulsion and steering systems capable of exerting significant indirect forces on the assisted vessel.

55.     Escort-rated tugs differ from conventional harbor tugs because their design enables them to provide hydrodynamic braking, steering, and emergency stopping capability in restricted or high-risk waters. Escort certification is granted by recognized classification societies based on performance tests and technical assessments demonstrating a tug's capability to control a vessel of a certain size and speed in emergency conditions.

**NFE's representations to the U.S. Coast Guard, and the Coast Guard's reliance thereon**

56.     On May 7, 2025, NFE reported the outcome of the simulations to the U.S. Coast Guard in its Waterway Suitability Assessment ("WSA") filings. Based on NFE's representations and its understanding of NFE's commitments with the San Juan Bay Pilots, in January of 2026 the Coast Guard issued a Letter of Recommendation ("LOR") to the Federal Energy Regulatory Commission. See docket no. 214-1.

57.     In its 2026 LOR the Coast Guard concluded that the waterway is suitable for transit and docking of NFE's proposed vessels (including those currently used) **with extraordinary precautions.** See docket no. 214-1, first paragraph (emphasis added). It further adds that "[NFE's] proposed risk mitigation strategies are ultimately necessary to enable practicable and safe navigation of the proposed vessels without imposition of conditions in the LOR." *Id.*, ¶ 2. In the Coast Guard's conclusions it further clarifies "Subject to the conditions established in the updated follow-on WSA dated March 17, 2025, I recommend that this waterway be considered suitable for the LNG marine traffic associated with the Applicant's proposal." See docket no. 214-2, p. 20, ¶ 6.B (underline added).

58.     The Coast Guard's 2026 LOR took note that on August 3, 2025 the San Juan Bay Pilots communicated to NFE the following:

> "[The escort tugs] are four sister vessels-escort rated, each capable of delivering 80 metric tons of bollard pull—with identical capabilities and handling characteristics… These vessels were introduced only after extensive simulation studies confirmed their necessity. Their proven performance so far—both during standard transits and in demanding, unplanned scenarios—has made clear that this tug spread is an indispensable component of the LNG maneuvering framework for San Juan Harbor."

See docket no. 214-2, p. 18, ¶ 5.i.

59.     The Coast Guard's LOR was premised on its assumption that NFE would provide tugs to the satisfaction of the pilots, on January 12, 2026, interpreting NFE's WSA "to stipulate

16

that tug escorts will be provided to the satisfaction of the San Juan Bay Pilots." See docket no. 214-2, p. 18, ¶ 5.A, second sentence.

60.    According to the Coast Guard, "Employing the pilots' collective knowledge is standard practice and, in most circumstances, yields a prudent approach; this is commensurate with the extraordinary risks that yield from the unique factors of the San [Juan] Bay." See docket no. 214-2, p. 18, ¶ 5.A, third sentence.

**NFE provides the agreed tugs**

61.    Pursuant to the contract between the plaintiff pilots and NFE, NFE executed a contract with Edison Chouest Offshore ("ECO") for the charter of four eighty-ton metric bollard pull escort-rated tugs (these tugs will be referred to hereinafter as the ECO tugs).

62.    The ECO tugs arrived in March of 2025, and were immediately used upon the arrival of the GASLOG SINGAPORE on March 20, 2025, when it first berthed in San Juan using the four tugs with the necessary characteristics to guarantee a safe maneuver.

63.    At least eighteen (18) such maneuvers were successfully completed, using the same equipment and employing the planned maneuver, taking into account the risks identified in prior simulations and studies.

64.    One of the maneuvers completed using the ECO tugs was an emergency maneuver performed on July 12, 2025; while the LNG vessel was in transit inbound within the harbor (close to the Coast Guard station), NFE instructed that the vessel be turned around and taken out of the port.

65.    NFE's sudden instructions were issued without communicating any reason (and no reason has been offered to this day despite requests for an explanation). This created a high risk for all involved, and required the pilots to choose and follow a contingency plan without knowing

17

if it was the right one (because the reason for the sudden maneuver was not communicated).

66.    The most analogous protocol to NFE's sudden instruction to turn the vessel around was the protocol for a terminal bomb threat, and the corresponding maneuver, to turn the vessel 180 degrees in tight quarters without running aground, was safely executed only because the proper equipment was in place and because the personnel involved had received specific training (to be clear, plaintiffs are not asserting there ever was a bomb threat; they only are describing that the protocol most analogous to the instructions for an immediate turn-around of the vessel was the protocol applicable to a bomb threat).

67.    There have been other instances where the 80 metric ton bollard pull escort-rated tugs have been necessary. For example, in one instance, Captain Jake Elmstrom was maneuvering one of NFE's large LNG vessels near the Army Terminal Turning Basin, when severe wind gusts unexpectedly arose. Captain Elmstrom required the use of the full 80 metric ton pull from the tugs to safely maneuver the vessel through this emergency. There have been other instances as well.

68.

69.    All in all, while the large LNG vessels were being maneuvered within the harbor using ECO tugs, there were at least three occasions when the power of the ECO tugs had to be used to complete the maneuver safely.

70.    Upon information and belief, NFE's cost of providing four 80 metric ton bollard pull escort-rated tugs is several million dollars per year.

**NFE breaches its contract with Plaintiffs**

71.    Earlier in 2025, press reports began to surface that NFE was experiencing financial difficulties. In fact, it has been reported that the company is "on the brink of bankruptcy."

18

72.     Subsequently, San Juan pilots received information that NFE would not renew the contract with ECO—the owner of the four tugs with the required capacity to conduct the maneuvers safely—and instead would replace the four tugs provided by ECO with lower-capacity tugs.

73.     NFE's decision to get rid of the four 80 metric ton bollard pull escort-rated tugs was driven principally by cost savings and financial pressure. According to NFE's subsidiary Genera PR LLC, NFE found the chartered ECO tug "expensive" and "facing financial pressures, [NFE] decided to use less expensive alternatives." See docket no. 85, p. 5, lines 1-3.

74.     The alternative tugs chosen by NFE were not only cheaper, but also, were substantially less capable. NFE's substitution of the four agreed-to tugs with substantially less capable tugs was a material breach of NFE's agreement with the pilots.

75.     On September 15, 2025, the four ECO tugs originally chartered by NFE left Puerto Rico, and NFE demanded that the pilots use the less capable tugs. Seven of the eight individual San Juan Bay pilots objected because of the danger presented by using inferior tugs, particularly if an emergency were to arise.

76.     NFE's refusal to pay for the four 80 metric ton bollard pull escort-rated tugs is a breach of its contractual obligations with plaintiffs, an obligation that represents a cost of several million dollars per year at least.

**NFE's Request for Commission Intervention and Resulting Cease-and-Desist Order**

77.     NFE not only breached its contractual and/or represented obligation to provide the agreed tug package; it also used, induced, encouraged, or substantially participated in the use of Commission process to suppress Plaintiffs' safety communications and to pressure Plaintiffs into accepting NFE's lower-cost tug configuration.

19

78. Plaintiffs' safety communications concerned matters of public safety and maritime safety, including the risks of moving large LNG vessels through San Juan Bay without the tug support and safeguards developed through the parties' technical process, represented by NFE to regulators, relied upon by the Coast Guard, and used in successful large LNG vessel transits.

79. Plaintiffs' safety communications interfered with NFE's plan to reduce operating costs by replacing or refusing to pay for the tug support and related safeguards on which the large LNG operational framework depended.

80. On August 3, 2025, seven of the eight San Juan Bay pilots communicated to NFE their serious safety concerns regarding NFE's plan to replace the four ECO escort-rated tugs with materially less capable tug support.

81. On or about August 14, 2025, the vessel's agent advised the San Juan Bay pilots that NFE intended to conduct the next large LNG vessel maneuver using replacement tugs belonging to local tug companies rather than the four ECO escort-rated tugs that had been used for prior large LNG vessel maneuvers.

82. On August 15, 2025, seven San Juan Bay pilots communicated safety concerns to Captain Daniel Montes and copied maritime stakeholders, vessel interests, and/or public agencies, including the Pilotage Commission, concerning the risks of proceeding with NFE's lower-capacity tug configuration.

83. The pilots' August 15 communication did not disclose confidential information and did not seek to obstruct lawful maritime commerce. It communicated professional safety concerns regarding the adequacy of tug support for a high-risk LNG maneuver in San Juan Bay.

84.     Shortly thereafter, a law firm representing one of the tug companies (which also happens to be a law firm for the Commission) sent a cease-and-desist letter accusing the pilots of interfering with economic interests.

85.     Approximately an hour and a half later, NFE, through Carlos Faris, Terminal Manager/FSO, wrote to the Puerto Rico Pilotage Commission requesting assistance to ensure that NFE's preferred operations could proceed.

86.     Within approximately two hours of NFE's request, the President of the Puerto Rico Pilotage Commission, Ms. Jessica Ñeco-Morales, issued a cease-and-desist order directed at the pilots who had raised safety concerns regarding NFE's proposed tug substitution.

87.     The compressed sequence of events—Plaintiffs' protected safety communication, the tug company cease-and-desist letter, NFE's request for Commission intervention, and the Commission President's cease-and-desist order—supports a reasonable inference that NFE used, induced, encouraged, or substantially participated in the use of Commission process to suppress Plaintiffs' safety communications and facilitate NFE's lower-cost tug plan.

88.     Upon information and belief, NFE's request to the Commission was not a neutral request for technical review, maritime safety evaluation, or an evidentiary process concerning the adequacy of substitute tugs. Rather, NFE sought Commission intervention to suppress, chill, or neutralize Plaintiffs' safety communications and to facilitate NFE's plan to proceed with a lower-cost tug configuration.

89.     The cease-and-desist order purported to restrict or chill the pilots' communications with maritime stakeholders, vessel interests, fellow pilots, and public agencies regarding safety issues.

90.    The cease-and-desist order was not directed at improving tug capacity, validating NFE's substitute tug configuration, convening a technical review, obtaining expert input, conducting simulations, or addressing the substance of the safety concerns raised by seven of the eight San Juan Bay pilots.

91.    The purpose and effect of the cease-and-desist order were not to protect maritime safety, validate NFE's proposed substitute tug configuration, or convene a neutral technical process. Its purpose and effect were to silence the pilots' safety communications, reduce resistance to NFE's lower-cost tug configuration, and shift operational, professional, financial, and safety risks away from NFE and onto Plaintiffs. NFE's use or procurement of Commission process for that collateral purpose created professional and regulatory exposure, chilled Plaintiffs' safety communications, forced Plaintiffs to seek judicial protection, and supports the need for prospective declaratory and injunctive relief. Plaintiffs seek attorneys' fees and costs only to the extent independently authorized by law, and do not seek compensatory damages for the Commission process, the cease-and-desist order, or related conduct.

92.    Upon information and belief, NFE did not merely report a concern to the Commission. NFE directed, requested, induced, encouraged, coordinated with, or substantially participated in causing the Commission President to issue the cease-and-desist order.

93.    Upon information and belief, NFE and the Commission President communicated regarding the pilots' safety communications before the cease-and-desist order was issued, and the order was issued in response to, and for the benefit of, NFE's request for Commission intervention.

94.    Upon information and belief, NFE petitioned the Commission requesting that all inbound and outbound maneuvers of its large LNG vessels be done by Captains César and Daniel Montes.

95.    Upon information and belief, the substance, timing, and practical effect of the cease-and-desist order reflected NFE's objective of suppressing the pilots' safety communications and facilitating NFE's plan to proceed with materially inferior tug support.

96.    Upon information and belief, NFE used the Commission President's official authority, and potentially the authority of other commissioners, as the instrumentality for suppressing Plaintiffs' safety communications, creating a chilling effect on the pilots, and advancing NFE's private cost-saving objective.

97.    The facts concerning the full extent of communications, coordination, requests, inducements, or pressure between NFE and the Commission President are peculiarly within the knowledge and control of NFE, the Commission President, and/or the Commission, and Plaintiffs expect discovery to reveal the full scope of that coordination.

98.    As a result of NFE's joint participation in the state action, Plaintiffs' ability to communicate safety concerns to maritime stakeholders and public agencies was chilled, impaired, or restricted.

99.    The cease-and-desist order forced Plaintiffs to seek judicial relief and created professional, regulatory, and safety-related exposure that supports the need for prospective declaratory and injunctive relief. Plaintiffs seek attorneys' fees and costs only to the extent independently authorized by law, and do not seek compensatory damages for the cease-and-desist order or related conduct.

100.    Within weeks after Plaintiffs initiated this action, the Pilotage Commission agreed to rescind the gag order previously issued, as well as rescind the appointment of Cesar Montes, a pilot who was not authorized to provide pilotage services in the San Juan harbor, to provide service to NFE's vessels. See docket no. 125-1.

101.    On or around the same time that Plaintiffs objected to NFE's dismissal or substitution of the four tugs it had agreed to provide, Plaintiffs also learned that a draft bill had been prepared that would repeal Act 226 of 1999 and make the pilots answer to the Puerto Rico Ports Authority, thereby undermining the pilots' professional independence. See draft of bill at docket nos. 233-2 and 233-3. Upon information and belief, NFE supported, encouraged, or was behind this initiative as part of its effort to reduce the independent professional judgment of the pilots and facilitate its lower-cost LNG operational model.

102.    Further prioritizing profits over safety, since on or about February of 2026, NFE has refused to pay for the standby tugs it had originally agreed with Plaintiffs that it would provide and pay for, and which in fact it had been paying for until February of 2026.

103.    In the professional opinion of the Plaintiff pilots, standby tugs are required for the safe navigation of vessels through the channel adjacent to NFE's LNG vessels.

104.    NFE's refusal to pay for the standby tugs is yet another breach of its contractual obligations with plaintiffs.

105.    In light of the Plaintiff pilots' communicated professional judgment that the standby tugs are required, NFE has retaliated once again, this time directing members of the Puerto Rico Shippers' Association to submit "Letters of Protest" to plaintiffs, wherein the members of the Puerto Rico Shippers' Association assert a right to recover the costs of the standby tugs from the plaintiffs.

106.    To the extent NFE has refused to bear the cost of standby tugs and has persuaded members of the Puerto Rico Shippers' Association to pursue Plaintiffs for those costs, Plaintiffs face coercive cost-shifting pressure and professional exposure that confirm the existence of a live controversy exceeding $75,000 in value. Plaintiffs do not seek damages, indemnity,

24

reimbursement, or monetary relief for any such exposure; rather, Plaintiffs seek prospective declaratory and injunctive relief establishing that NFE may not shift to Plaintiffs costs, risks, or obligations that NFE agreed, represented, or induced Plaintiffs to understand NFE would bear.

107. Separately, NFE is fully aware that the tugs available in the San Juan Bay are unable to meet the large LNG vessels before entering the harbor. For one, in order for the LNG vessels to safely enter the harbor, they have to be traveling at a speed of at least ten knots which is why NFE agreed to this with plaintiffs. Second, even if the available tugs were able to tie up to the LNG vessel in open sea, by their design they would be unable to provide the assistance required particularly in the event of an emergency.

108. Upon information and belief, NFE intends to justify the use of the currently available tugs outside the harbor by requiring the large LNG vessels to travel at less than ten knots. However, entering LNG vessels into the harbor at speeds lower than ten knots is a breach of the agreement between plaintiffs and NFE for the safe transit of LNG vessels into the harbor.

## CAUSES OF ACTION

### Preliminary Allegations Before Counts

109. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

110. Plaintiffs bring this action to protect maritime safety, preserve the professional independence of compulsory harbor pilots, and obtain prospective judicial clarification and enforcement of the safety framework governing large LNG vessel movements in San Juan Bay. Plaintiffs do not bring this action to obtain a monetary recovery for themselves.

111. Plaintiffs do not seek compensatory damages, lost profits, lost pilotage revenues, indemnification, reimbursement, restitution, disgorgement, quantum meruit, reliance damages,

25

extracontractual damages, nominal damages, punitive damages, or any other monetary recovery for past injury.

112.    Plaintiffs seek prospective enforcement of NFE's own operational obligation to provide, procure, maintain, and bear the cost of required tug support and safeguards. Plaintiffs do not seek an order requiring NFE to pay money to Plaintiffs, reimburse Plaintiffs, indemnify Plaintiffs, or compensate Plaintiffs for past injury.

113.    Plaintiffs seek declaratory relief, preliminary and permanent injunctive relief, specific performance or equivalent equitable relief, taxable costs, and attorneys' fees only to the extent authorized by applicable statute, rule, contract, maritime bad-faith doctrine, or the Court's inherent authority.

114.    Plaintiffs plead their contract-based claims primarily under federal maritime law because the agreement concerns pilotage, tug assistance, docking, undocking, shifting, standby tug arrangements, and the movement of large LNG vessels through navigable waters.

115.    In the alternative, pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332 and supplemental jurisdiction under 28 U.S.C. § 1367, Plaintiffs plead their contract-based and equitable claims under the Puerto Rico Civil Code to the extent the Court determines that Puerto Rico law governs, supplements federal maritime law, or supplies the rule of decision for any aspect of the parties' agreement or course of dealing.

116.    Plaintiffs plead alternative theories only to preserve non-monetary relief if the Court determines that no enforceable express or implied-in-fact maritime contract governs the parties' dispute.

## COUNT I — DECLARATORY RELIEF AND SPECIFIC PERFORMANCE OF MARITIME CONTRACT / IMPLIED-IN-FACT MARITIME CONTRACT AGAINST NFE

117. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

118. NFE and Plaintiffs entered into an express maritime contract, or alternatively an implied-in-fact maritime contract, governing the conditions under which Plaintiffs would provide pilotage, navigational judgment, harbor-navigation services, docking, undocking, shifting, standby tug coordination, and related vessel-movement services for NFE's large LNG vessels in San Juan Bay.

119. The agreement concerns classic maritime services and operations, including pilotage, tug assistance, vessel transit through navigable waters, docking, undocking, shifting, and the safe navigation of large LNG vessels in the Port of San Juan.

120. The agreement was formed through the parties' course of dealings, technical meetings, simulations, operational planning, NFE's representations to regulators and maritime stakeholders, NFE's procurement of the ECO tug package, and the parties' subsequent performance of large LNG vessel movements under the agreed safety framework.

121. Under the agreement, NFE agreed to procure, provide, maintain, and pay for the safety measures required for large LNG vessel operations in San Juan Bay, including four escort-rated tugs with minimum bollard pull of 80 metric tons, two-pilot operations, agreed operating parameters, standby tug arrangements when required by the agreed operational framework, and associated navigational safeguards.

122. Plaintiffs performed their obligations by participating in the technical process, providing professional expertise, participating in simulations and operational planning, developing

27

and implementing the large LNG vessel maneuver, and performing large LNG vessel movements using the agreed safety framework.

123. NFE accepted the benefits of Plaintiffs' expertise, the simulations, the agreed maneuver, the Coast Guard's reliance on NFE's proposed mitigation measures, and successful LNG transits using the agreed tug package.

124. NFE has breached, repudiated, or threatened to breach the parties' maritime agreement by withdrawing, refusing to provide, refusing to pay for, or attempting to substitute materially inferior tug support and related safeguards, including standby tug arrangements, without the same technical validation and consensus that produced the agreed operational framework.

125. NFE's threatened or continuing nonperformance shifts operational, professional, regulatory, safety, and coercive cost-shifting risks to Plaintiffs and undermines the safety framework that NFE agreed to provide, represented to regulators, and induced Plaintiffs to rely upon.

126. Monetary damages are inadequate because the dispute concerns continuing maritime-safety obligations, pilots' professional independence, public safety, the safe movement of large LNG vessels through San Juan Bay, and the allocation of operational safeguards necessary to prevent risks that cannot be reliably measured or remedied after the fact.

127. Plaintiffs seek a declaration that NFE is obligated to comply with the parties' maritime agreement, including the obligation to provide, procure, maintain, and pay for the agreed escort-rated tug package, standby tug measures, and related safeguards required by the large LNG vessel operational framework.

128. Plaintiffs further seek preliminary and permanent injunctive relief, specific performance, or equivalent equitable relief requiring NFE to comply with the agreed safety

28

framework, or to provide an equivalent arrangement demonstrated through a technically reliable process to meet or exceed the agreed safety and maneuverability standards.

129.    Plaintiffs do not seek damages, lost pilotage revenues, reimbursement, indemnification, restitution, disgorgement, quantum meruit, or monetary compensation under this Count.

## COUNT II — IN THE ALTERNATIVE, DECLARATORY RELIEF AND SPECIFIC PERFORMANCE UNDER THE PUERTO RICO CIVIL CODE

130.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

131.    Plaintiffs plead this Count in the alternative to Count I, to the extent the Court determines that Puerto Rico law governs, supplements federal maritime law, or supplies the rule of decision for any aspect of the parties' agreement.

132.    NFE and Plaintiffs entered into an enforceable agreement governing the conditions under which Plaintiffs would provide pilotage, navigational judgment, harbor-navigation services, standby tug coordination, and vessel-movement services for NFE's large LNG vessels in San Juan Bay.

133.    The agreement was formed through the parties' consent, course of dealings, technical meetings, simulations, operational planning, NFE's representations to regulators and maritime stakeholders, NFE's procurement of the ECO tug package, and the parties' subsequent performance of large LNG vessel movements under the agreed safety framework.

134.    The agreement had a lawful object and cause: enabling NFE's large LNG vessel operations in San Juan Bay while protecting maritime safety, port infrastructure, the public, the pilots, the vessels, and the San Juan Bay through agreed operational safeguards.

135.    The cause for NFE's obligations included Plaintiffs' technical expertise, participation in the simulations and technical process, development and implementation of the large LNG vessel maneuver, provision of pilotage services and professional navigational judgment, acceptance of professional and operational responsibility, and NFE's resulting ability to obtain regulatory acceptance and conduct large LNG vessel operations in San Juan Bay.

136.    Under the agreement, NFE was obligated to procure, provide, maintain, and pay for the tug support and related safeguards required for safe large-LNG-vessel movements, including four escort-rated tugs with minimum bollard pull of 80 metric tons, standby tug arrangements when required by the agreed operational framework, and other related safety measures.

137.    Plaintiffs performed their obligations by participating in the technical process, providing professional expertise, participating in simulations and operational planning, developing and implementing the agreed maneuver, and performing large LNG vessel movements using the agreed safety framework.

138.    NFE has breached, repudiated, or threatened to breach the agreement by withdrawing, refusing to provide, refusing to pay for, or attempting to substitute materially inferior tug support and related safeguards, including standby tug arrangements, without the same technical validation and consensus that produced the agreed operational framework.

139.    NFE's threatened or continuing nonperformance creates a present and ongoing controversy regarding the parties' rights and obligations and threatens maritime safety, Plaintiffs' professional independence, and the integrity of the agreed operational framework.

140.    Plaintiffs seek a declaration that NFE is obligated under Puerto Rico law to comply with the parties' agreement, including the obligation to provide, procure, maintain, and pay for the

30

agreed escort-rated tug package, standby tug measures, and related safeguards required by the large LNG vessel operational framework.

141.    Plaintiffs further seek preliminary and permanent injunctive relief, specific performance, or equivalent equitable relief requiring NFE to comply with the agreed safety framework, or to provide an equivalent arrangement demonstrated through a technically reliable process to meet or exceed the agreed safety and maneuverability standards.

142.    Plaintiffs do not seek damages, lost pilotage revenues, reimbursement, indemnification, restitution, disgorgement, quantum meruit, or monetary compensation under this Count.

### COUNT III — IN THE ALTERNATIVE, EQUITABLE ESTOPPEL / RELIANCE UNDER PUERTO RICO LAW

143.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

144.    Plaintiffs plead this Count in the alternative, to the extent the Court determines that no enforceable express or implied-in-fact contract governs the parties' dispute.

145.    Through its words, conduct, technical process, regulatory submissions, course of dealing, procurement of the ECO tug package, and performance of large LNG vessel movements under the agreed safety framework, NFE represented to Plaintiffs, regulators, and maritime stakeholders that large LNG vessel operations in San Juan Bay would be conducted using the safety measures identified through the parties' technical process.

146.    Those represented safety measures included four escort-rated tugs with minimum bollard pull of 80 metric tons, standby tug arrangements when required by the agreed operational framework, two-pilot operations, operating parameters, and related navigational safeguards.

147. NFE's conduct created a reasonable and foreseeable understanding that NFE would provide, procure, maintain, and pay for the tug support and safety safeguards that formed the basis of the parties' large LNG vessel operational framework.

148. Plaintiffs reasonably and in good faith relied on NFE's representations and conduct by participating in the simulations and technical process, providing professional expertise, developing and implementing the agreed maneuver, performing large LNG vessel movements under the agreed safety framework, and accepting professional and operational responsibility for those movements.

149. NFE knew or should have known that Plaintiffs would rely on NFE's representations and conduct in deciding whether and how to participate in large LNG vessel operations in San Juan Bay.

150. NFE also knew or should have known that Plaintiffs' reliance was particularly significant because large LNG vessel operations in San Juan Bay implicate maritime safety, public safety, pilot professional responsibility, port infrastructure, environmental risk, and the Puerto Rico economy.

151. Plaintiffs would be prejudiced if NFE were permitted to repudiate or contradict the representations and course of conduct on which Plaintiffs reasonably relied while continuing to benefit from the regulatory and operational framework that those representations helped create.

152. NFE should be estopped from denying its obligation to provide, procure, maintain, and pay for the tug support and safety safeguards on which Plaintiffs reasonably relied, or from shifting to Plaintiffs the costs, risks, or obligations that NFE represented it would bear.

153. Plaintiffs seek declaratory relief, preliminary and permanent injunctive relief, and equivalent equitable relief necessary to prevent NFE from benefiting from Plaintiffs' reliance, expertise, and operational participation while repudiating the safeguards that induced that reliance.

154. Plaintiffs do not seek reliance damages, restitution, disgorgement, quantum meruit, reimbursement, indemnification, or monetary compensation under this Count.

**COUNT IV — IN THE ALTERNATIVE, EQUITABLE RELIEF TO PREVENT REPUDIATION OF THE SAFETY FRAMEWORK AFTER NFE ACCEPTED ITS REGULATORY AND OPERATIONAL BENEFITS**

155. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

156. Plaintiffs plead this Count in the alternative, to the extent the Court determines that no enforceable express or implied-in-fact contract governs the parties' dispute and that equitable relief is necessary to prevent NFE from continuing to rely on the regulatory and operational framework developed through Plaintiffs' safety-related work while repudiating the safeguards that induced and structured that work.

157. NFE obtained and accepted regulatory and operational advantages from Plaintiffs' professional expertise, participation in the technical process, simulations, operational planning, development and implementation of the agreed maneuver, and performance of large LNG vessel movements in San Juan Bay.

158. NFE also obtained, accepted, and relied upon regulatory and operational acceptance arising from the safety framework developed with Plaintiffs, including NFE's representations concerning tug support, pilotage, operating parameters, standby tug arrangements, and related safeguards for large LNG vessel operations.

159.    NFE's ability to conduct large LNG vessel operations in San Juan Bay depended upon Plaintiffs' expertise, reliance, operational participation, and professional acceptance of responsibility within the agreed or represented safety framework.

160.    NFE lacks equitable justification to continue relying on that regulatory and operational framework while repudiating or avoiding the tug support, standby tug arrangements, operating parameters, and related safeguards that induced and structured Plaintiffs' participation.

161.    Plaintiffs seek only prospective declaratory and injunctive relief necessary to prevent NFE from continuing to rely on the operational and regulatory framework developed through Plaintiffs' participation while avoiding the safety framework on which that participation depended.

162.    Plaintiffs do not seek restitution, disgorgement, quantum meruit, reimbursement, indemnification, damages, or monetary compensation under this Count.

### COUNT V — 42 U.S.C. § 1983 — JOINT ACTION WITH STATE ACTOR TO SUPPRESS PROTECTED SAFETY COMMUNICATIONS

163.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

164.    Plaintiffs plead this Count against NFE to the extent NFE jointly participated with, conspired with, induced, directed, encouraged, coordinated with, or willfully caused state action by the President of the Puerto Rico Pilotage Commission or other Commission actors.

165.    Plaintiffs engaged in protected speech and protected professional activity when they communicated maritime safety concerns regarding NFE's proposed use of materially inferior tug support for large LNG vessel movements in San Juan Bay.

166.    Plaintiffs' communications addressed matters of public concern, including maritime safety, navigation in federally regulated waters, public safety, pilot professional

34

responsibility, port infrastructure, environmental risk, and the safe movement of large LNG vessels in San Juan Bay.

167.    NFE had a financial and operational motive to suppress, chill, or neutralize Plaintiffs' safety communications because those communications interfered with NFE's effort to reduce costs by replacing or refusing to pay for the tug support and safeguards developed through the parties' technical process.

168.    Upon information and belief, NFE directed, requested, induced, encouraged, coordinated with, or substantially participated in causing the President of the Puerto Rico Pilotage Commission to issue the cease-and-desist order directed at Plaintiffs' safety communications.

169.    The Commission President issued the cease-and-desist order under color of Puerto Rico law and purported to restrict, chill, or control Plaintiffs' communications with maritime stakeholders, vessel interests, fellow pilots, and public agencies regarding safety issues.

170.    NFE was a willful participant in the challenged state action because it requested, encouraged, coordinated, procured, or substantially participated in causing the Commission President's action and benefited from the resulting suppression or chilling of Plaintiffs' speech.

171.    NFE did not merely petition the Commission for neutral technical review or maritime-safety evaluation. Upon information and belief, NFE used or attempted to use the Commission President's official authority as the instrumentality for suppressing Plaintiffs' safety communications and facilitating NFE's private cost-saving objective.

172.    Although the cease-and-desist order was later rescinded, Plaintiffs continue to face a reasonable concern that NFE may seek to suppress, chill, retaliate against, or interfere with Plaintiffs' safety communications in connection with NFE's ongoing large LNG vessel operations and tug-support disputes.

35

173. Plaintiffs seek declaratory relief establishing that NFE may not jointly participate with, induce, direct, coordinate with, or willfully cause state action that suppresses or chills Plaintiffs' protected safety communications.

174. Plaintiffs further seek preliminary and permanent injunctive relief prohibiting NFE from jointly participating with, inducing, directing, coordinating with, or willfully causing state action that suppresses, chills, retaliates against, or interferes with Plaintiffs' protected safety communications concerning maritime safety.

175. If Plaintiffs prevail on this Count, Plaintiffs seek reasonable attorneys' fees, expenses, and costs pursuant to 42 U.S.C. § 1988(b).

176. Plaintiffs do not seek compensatory damages, nominal damages, punitive damages, reimbursement, indemnification, or monetary compensation under this Count.

## COUNT VI — DECLARATORY JUDGMENT AGAINST NFE

177. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

178. An actual controversy exists between Plaintiffs and NFE concerning NFE's obligations to provide, procure, maintain, and pay for the tug support and related navigational safeguards for large LNG vessel movements in San Juan Bay.

179. Plaintiffs contend that NFE has a continuing obligation to provide, procure, maintain, and pay for the escort-rated tug package, standby tug measures, operating parameters, and related safeguards required for safe large-LNG-vessel operations in San Juan Bay.

180. NFE disputes, has refused to comply with, has attempted to evade, or has threatened to evade those obligations.

181.     An actual controversy also exists concerning whether NFE may shift to Plaintiffs the costs, risks, or obligations associated with tug support, standby tug arrangements, operating parameters, or other safeguards that NFE agreed, represented, or induced Plaintiffs to understand NFE would bear.

182.     An actual controversy further exists concerning whether NFE may conduct or cause large LNG vessel movements in San Juan Bay under conditions materially inconsistent with the agreed or relied-upon safety framework without equivalent safeguards validated through a technically reliable process.

183.     A declaration of the parties' rights and obligations will resolve uncertainty and guide future conduct concerning large LNG vessel movements in San Juan Bay.

184.     Plaintiffs request a declaration that NFE is obligated to comply with the parties' agreement, including the obligation to provide, procure, maintain, and pay for the agreed escort-rated tug package, standby tug measures, operating parameters, and related safeguards.

185.     In the alternative, if the Court determines that no enforceable contract exists, Plaintiffs request a declaration that NFE is estopped from repudiating the safety framework on which Plaintiffs reasonably relied and that NFE may not continue to benefit from Plaintiffs' expertise, reliance, and operational participation while avoiding the safeguards that induced that reliance.

186.     Plaintiffs further request a declaration that NFE may not shift to Plaintiffs the costs, risks, or obligations that NFE agreed, represented, or induced Plaintiffs to understand NFE would bear.

187.    Plaintiffs do not seek damages, reimbursement, indemnification, restitution, disgorgement, quantum meruit, reliance damages, extracontractual damages, or monetary compensation under this Count.

**COUNT VII — INJUNCTIVE RELIEF / SPECIFIC PERFORMANCE / ALTERNATIVE EQUITABLE RELIEF AGAINST NFE**

188.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

189.    Monetary damages are inadequate because NFE's threatened or continuing conduct places Plaintiffs' professional independence, professional licenses, operational responsibilities, safety obligations, and public maritime safety at risk in ways that cannot be fully measured or remedied through money damages after the fact.

190.    The balance of hardships favors Plaintiffs because the requested relief requires NFE to comply with the safety framework it agreed to, represented to regulators, and induced Plaintiffs to rely upon, while denial of relief would shift operational, professional, regulatory, safety, and coercive cost-shifting risks onto Plaintiffs and the public.

191.    The public interest favors enforcement of the agreed or relied-upon safety framework because San Juan Bay is Puerto Rico's principal maritime gateway and large LNG vessel operations present extraordinary risks to maritime safety, port infrastructure, human life, property, the environment, and the Puerto Rico economy.

192.    Plaintiffs request preliminary and permanent injunctive relief requiring NFE to provide, procure, maintain, and pay for the agreed tug package, standby tug measures, operating parameters, and related safeguards, or an equivalent arrangement demonstrated through a technically reliable process to meet or exceed the agreed safety and maneuverability standards.

193.    In the alternative, if the Court determines that no enforceable contract exists, Plaintiffs request equitable relief necessary to prevent NFE from benefiting from Plaintiffs' reliance, expertise, and operational participation while repudiating the safeguards that induced such reliance.

194.    Plaintiffs request that NFE be enjoined from conducting or causing large LNG vessel movements in San Juan Bay under conditions materially inconsistent with the agreed or relied-upon safety framework unless NFE provides equivalent safeguards validated through a technically reliable process.

195.    Plaintiffs further request that NFE be enjoined from shifting to Plaintiffs the costs, risks, or obligations associated with tug support, standby tug arrangements, operating parameters, or other safeguards that NFE agreed, represented, or induced Plaintiffs to understand NFE would bear.

196.    Plaintiffs do not seek damages, reimbursement, indemnification, restitution, disgorgement, quantum meruit, reliance damages, extracontractual damages, or monetary compensation under this Count.

## JURY TRIAL DEMAND

197.    Plaintiffs demand a trial by jury on all issues so triable. Plaintiffs recognize that their principal requested relief is declaratory and equitable, and this demand is preserved only to the extent any issue is triable by jury as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against NFE and grant the following non-monetary relief:

1. Declare that NFE is obligated to comply with the parties' maritime agreement and/or, in the alternative, the parties' agreement enforceable under the Puerto Rico Civil Code;

2. Declare that NFE is obligated to provide, procure, maintain, and pay for the tug support and related safeguards required for large LNG vessel movements in San Juan Bay, including the agreed escort-rated tug package, standby tug measures, operating parameters, and related safeguards;

3. In the alternative, declare that NFE is estopped from repudiating the safety framework on which Plaintiffs reasonably relied, and that NFE may not continue to benefit from Plaintiffs' expertise, reliance, and operational participation while avoiding the safeguards that induced such reliance;

4. Declare that NFE may not shift to Plaintiffs the costs, risks, or obligations that NFE agreed, represented, or induced Plaintiffs to understand NFE would bear, including costs, risks, or obligations associated with tug support, standby tug arrangements, operating parameters, or other safeguards required by the large LNG vessel operational framework;

5. Grant preliminary and permanent injunctive relief requiring NFE to comply with the agreed or relied-upon safety framework, including the obligation to provide, procure, maintain, and pay for the agreed tug package, standby tug measures, operating parameters, and related safeguards, or an equivalent arrangement demonstrated through a technically reliable process to meet or exceed the agreed safety and maneuverability standards;

6. Enjoin NFE from conducting or causing large LNG vessel movements in San Juan Bay under conditions materially inconsistent with the agreed or relied-upon safety

framework unless NFE provides equivalent safeguards validated through a technically reliable process;

7. Enjoin NFE from shifting to Plaintiffs the costs, risks, or obligations associated with tug support, standby tug arrangements, operating parameters, or other safeguards that NFE agreed, represented, or induced Plaintiffs to understand NFE would bear;

8. To the extent Plaintiffs prevail on their 42 U.S.C. § 1983 claim, declare that NFE may not jointly participate with, induce, direct, coordinate with, or willfully cause state action that suppresses, chills, retaliates against, or interferes with Plaintiffs' protected safety communications concerning maritime safety;

9. To the extent Plaintiffs prevail on their 42 U.S.C. § 1983 claim, enjoin NFE from jointly participating with, inducing, directing, coordinating with, or willfully causing state action that suppresses, chills, retaliates against, or interferes with Plaintiffs' protected safety communications concerning maritime safety;

10. Award Plaintiffs taxable costs and reasonable attorneys' fees only to the extent authorized by applicable statute, rule, contract, maritime bad-faith doctrine, or the Court's inherent authority, including 42 U.S.C. § 1988(b) to the extent Plaintiffs prevail on their claim under 42 U.S.C. § 1983, Puerto Rico Rule of Civil Procedure 44.1(d) to the extent applicable, any contractual fee provision proven in this action, and the Court's inherent authority in the event the Court finds that NFE acted in bad faith, vexatiously, wantonly, obstinately, or for oppressive reasons;

11. Grant Plaintiffs any other declaratory, injunctive, or equitable non-monetary relief to which they are entitled in law or equity.

41

Plaintiffs expressly disclaim compensatory damages, lost profits, lost pilotage revenues, indemnification, reimbursement, restitution, disgorgement, quantum meruit, reliance damages, extracontractual damages, nominal damages, punitive damages, and any monetary recovery for past injury.

In San Juan, Puerto Rico, this 6th day of July, 2026.

I HEREBY CERTIFY that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notice of its filing electronically to the attorneys of record.

Respectfully submitted,

**S/ FRANCISCO E. COLÓN-RAMÍREZ**
FRANCISCO E. COLÓN-RAMÍREZ, ESQ.
USDC-PR No.: 210510
E-mail: fecolon@colonramirez.com
**COLÓN RAMÍREZ LLC**
PO Box 361920
San Juan, PR 00936-1920
Tel.: (787) 425-4652
Fax: (787) 425-4731

**S/GIANCARLO FONT GARCÍA**
GIANCARLO FONT GARCÍA
USDC-PR No.: 210612
gfont@drcprlaw.com
Urb. Baldrich
306 Calle Coll y Toste
San Juan, PR 00918
Tel.: (787) 622-6999
(787) 647-1876

**S/ MIGUEL A. NAZARIO, JR.**
MIGUEL A. NAZARIO,JR.
USDC PR No.: 214502
e-mail: man@nblawpr.com
**NAZARIO BRICEÑO LAW OFFICES, LLC**
Cervantes 82,
San Juan, PR 00907
Tel.: (787) 449-2717

42

**S/ LUIS MANUEL PAVÍA-VIDAL**
LUIS MANUEL PAVÍA-VIDAL
USDC-PR No.: 227205
pavialaw@gmail.com
Urb. Baldrich
306 Calle Coll y Toste
San Juan, PR 00918
Tel.: (787) 622-6999