THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CAPT. TOMÁS BUSTO ÁLVAREZ et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NFENERGIA LLC<br><br>Defendant. | CIVIL NO.: 25-1462 (SCC)<br><br>JURY TRIAL DEMANDED |

**OPPOSITION TO NFE'S MOTION TO DISMISS THIRD AMENDED COMPLAINT**

TO THE HONORABLE COURT:

COME NOW, Plaintiffs, by and through the undersigned attorneys, respectfully oppose NFEnergia LLC's ("NFE") Motion to Dismiss the Third Amended Complaint at Docket No. 326:

## I. INTRODUCTION

NFE's motion does not expose a defective pleading; it exposes NFE's unwillingness to accept the pleading standard that governs at this stage. The Third Amended Complaint ("TAC") does not merely assert that an agreement existed. It alleges very specifically what NFE agreed to, how the agreement was developed, what each side undertook, how NFE performed it, how the parties repeatedly operated under it, and how NFE later repudiated it. See Docket No. 313, ¶ 49(a)–(i), ¶¶ 50–54. The TAC alleges an agreed-to safety framework for NFE's large LNG-vessel operations with nine specific items, including four escort-rated tugs with minimum bollard pull of 80 metric tons to be procured and paid for by NFE; two pilots; speed, wind, and operational restrictions; standby-tug arrangements; and related navigational safeguards. *Id.,* ¶ 49(a)-(i). It alleges that NFE commissioned and paid for the simulations that established those requirements, procured four conforming ECO tugs, represented the framework to regulators and maritime stakeholders, and completed at least eighteen vessel movements under it. See Docket No. 313, ¶¶

43–48, 56–69. NFE responds by pretending these allegations do not exist, repeatedly asserting that the TAC does not allege "who agreed to what," does not identify the agreement's terms, and contains no facts supporting mutual assent or consideration. See Docket No. 326, p. 16, l. 19 ("who agreed to what"); p. 17, l. 1-2 (asserting that the TAC fails to allege "even the terms of the agreement"); p. 17, l. 13-14, (alleging complaint is "devoid of factual allegations" supporting mutual assent). These alleged deficiencies do not stand up to the very specific allegations as to what NFE agreed to.

NFE's jurisdictional arguments fare no better. NFE devotes an entire section to showing that the Ports and Waterways Safety Act ("PWSA") does not create a private right of action. Plaintiffs did not plead a PWSA cause of action. Count I pleads a maritime contract concerning pilotage, tug assistance, docking, undocking, navigation, standby-tug coordination, and vessel movements on navigable waters. The TAC expressly invokes admiralty jurisdiction under 28 U.S.C. § 1333 and designates the claim under Rule 9(h). See Docket No. 313, ¶ 5. NFE never meaningfully addresses that independent jurisdictional basis. The TAC also expressly invokes diversity jurisdiction. See Docket No. 313, ¶ 7. NFE's diversity argument is limited to insisting that it is legally certain that less than $75,000 is at stake, at the same time it calls the disputed obligation a "multi-million-dollar-per-year tug package." See Docket No. 326, p. 27, l. 19. NFE cannot have it both ways.

The motion likewise confuses standing with the merits. NFE may deny that it made or breached the alleged agreement. But a defendant cannot manufacture an Article III defect merely by disputing the contractual right whose breach supplies the injury. NFE's own authority recognizes that, for Article III purposes, a plaintiff who generally alleges the existence and breach of a contract ordinarily alleges an injury to the asserted contractual rights. See *Katz v. Pershing,*

LLC, 672 F.3d 64, 71–72 (1st Cir. 2012) cited by NFE at Docket No. 326, p. 5, l. 15. NFE's disagreement with the existence or scope of the alleged agreement therefore does not, by itself, establish the absence of Article III injury.

This pattern is not isolated, and it is not incidental. As shown throughout this Opposition, NFE's motion attacks a claim Plaintiffs did not plead (Section IV), advances an amount-in-controversy argument that its own motion later contradicts (Section VII), misattributes its own cited authority (Section VIII.C), and repeatedly tells the Court that allegations are absent from a complaint that contains them. That recurring pattern warrants close comparison of NFE's characterizations against the TAC and the authorities NFE cites.

For the reasons more fully developed below, NFE's motion should be denied. At minimum, dismissal with prejudice would be indefensible. Any jurisdictional dismissal must be without prejudice. And to the extent the Court identifies any curable pleading deficiency—notwithstanding Plaintiffs' position that the TAC adequately pleads each claim—such deficiency should be addressed through leave to amend rather than the case-ending sanction NFE requests.

## II. RELEVANT ALLEGATIONS

NFE approached the San Juan Bay Pilots in May 2023 about expanding its LNG operation to include substantially larger vessels. See Docket No. 313, ¶¶ 31-33. NFE did not ask Plaintiffs merely to perform an ordinary compulsory-pilotage assignment. It engaged them in an extended technical and operational process to determine whether—and under what conditions—those vessels could be safely moved through San Juan Bay.

NFE commissioned and funded extensive simulations involving the pilots and tug captains. More than one hundred simulation runs reproduced the proposed vessels, tug configurations, and San Juan Bay conditions. See Docket No. 313, ¶¶ 43–48. The simulations demonstrated that 60-

ton bollard-pull tugs were inadequate and that 80-ton bollard-pull tugs were acceptable, with an additional safety margin recommended. *Id.,* ¶ 48.

The parties' technical process produced a specific operational framework that the parties agreed to. Specifically, the TAC alleges that NFE and Plaintiffs agreed, among other things, that:

- large LNG vessels would use four escort-rated tugs with minimum bollard pull of 80 metric tons;
- NFE would procure, provide, and pay for those tugs;
- two pilots would be aboard the LNG vessel;
- identified speed, wind, and operating restrictions would govern the movements;
- standby-tug measures would protect other port users and operations; and
- agreed navigation aids and related safeguards would be implemented.

See Docket No. 313, ¶ 49(a)–(i), ¶¶ 50–53, 118–129.

NFE then did exactly what the agreement required: it procured four ECO escort-rated tugs meeting the agreed specifications. *Id.,* ¶ 61. Beginning in March 2025, NFE and Plaintiffs used those tugs and the agreed maneuver to conduct at least eighteen large LNG-vessel movements. *Id.,* ¶¶ 62–63. On several occasions, including severe-wind and emergency events, the power and capabilities of the agreed tugs were necessary to complete the movements safely. *Id.,* ¶¶ 64–69. The TAC further alleges that NFE incorporated the agreed operational framework in its representations to regulators and maritime stakeholders and obtained the operational and regulatory benefits of Plaintiffs' work and acceptance. See Docket No. 313, ¶¶ 59–60, 145–162. The Coast Guard's later Letter of Recommendation was issued based on NFE's representations and its understanding of NFE's commitments with the pilots. *Id.,* ¶ 56.

NFE later sought to abandon its agreement with plaintiffs for financial reasons. Specifically, the TAC alleges that NFE withdrew the four ECO tugs, sought to substitute materially inferior support without equivalent technical validation, stopped paying for standby tugs, and attempted to shift associated costs and risks to Plaintiffs. See Docket No. 313, ¶¶ 74–108. It alleges that NFE's decision was driven principally by cost savings and financial pressure. *Id.,* ¶ 73 (citing Genera PR who made this statement at Docket No. 85, p. 5, lines 1-3). When Plaintiffs raised safety concerns, NFE allegedly invoked the Puerto Rico Pilotage Commission's authority to silence them. *Id.,* ¶¶ 77-100. The TAC alleges that NFE, through Carlos Faris, requested Commission intervention and that within approximately two hours the Commission president issued a cease-and-desist order directed at the pilots' safety communications. *Id.,* ¶¶ 83–100. It further alleges that NFE directed, induced, encouraged, coordinated with, or substantially participated in procuring that state action for the purpose of suppressing opposition to its lower-cost tug configuration. *Id.,* ¶¶ 163-176.

The allegations recited above are the allegations the Court must accept as true. NFE's motion instead asks the Court to adopt NFE's competing account: that the simulations, procurement, regulatory submissions, and eighteen completed maneuvers reflected only "a series of facts that are routine in the operation of an LNG facility." See docket 326, p. 1, last line, to p. 2, first line. That is a merits defense, not a basis for dismissal under Rule 12(b)(6).

## III. GOVERNING STANDARD

A Rule 12(b)(6) motion tests whether the complaint states a plausible claim, not whether Plaintiffs have already proved it. The Court must accept well-pleaded facts as true, draw every reasonable inference in Plaintiffs' favor, and read the allegations as a whole. *Ocasio-Hernández v. Fortuño-Burset,* 640 F.3d 1, 13 (1st Cir. 2011). A plausible but inconclusive inference survives

dismissal; the Court may not choose the defendant's competing interpretation, and may not "attempt to forecast a plaintiff's likelihood of success on the merits." *Id.*

The First Circuit has repeatedly cautioned against applying plausibility "too mechanically" or importing proof-stage burdens into Rule 12(b)(6). *García-Catalán v. United States,* 734 F.3d 100, 103 (1st Cir. 2013). A complaint need not contain a high degree of factual specificity, and circumstantial facts may supply the reasonable inference of liability. *Id.,* citing *Grajales v. P.R. Ports Auth.,* 682 F.3d 40, 44 and 47 (1st Cir.2012). Summary judgment and trial turn on evidence; a motion to dismiss turns on the sufficiency of the allegations. Id. at 103–04; see also Rodríguez–Reyes v. Molina–Rodríguez, 711 F.3d 49, 53–54 (1st Cir. 2013).

For a facial Rule 12(b)(1) challenge, the same essential approach applies: the Court credits the well-pleaded jurisdictional facts and draws reasonable inferences for Plaintiffs. Where a jurisdictional issue is intertwined with the merits—such as NFE's insistence that no contractual right exists—the Court should not resolve disputed merits facts under the guise of jurisdiction. NFE's motion repeatedly violates these rules. It disregards detailed allegations, demands identification of evidence and witnesses, draws inferences against Plaintiffs, and treats NFE's denial of agreement as proof that no agreement was pleaded. The Court should reject that approach at the threshold.

## IV. THE COURT HAS ADMIRALTY JURISDICTION UNDER 28 U.S.C. § 1333

### *A. NFE's motion conspicuously fails to address the jurisdiction Plaintiffs actually invoke for Count I.*

The TAC expressly invokes this Court's admiralty jurisdiction under 28 U.S.C. § 1333 and designates its maritime claim under Rule 9(h). See Docket No. 313, ¶ 5. Count I alleges an express or implied-in-fact maritime contract governing pilotage, navigational judgment, docking,

undocking, shifting, standby-tug coordination, tug assistance, and vessel movements on navigable waters. *Id.,* ¶¶ 114, 118–129.

Whether a contract is maritime turns on its "nature and character" and whether its principal objective concerns maritime service or commerce—not on the place of formation or on whether every obligation is performed aboard a vessel. *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23–24 (2004); *Kossick v. United Fruit Co.*, 365 U.S. 731, 735–38 (1961). The agreement pled in this case governs pilotage, tug-assisted navigation, docking, undocking, vessel speed, wind limits, standby-tug support, and the movement of LNG carriers through San Juan Bay. Its principal objective could scarcely be more maritime.

Consistent with those principles, the First Circuit has exercised § 1333 jurisdiction over a San Juan Harbor dispute involving pilotage, tug assistance, and docking operations. *Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1 (1st Cir. 1990). NFE does not explain why an agreement whose principal objective is the tug-assisted navigation and movement of ocean-going LNG vessels through San Juan Bay would fall outside admiralty.

Instead, NFE declares that the Court lacks "federal question jurisdiction" because the PWSA and 33 C.F.R. §§ 127.007 and 127.009 do not create a private right of action. See Docket No. 326, pp. 14–16. That argument answers a claim Plaintiffs did not bring. The TAC does not plead a PWSA count, seek judicial review of the Coast Guard's LOR, or ask Plaintiffs to enforce Coast Guard regulations as private attorneys general. It cites the WSA/LOR process because NFE's representations to regulators are factual manifestations of the parties' agreement, NFE's acceptance of the framework, and the benefits NFE obtained from Plaintiffs' performance.

NFE's private-right-of-action authorities therefore do not defeat jurisdiction over Count I. Whether the PWSA independently authorizes a private enforcement suit has nothing to do with

whether 28 U.S.C. § 1333 and Rule 9(h) supply admiralty jurisdiction over a maritime contract. NFE's failure even to confront that distinction is fatal to its request to dismiss the entire TAC for want of subject-matter jurisdiction.

***B. The viability of the maritime claim is not a jurisdictional question merely because NFE disputes contract formation.***

NFE's position also rests on a second error: it treats its merits defense, that "the contract does not exist," as a jurisdictional defect. See Docket No. 326, p. 1, last sentence. But federal courts do not lose statutory jurisdiction whenever a defendant denies an element of a federal or maritime claim. Unless a claim is wholly insubstantial or frivolous, jurisdiction exists to decide whether the claim succeeds.

Count I is neither insubstantial nor frivolous. It alleges detailed terms, reciprocal undertakings, conduct manifesting agreement, substantial performance, regulatory reliance, and breach. The Court must accept these well-pled facts as true for purposes of NFE's motion to dismiss. NFE may contest those allegations after discovery; however, NFE cannot erase § 1333 by announcing that it disagrees with them.

***C. Even if an alternative jurisdictional theory failed, the entire action would not disappear.***

NFE argues as though Plaintiffs must establish admiralty jurisdiction, diversity jurisdiction, and federal-question jurisdiction simultaneously. They do not. Each is an independent basis for original jurisdiction, and NFE's motion never confronts that basic proposition. Admiralty jurisdiction under 28 U.S.C. § 1333 supports Count I regardless of the diversity dispute. Count V arises under 42 U.S.C. § 1983 and independently supports federal-question jurisdiction under 28 U.S.C. § 1331. The TAC expressly invokes supplemental jurisdiction over the remaining Puerto Rico-law counts under 28 U.S.C. § 1367(a). See Docket No. 313, ¶ 115. Counts II, III, IV, VI, and VII arise from the same nucleus of operative fact as Count I and Count V: NFE's withdrawal of

the agreed tug package and its treatment of Plaintiffs' safety communications. A district court's supplemental jurisdiction attaches to those related claims once any single claim provides an independent jurisdictional basis; Plaintiffs need not separately establish diversity over every count. See 28 U.S.C. § 1367(a). Thus, even if the Court found the diversity allegations insufficiently supported—which, as shown in Section VII below, it should not—that finding would not justify dismissal of the entire action; at most it would eliminate one of several independent and overlapping jurisdictional bases.

## V. PLAINTIFFS HAVE ARTICLE III STANDING

### *A. NFE improperly converts a merits dispute into a standing objection.*

NFE insists that Plaintiffs lack standing because, in its view, no enforceable agreement exists and no Plaintiff has yet suffered a casualty. But this argument misidentifies the alleged injury.

Plaintiffs allege NFE breached its contractual obligations and invaded Plaintiffs' professional rights by repudiating the agreed-upon operational framework, withdrawing the agreed support, refusing to fund standby measures, attempting to shift costs, and pressuring Plaintiffs to conduct large LNG-vessel movements outside the conditions agreed upon by Plaintiffs and NFE. These alleged contractual and professional injuries are concrete and particularized. Plaintiffs need not wait for a collision, grounding, loss of license, or catastrophic LNG casualty before asking a court to determine the parties' present rights.

NFE's own cited authority undermines its standing argument. *Katz* recognizes that an invasion of a common-law right, including a contractual right, can constitute an Article III injury. More specifically, *Katz* explains that when a plaintiff generally alleges the existence of an express or implied contract and a concomitant breach, "her pleading adequately shows an injury to her

rights." *Katz v. Pershing, LLC*, 672 F.3d 64, 71–72 (1st Cir. 2012). The court then separately tested whether the complaint stated an actionable contract claim. *Id.* at 72–74. Thus, NFE's disagreement with the existence or scope of the alleged agreement does not, by itself, establish the absence of Article III injury. NFE cites *Katz* for its discussion of speculative data-breach injuries while ignoring the portion directly addressing alleged contractual injury.

The TAC alleges that NFE breached or threatened to breach by withdrawing, refusing to provide or pay for, and attempting to substitute materially inferior tug support and safeguards. See Docket No. 313, ¶ 124. Taking that allegation as true, Plaintiffs have alleged a present invasion of legal rights traceable to NFE and redressable through declaratory and equitable relief.

***B. NFE falsely reduces the alleged injuries to fear of a hypothetical future emergency.***

NFE emphasizes that prior movements using the ECO tugs were safely completed and argues that Plaintiffs fear only that some future emergency might expose inadequate tug support. See Docket No. 326, pp. 5–7. That is a straw man.

The successful movements demonstrate performance under the agreement and the practical importance of the agreed equipment. They are not the injury. The injuries alleged include NFE's completed withdrawal of the ECO tugs, repudiation of its procurement and payment obligations, attempted substitution of materially inferior support, refusal to pay for standby tugs, cost-shifting pressure, and interference with Plaintiffs' independent professional judgment. TAC ¶¶ 74–108. The TAC alleges that NFE has already changed its position and already placed Plaintiffs in the untenable position of either accepting disputed operating conditions or refusing movements while facing commercial and regulatory pressure.

A party to an ongoing operational agreement need not await physical disaster before seeking declaratory relief concerning a present repudiation. NFE's argument would perversely

make the absence of a casualty—achieved through the safeguards Plaintiffs seek to preserve—a reason to deny judicial review.

### *C. The alleged cost-shifting pressure is present, not imaginary.*

The TAC alleges that NFE encouraged members of the Puerto Rico Shippers' Association to submit letters of protest asserting a right to recover standby-tug costs from Plaintiffs. [1] TAC ¶¶ 104–106. See Docket No. 313, ¶¶ 105-106. Receipt of demands asserting that Plaintiffs bear costs that NFE allegedly agreed to bear is current coercive pressure and a present dispute over allocation of responsibility. Plaintiffs seek a declaration of their rights against NFE; they do not ask this Court to adjudicate a hypothetical judgment in a future suit by an absent shipper.

NFE also argues that a declaration against it would not bind the shippers. This misses the point. Plaintiffs allege that NFE created or directed the cost-shifting campaign and that the underlying dispute concerns whether NFE may repudiate its own obligation and transfer the burden to Plaintiffs. See Docket No. 313, ¶¶ 105-106. A declaration fixing NFE's obligations would materially redress that injury even with the shippers absent.

### *D. SJBPC has adequately alleged an interest in the controversy.*

NFE asserts that SJBPC is merely an association with no distinct injury and faults the TAC for failing to recite the *Hunt* factors by name. See Docket No. 326, p. 8, § II. Rule 8 requires facts, not talismanic citation to a standing doctrine. Under the applicable standard, the threshold inquiry is whether the TAC alleges facts that meet the standing doctrine. The TAC meets this threshold; it specifically alleges that SJBPC is the corporation associating the licensed harbor pilots authorized to provide compulsory pilotage in San Juan; that it participated in the technical,

[1] The continuing nature of the cost dispute is further reflected in Civil No. 26-1360, in which SJBP has filed a third-party complaint against NFE seeking to hold NFE financially responsible for the standby-tug costs.

operational, and regulatory framework at issue; and that the requested prospective relief concerns the conditions under which its members perform those services. See Docket No. 313, ¶¶ 1, 34–73, 109–116. The interests at stake—safe pilotage, professional independence, and conditions governing members' performance—are plainly germane to SJBPC's purpose. The requested declaratory and injunctive relief does not require individualized damages determinations because Plaintiffs expressly disclaim damages.

At least one individual pilot has standing to seek the uniform declaratory and injunctive relief requested concerning the operational framework. That is sufficient for the Court to adjudicate that shared relief regardless of whether SJBPC independently establishes standing for precisely the same relief. See *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (for each form of relief requested, at least one litigant must possess standing). Separately, the TAC plausibly alleges the substance of associational standing: the individual pilot-members would have standing in their own right; the safety, pilotage, and professional-independence interests at stake are germane to SJBPC's organizational purpose; and the requested uniform declaratory and injunctive relief does not require individualized damages determinations. See *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). Rule 8 requires factual allegations supporting standing, not an express invocation of *Hunt* by name or a formulaic recital of its elements.

## VI. THE CONTROVERSY IS RIPE

NFE's ripeness argument again depends on rewriting the TAC as a request for advice about hypothetical future transits. It is not. The controversy has already matured: the parties developed and performed under an identified operational framework; NFE procured the specified tugs; NFE later withdrew them, stopped paying for standby support, proposed materially different equipment

and operating conditions, and denied or evaded the continuing obligations Plaintiffs allege. See Docket No. 313, ¶¶ 61–108, 177–188.

Count VI alleges an actual controversy concerning whether NFE must provide, procure, maintain, and pay for tug support and related safeguards; whether NFE may shift those costs and risks to Plaintiffs; and whether NFE may conduct future movements materially inconsistently with the framework while continuing to obtain its benefits. See Docket No. 313, ¶¶ 178–186. Those are adverse legal positions concerning an ongoing operation and an alleged present repudiation. A declaration would conclusively settle legal relations and guide the parties before the next movement—not opine on an imaginary arrangement.

NFE's reliance on *Hight v. U.S. Department of Homeland Security,* 135 F.4th 996 (D.C. Cir. 2025), is misplaced. Hight involved a pilot who was not eligible to join an association, might never become eligible, might never receive registration, and might not be admitted even if registered. The claimed membership injury depended on each of those contingencies. Here, there is no comparable chain. NFE's large LNG-vessel operation exists. The framework was used repeatedly. NFE withdrew the agreed tugs and allegedly repudiated its obligations. The parties' disagreement is concrete and operational, not abstract.

NFE also relies on Plaintiffs' statement that their request for a preliminary injunction became moot. See Docket No. 326, p. 6, last paragraph. Mootness of emergency preliminary relief under interim circumstances does not establish that the underlying claims for permanent declaratory and injunctive relief have become moot. Nor does the temporary cessation of the circumstances giving rise to emergency relief eliminate the controversy where the challenged conduct may recur and the parties continue to dispute their respective contractual obligations. Preliminary and permanent relief serve different functions, require different showings, and operate

on different records. NFE cites no authority holding that a party who no longer requires emergency interim relief forfeits its right to obtain a final adjudication of an ongoing contractual controversy.

## VII. THE TAC SUFFICIENTLY PLEADS THE JURISDICTIONAL AMOUNT, AND NFE CANNOT ESTABLISH THE LEGAL CERTAINTY REQUIRED FOR DISMISSAL

NFE's amount-in-controversy argument cannot support dismissal of Count I because § 1333 contains no $75,000 threshold. Nor can it eliminate Count V or supplemental jurisdiction over the remaining counts if Count I or Count V survives, for the reasons explained in Section IV.C above. The Court therefore need not resolve diversity at all to reject NFE's request for wholesale dismissal.

But NFE's diversity argument also fails on its own terms. Although NFE invokes the legal-certainty test, it does not come close to satisfying it. NFE's conclusion rests on the false premise that the TAC alleges no value for the disputed obligation, ignores the TAC's express allegations that the tug package costs several million dollars per year, and is contradicted by NFE's own later characterization of the same obligation as a "multi-million-dollar-per-year tug package." The governing question is whether it is legally certain that less than $75,000 is at stake. On this pleading—and on NFE's own description of the controversy—the answer is plainly no.

### *A. The governing standard is legal certainty, not pleading precision.*

Since 1938, the rule has been that "[t]he rule governing dismissal for want of jurisdiction ... is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." St. *Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288-89 (1938), quoted in *Rosario Ortega v. Star-Kist Foods, Inc.,* 370 F.3d 124, 127 (1st Cir. 2004). The First Circuit applies that standard "without deviation," as NFE's own motion concedes. See Docket No. 326, p. 11 (citing *Spielman v. Genzyme Corp.,* 251 F.3d 1, 5 (1st

Cir. 2001)). And once the standard is invoked, it cuts against the defendant, not the plaintiff: "[o]nce a defendant questions jurisdiction by challenging the amount of damages alleged in the complaint, the burden shifts to the plaintiff to show that it is not a legal certainty that the claims do not involve the requisite amount." *Star-Kist,* 370 F.3d at 127-28 (citing *Spielman*, 251 F.3d at 4). The double negative is deliberate and outcome-determinative: Plaintiffs need only show it is not a legal certainty the TAC's claims fall short of $75,000 — a considerably lighter burden than the one NFE's motion assumes.

*Star-Kist* illustrates how demanding the legal-certainty standard is. There, the First Circuit reversed the dismissal of an injured plaintiff's claim even on a developed record containing depositions, medical records, and expert evidence because it was not legally certain that the plaintiff could not recover more than $75,000. *Star-Kist*, 370 F.3d at 127–30. The jurisdictional inquiry does not demand mathematical precision; it asks whether the asserted recovery is legally foreclosed. Here, nothing in the TAC—or in NFE's own characterization of the disputed obligation—remotely establishes that its value is legally certain to fall below $75,000.

***B. Even assuming NFE's motion shifts the burden, the TAC and NFE's own valuation foreclose dismissal.***

NFE purports to challenge the jurisdictional amount and thereby invokes Plaintiffs' obligation to show that it is not legally certain that less than $75,000 is at stake. Plaintiffs readily satisfy that burden from the face of the TAC. Paragraph 70 alleges that NFE's cost of providing the four required escort-rated tugs is "several million dollars per year." Paragraph 76 repeats that NFE's refusal to provide and pay for those tugs concerns "a cost of several million dollars per year at least." NFE does not address either allegation. More fundamentally, NFE independently describes the same disputed obligation as a "multi-million-dollar-per-year tug package." Docket No. 326, p. 27. Thus, even assuming NFE has adequately placed the amount in controversy at

issue, both the TAC and NFE's own characterization establish that it is not legally certain that less than $75,000 is at stake.

***C. NFE's authorities do not rescue its argument.***

NFE's reliance on *Andersen v. Vagaro, Inc.*, 57 F.4th 11 (1st Cir. 2023), is misplaced. *Andersen* involved a plaintiff who demanded more than $7 million in damages but, after the defendant challenged jurisdiction, provided no monetary valuation for readily quantifiable lost services, memberships, clients, profits, or business value. *Id.* at 15–17. Here, the TAC does exactly what the complaint in *Andersen* failed to do: it identifies the object of the requested equitable relief and alleges its value in the millions of dollars per year. See Docket No. 313, ¶¶ 70, 76. NFE then independently confirms that valuation by describing the same obligation as a "multi-million-dollar-per-year tug package." See Docket No. 326 at 27. *Andersen* does not require mathematical precision in the complaint, much less permit a defendant to contradict its own valuation to manufacture legal certainty that the jurisdictional threshold is unmet.

NFE also invokes the rule against aggregating separate and distinct claims without analyzing the nature of the right Plaintiffs seek to enforce. Plaintiffs seek enforcement of one operational framework governing the same LNG-vessel movements and the same four-tug package—not separate, unrelated damages awards. Whether the asserted right is common and undivided cannot be resolved by simply dividing the package's value by the number of Plaintiffs. In any event, NFE's own characterization of the recurring obligation as worth multiple millions of dollars per year forecloses its contention that it is legally certain that the jurisdictional threshold is unmet.

Plaintiffs need not submit present valuation evidence to cure a defect that does not exist. The TAC expressly alleges both the nature and multimillion-dollar value of the disputed

obligation, and NFE's own motion confirms that valuation. If greater precision ever becomes material, that is a matter for a later factual record. At this stage, the TAC comfortably satisfies the jurisdictional pleading standard, and NFE comes nowhere close to establishing the legal certainty required for dismissal.

## VIII. COUNTS I AND II PLAUSIBLY ALLEGE AN ENFORCEABLE AGREEMENT

### *A. NFE's assertion that the TAC does not identify the agreed terms is demonstrably false.*

NFE tells the Court that the TAC "nowhere" alleges what the terms of the agreement are. See Docket No. 326, p. 16, Section V, line 2. This assertion cannot be reconciled with the pleading. The TAC identifies the agreed number of tugs, tug rating, minimum bollard pull, responsibility for procurement and payment, number of pilots, operating speeds, wind restrictions, standby arrangements, navigation aids, and related safeguards. See Docket No. 313, ¶¶ 45–60, 118–129. It further alleges the conditions under which Plaintiffs would provide pilotage and other vessel-movement services and the obligations NFE assumed in return. Count I itself repeats those terms. *Id.*, ¶¶ 118–125.

NFE may dispute that those requirements became contractual terms. It may contend they were only recommendations, regulatory commitments, or temporary operating choices. But NFE cannot truthfully say the TAC fails to identify them. The difference between "no terms were pleaded" and "NFE disputes that the pleaded terms were contractually binding" is the difference between Rule 12(b)(6) and summary judgment.

### *B. The TAC plausibly alleges mutual assent through express agreement, conduct, and performance.*

The TAC expressly alleges that NFE and the pilots "came to an agreement" and then identifies the agreement's detailed terms. See Docket No. 313, ¶¶ 49–54. That allegation is reinforced—not left unsupported—by objective conduct: NFE initiated the expanded-operation

process, *Id.,* ¶¶ 31–33; NFE engaged the pilots as experts and commissioned and paid for extensive simulations, *Id.,* ¶¶ 43–48; NFE engaged Plaintiffs in and participated in the technical and simulation process that produced the operational framework, *Id.,* ¶¶ 43–53; NFE agreed to procure and provide the specified tugs at its expense, *Id.,* ¶ 49(b), (i); NFE chartered four conforming ECO tugs, *Id.,* ¶¶ 61–62; and NFE completed at least eighteen movements using the agreed equipment and maneuver, *Id.,* ¶¶ 62–69. The TAC further alleges that NFE represented the framework to regulators and accepted its regulatory and operational benefits. *Id.,* ¶¶ 56–60, 123, 145–51, 157–60. Count I accordingly pleads an express maritime contract or, alternatively, an implied-in-fact maritime contract manifested through the parties' course of dealing, procurement, representations, and performance. *Id.,* ¶¶ 118–24. It alleges precisely the objective manifestations NFE's own cases say are relevant.

NFE's demand that the TAC identify the particular individual who spoke for NFE, the exact date and place of assent, and that person's corporate authority finds no support in the authorities it cites. Rule 8 does not require a plaintiff suing an entity to identify the employee who manifested the entity's assent where the complaint alleges that the entity agreed and pleads facts making that allegation plausible. Ocasio-Hernández rejected dismissal based on demands for the identities, dates, and specific conversations necessary to prove a claim, emphasizing that factual allegations must be read cumulatively and need only provide fair notice and a plausible inference. *Ocasio-Hernández,* 640 F.3d at 14-15.

NFE's approach is particularly improper because the details of its internal authority structure and decision-making are predominantly within NFE's control. García-Catalán recognizes that some latitude is appropriate where discovery may supply information controlled by the

defendant and squarely warns against importing summary-judgment evidentiary burdens at the pleading stage. *García-Catalán,* 734 F.3d at 104.

Whether Plaintiffs can prove that an authorized NFE representative manifested assent—or that NFE ratified or adopted the agreement through procurement, payment, performance, representations, and acceptance of benefits—is a merits issue. NFE asks the Court to answer that evidentiary question now and in NFE's favor. Rule 12(b)(6) does not permit it.

### *C. Twombly does not impose the corporate-speaker pleading rule NFE invents.*

NFE invokes *Twombly* and Iqbal as though those cases require a complaint to plead the name and authority of every corporate participant in an agreement. They do not.

*Twombly* involved an alleged clandestine antitrust conspiracy among several independent competitors. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007). The complaint alleged parallel conduct that was equally consistent with lawful independent business decisions and gave no meaningful notice about which defendants supposedly conspired with which others. *Id.* Here, the TAC identifies one contracting defendant, a bilateral operational undertaking, detailed terms, an extended joint technical process, conforming procurement, regulatory representations, and repeated performance. The factual allegations make an agreement plausible; they do not merely assert parallel conduct and affix the word "contract."

NFE even misattributes *Twombly*'s "labels and conclusions" language to "*Iqbal*, 550 U.S. at 55." See Docket No. 326, p. 18. *Iqbal* is reported at 556 U.S. 662; 550 U.S. 544 is *Twombly*. The citation error is not independently dispositive, but it is another instance in which NFE asks the Court to accept its account without checking the cited source.

***D. The TAC alleges consideration and reciprocal obligations.***

NFE's assertion that the TAC alleges no consideration is equally untenable. Plaintiffs allege that they supplied specialized expertise, participated in extensive simulations and planning, developed and accepted professional responsibility for the maneuver, and performed repeated large LNG-vessel movements under the agreed framework. NFE, in return, agreed to procure, provide, maintain, and pay for the necessary tug support and safeguards. See Docket No. 313, ¶¶ 118–126.

NFE argues that Plaintiffs were already legally required to provide compulsory pilotage. See Docket No. 326, p. 19. That overstates the statutory duty and ignores the alleged bargain. The agreement was not simply "Plaintiffs will provide ordinary compulsory pilotage." It concerned whether and under what specifically developed conditions Plaintiffs would undertake a novel large-LNG-vessel operation, assume associated professional responsibility, participate in simulations and regulatory planning, and perform movements using a validated tug-and-safeguard package. The existence of a general pilotage duty does not establish, as a matter of law on the pleadings, that all of those additional undertakings supplied no consideration.

***E. NFE's authority and regulatory arguments raise factual and legal defenses, not pleading defects.***

NFE relies on Pilotage Commission Rule 14, Act 226, and SJBPC's charter and bylaws to argue that Plaintiffs lacked authority to form the agreement. See Docket No. 326, at 26–28. These arguments rely on materials outside the TAC and draw contested inferences from them.

Rule 14's recognition that pilots may request additional tugs does not negate a separate agreement allocating responsibility to NFE for an established tug package. More fundamentally, Rule 14 sets a regulatory floor, not a ceiling: it guarantees a pilot's right to request additional tugs when circumstances warrant it, and it says nothing that forecloses a facility operator from

voluntarily agreeing, in advance, to a higher, pre-validated standard for its own operations. NFE reads a minimum-safety regulation as an implicit ceiling on what a terminal operator may privately agree to provide — a reading unsupported by Rule 14's text and unexplained in NFE's motion. Nor does regulation of pilotage rates transform NFE's obligation to procure tug services from third parties into a unilateral pilotage "rate" imposed by Plaintiffs. Plaintiffs do not allege that they fixed a pilotage fee or required NFE to pay money to SJBPC. They allege that NFE agreed to procure and bear the cost of operational support for NFE's vessels.

NFE's assertion that a statutory requirement for Commission approval of SJBPC capital expenditures over $20,000 applies to NFE's procurement of third-party tug services is, at minimum, a contested interpretation. NFE's recurring description of the alleged tug obligation as though SJBPC itself were making a capital expenditure is not supported by the TAC.

The Court may take notice that public records exist; it may not take judicial notice of NFE's disputed interpretation of those records or accept the truth of factual inferences NFE draws from them. If the Court considers the materials as part of a factual jurisdictional challenge, Plaintiffs request an opportunity for discovery and evidentiary submission. They cannot support dismissal with prejudice under Rule 12(b)(6).

## IX. COUNTS III AND IV ARE PERMISSIBLE ALTERNATIVE EQUITABLE THEORIES

NFE dismisses Counts III and IV in a single paragraph because, it says, they depend on a contract the TAC failed to plead. See Docket No. 326, pp. 19–20. The premise is wrong, and so is the conclusion.

Rules 8(d)(2) and (3) expressly permit alternative and inconsistent pleading. Plaintiffs primarily allege an enforceable maritime agreement and plead Puerto Rico contractual and equitable theories in the alternative if the Court determines that no express or implied-in-fact

maritime contract governs. See Docket No. 313, ¶¶ 114–116, 143–162. The TAC alleges NFE's representations and conduct, Plaintiffs' foreseeable and reasonable reliance, Plaintiffs' technical and operational performance, NFE's acceptance of regulatory and operational benefits, and the prejudice that would result if NFE could retain those benefits while repudiating the safeguards that induced Plaintiffs' participation.

NFE mischaracterizes these counts as merely repeating that a contract existed. Count III expressly proceeds on the alternative premise that no enforceable express or implied-in-fact contract governs the dispute and alleges NFE's representations, Plaintiffs' foreseeable reliance and performance, and the prejudice resulting from NFE's acceptance of the framework's benefits while repudiating the safeguards that induced Plaintiffs' participation. See Docket No. 313, ¶¶ 143–154. Count IV likewise alleges that NFE obtained and continues to rely on regulatory and operational benefits derived from Plaintiffs' expertise, simulations, planning, and performance, while attempting to avoid the corresponding safeguards. *Id.* ¶¶ 155–162.

Plaintiffs do not depend on the captions of Counts III and IV to create substantive rights. Those counts plead alternative equitable doctrines and factual grounds supporting declaratory and injunctive relief if the Court concludes that no enforceable contract governs. The pleaded facts must be evaluated under the equitable doctrines recognized by Puerto Rico law—not discarded merely because NFE disputes Plaintiffs' characterization of the appropriate remedy. If the Court concludes that either equitable doctrine should not appear as a separately numbered cause of action, the proper course is to treat the allegations as alternative grounds supporting the requested equitable relief, not to dismiss the underlying factual and equitable theories with prejudice.

## X. COUNT V PLAUSIBLY ALLEGES JOINT ACTION UNDER 42 U.S.C. § 1983

### *A. NFE analyzes the wrong state-action theory.*

Count V does not allege that operating an LNG facility is an exclusive public function. It does not allege that NFE became a state actor because it is regulated. It alleges that NFE jointly participated in procuring a specific exercise of state authority: a cease-and-desist order suppressing Plaintiffs' safety communications.

A private party acts under color of law when it is a willful participant in joint action with state officials. *Dennis v. Sparks,* 449 U.S. 24, 28-29 (1980); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 941 (1982). The private participant need not independently possess governmental authority; the point is that the challenged deprivation is accomplished through joint participation with the official who does.

NFE spends pages arguing that it does not regulate pilots, issue administrative orders, operate a traditional public function, or maintain a general "symbiotic relationship" with the Commission. See Docket No. 326, pp. 20–22. None of that answers the pleaded theory. The relevant question is whether NFE directed, induced, encouraged, coordinated with, or substantially participated in the Commission president's issuance of the challenged order.

### *B. The TAC provides factual support beyond a formulaic allegation of coordination.*

The TAC alleges:

- Plaintiffs opposed NFE's proposed lower-capability tug configuration on safety grounds;
- NFE, through its Terminal Manager/FSO Carlos Faris, asked the Commission for intervention against Plaintiffs;
- the Commission president issued a cease-and-desist order approximately two hours later;
- the order targeted Plaintiffs' safety communications concerning NFE's tug substitution;

- the order advanced NFE's private objective of reducing resistance to a less expensive configuration; and
- information concerning the full scope of communications and coordination is held by NFE and Commission actors and is expected to be developed in discovery.

See Docket No. 313, ¶¶ 83–100, 163–176. The TAC alleges actual state action, identifies NFE's request, identifies the state actor and order, describes the extraordinarily compressed timing, identifies the speech affected, and explains the shared objective. That is enough to make joint participation plausible.

NFE characterizes its conduct as merely "seeking an administrative remedy." See Docket No. 326, p. 21. That is NFE's factual defense, not a fact pleaded in the TAC. At this stage, the Court must accept Plaintiffs' allegation that NFE did not merely report a concern but participated in procuring targeted state action to silence opposition to its private cost-saving objective. See Docket No. 313, ¶¶ 87-88.

### *C. The Prior Order, Ongoing Operational Dispute, and Continuing Relationship Plausibly Establish a Threat of Recurrence.*

NFE argues that rescission of the cease-and-desist order necessarily eliminates standing under Count V. See Docket No. 326, pp. 7–8. That argument isolates the rescission from the continuing dispute that produced the order and disregards the factual context in which prospective relief is sought.

Plaintiffs do not contend that the completed violation, standing alone, establishes entitlement to prospective relief. The threat of recurrence arises from the completed violation **combined with** the continuing identity of the parties, NFE's ongoing large-LNG-vessel operations, the unresolved dispute over tug support and operating conditions, Plaintiffs' continuing obligation to communicate safety concerns, and NFE's continuing financial incentive to suppress

objections to its proposed lower-cost configuration. See Docket No. 313, ¶¶ 71–108, 163–176. This is not a case involving an isolated past act by parties whose relationship has ended. The same parties remain locked in the same operational dispute, concerning the same vessels, the same tug configuration, the same safety objections, and the same regulatory body whose authority NFE allegedly invoked once already.

The TAC alleges that NFE did not merely report a concern to the Commission. It alleges that NFE directed, requested, induced, encouraged, coordinated with, or substantially participated in causing the Commission president to issue a cease-and-desist order aimed at Plaintiffs' safety communications. *Id.,* ¶¶ 87–98. The order issued approximately two hours after NFE sought Commission intervention and served NFE's alleged private objective of suppressing resistance to its less expensive tug configuration. *Id.,* ¶¶ 83–98. The Commission rescinded the order only after Plaintiffs instituted this litigation. *Id.,* ¶ 100. Those allegations describe not a speculative fear of first-time misconduct, but a concrete course of conduct that occurred once, accomplished its intended coercive effect, and remains capable of repetition while the underlying dispute continues.

NFE's reliance on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), does not establish otherwise. *Lyons* rejected prospective relief where recurrence depended on speculation that the plaintiff would again encounter police officers and again be subjected to the same unlawful chokehold. Here, recurrence does not depend on an accidental future encounter or an unrelated chain of contingencies. NFE and Plaintiffs remain participants in the same ongoing LNG operation; Plaintiffs must continue expressing professional judgments concerning the safety of NFE's proposed tug configurations; and NFE allegedly retains the same incentive and opportunity to invoke Commission authority when those judgments interfere with its preferred operating model. The prior order is therefore relevant not merely as evidence of past injury, but as concrete

evidence that the alleged mechanism of suppression exists and has already been used in this continuing dispute.

At the pleading stage, Plaintiffs need not prove that NFE will certainly procure another order. They need only allege facts supporting a plausible, nonconclusory threat that the challenged conduct may recur. The prior procurement of the order, its direct relationship to the still-unresolved tug dispute, the continuing operational relationship between the parties, and NFE's alleged ongoing efforts to substitute lower-capability tugs collectively satisfy that standard. NFE's motion improperly strips those allegations from their context and reduces them to the phrase "reasonable concern" in TAC ¶ 172, as though that paragraph stood alone. It does not. The TAC must be read as a whole.

If the Court nevertheless concludes that the TAC should allege additional facts concerning recurrence, that would identify a curable issue concerning the scope of prospective relief—not grounds to dismiss Count V with prejudice, much less the entire action. Plaintiffs should be granted leave to amend before dismissal of the claim.

### *D. Commission actors need not be defendants for NFE to be liable for its own joint participation.*

NFE emphasizes that the Commission and its officers are not presently defendants. See Docket No. 326, p. 20. It cites no authority requiring every state participant to be joined before a § 1983 claim may proceed against a private joint participant. Dennis confirms the opposite principle: immunity or absence of the state participant does not insulate private parties from liability for their own joint conduct. NFE does not develop a Rule 19 analysis, identify any relief that cannot be accorded among existing parties, or establish that Commission actors are indispensable. The observation is not a ground for dismissal.

## XI. COUNT VI PRESENTS AN ACTUAL CONTROVERSY AND IS NOT DEFEATED BY NFE'S LABEL OF "PAST CONDUCT"

NFE argues that declaratory relief can never address a dispute arising from conduct that has already occurred. See Docket No. 326, pp. 23–25. That proposition is overstated. A completed act may create an ongoing dispute about present and future legal obligations. The issue is whether a declaration would resolve current adverse legal interests, not whether the parties' disagreement has a history.

Here, NFE's withdrawal of the ECO tugs and refusal to pay for standby support are the events crystallizing the controversy. They do not make the controversy retrospective. NFE's large LNG-vessel operation continues; future movements remain contemplated; the parties dispute who must provide and pay for tug support; and Plaintiffs face continuing pressure concerning the conditions under which they will perform. Indeed, NFE's responsibility for the standby-tug costs is not hypothetical: it is already the subject of a separate pending action in which SJBP has filed a third-party complaint against NFE seeking to hold NFE financially responsible for those costs. *See Asociación de Navieros de Puerto Rico, Inc. v. San Juan Bay Pilots Corp.,* Civil No. 26-1360 (ADC), Third-Party Complaint, Docket No. 13. A declaration would determine current obligations before Plaintiffs must act at their professional peril.

NFE further argues that Count VI is conclusory because it does not quote the precise words by which NFE denied its obligation. See Docket No. 326, p. 23. But conduct can manifest repudiation. The TAC alleges that NFE withdrew the agreed tugs, refused to pay for standby tugs, proposed materially different equipment and operating conditions, and sought to shift costs to Plaintiffs. Those concrete acts plausibly demonstrate a dispute over the obligation whether or not NFE issued a formal written denial.

Nor is the requested declaration fatally indefinite. The TAC identifies the baseline framework in detail. To the extent the Court concludes that final relief should be framed more narrowly, that is a remedial issue to be addressed after liability and a factual record—not a reason to dismiss the underlying controversy. Plaintiffs seek enforcement of identified obligations or an equivalent arrangement validated through a technically reliable process that meets or exceeds the agreed standards; they do not ask the Court to operate the Port or replace the Coast Guard.

Nor must the Court either adopt the TAC's proposed remedial language verbatim or dismiss the controversy altogether. The TAC identifies the baseline operational framework in concrete terms, including the number and capacity of the escort-rated tugs, responsibility for their procurement and cost, two-pilot operations, identified operating parameters, standby-tug arrangements, and associated navigational safeguards. See Docket No. 313, ¶¶ 49–60, 118–128. The phrases "materially inconsistent," "equivalent safeguards," and "technically reliable process" do not ask the Court to supervise port operations in the abstract; they preserve the possibility that NFE may satisfy its alleged obligations through an objectively validated arrangement that meets or exceeds the agreed safety and maneuverability standards rather than through the identical equipment originally used. Rule 54(c) authorizes the Court to grant the relief supported by the claims and proof without adopting Plaintiffs' proposed wording verbatim. Any concern about the final decree's specificity therefore warrants tailoring or narrowing the remedy after factual development—not dismissal of the underlying contract and declaratory-judgment claims.

Count VI also rests on the substantive rights pleaded in Counts I through V; Plaintiffs do not contend that the Declaratory Judgment Act independently creates jurisdiction. NFE's *Skelly Oil* argument therefore attacks a position Plaintiffs have not taken.

## XII. COUNT VII PRESERVES EQUITABLE REMEDIES AVAILABLE ON THE SUBSTANTIVE CLAIMS

NFE argues that Count VII must be dismissed because injunctive relief is a remedy rather than an independent cause of action. See Docket No. 326, p. 30. That observation does not support dismissal of the equitable relief Plaintiffs request. The TAC pleads substantive maritime, contractual, equitable, and constitutional claims and then identifies the prospective remedies necessary to redress those claims. See Docket No. 313, ¶¶ 189–197 and Prayer for Relief. Whether styled as a separately numbered count or as part of the prayer, Plaintiffs' request for injunctive and specific-performance relief remains available if supported by a surviving substantive claim and the developed record.

Count VII alleges why damages are inadequate, why NFE's threatened and continuing conduct implicates Plaintiffs' professional independence and maritime-safety obligations, and why the balance of hardships and public interest favor equitable relief. *Id.,* ¶¶ 190–196. Plaintiffs are not required at the pleading stage to prove their ultimate entitlement to a permanent injunction. The four-factor inquiry governing final equitable relief applies after the merits and evidentiary record have been developed; it does not supply an independent basis to dismiss otherwise viable substantive claims or strike the remedies attached to them. As explained in Section XI, Rule 54(c) permits the Court to tailor the final relief to the claims and proof.

Accordingly, if the Court concludes that injunctive relief should not be pleaded as a freestanding cause of action, it may treat Count VII as a specification of the remedies sought under Counts I through VI. That organizational treatment would not eliminate or narrow the Court's authority to award declaratory relief, specific performance, or an appropriately tailored injunction on any surviving claim. NFE's assertion that the remedy "cannot outlive" the substantive claims is beside the point because, for the reasons established above, those claims should not be dismissed.

## XIII. NFE'S REQUEST FOR DISMISSAL WITH PREJUDICE IS LEGALLY UNTENABLE

NFE asks the Court to dismiss every count with prejudice, including for lack of subject-matter jurisdiction. See Docket No. 326, p. 31. A jurisdictional dismissal is not a judgment on the merits and ordinarily must be without prejudice. NFE provides no basis for converting an alleged lack of judicial power into merits preclusion.

Nor does NFE justify denying leave to amend. The motion raises alleged deficiencies concerning corporate authority, recurrence, and specificity—matters that, even if the Court found them deficient, are potentially curable. The amount-in-controversy allegation, however, is already sufficient for the reasons explained above and requires no cure. Plaintiffs submit that the TAC is sufficient. But if the Court concludes otherwise, Plaintiffs respectfully request leave to amend under Rule 15 rather than dismissal with prejudice.

NFE also relies on materials outside the TAC, including the Rule 26(f) report, Pilotage Commission rules, corporate records, and bylaws. If the Court treats the motion as a factual jurisdictional challenge or considers those materials beyond their mere existence, Plaintiffs request a fair opportunity for jurisdictional discovery and evidentiary submission. NFE should not be permitted to introduce its selected materials, demand adverse factual inferences, and obtain merits dismissal before Plaintiffs have had that opportunity.

NFE's motion, considered as a whole, asks this Court to dismiss the detailed TAC with prejudice on arguments that do not survive contact with NFE's own filings: a federal-question section addressed to a statutory cause of action Plaintiffs never pleaded; a standing argument that treats NFE's own denial of liability as proof that Plaintiffs suffered no injury; a diversity argument that omits the TAC's express multimillion-dollar allegations at paragraphs 70 and 76 and is contradicted by NFE's own later characterization of the same obligation as a "multi-million-dollar-

per-year tug package"; and a merits section that repeatedly tells the Court that allegations are missing from a complaint that contains them, down to misattributing its own lead quotation from *Twombly* to *Iqbal*. The Court should not reward that pattern with the dismissal with prejudice NFE requests.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny NFE's Motion to Dismiss in its entirety. In the alternative, Plaintiffs request that the Court:

- reject NFE's request for dismissal with prejudice;
- dismiss no claim for lack of jurisdiction without prejudice;
- if the Court determines that any factual jurisdictional issue requires resolution beyond the sufficient allegations of the TAC, permit appropriate discovery and evidentiary submissions before resolving that issue;
- preserve declaratory and injunctive remedies attached to any surviving substantive claim;
- and to the extent the Court identifies any curable pleading deficiency—notwithstanding Plaintiffs' position that the TAC adequately pleads each claim—grant Plaintiffs leave to amend before dismissing any claim and deny NFE's request for dismissal with prejudice.

In San Juan, Puerto Rico, this 18th day of August, 2026.

I HEREBY CERTIFY that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notice of its filing electronically to all parties of record through their attorneys of record.

Respectfully submitted,

**S/ FRANCISCO E. COLÓN-RAMÍREZ**
FRANCISCO E. COLÓN-RAMÍREZ, ESQ.
USDC-PR No.: 210510
E-mail: fecolon@colonramirez.com
**COLÓN RAMÍREZ LLC**
PO Box 361920
San Juan, PR 00936-1920
Tel.: (787) 425-4652/Fax: (787) 425-4731

**S/GIANCARLO FONT GARCÍA**
GIANCARLO FONT GARCÍA
USDC-PR No.: 210612
gfont@drcprlaw.com
Urb. Baldrich
306 Calle Coll y Toste
San Juan, PR 00918
Tel.: (787) 622-6999
(787) 647-1876

**S/ MIGUEL A. NAZARIO, JR.**
MIGUEL A. NAZARIO, JR.
USDC PR No.: 214502
e-mail: man@nblawpr.com
**NAZARIO BRICEÑO LAW OFFICES, LLC**
82 Calle Cervantes
San Juan, PR 00907
Tel.: (787) 449-2717

**S/ LUIS MANUEL PAVÍA-VIDAL**
LUIS MANUEL PAVÍA-VIDAL
USDC-PR No.: 227205
pavialaw@gmail.com
Urb. Baldrich
306 Calle Coll y Toste
San Juan, PR 00918
Tel.: (787) 622-6999